IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-453 (RGA) |
| | ) | |
| ACTIVISION BLIZZARD, INC. | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-454 (RGA) |
| | ) | |
| ELECTRONIC ARTS INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-455 (RGA) |
| | ) | |
| TAKE-TWO INTERACTIVE SOFTWARE, | ) | **REDACTED** |
| INC., ROCKSTAR GAMES, INC. and | ) | **PUBLIC VERSION** |
| 2K SPORTS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF ACCELERATION BAY LLC'S
OBJECTIONS TO SPECIAL MASTER ORDER NO. 13**

OF COUNSEL:

Michael A. Tomasulo
Gino Cheng
David K. Lin
Joe S. Netikosol
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
(213) 615-1700

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendants*

David P. Enzminger
Louis L. Campbell
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
(650) 858-6500

Dan K. Webb
Kathleen B. Barry
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

Krista M. Enns
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
(415) 591-1000

Michael M. Murray
Anup K. Misra
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

Andrew R. Sommer
Thomas M. Dunham
Michael Woods
Joseph C. Masullo
Paul N. Harold
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
(202) 282-5000

Original Filing Date: December 27, 2017
Redacted Filing Date: January 17, 2018

I. **INTRODUCTION**

This Motion is about emails and other materials, including expert analysis, shared by Acceleration Bay ("Acceleration") with its then-prospective litigation funder, Hamilton Capital ("Hamilton"). These diligence materials were provided for Hamilton's pre-deal efforts to evaluate whether to extend a ███████████ to Acceleration to purchase the Asserted Patents and bring these suits. All the materials were disclosed to Hamilton ███████████ ███████████—and therefore before the existence of any common interest between Acceleration and Hamilton.

Plaintiff argues that the emails are work product and privileged. Not only is this incorrect, but Plaintiff forfeited any right to assert work product or privilege over these documents nearly two years ago. In February 2016, Defendants moved for a privilege log of communications between Hamilton and Acceleration. In opposing Defendants' Motion, Acceleration represented to the Court that there were "no exchanges of diligence information regarding the Asserted Patents between Acceleration Bay and Hamilton Capital" and "nothing to log." D.I. 340, Ex. C, Ex. 1 at 3; *see also* D.I. 340, Ex. C, Ex. 2 at 60–61. Yet, as explained below and now admitted by Acceleration, it did exchange diligence materials with Hamilton, including emails regarding the Asserted Patents and the Accused Products. In fact, Acceleration now characterizes its pre-loan, pre-suit communications with Hamilton as the "Diligence Emails." D.I. 339 at 2 ("In connection with diligence for the funding of these actions, outside counsel for Acceleration Bay (Kramer Levin) and its litigation funder, Hamilton (Reed Smith), exchanged several emails (the 'Diligence Emails').") By earlier representing that there was "nothing to log," Plaintiff waived any right to assert work product or privilege over the materials.

Defendants learned of these materials independently. More than a year after Acceleration denied that any diligence documents existed, Defendants uncovered publicly filed documents in a

1

criminal case against the owners of Hamilton that revealed that Hamilton had hired Reed Smith to evaluate the loan on its behalf. D.I. 340, Ex. C, Ex. 16 at 4. Defendants then served discovery on Reed Smith. That discovery revealed eight pre-loan diligence email chains between Acceleration's attorneys and Reed Smith relating to the patents, Defendants, and the accused products. Attached to these eight email chains were 16 references, many of which discussed the technology of the asserted patents and Defendants' products, two significant prior art references, and the supposedly highly-confidential Boeing-Airbus Agreement.

Acceleration now admits that it "provided [documents] to Hamilton in connection with due diligence," characterizing them as the "Diligence Emails"; but it never squares that admission with its February 2016 representation to this Court that there were "no exchanges of diligence information" with Hamilton. *Compare* D.I. 339 at 1 *with* D.I. 340, Ex. C, Ex. 1 at 3.[1] In objecting to the Special Master's Order that it produce the documents it withheld for nearly two years, Acceleration raises arguments that this Court has already rejected, that were not raised before the Special Master, or that are, in any event, meritless. Acceleration should have produced or at least logged these documents long ago. By withholding these documents, Acceleration denied Defendants' early access to relevant references that could have clarified Acceleration's allegations and thereby prejudiced Defendants. Because all of these documents were exchanged prior to the consummation of a deal between Acceleration and Hamilton, and before Acceleration even owned the patents, no common interest existed and all privilege and work product protection has been waived. Acceleration's objections should be overruled.

