IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACCELERATION BAY LLC,<br><br>      Plaintiff,<br><br>            v.<br><br>ACTIVISION BLIZZARD, INC.<br><br>      Defendant. | Civil Action No. 16-453-RGA |
| ACCELERATION BAY LLC,<br><br>      Plaintiff,<br><br>            v.<br><br>ELECTRONIC ARTS INC.<br><br>      Defendant. | Civil Action No. 16-454-RGA |
| ACCELERATION BAY LLC,<br><br>      Plaintiff,<br><br>            v.<br><br>TAKE-TWO INTERACTIVE SOFTWARE,<br>INC., ROCKSTAR GAMES, INC., AND 2K<br>SPORTS, INC.<br><br>      Defendants. | Civil Action No. 16-455-RGA |

## MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Paul J. Andre (argued), Lisa Kobialka, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Aaron M. Frankel (argued), KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY

Attorneys for Plaintiff.

Jack B. Blumenfeld, Stephen J. Kraftschik, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; Michael A. Tomasulo (argued), Gino Cheng, David K. Lin, Joe S. Netikosol, WINSTON & STRAWN LLP, Los Angeles, CA; David P. Enzminger (argued), Louis L. Campbell, WINSTON & STRAWN LLP, Menlo Park, CA; Dan K. Webb, Kathleen B. Barry, WINSTON & STRAWN LLP, Chicago, IL; Krista M. Enns, WINSTON & STRAWN LLP, San Francisco, CA; Michael M. Murray, Anup K. Misra, WINSTON & STRAWN LLP, New York, NY; Andrew R. Sommer, Thomas M. Dunham, Michael Woods, Paul N. Harold, Joseph S. Masullo, WINSTON & STRAWN LLP, Washington, DC.

Attorneys for Defendants.

August , 2018

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court are Plaintiff's Motion for Summary Judgment of Infringement and Validity and Motion to Exclude Expert Testimony of Catharine M. Lawton (No. 16-453, D.I. 439; D.I. 16-454, D.I. 388; D.I. 16-455, D.I. 386)[1] and related briefing (D.I. 448, 474, 503); Plaintiff's Motion to Correct Claim 19 of the '634 patent (D.I. 438) and related briefing (D.I. 438, 472, 473); Defendant Activision Blizzard Inc.'s ("Activision") Motion for Summary Judgment (D.I. 440) and related briefing (D.I. 442, 475, 505); and Activision's Motion to Exclude Expert Opinions of Dr. Nenad Medvidovic, Dr. Michael Mitzenmacher, Dr. Christine Meyer, Dr. Harry Bims, and Dr. Ricardo Valerdi (D.I. 441) and related briefing (D.I. 442, 475, 505). I held oral argument on May 17, 2018. (D.I. 560 ("Tr.")). At that time, I ordered additional briefing and letter briefing, which the parties completed on June 6, 2018. (D.I. 561, 562, 563, 564, 565, 570, 572).

For the reasons that follow, the Court will **DENY** Plaintiff's Motion for Summary Judgment of Infringement and Validity and Motion to Exclude Expert Testimony of Catharine M. Lawton (D.I. 439); **DENY** Plaintiff's Motion to Correct Claim 19 of the '634 patent (D.I. 438); **GRANT** Activision's Motion for Summary Judgment (D.I. 440), as to the invalidity of all asserted claims of U.S. Patent No. 6,829,634 and claims 11, 15, and 16 of U.S. Patent No. 6,732,147, and as to non-infringement of U.S. Patent Nos. 6,701,344, 6,714,966, and 6,920,497, limited to the accused CoD and Destiny games, and otherwise **DENY** that Motion; and **GRANT** in part and **DENY** in part Activision's Motion to Exclude Expert Opinions of Dr. Nenad

---

[1] Hereinafter, all citations to the docket are to the docket in No. 16-453, unless otherwise noted. Plaintiff's Motion for Summary Judgment is only against Activision, as to infringement and the exclusion of expert testimony, and is against all three Defendants, as to validity. (D.I. 439). Consequently, all Defendants joined the opposition to Plaintiff's motion, as to validity. (No. 16-454, D.I. 407; No. 16-455, D.I. 405). All Defendants joined Activision's Motion for Summary Judgment, as to invalidity. (No. 16-454, D.I. 389, 418; No. 16-455, D.I. 387, 412).

Medvidovic, Dr. Michael Mitzenmacher, Dr. Christine Meyer, Dr. Harry Bims, and Dr. Ricardo

Valerdi (D.I. 441).

## I.   BACKGROUND

Plaintiff brought this suit against Activision on June 17, 2016, alleging that Activision

infringes United States Patent Nos. 6,701,344 ("the '344 patent"), 6,714,966 ("the '966 patent"),

6,829,634 ("the '634 patent"), 6,910,069 ("the '069 patent"), 6,732,147 ("the '147 patent"), and

6,920,497 ("the '497 patent") (collectively, the "Asserted Patents") by making, using, selling,

offering for sale, and/or importing into the United States and this District four video games:

World of Warcraft ("WoW"), Call of Duty: Advanced Warfare and Call of Duty: Black Ops III

(collectively, "CoD"), and Destiny.  (D.I. 1).  The asserted claims are claims 12, 13, 14, and 15

of the '344 patent; claims 12 and 13 of the '966 patent; claims 19 and 22 of the '634 patent;

claims 1 and 11 of the '069 patent; claims 1, 11, 15, and 16 of the '147 patent; and claims 9 and

16 of the '497 patent.  (D.I. 442-1, Exh. D-1).

## II.   LEGAL STANDARD

### a.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

330 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party."  *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When determining

whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

### b. *Daubert*

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset,

5

> pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether
> the expert is proposing to testify to (1) scientific knowledge that (2)
> will assist the trier of fact to understand or determine a fact in
> issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (footnote and

internal citations omitted).[2]

## III.   DISCUSSION

### A.  Kegel and ActiveNet References

Plaintiff argues that the Kegel and ActiveNet references do not invalidate the asserted

claims of the '497 patent, because, "Defendants failed to come forward with any evidence that

either reference was available as prior art before the priority date of the Asserted Claims of the

'497 Patent." (D.I. 448 at 14).  A prior art reference may be shown to be a "printed publication"

if it was: (1) publicly accessible, or (2) distributed to those of skill in the art.  *In re NTP*, 654

F.3d 1279, 1296 (Fed. Cir. 2011).  The critical date of the '497 patent is July 31, 1999.  (D.I. 448

at 15; D.I. 474 at 33).