---

[1] Despite multiple requests, Acceleration has never explained why it did not produce or log those Diligence Emails, saying only that it produced other materials. D.I. 340, Ex. B at 4–5, 50–51. It never explained how it made the February representation, or whether there was some reason for not producing or logging them. *See* D.I. 340, Ex. B. Nor do its Objections explain why.

## II.     NATURE AND STAGE OF PROCEEDINGS

On September 30, 2015, Defendants requested documents related to Acceleration's relationship with Hamilton. D.I. 340, Ex. C, Ex. 5. When Acceleration objected, Defendants moved to compel a privilege log, arguing the documents could be relevant to issues including "patent valuation, damages, royalty rates, and pre-suit investigative diligence." D.I. 340, Ex. C, Ex. 7 at 3. Acceleration responded that there was "nothing to log" and "*that there have been no exchanges of diligence information regarding the Asserted Patents between Acceleration Bay and Hamilton Capital*." D.I. 340, Ex. C, Ex. 1 at 3 (emphasis added). The Court ruled that "the representation that there's nothing to log takes care of it for today." D.I. 340, Ex. C, Ex. 2 at 61.

On March 3, 2017, Defendants again requested documents relating to Acceleration's communications with Hamilton. D.I. 340, Ex. C, Ex. 8 (RFP 139) at 8. Defendants again moved to compel. D.I. 340, Ex. C, Ex. 11. The Special Master granted Defendants' motion and ordered Acceleration to respond fully to RFP 139. D.I. 340, Ex. C, Ex. 13 (SM Order No. 6) at 8–9. Acceleration objected to the Special Master's Order, asserting that it "requires Acceleration Bay to produce its exchanges with Hamilton Capital, which are not relevant, contain work product and are subject to common interest immunity." D.I. 340, Ex. C, Ex. 14 at 2. The Court agreed with the Special Master that Acceleration had to comply with the Special Master's Order with respect to RFP 139 if it continued to assert that it was an "operating company." D.I. 340, Ex. C, Ex. 15 at 2–3. The Court also expressly rejected Acceleration's claim of work product protection. *Id.* Acceleration has since stated that it will advance its position that it is an "operating company." *See* D.I. 340, Ex. C, Ex. 17. After that Order, Defendants repeatedly requested that Acceleration produce "the diligence documents between Acceleration Bay including its representatives and Hamilton Capital including its representatives." *See* D.I. 340, Ex. C, Ex. 17 at 1. Acceleration replied, "*There are no such documents*." *Id.* (emphasis added).

3

Just before the close of discovery, Defendants learned that Hamilton's parent company had been placed in receivership for alleged securities fraud. *See* D.I. 340, Ex. C, Ex. 16. The receivership documents indicated that Hamilton had retained Reed Smith to provide diligence for the loan to Acceleration before it was consummated. D.I. 340, Ex. C, Ex. 16 at 4. In September 2017, in response to Defendants' subpoena, Reed Smith produced a privilege log showing extensive communications with Plaintiff's litigation counsel. That log revealed that Acceleration's litigation counsel had, in fact, exchanged at least eight email chains, provided Reed Smith with at least two dozen documents, and apparently had a meeting with Reed Smith to assist it with diligence for the loan for Hamilton. Reed Smith explained to Defendants' counsel that Reed Smith had received "expert materials" from Acceleration to review in connection with its diligence efforts. All of these communications occurred before Hamilton agreed to finance Acceleration in February 2015 and before Acceleration actually acquired the patents from Boeing.[2]  D.I. 340, Ex. C, Ex. 3; D.I. 340, Ex. C, Ex. 4.

Defendants again moved to compel. *See* D.I. 340, Ex. C. Acceleration, now aware that Defendants had proof of the diligence documents' existence, argued that the documents were "irrelevant and subject to common interest." D.I. 340, Ex. D at 7. Despite repeated requests, Acceleration never explained why it had not produced the email attachments, which include prior art documents, the Boeing-Airbus agreement, and articles about Defendants and their products. *See* D.I. 340, Ex. B at 9, 44–46. At the hearing, Acceleration tried to diminish the significance of the withheld emails and attachments, arguing that the prior art was publicly available (as is nearly all prior art) and that just one article mentioned the Accused Products. *Id.* at 51 ("There's a passing

---

[2] The Purchase Agreement was executed ▮▮▮▮▮▮▮▮▮▮ but the closing did not occur until after Acceleration Bay and Hamilton reached the funding agreement. *See* D.I. 340, Ex. C, Ex. 11 at 148. Hamilton then wired Boeing to pay for the patents.