The Kegel reference is an article that "discusses Network Address Translation

technology."  (D.I. 448 at 14).  Plaintiff argues that the reference was not publicly accessible to

an interested POSITA "until at least 2001."  (*Id.* at 15).  Defendants, however, argue that the

Kegel reference was posted to a website, and was shared "on a public web forum in a discussion

on cable modem networking" on July 20, 1999.[3]  (D.I. 474 at 31).  Defendants also represent that

Mr. Kegel, the author of the reference, will testify that he last updated his website on July 17,

---

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

[3] Defendants aver that they are not "relying on this [web forum post] for . . . a hearsay purpose," because they "don't care whether what [the author of the post] says it is actually true.  We're just showing that he was aware of the [reference] and was telling other people about it."  (Tr. 19:4-13).  Defendants may offer the web forum post for a purpose other than proving its truth, including showing the author's awareness of the reference. Fed. R. Civ. P. 801(c).

6

1999.  (Tr. 16:6-8; D.I. 453-1, Exh. 19).  I find that Defendants have shown at least a genuine

dispute of material fact as to the public availability of the Kegel reference.  Therefore, I will

deny Plaintiff's Motion for Summary Judgment, as to that reference.

"ActiveNet is a multiplayer game system developed by Activision." (D.I. 448 at 16).

Defendants argue, "ActiveNet was used in two games that are relevant to this case: Heavy Gear

II and Heavy Gear II Demo." (D.I. 474 at 32).  Defendants assert that these games were

available before the critical date.  (*Id.*).  However, Plaintiff argues that Defendants cannot show

that these games used ActiveNet. (D.I. 448 at 16-17).  Defendants respond that Dr. Kegel will

testify as to the release dates of Heavy Gear II and Heavy Gear II Demo, and technical expert Dr.

Karger will testify that the ActiveNet source code was comparable to the code in Heavy Gear II

Demo before the critical date. (Tr. 21:17-24:6).  I find that Defendants have shown at least a

genuine dispute of material fact as to the public availability of the ActiveNet reference.[4]

Therefore, I will deny Plaintiff's Motion for Summary Judgment, as to that reference.

### B.  Validity of the Asserted Claims of the '634 Patent

Defendants argue that the asserted claims of the '634 patent are indefinite and therefore

invalid. (D.I. 442 at 32).  The Court found claim 19 of the '634 patent indefinite. (D.I. 423 at

14).  The only other asserted claim of the '634 patent, claim 22, depends from claim 19. (D.I.

444-1, Exh. D-1).

Plaintiff's only argument that the two claims are not invalid for indefiniteness is that

claim 19 of the '634 patent should be corrected. (D.I. 475 at 26-27).

---

[4] Even if the ActiveNet reference was available before the critical date, both parties agree that it was available only as source code in Heavy Gear II. (Tr. 10:3-4, 21:8-11).  At oral argument, Plaintiff asserted that source code cannot constitute public availability. (Tr. 10:17-23).  However, in post-argument briefing, Plaintiff agrees that "commercial source code [can] be relevant evidence of prior art [if it is] 'embodied' in a commercially available product." (D.I. 563 at 5-6).

Plaintiff argues that claim 19 "contains an obvious error" that the Court should correct. (D.I. 438 at 1).  Claim 19 covers, "A *non-routing tabled based* computer readable medium containing instructions for controlling communications of a participant of a broadcast channel within a network, by a method comprising" several steps.  (D.I. 117-2, Exh. A-4, claim 19) (emphasis added).  During claim construction, I held that "non-routing table based" modifies "computer readable medium," and found that "non-routing table based computer readable medium" is "nonsensical."  (D.I. 423 at 16-17).

Plaintiff urges that claim 19 should read: "A computer readable medium containing instructions for controlling communications of a participant of a broadcast channel within a network, by a *non-routing tabled based* method comprising" several steps.  (D.I. 438 at 1).

A "district court may correct an obvious error in a patent claim . . . 'only if (1) the correction is not subject to a reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims.'"  *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (*citing Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)).  As a general matter, "[c]ourts do not rewrite claims; instead, [they] give effect to the terms chosen by the patentee."  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999).

Although I found claim 19 "nonsensical," it is not clear that the claim contains an "obvious error."  Plaintiff mentioned no "obvious" error in its Markman briefing or at any Markman hearing.  (*See generally* D.I. 366; D.I. 391).

Even if it were obvious that claim 19 contains an error,[5] the correction is "subject to a reasonable debate."  At a Markman hearing, Plaintiff argued that "non-routing table based"

---

[5] The parties dispute whether an "obvious error" must be typographical in nature, or if it can be more substantive. (Tr. 36:10-16, 42:25-43:2). However, in light of my conclusion, I need not evaluate that dispute.

modifies the entire preamble. (D.I. 363 at 91:1-92:25). In its Markman briefing, Plaintiff argued

that "non-routing table based" modifies the "network." (D.I. 366 at 33). Now, Plaintiff argues

that "non-routing table based" modifies the "method." (D.I. 438 at 2). Each of these corrections

results in a different claim scope. *See Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, 61

F. Supp. 3d 437, 442-43 (D. Del. 2014) (refusing to exercise discretion to rewrite a claim

because different corrections left the "scope of the claim subject to reasonable debate"). If the

claim is re-written so that the "network" is non-routing table based, then the claim would be

limited to a network that does not employ routing tables. However, if the claim is rewritten so

that the "method" is "non-routing table based," then the claim would encompass a network that

includes routing tables, so long as the method itself does not employ routing tables.

Accordingly, Plaintiff's arguments demonstrate that the correction is itself subject to a

reasonable debate. *CBT Flint Partners*, 654 F.3d at 1358. This precludes me from correcting

claim 19.

I will therefore deny Plaintiff's Motion to Correct Claim 19 of the '634 patent. (D.I.

438).

As a result, asserted claims 19 and 22 of the '634 patent are invalid as indefinite. I will

grant Defendants' Motion for Summary Judgment, as to the validity of those claims. (D.I. 440).

## C. Making and Using the Accused Products

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells

any patented invention, within the United States . . . during the term of the patent . . . ." 35

U.S.C. § 271(a).

9

### 1. '344 and '966 patents

Activision argues that its sale of software for the CoD and Destiny games does not infringe the '344 and '966 patents because it "does not make, use, sell or offer to sell" the accused CoD and Destiny networks. (D.I. 442 at 3). Plaintiff has not alleged indirect infringement. (D.I. 1).

In response, Plaintiff argues that Activision "makes," "uses," and "sells" the accused networks. (D.I. 475 at 1-5; D.I. 570 at 1-2).

The asserted claims of the '344 and '966 patents require "computer networks," "broadcast channels," or both. The claimed "computer networks" and "broadcast channels" are made up of "participants" and "connections" between those "participants." (*See, e.g.*, '344 patent, claims 1, 13). A "computer network" is a "group of connected computers or group of connected computer processes." (D.I. 423 at 8). A "broadcast channel" is a "communications network consisting of interconnected participants where each participant receives all data broadcasted on that communications network." (D.I. 432 at 2).