4

reference to one of the games in one of the articles, and that's it."). But that, too, was incorrect. At least six of the withheld documents identify an accused product by name and at least one confirms it is a client/server system, as Defendants have argued all along. *See* Exs. 1–6; D.I. 340, Ex. C, Ex. 4. The Special Master stated he was "concerned" that Acceleration might have been "essentially hiding relevant documents." D.I. 340, Ex. B at 16. The Special Master noted that Defendants' "motion is difficult to resolve without doubting Plaintiff's representations," found that Acceleration was "not justif[ied] [in] not identifying or logging the documents," and ordered it to produce the emails and documents it had provided to Hamilton. *See* D.I. 340, Ex. A at 5–7.

### III.   ARGUMENT

#### A.   Acceleration's communications with its prospective lender were not work product.

Acceleration forfeited its claim of work product protection by its "nothing to log" representation to this Court in February 2016. *See Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 592 (N.D. Fla. 2010) ("[A] party claiming privilege is obliged to produce a privilege log and its failure to do so means the privilege is waived.").

Even if that were not the case, this Court has already rejected Acceleration's bare assertion of work product protection over communications with Hamilton. Further, Acceleration waived any work product protection by not raising it in its brief to the Special Master. Lastly, Acceleration's newly claimed work product is for communications *before* the lender had agreed to the loan, before Acceleration even owned the patents, and thus before Acceleration and Hamilton had any common legal interest, making such a claim meritless.

This Court previously rejected a similar claim of work product protection months ago when it overruled Acceleration's objections to Special Master Order No. 6. The Court found that Acceleration had failed to establish work product protection for communications between it and

5

Hamilton.  D.I. 340, Ex. C, Ex. 15 at 2–3 ("Based on the submissions, I do not think Plaintiff has done anything more than boldly assert Mr. Ward's communications with his lender are work product.").  Acceleration should not get multiple bites at the apple.

With its previous assertion of work product having been rejected by this Court, Acceleration did not raise this argument in its brief to the Special Master.  Instead, Acceleration argued that the emails were "irrelevant" and "subject to common interest."  D.I. 340, Ex. D at 7–8.[3]  Although Acceleration now claims that there is no "substantial need" for production of the emails—observing that "the Order does not identify any such need"—it did not argue that in its earlier briefing.  D.I. 340, Ex. D at 7–10.  Nor did it cite to the Special Master several of the cases it now cites or assert that the emails were "'core' work product that are afforded 'near absolute protection from discovery.'"  D.I. 339 at 3.  On all these points, Acceleration, "as the party asserting protection under the work product doctrine," has the burden, and it failed to assert the protection—or carry its burden—before the Special Master.  *Ansell Healthcare Products LLC v. Reckitt Benckiser LLC*, C.A. No. 15-915-RGA, 2017 WL 6328149, at *4 (D. Del. Dec. 11, 2017).

In any event, the Diligence Emails are not eligible for work product protection.  First, the Diligence Emails were not prepared in anticipation of litigation.  For a document to be work product, "*the primary purpose* behind its creation [must be] to aid in possible future litigation." *Immersion Corp. v. HTC Corp.*, C.A. No. 12-259-RGA, 2014 WL 3948021, at *2 (D. Del. Aug. 7, 2014) (emphasis added).  Acceleration admits that the Diligence Emails were created "for the purpose of obtaining funding."  D.I. 339 at 3.  Indeed they were created before Acceleration even owned the patents.  *See* D.I. 340, Ex. C, Ex. 11 at 148.  Second, they were prepared for a non-party.  "If the

---

[3] In Acceleration Bay's objections to Special Master Order No. 6, it asserted that "its exchanges with Hamilton Capital … are not relevant, *contain work product* and are subject to common interest immunity."  D.I. 340, Ex. C, Ex. 14 at 2 (emphasis added).

6

document sought 'is prepared for a nonparty to the litigation, work product protection does not apply, even if the nonparty is a party to closely related litigation.'" *Delaware Display Grp. LLC v. Lenovo Grp. Ltd., Lenovo Holding Co.*, C.A. No. 13-2108-RGA, 2016 WL 720977, at *2 (D. Del. Feb. 23, 2016) (quoting 6 Moore's Federal Practice § 26.70 (3d ed. 2015)).  The Diligence Emails were prepared for Hamilton, a "non-part[y]," as part of its diligence on a *prospective* loan.  D.I. 340, Ex. A at 6.  In sum, the Diligence Emails are not work product.