### a. "Makes"

Plaintiff argues that Activision "makes" the infringing system "through compiling the source code that configures the accused networks to infringe." (D.I. 475 at 3 (citing *CNET Networks, Inc. v. Etilize, Inc.*, 528 F. Supp. 2d 985, 994 (N.D. Cal. 2007) (infringing software is made "when expressed and stored as machine-readable object code, e.g. burned on a CD-ROM or written to a server hard drive such that it is capable of being downloaded from the internet . . . [and the] software become[s] an actual, physical component amenable to construction"))). However, Activision notes that "compiling source code does not 'combine all of the [system's] claim elements.'" (D.I. 505 at 2 (citing *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l Inc.*,

10

631 F.3d 1279, 1288 (Fed. Cir. 2011))).  In *Centillion*, even though the defendant "made" three of four claim elements and provided software to make the fourth element, the defendant "did not "combine all of the claim elements."  631 F.3d at 1288.  The system was not complete until "[t]he customer . . . provid[ed] the 'personal computer data processing means' and install[ed] the client software."  *Id.* at 1287-88.  The Federal Circuit found that the defendant therefore did not "make" the claimed system.  *Id.*

Activision argues that the situation here is akin to the situation in *Centillion*, because compiling source code "does not create participants . . . , connect them to each other, or configure them to broadcast messages as the claims require."  (D.I. 505 at 2).

Plaintiff, however, argues that *Centillion* is distinguishable.

First, Plaintiff argues that the users here have less control over whether they "install and operate" the software than the customers in *Centillion*.  (Tr. 116-17).  In its summary judgment briefing, Plaintiff argues that the *Centillion* defendant's "customers maintained and controlled the 'front-end' portion of the claimed system," but stated that "is not the case here as Activision owns and controls the software participating in the network."  (D.I. 475 at 2-3).  Plaintiff argues that Activision's customers have "zero input" over the claimed system.  (Tr. 115:23-116:3).  Activision notes, however, that Plaintiff's experts agree that Activision's customers can play the accused games in ways that do not infringe.  (D.I. 565 at 6 (citing D.I. 443, Exh. A-1 at ¶ 2, 81; D.I. 443, Exh. A-2 at ¶ 2)).  Plaintiff responds that even though "Activision suggests that it has infringing and non-infringing game modes from which a user may select," "Destiny has no off-line mode," "Destiny must connect to the infringing network before it can be used," and "the multiplayer version of [CoD] always infringes."  (D.I. 570 at 17, n.4 (citing D.I. 454, Exh. 28 at ¶ 73; D.I. 454-55, Exh. 40 at ¶¶ 69, 81-82, 84, 123)).  Plaintiff's response, even if true, does not

distinguish *Centillion*. As Activision notes, Plaintiff "nowhere disputes that a customer, even once in online mode, has several non-accused game modes available, and must choose a multiplayer game with six or more players to form an accused network." (D.I. 572 at 3). Accordingly, Activision's customers have a degree of control comparable to that of the *Centillion* customers, who requested reports "a single time, . . . caus[ing] the back-end processing to perform its function on a monthly basis." 631 F.3d at 1285.

Second, Plaintiff argues, "The configured 'participants' are Activision's software." (D.I. 475 at 3; D.I. 565 at 6-7). In *Centillion*, the final claim element allegedly provided by the defendant was "personal computer data processing means adapted to perform" a task by having the defendant's software installed on them. *Centillion*, 631 F.3d at 1281. The system was not complete until "[t]he customer . . . install[ed] the client software." *Id.* at 1288.

Here, argues Plaintiff, no computer or computer data processing means is required by the claims. (D.I. 570 at 3, 8-9). The parties stipulated that "participant" means "a computer and/or computer process that participates in a network." (D.I. 320 at 2). Accordingly, the claimed network "participants" need not each be a computer. But even if a "participant" can be a "computer process," Plaintiff's experts agree that "participants" are ultimately "application programs that are executing on the client computers." (D.I. 572 at 4 (citing D.I. 443, Exh. A-1 at ¶¶ 2, 74; D.I. 443, Exh. A-2 at ¶¶ 2, 76)). This agreement is consistent with the parties' construction for "participants." Even if each "participant" need not be a "computer," each "participant" still requires a user computer and some action taken by the user.[6,7]

---

[6] I previously found that "the claims do not 'claim activities performed by the user' or make any reference to a 'user.' . . . Rather, they claim a network in which participants are configured to send data to their neighbors." (D.I. 386 at 22-23). This is consistent with my present holding. Even if the claim scope does not include a "user," some user action is still required to "make" the invention.

[7] Activision argues, "If [Plaintiff] is accusing pure software" by arguing that "participants" are "software," "then the patents are invalid." (D.I. 565 at 11). Because Activision has not fully briefed this issue, I will not consider Activision's argument.

As Activision argues, "the customer must install Activision's software" on a computer, "execute it, and choose an online, multiplayer game mode with more than 5 other participants to make and use the accused networks." (D.I. 572 at 3; D.I. 565 at 4). Plaintiff does not meaningfully respond to this argument or dispute that Activision's customers take the action that leads to the "back-end processing." (D.I. 570). Similarly, in *Centillion*, the Federal Circuit explained, "It makes no difference that the back-end processing is physically possessed by [the defendant]," because "if the user did not make the request, then the back-end processing would not be put into service." *Centillion*, 631 F.3d at 1285. Just as "user" action was required by the final claim element in *Centillion*, action by multiple customers is required here for the claimed "participants" to be in place and to send data in the network. Therefore, Plaintiff's effort to distinguish *Centillion* on the basis that the claims there more explicitly required customers' use of a computer falls short.[8]

Plaintiff proffers two other theories as to why Plaintiff "makes" the infringing network.

First, Plaintiff argues that Activision's "license agreements, which players accept when downloading the software, explicitly state that Activision maintains complete ownership of the

---

[8] Plaintiff also argues, "[E]ven if the input of Activision's customers is required to cause the network to be formed . . . , Activision does not avoid infringement by selling an otherwise-infringing, but disassembled network." (D.I. 570 at 9 (citing dicta from *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) ("[I]f a device is designed to be altered or assembled before operation, the manufacturer may be held liable for infringement if the device, as altered or assembled, infringes a valid patent.")). Plaintiff continues, "*Centillion* does not replace the *High Tech* . . . standard where, as is the case here, no actions by other parties are required to make the component claim limitations." (D.I. 570 at 9). Plaintiff's argument is off-base. As Activision notes, Plaintiff's argument "relies on the . . . claims that . . . Activision's customers have 'zero input' over installation of software, whether to execute it, or what game mode to play in." (D.I. 572 at 4). As I explain earlier in the opinion, this assumption is faulty. Furthermore, the *High Tech* court cites *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 19 (Fed. Cir. 1984) to support its proposition. 49 F.3d at 1556. In *Paper Converting*, the Federal Circuit held that a finding of infringement was not clearly erroneous only because "of the amount of testing performed . . . , coupled with the sale and delivery during the patent-term of a 'completed' machine (completed by being ready for assembly and with no useful noninfringing purpose) . . . ." 745 F.3d at 19. The "no useful noninfringing purpose" language seems irrelevant to direct infringement, but is suggestive of contributory infringement. Plaintiff has not alleged such extensive testing or readiness for assembly here, and has not alleged indirect infringement. Therefore, *Centillion* applies, and *High Tech* does not.