### B. Acceleration's communications with its prospective lender were not covered by the common interest doctrine.

Acceleration next objects that its communications with its prospective lender were covered by the attorney-client privilege under the common interest doctrine. This objection, too, was waived by the "nothing to log" representation and, in any event, is meritless.

Applying this Court's decision in *Delaware Display Group*, the Special Master correctly found that the Diligence Emails "were provided before any agreement was reached between Plaintiff and Hamilton Capital, and before any litigation was filed," and therefore Acceleration and Hamilton "were not 'allied in a common legal cause' when the documents were provided." D.I. 340, Ex. A at 7.  Acceleration ignores this fact, and its Objections assume—contrary to the now indisputable facts—that at the time of the emails, "Hamilton Capital [was] plaintiff's litigation funder with a financial interest in Acceleration Bay's successful enforcement of the patents." D.I. 339 at 6.  To the contrary, at that time, Hamilton had not yet agreed to fund Acceleration and thus "possesse[d] no legal interest in the patents-in-suit" or in any potential litigation. *Delaware Display Grp.*, 2016 WL 720977, at *5.  Acceleration "bears the burden of establishing the privilege," and has failed to carry its burden. *Id.* at *2.

### C. The Diligence Emails are relevant.

Lastly, Acceleration asks the Court to find that the Special Master abused his discretion on the issue of relevance.[4] D.I. 339 at 7. This objection is also meritless. It is also foreclosed by this Court's September 5, 2017, Order that Acceleration respond to RFP 139, which requested Acceleration's communications with Hamilton about the asserted patents. *See* D.I. 340, Ex. C, Ex. 15 at 2; D.I. 340, Ex. C, Ex. 8 at 8 (RFP 139).

Acceleration concedes that the emails "relate[] to the asserted patents." D.I. 339 at 2. This suffices to establish their relevance. The Diligence Emails may be relevant to central issues like validity and infringement, valuation, damages, royalty rates, pre-suit investigative diligence, and whether Acceleration is an operating company. Common sense confirms the emails' relevance: Acceleration would not have been providing irrelevant information about the patents to its prospective litigation financier to secure money to bring this case. A prospective lender's due diligence would likely include issues like validity, infringement, the value of the patents, and whether they could be licensed or commercialized.

Acceleration glosses over the fact that the "attachments to the Diligence Emails" are unquestionably relevant. D.I. 339 at 2 n.3. These unquestionably relevant attachments included (i) the Asserted Patents and their file histories, (ii) the General Agreement between Airbus and Boeing, (iii) at least two prior art references, and (iv) at least 14 other documents related to the technology of the Asserted Patents, many of which reference the Accused Products by name. *See* D.I. 340, Ex. C, Ex. 4. That the Diligence Emails had relevant attachments strongly suggests that the emails themselves are relevant. Independent of that, where the attachments are relevant, the emails should

---

[4] Because the relevance of the Diligence Emails concerns "the scope of discovery," which is "a procedural matter," this portion of the Special Master's Order is reviewed for abuse of discretion. *See Callwave Commc'ns LLC v. AT&T Mobility LLC*, C.A. No. 12-1701-RGA, 2016 WL 3450736, at *1 & n.3 (D. Del. June 16, 2016).

be produced with them, both for the sake of "completeness" and because that is presumptively how "they are kept in the usual course of business." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 2011 WL 3738979, at *5 (S.D.N.Y. Aug. 18, 2011).

Incredibly, the withheld references likely inspired Acceleration's infringement theories. The withheld prior art references show the very features that are accused of causing infringement. *Compare* D.I. 340, Ex. C, Ex. 21 (withheld prior art article showing games using dynamic load balancing and "need to know" updating) *with* D.I. 340, Ex. C, Exs. 28, 29, 30 (alleging that the accused products are m-regular through use of load balancing and proximity rules (aka "need to know" updating)). Acceleration's withholding of these references prejudiced Defendants and undercuts its assertion that the Diligence Emails are irrelevant.[5]

### D. Acceleration should produce all material it provided to Hamilton, not just the Diligence Emails.

The Special Master's Order was not limited to the Diligence Emails. It ordered Acceleration "to produce what it provided in writing to Hamilton Capital or its counsel at the time of Hamilton Capital's due diligence." D.I. 340, Ex. A at 7. Defendants now know that Acceleration provided at least the Diligence Emails and their attachments to Reed Smith. But it appears likely that these are merely a subset of what Acceleration disclosed to Hamilton.