13

software, confirming that Activision is the party building the network." (D.I. 570 at 7 (citing

D.I. 482, Exh. 74 at AB-AB-009835)). However, as Activision notes, "Whether Activision owns

the software is irrelevant because owning is not an infringing act, i.e., making, using, selling, or

offering to sell, and [Plaintiff] cites no case in support of its theory of infringement-by-owning."

(D.I. 572 at 6). Furthermore, Plaintiff does not explain how owning software necessarily entails

making a network. (D.I. 570 at 7). Therefore, Plaintiff's argument falls short.

Second, Plaintiff argues that Activision "infringes by making the infringing networks,"

because "Activision is vicariously liable for the actions of its customers." (D.I. 570 at 9). As

support, Plaintiff cites *Travel Sentry, Inc. v. Tropp*, 877 F.3d 1370, 1378 (Fed. Cir. 2017). (D.I.

570 at 9-10). However, *Travel Sentry* involved method claims, and the claims at issue are

system claims. 877 F.3d at 1378. "[S]ystem claims are different from method claims and are

still treated under the *Centillion* standard for infringement." *Centrak, Inc. v. Sonitor Techs., Inc.*,

2017 WL 3730617, at *6 (D. Del. Aug. 30, 2017), *appeal pending*, No. 17-2510 (Fed. Cir.).

Under *Centillion*, "it [was] entirely the decision of the customer whether to install and operate

this software on its personal computer data processing means." 631 F.3d at 1287. As previously

explained, this case is analogous to *Centillion* because the customer here can choose whether to

install and operate Activision's software. "[Activision] is not vicariously liable for the actions of

its customers. . . . [Activision's] customers do not act as [Activision's] agents as a matter of law

nor are they contractually obligated by [Activision] to act." *Centillion*, 631 F.3d at 1288.

Accordingly, Plaintiff's argument for vicarious liability falls short.

Accordingly, I find that that Activision's sale of software for the CoD and Destiny games

does not mean that Activision "makes" the accused CoD and Destiny networks.

### b. "Uses"

Plaintiff argues that Activision "uses" the infringing system because it "puts the invention into service by controlling the system as a whole and obtaining the benefit from its use." (D.I. 475 at 2 (citing *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316-17 (Fed. Cir. 2005))).

Plaintiff explains that Activision "exclusively owns and controls the software" participating in the network, and therefore "control[s] the system as a whole." (D.I. 475 at 2-3; D.I. 570 at 14). However, "[s]upplying the software for the customer to use is not the same as using the system." *Centillion*, 631 F.3d at 1286. In *Centillion*, the defendant possessed and operated three of four claim elements. The fourth element was a customer's personal computer "adapted to perform" a task by having the defendant's software installed on it. 631 F.3d at 1281. The Federal Circuit found that the defendant did not use the entire system, because supplying software to customers was not "put[ting] into service" the entire claimed system. *Id.* at 1286. Activision therefore argues that, like the *Centillion* defendant, its exclusive ownership and control of the game software does not "put the invention into service." (D.I. 565 at 4-5). Just as the defendant in *Centillion* "never 'use[d]' the entire claimed system because it never put[] into service the personal computer data processing means," Activision argues that it never uses the entire claimed system because "[n]o claimed system can be put into service until multiple customers install the software and 'execut[e] [it] on the client computers.'" (D.I. 505 at 2 (citing D.I. 443, Exh. A-1 at ¶ 2)).

Activision also argues that it does not "obtain the benefit" from the system's use. (D.I. 505 at 2). Use requires that an "infringer obtain[] 'benefit' from each and every element of the claimed system." *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1329

(Fed. Cir. 2017) (citing *Centillion*, 631 F.3d at 1284).  The only "benefits" to which Plaintiff points are general financial benefits and vague technological benefits.  (D.I. 475 at 2; D.I. 570 at 15 (citing D.I. 480-1, Exh. 67 at ¶¶ 50-62, 65-70; D.I. 480-1, Exh. 69 at ¶¶ 24-33; D.I. 455-1, Exh. 50 at ¶¶ 535, 542-47, 573, 549-61, 548)).  Plaintiff nonetheless argues that Activision's benefits are in fact tethered to "each and every element" of the claimed network.  (D.I. 570 at 15).  However, Plaintiff cites only to expert reports, where technological "benefits" of the system are generally discussed.  No analysis of Activision's element-by-element benefits is provided in those citations.  (D.I. 480-1).  Plaintiff provides no such analysis in its briefing, either.  (D.I. 570 at 15).  Activision thus argues that any benefit identified by Plaintiff is not "tethered to the claims," as is required for Activision to "use" the infringing system.  (D.I. 505 at 2 (citing *Grecia v. McDonald's Corp.*, 2018 WL 1172580, at *4 (Fed. Cir. Mar. 6, 2018))).

I agree with Activision that it neither puts the entire claimed invention into service nor obtains the benefit from each and every element of the claimed system.  Accordingly, I find that Activision does not "use" the infringing system by "put[ting] the invention into service by controlling the system as a whole and obtaining the benefit from its use."

Separately, Plaintiff argues that Activision "uses" the claimed system by testing it.  More specifically, Plaintiff argues, "Activision directly infringes the Asserted Claims [of the '344 and '966 patents] through its employees' updating, maintaining, playing and testing of Destiny and [CoD]."  (D.I. 570 at 11).  Among other evidence of testing, Plaintiff points to SEC filings "confirm[ing]" that Activision engineers "develop, review and test its software, including Destiny and [CoD]."  (D.I. 570 at 12 (citing D.I. 571-1, Exh. 116 at ATVI0030557)).  Plaintiff also says, "Activision and its contractual partners continue . . . to hire Quality Assurance test engineers with experience playing Destiny and [CoD] for testing and quality assurance purposes

for those games," citing job postings.  (D.I. 570 at 13 (citing D.I. 571-1, Exh. 126)).  Plaintiff

further points to testimony from Activision's employees that they "play Destiny and [CoD] both

at home and the office to test the games and verify their quality."[9]  (D.I. 570 at 12).