As noted, Acceleration's litigation lawyers were in close contact with Reed Smith to convince Reed Smith to sign off on the loan Acceleration was requesting to purchase the patents and bring these suits. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Reed Smith did not have an email record of receiving such materials. But the privilege log does refer to an in-person meeting. *See* D.I. 340, Ex. C, Ex. 3 (referencing "a proposed

---

[5] Defendants reserve the right to seek costs based on Acceleration's withholding the documents.

9

12/18 meeting in Menlo Park relating to the 'Asserted Patents'"). All materials shown or discussed, including any expert materials or expert analysis, including summaries, slides, or handouts, should be produced. D.I. 340, Ex. A at 7.

Moreover, the expert materials in question were admittedly prepared by ▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ This fact alone renders his pre-suit analysis and materials discoverable. *See Ansell*, 2017 WL 6328149, at *3–4 (ordering production of testifying expert material that was not a draft of a testifying expert report). And, it also is likely that his analysis was used to help secure the loan, and would therefore be discoverable on that basis as well. Acceleration never denied that ▬▬▬▬ *analysis* was communicated to Reed Smith during Acceleration's efforts to secure the loan from Hamilton. Its counsel was careful to say only that there were no "written" materials from ▬▬▬▬. *See* D.I. 340, Ex. B at 22 ("[SPECIAL MASTER:] Mr. Blumenfeld referred to ▬▬▬▬▬▬ possibility of providing some analysis in connection with the due diligence to Reed Smith and Hamilton. Was anything provided by that expert? MR. FRANKEL: Well, if you are asking me if anything – *if there was anything written material*, any *written document* that he created or that we created with his assistance that was provided to Reed Smith, the answer is no.") (emphasis added). Whatever analysis was provided, shown or discussed, should be disclosed. Having used ▬▬▬▬▬ analysis to secure the loan that financed these suits, Acceleration cannot claim privilege over that analysis ▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ "[P]rivilege cannot be used both as a sword and a shield." *Ansell*, 2017 WL 6328149, at *4.

**IV.   Conclusion**

The Court should overrule Acceleration's Objections to Special Master Order No. 13.

OF COUNSEL:

Michael A. Tomasulo
Gino Cheng
David K. Lin
Joe S. Netikosol
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071
(213) 615-1700

David P. Enzminger
Louis L. Campbell
WINSTON & STRAWN LLP
275 Middlefield Road, Suite 205
Menlo Park, CA 94025
(650) 858-6500

Dan K. Webb
Kathleen B. Barry
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
(312) 558-5600

Krista M. Enns
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111
(415) 591-1000

Michael M. Murray
Anup K. Misra
WINSTON & STRAWN LLP
200 Park Avenue,
New York, NY 10166
(212) 294-6700

Andrew R. Sommer
Thomas M. Dunham
Michael Woods
Joseph C. Masullo
Paul N. Harold
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
(202) 282-5000

December 27, 2017

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 17, 2018, upon the following in the manner indicated:

| | |
|---|---|
| Philip A. Rovner, Esquire<br>Jonathan A. Choa, Esquire<br>POTTER ANDERSON & CORROON LLP<br>1313 North Market Street, 6th Floor<br>Wilmington, DE 19801<br>*Attorneys for Plaintiff* | VIA ELECTRONIC MAIL |
| Paul J. Andre, Esquire<br>Lisa Kobialka, Esquire<br>James R. Hannah, Esquire<br>Hannah Lee, Esquire<br>Yuridia Caire, Esquire<br>Greg Proctor, Esquire<br>KRAMER LEVIN NAFTALIS & FRANKEL LLP<br>990 Marsh Road<br>Menlo Park, CA 94025<br>*Attorneys for Plaintiff* | VIA ELECTRONIC MAIL |
| Aaron M. Frankel, Esquire<br>Marcus A. Colucci, Esquire<br>KRAMER LEVIN NAFTALIS & FRANKEL LLP<br>1177 Avenue of the Americas<br>New York, NY 10036<br>*Attorneys for Plaintiff* | VIA ELECTRONIC MAIL |

                                                          */s/ Stephen J. Kraftschik*
                                                          Stephen J. Kraftschik (#5623)