In *Ricoh Co. v. Quanta Computer Inc.*, the Federal Circuit affirmed summary judgment

for lack of "specific evidence that [Defendant] tested [the accused products] in a way that would

constitute infringement."  550 F.3d 1325, 1335-36 (Fed. Cir. 2008).  As I have held before,

summary judgment requires "specific evidence."  Plaintiff cannot generally allege that "if the

system was sold, Defendant must necessarily have tested it."  *Centrak,* 2017 WL 3730617, at *7.

Here, Plaintiff has identified a great deal of smoke, but no fire.  Plaintiff's allegations of

Activision's testing are in no way "specific."  First, the allegations do not specify that testing

occurred in a game mode accused of infringement.  Some game modes, like CoD's "Single

player" mode, are not accused of infringement.  (D.I. 443, Exh. A-1 at ¶ 81).  Second, Plaintiff's

testing allegations are not platform-specific.  Plaintiff cannot rely on allegations of testing that

occurred on Sony platforms, because those products were dismissed from the case.  (D.I. 268 at

7).  As a result, Plaintiff's allegations do not specify whether testing was performed on a

platform that is actually in the case.  Third, Plaintiff cannot rely on testing that occurred before

its earliest infringement allegations, which date to the filing of an earlier complaint in March

2015.  (D.I. 62 at 2).  Plaintiff's testing allegations are not specific to dates that fall in or after

March 2015.  Accordingly, I find that Plaintiff has not shown that Activision "uses" the claimed

system by testing it.

---

[9] Activision notes, Robert Kostich "merely testified that Activision generally looks at some data points to conduct game quality assessment, ran a beta before November of 2015, and that it 'may have done' small internal testing."  (D.I. 572 at 8-9).  These allegations are not specific.

### c.  "Sells"

Plaintiff separately argues that Activision infringes the system claims of the '344 and '966 patents by "selling" the infringing networks.[10]  (D.I. 570 at 2-7).  However, as Activision notes, Plaintiff presents "no evidence that the software discs that Activision sells are networks, or even the participants and connections that compose networks."  (D.I. 572 at 4-5; D.I. 565 at 10-12).  The parties agree that "participant" means "a computer and/or computer process that participates in a network," and I construed "computer network" to mean "group of connected computers or group of connected computer processes."  (D.I. 423 at 8; D.I. 320 at 2; D.I. 570 at 3).  Activision's software discs are not networks, computers, or computer processes.  Rather, software is a "set of instructions . . . that directs a computer to perform specified functions or operations."  *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 447 (2007).  By selling software discs, Activision does not sell the infringing networks, which require that multiple "participants" form a network.  Accordingly, Plaintiff's argument falls short.[11]

I find that that Activision's sale of software for the CoD and Destiny games does not infringe the '344 and '966 patents because it "does not make, use, sell or offer to sell" the accused CoD and Destiny networks.  I will grant Defendants' Motion for Summary Judgment of non-infringement, as to the '344 and '966 patents, limited to the accused CoD and Destiny games.  (D.I. 440).

---

[10] Plaintiff did not flesh out an argument that Activision "sells" the infringing networks in its summary judgment brief.  (D.I. 475 at 1-7).

[11] Activision argues, "in accusing the sale of inert software discs . . . , [Plaintiff] is accusing pure software." (D.I. 572 at 5).  Activision continues, "If the claims cover pure software alone, they are invalid for claiming non-statutory subject matter."  (D.I. 572 at 5).  Because I find that Activision does not sell the infringing networks, I need not evaluate Activision's argument.

### 2.  '497 patent

Activision also argues that it does not infringe the '497 patent because it does not make,

use, or sell the accused hardware component.[12]  (D.I. 475 at 6).  The asserted '497 patent claims

recite, "A component in a computer system for locating a call-in port of a portal computer,

comprising" four means-plus function elements.  ('497 patent, claim 9).  Each element is a

hardware "processor programmed to perform" a function.  (D.I. 275 at 5-14).

First, Activision does not "make" the '497 claims, because it does not "combine all of the

claim elements."  *Centillion*, 631 F.3d at 1288.  Plaintiff does not argue that Activision installs

software on its customers' Xboxes.  (D.I. 565 at 8; D.I. 570 at 14).  In fact, Plaintiff did not even

argue that Activision "makes" the '497 claims in its summary judgment briefing.  (D.I. 565 at 8;

D.I. 475 at 5).  Now, Plaintiff argues, "During the entire development process from writing

source code through compiling the code into the games, Activision makes Destiny and [CoD]

using computers which contain processors."  (D.I. 570 at 18).  But Plaintiff does not argue that

those "processors" are the processors "for locating a call-in port of a portal computer."  (*See,

e.g.,* '497 patent, claim 9).

Second, Activision does not "use" the accused hardware component.  As Activision

argues, "The function of the '497 component is to enable players to join a multiplayer game by

locating a portal computer through which the user can join a network.  Activision is not putting

into service the component because it is not seeking to join a multiplayer game."  (D.I. 565 at 8-

9).  In other words, Activision does not use its customers' processors "for locating a call-in port

of a portal computer."  Plaintiff does not contest Activision's assertion.  (D.I. 570 at 18).  Rather,

---

[12] This argument applies to CoD and Destiny only.

Plaintiff reiterates its testing argument, which the Court already rejected. *Supra* Section III.C.1.b.

Third, Activision does not sell "the entire invention as claimed in the patent." *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1252 (Fed. Cir. 2000). Activision does not sell any hardware components or processors, and thus does not sell the Xboxes Plaintiff "accuses of satisfying the claims."[13] (D.I. 565 at 9). Plaintiff argues, "Activision sells the software and puts the customer's processors into use when it sends the software to the customer's computers and provides updates to the game." (D.I. 570 at 19 (citing D.I. 455, Exh. 50 at ¶¶ 122-24; D.I. 455, Exh. 35 at ¶¶ 132-34)). However, in making its argument, Plaintiff admits that Activision does not actually sell the processors required by the '497 patent claims.

Because Activision does not make, use, or sell the accused hardware component, I will grant Defendants' Motion for Summary Judgment of non-infringement, as to the '497 patent, limited to the accused CoD and Destiny games. (D.I. 440).

### D. The "Computer Readable Medium" Claims

Defendants argue that each asserted "computer readable medium" claim—claims 11, 15, and 16 of the '147 patent, and claims 19 and 22 of the '634 patent—is invalid as including non-statutory subject matter. (D.I. 442 at 37-38).

---

[13] Plaintiff invokes the doctrine of equivalents to overcome Activision's arguments about the '497 patent. Plaintiff asserts that "Activision's software, which is designed to be run on a processor, is, at a minimum, the equivalent to a processor running the software because the software provides the exact same functionality that a processor running the software provides, in the same way to yield the same result." (D.I. 475 at 5). "In other words," explains Plaintiff, "if [Activision's] software controls the processor, that is the equivalent to the actual processor forming an element of the infringing network." (D.I. 570 at 19). However, as Activision explains, Plaintiff presents no authority that the doctrine of equivalents applies not only to particular claim limitations, but also "to acts of infringement under § 271(a)." (D.I. 572 at 10). As Activision notes, "Plaintiff's equivalents argument would eliminate the difference between direct and indirect infringement." (D.I. 565 at 10). Accordingly, Plaintiff's argument falls short.

The Court construed the term "computer readable medium" as "any medium for storing or transporting computer readable instructions, including memory, storage devices, carrier waves, and communications links."  (D.I. 386 at 7).

"If a claim covers material not found in any of the four statutory categories, that claim falls outside the plainly expressed scope of § 101 even if the subject matter is otherwise new and useful."  *In re Nuijten*, 500 F.3d 1346, 1354 (Fed. Cir. 2007).  This statutory eligibility inquiry is separate from the patent eligibility analysis set forth in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 124 S. Ct. 2347, 2354 (2014).  *See Digitech Image Techs., LLC v. Elecs. For Imaging, Inc.*, 758 F.3d 1344, 1348-51 (Fed. Cir. 2014).  A claim that encompasses "carrier waves" is invalid because it covers unpatentable subject matter.  *Nuijten*, 500 F.3d at 1357 ("a signal cannot be patentable subject matter"); *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1294 (Fed. Cir. 2017) (concluding that claims covering "carrier signals themselves" were invalid under § 101).  Because the "computer readable medium" claims cover "carrier signals," they are invalid as including non-statutory subject matter.

Plaintiff conceded this point at oral argument on claim construction.  When asked whether it agrees that "the claims are ineligible" if they "include[] fleeting medium such as carrier waves," Plaintiff responded, "[T]he short answer is yes."  (D.I. 363 at 64:24-65:1).

However, Plaintiff no longer concedes this point.  Plaintiff now argues that the "computer readable medium" claims are not patent ineligible, because "[e]ach of these claims effectively recites a method."  (D.I. 475 at 31-33 (citing *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373-75 (Fed. Cir. 2011) ("treating … a claim to a computer readable medium" as an apparatus claim would "exalt form over substance since the claim is really to the method or series of functions itself"))).  "Because the asserted computer readable medium claims are

effectively method claims for purposes of the § 101 analysis," argues Plaintiff, "they fall within a statutory category of subject matter." (D.I. 475 at 33, citing 35 U.S.C. § 101 ("Whoever invents or discovers any new and useful process . . . or any new and useful improvement thereof, may obtain a patent therefor")). Plaintiff distinguishes *In re Nuijten* and *Mentor Graphics* as not pertaining to method claims. (*Id.*).

However, "[r]egardless of what statutory category . . . a claim's language is crafted in," the Court must evaluate the underlying invention for patent eligibility. *CyberSource*, 654 F.3d at 1374. Accordingly, the mere fact that the "computer readable medium" claims are crafted in "method" language does not render the claims patent eligible.

The claims here are akin to the claims in *Mentor Graphics*. There, the Federal Circuit invalidated a claim directed to "[a] machine-readable medium containing instructions that when executed on a data processing system causes the system to perform a method for debugging . . . , the method comprising" several steps, including "activating at least one aspect of the instrumentation circuitry available for debugging," and "determining configuration information." *Mentor Graphics*, 851 F.3d at 1294. The Court reasoned that the challenged "claims cover[ed] carrier signals themselves," and therefore lacked patent-eligible subject matter. *Id.* Similarly, the claims here cover a "computer readable medium containing instructions for controlling communications of a participant of a broadcast channel within a network, by a method comprising" several steps, including "locating a portal computer" and "requesting" a provision from the located portal computer. ('634 patent, claim 19). My construction specifies that the claims cover carrier waves themselves. (D.I. 386 at 7). Thus, the claims are patent-ineligible.

In *CyberSource*, on the other hand, the Federal Circuit examined the "underlying invention," and found it "clear" that the invention was "a method for detecting credit card fraud,

not a manufacture for storing computer-readable information." 654 F.3d at 1374. But the Federal Circuit never found that those claims were directed to patent-ineligible material like carrier waves. Rather, the Federal Court examined whether the claims fells into "any of the three patent-eligibility exceptions the Supreme Court has recognized for 'laws of nature, physical phenomena, [or] abstract ideas.'" *Id.* Here, the claims cover "carrier waves," which extend beyond any statutory category.

Because they are directed to patent-ineligible material, claims 11, 15, and 16 of the '147 patent, and claims 19 and 22 of the '634 patent are invalid. I will grant Defendants' Motion for Summary Judgment, as to those claims. (D.I. 440).

### E.  Other Summary Judgment Issues

Plaintiff moves for summary judgment of validity over several combinations of prior art, and that all accused products infringe claim 12 of the '344 patent. (D.I. 448 at 1-32). Likewise, Activision argues that I should grant summary judgment of invalidity on several grounds, and that the accused products do not infringe the Asserted Patents. (D.I. 442 at 21-39). Both parties raise so many issues that many of them are at best cursorily briefed.[14] The parties may have made some valid arguments buried among their conclusorily-supported arguments and genuine disputes of material fact, but I do not see them.

I will deny Plaintiff's Motion for Summary Judgment of Infringement and Validity and Motion to Exclude Expert Testimony of Catharine M. Lawton (D.I. 439), as to all summary judgment issues, and will deny Activision's Motion for Summary Judgment (D.I. 440), as to all issues other than those discussed previously.

---

[14] Activision raised about twenty-six main arguments in its fifty pages of briefing. (D.I. 442).

## F.  Plaintiff's *Daubert* Motion

Plaintiff seeks to exclude the expert testimony of Activision's damages expert Catharine

M. Lawton.  (D.I. 439).

Plaintiff makes arguments to exclude several different pieces of Ms. Lawton's opinion.

First, Plaintiff argues that Ms. Lawton's reasonable royalty opinion "necessarily rests on

speculation."  (D.I. 448 at 32).  More specifically, Plaintiff argues that Ms. Lawton (1) assumes

the comparability of a past license between Sony Computer Entertainment America, Inc. and

Boeing Management Company to the license the parties would have reached, and arbitrarily

reduces that past license fee by 50%; (2) reduces the license fee "by another 47% based on her

unfounded comparison of the term" of the past license and the hypothetical license; (3)

"arbitrarily assum[es] that there are thirteen games that would have been licensed under the" past

license to come up with a per-game royalty, and (4) "arbitrarily opines that $300,000 is the high-

end of the reasonable royalty range."  (*Id.* at 34-36).  Second, Plaintiff argues that Ms. Lawton

assumes the comparability of the Boeing/Sony license to the hypothetical license "without any

analysis."  (*Id.* at 38-43).  Third, Plaintiff argues that Ms. Lawton's opinion as to the hypothetical

negotiation date "is completely unsupported and arbitrary."[15]  (*Id.* at 43-46).  Activision responds

to each of these arguments by pointing to evidence supporting Ms. Lawton's opinions.  (D.I. 474

at 34-45).  Accordingly, Plaintiff's arguments amount to failure of proof arguments.  I will not

exclude Ms. Lawton's testimony, as to these opinions.

Plaintiff separately argues that Ms. Lawton should be precluded from offering technical

opinions regarding non-infringing alternatives, because she is not qualified.  (D.I. 448 at 46-48).

In response, Activision notes that Ms. Lawton relies on certain technologies as non-infringing

---

[15] Ms. Lawton "offered extensive opinions regarding a reasonable royalty based on other hypothetical dates, including the hypothetical negotiation date Plaintiff asserts."  (D.I. 474 at 38).

alternatives, because Boeing and the inventors identified them as such.  (D.I. 474 at 46).  Ms. Lawton may testify about non-infringing alternatives, to the extent that her testimony represents evidence she relied upon in forming her opinion about damages.  *Monsanto Co. v. David*, 516 F.3d 1009, 1016 (Fed. Cir. 2008) ("Rule 703 expressly authorizes the admission of expert opinion that is based on 'facts or data' that themselves are inadmissible…").

Plaintiff also argues that Ms. Lawton's testimony about secondary considerations should be excluded, because she "does not have the expertise or qualifications to opine on technical issues relating to secondary considerations," and because her opinions are "an improper lay summation of factual evidence."  (D.I. 448 at 48-50).  Ms. Lawton may testify about secondary considerations, but she may not provide an opinion about technical issues outside her expertise or summarize technical facts using a slide deck.

Plaintiff's Motion for Summary Judgment of Infringement and Validity and Motion to Exclude Expert Testimony of Catharine M. Lawton (D.I. 388) is denied, as to the testimony of Ms. Lawton.

### G.  Activision's *Daubert* Motion

Activision first seeks to exclude Dr. Nenad Medvidovic and Dr. Michael Mitzenmacher's opinions that the accused products "use various rules and constants" to converge on m-regular and create a broadcast channel.  (D.I. 442 at 38).  Activision argues that Dr. Medvidovic and Dr. Mitzenmacher make these assertions in conclusory fashion, and "cite well over 1,500 pages of code without identifying or explaining the source code."  (*Id.*).  In response, Plaintiff points to numerous locations in their experts' reports, which Plaintiff avers "provide a detailed explanation of their infringement opinions," including the opinions singled out by Activision.  (D.I. 475 at 33-35).  Thus, Activision's arguments are not well-taken.  Activision does not make

a serious case to exclude expert testimony on the basis of "qualification, reliability, and fit." *See*

*Schneider ex rel. Estate of Schneider*, 320 F.3d at 404-05. Accordingly, I will deny Activision's

motion, as to the opinions of Dr. Medvidovic and Dr. Mitzenmacher. (D.I. 441).

Activision next seeks to exclude the testimony of damages expert Dr. Christine Meyer

and technical experts Dr. Harry Bims and Dr. Ricardo Valerdi, who combine to provide

Plaintiff's reasonable royalty calculation. (D.I. 442 at 40).

To reach her ultimate reasonable royalty opinion, Dr. Meyer chooses a hypothetical

negotiation date, and recalculates the jury verdict from *Uniloc USA, Inc. v. EA*, No. 6:13-cv-

00259-RWA (E.D. Tex. Dec. 15, 2014).[16] (D.I. 475 at 36). To recalculate the verdict, Dr.

Meyer takes Dr. Bims' opinion that the Asserted Patents are 6-15 times more valuable than the

*Uniloc* patent (U.S. Patent No. 5,490,216), and multiplies the midpoint of this range (10.5) by the

20 cents per unit rate from *Uniloc*. (D.I. 475 at 43-45). This provides a royalty of $2.10 for all

six Asserted Patents. (*Id.*). Dr. Meyer then multiplies this rate by a royalty base, which she

determines by apportioning the value of the Asserted Patents. (*Id.* at 45-48).

First, Activision argues that Dr. Meyer wrongly assumes a hypothetical negotiation date

of the filing of the complaint. (D.I. 442 at 40). I addressed this argument in an Oral Order on

April 13, 2018. (D.I. 521). "[T]he date of the hypothetical negotiation is the date that

infringement began," not the date of the filing of the complaint. *LaserDynamics, Inc. v. Quanta

Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012). Thus, I will exclude Dr. Meyer's damages

testimony, insofar as it uses the date of the filing of the complaint as the date of the hypothetical

negotiation. Plaintiff supplemented Dr. Meyer's reports with an analysis using an arguably

---

[16] The Federal Circuit later upheld a decision from the PTAB that the *Uniloc* patent is invalid. *Uniloc USA, Inc. v. Sega of Am., Inc.*, 2017 WL 4772565, at *1 (Fed. Cir. Oct. 23, 2017), *cert. denied*, 138 S. Ct. 1697 (2018).

correct hypothetical negotiation date on April 18, 2018.  (D.I. 534-1).  The supplementation fixes the hypothetical negotiation date problem.

Second, Activision argues that Dr. Meyer cannot use the *Uniloc* jury verdict to establish a royalty, and in any event cannot support her opinion regarding the comparability between the *Uniloc* patent and the Asserted Patents.  (D.I. 442 at 41-43).  Jury-determined damages are not evidence of arm's-length negotiations between parties, and will not help the trier of fact determine a royalty.  Plaintiff cites no authority for the proposition that expert damages opinions may rely on prior jury verdicts.[17]  In fact, the only evidence Plaintiff cites for that proposition is a statement from Activision's damages expert indicating agreement that "a litigation verdict [can] be a reliable data point in a hypothetical reasonable royalty negotiation for a patent case" if "the verdict is based on economically and technically comparable facts."  (D.I. 475 at 41; D.I. 482-1, Exh. 97 at 20:10-21:1).  This citation is insufficient.  Dr. Meyer cannot use the *Uniloc* jury verdict to calculate a reasonable royalty, because it is not sufficiently comparable to the circumstances of the hypothetical negotiation here.  Activision admits that it holds a license to the *Uniloc* patent and that said license is relevant to the reasonable royalty, but that does not render the *Uniloc* jury verdict comparable to the hypothetical negotiation here.  (D.I. 475 at 41; D.I. 482-1, Exh. 93 at 8).[18]  A jury verdict does not represent evidence from which a hypothetical negotiation can be reliably determined.  A jury verdict represents the considered judgment of twelve (or maybe fewer) random non-experts as to what a hypothetical negotiation

---

[17] During a deposition, Plaintiff's attorney asked Ms. Lawton, "Are you aware of the Prism v. Sprint federal circuit case addressing the use of a verdict in the reasonable royalty hypothetical negotiation."  (D.I. 482-1, Exh. 97 at 21:2-5).  Plaintiff's attorney was presumably referring to *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360 (Fed. Cir. 2017), which it cited in briefing for another purpose.  (D.I. 475 at 43).  However, *Prism* does not endorse the use of prior jury verdicts in expert damages opinions.  Rather, it discusses "admission of litigation settlements on the issue of a reasonable . . . royalty."  849 F.3d at 1372.

[18] The cited interrogatory response provides bates numbers, one of which I assume corresponds to Activision's license to the *Uniloc* patent.  (D.I. 482-1, Exh. 93 at 8).

would have resulted in for the patent(s) at issue. It is, at best, an informed lay opinion. No economist would consider a jury verdict as to a hypothetical negotiation about one patent as a reliable basis for determining what the results of an actual arm's-length negotiation about a second patent would be.[19]  *See Atlas IP, LLC v. Medtronic, Inc.*, 2014 WL 5741870, at *6 (S.D. Fla. Oct. 6, 2014) ("[I]t is self-evident jury-determined damages are not evidence of arm's-length negotiations between parties.").

It is accordingly of no matter that Dr. Meyer and Dr. Bims purport to provide both a technical comparability analysis and an economic relevance analysis of the *Uniloc* case. (D.I. 475 at 42). I will exclude Dr. Meyer's royalty opinion insofar as it relies on the *Uniloc* jury verdict.

Third, Activision argues, "Dr. Meyer should be precluded from offering her opinion that the [Boeing/Sony] License is not comparable because Boeing did not intend for the license to say what it says." (D.I. 442 at 41 n.19). Activision takes particular issue with Dr. Meyer's opinion that "when the parties entered into the [Boeing/Sony License,] Boeing did not consider that PlayStation gaming systems would be covered." (D.I. 505 at 22-23). Plaintiff responds that Dr. Meyer presents evidence supporting her opinion that "the Boeing/Sony License is not comparable to the hypothetical negotiation in this case." (D.I. 475 at 41; D.I. 441-1, Exh. C-1 at ¶ 63-64). The Boeing/Sony License expressly says it covers the accused products. (D.I. 268). Therefore, I will not allow Dr. Meyer to testify that the Boeing/Sony License does not cover the accused products. However, I will not exclude Dr. Meyer's opinions that the Boeing/Sony License was undervalued. Activision can cross-examine her on those opinions.

---

[19] As a side note, I would never let the jury hear such hearsay testimony under Rule 703, even if it were reliable evidence.

My exclusion of Dr. Meyer's use of the *Uniloc* jury verdict moots at least two arguments raised in Activision's Motion.  For example, Activision argues that Dr. Bims' opinion that the relative value of Asserted Patents is 6-15 times more valuable than the *Uniloc* patent is arbitrary, and should be excluded.  (D.I. 442 at 43-45).  Because Dr. Meyer may not testify about the *Uniloc* jury verdict, any comparison to the *Uniloc* patent is irrelevant.  Neither she nor Dr. Bims may testify about the value of the Asserted Patents, as compared to the *Uniloc* patent.

Fourth, Activision argues that Dr. Meyer's opinion on the royalty base violates court orders and legal principles by including future products.  Dr. Meyer "calculate[s] reasonable royalty damages on sales of the infringing products from the date of the hypothetical negotiation through the date of the last patent expiry."  (D.I. 441-1, Exh. C-3 at ¶ 177).  Plaintiff asserts that Dr. Meyer calculates a lump sum royalty through the life of the patents.  (D.I. 475 at 47-48).  A lump sum royalty is proper.  *Allergan Sales, LLC v. UCB, Inc.*, 2016 WL 8222619, at *2 (E.D. Tex. Nov. 7, 2016) (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009) (holding that a lump sum royalty may "compensate[] the patent holder for both past and anticipated future infringement all at once, usually through the life of the patent term")).  However, Activision asserts that Dr. Meyer does not propose a lump sum royalty, but rather a "running royalty discounted to the net present value."  (D.I. 505 at 25).  Thus, argues Activision, her testimony is improper.  (D.I. 442 at 46 (citing *Allergan*, 2016 WL 8222619, at *2 (noting that "post-trial infringement" is "typically dealt with" using procedures set forth in *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1317 (Fed. Cir. 2017), "in which the parties are afforded an opportunity to negotiate a post-trial license to address future infringement")).  The *Allergan* court rejected an "approach in which the jury determines past and future damages all at once," and found, "Any opinion on a future royalty that may accrue from infringement that has not yet

29

occurred (as opposed to a lump-sum royalty) is properly excluded under Rule 702(a)."  2016 WL 8222619 at *2-3.  However, *Allergan* is distinguishable.  There, the expert in question suggested a "running royalty, not a lump sum royalty."  *Id.* at *2.  Because "a running royalty is based on actual sales or use," Judge Payne found the expert's opinions to be improperly "based on a running royalty applied to future acts of infringement that have not yet occurred."  *Id.*  Here, Plaintiff clearly articulates that it seeks a lump sum royalty.  (D.I. 475 at 48).  No case explicitly discusses a "running royalty discounted to the net present value."  In another case, Judge Payne opined, "[A] lump sum royalty includes compensation for projected future infringement . . . . The lump sum may be based on developments that have occurred after the date of the hypothetical negotiations, including realistic projections of future sales."  *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.,* 2018 WL 3089701, at *7 (E.D. Tex. Mar. 7, 2018).  Dr. Meyer may calculate and testify about a lump sum royalty.

Separately, Activision argues that Dr. Meyer's testimony should be excluded because she fails to apportion the value of the Asserted Patents versus the value from non-patented features of the accused products.  (D.I. 442 at 46-48).  Dr. Meyer uses the accused games' "multiplayer" feature to apportion the Asserted Patents' contribution to all three accused games.  (D.I. 475 at 46; D.I. 441-1, Exh. C-3 at ¶ 169-76).  Plaintiff also notes that Dr. Meyer uses an "already apportioned . . . unit rate from *Uniloc*."  (D.I. 475 at 37).  I am excluding Dr. Meyer's reliance on *Uniloc*.  Accordingly, Activision's apportionment argument is moot.  However, I note that Dr. Meyer must properly apportion any other royalty base she uses.

Fifth, Activision argues that Dr. Valerdi's testimony that redesigning a broadcast channel technique would cost $7 billion should be excluded.  (D.I. 442 at 48).  Activision takes issue

specifically with the computer program that Dr. Valerdi uses.  (*Id.* at 48-49).  This is a failure of proof argument.  Activision can cross-examine Dr. Valerdi about the program.

## IV.   CONCLUSION

A separate order will be entered.