1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4      ACCELERATION BAY, LLC           )
                                       )
5                      Plaintiff,      )
                                       )
6                                      ) Civil Action No. 15-453-RGA
       v.                              )
7                                      )
       ACTIVISION BLIZZARD, INC.,      )
8                                      )
                       Defendant.      )
9

10                                     J. Caleb Boggs Courthouse
                                       844 King Street
11                                     Wilmington, Delaware

12                                     Friday, October 19, 2018
                                       8:32 a.m.
13                                     Pretrial Hearing

14

       BEFORE:  THE HONORABLE RICHARD G. ANDREWS
15              United States District Court Judge

16

17     APPEARANCES:

18              PHILIP A. ROVNER, ESQUIRE
                POTTER ANDERSON & CORROON, LLP
19                 1313 N. Market Street, 6th Floor
                   Hercules Building
20                 Wilmington, Delaware  19899

21                        -and-

22              PAUL ANDRE, ESQUIRE
                LISA KOBIALKA, ESQUIRE
23              AARON M. FRANKEL, ESQURE
                KRAMER LEVIN NAFTALIS & FRANKEL, LLP
24                 990 Marsh Road
                   Menlo Park, California  94025
25                 For the Plaintiff

1    APPEARANCES CONTINUED:

2            JACK B. BLUMENFELD, ESQUIRE
             MORRIS NICHOLS ARSHT & TUNNELL, LLP
3              1201 North Market Street
               Wilmington, Delaware  19899
4
                         -and-
5
             DAVID P. ENZMINGER, ESQUIRE
6            MICHAEL TOMASULO, ESQUIRE
             KATHLEEN B. BARRY, ESQUIRE
7            WINSTON & STRAWN, LLP
               333 S. Grand Avenue, 38th Floor
8              Los Angeles, California  90071

9                        -and-

10           B. TRENT WEBB, ESQUIRE
             AARON E. HANKEL, ESQUIRE
11           SHOOK HARDY & BACON, L.L.P.
               2555 Grand Boulevard
12             Kansas City, Missouri 64108-2613
               For the Defendant
13
     Also Present:
14
             Mr. Omar Salik
15           Ms. Julia Kazaks

16

17

18

19

20

21

22

23

24

25

08:32:58  1                    THE CLERK:  All rise.

08:33:07  2                    THE COURT:  All right.  Good morning.  Please be

08:33:09  3    seated.

08:33:16  4                    This is Acceleration Bay versus Activision

08:33:19  5    Blizzard.  Civil Action Number 16-453.

08:33:22  6                    Good morning, Mr. Rovner.

08:33:23  7                    MR. ROVNER:  Good morning, Your Honor.  Phil

08:33:25  8    Rovner from Potter Anderson for plaintiff, Acceleration Bay.

08:33:27  9    With me from Kramer Levin, Paul Andre.

08:33:27 10                    MR. ANDRE:  Good morning, Your Honor.

08:33:30 11                    MR. ROVNER:  Lisa Kobialka.

08:33:30 12                    MS. KOBIALKA:  Good morning, Your Honor.

08:33:32 13                    MR. ROVNER:  And Aaron Frankel.

08:33:33 14                    MR. FRANKEL:  Good morning, Your Honor.

08:33:34 15                    THE COURT:  All right.  Good morning to you all.

08:33:36 16                    Mr. Blumenfeld.

08:33:37 17                    MR. BLUMENFELD:  Good morning, Your Honor.  Jack

08:33:43 18    Blumenfeld for Activision Blizzard.  And with me are Trent

08:33:45 19    Webb from Shook Hardy & Bacon, David Enzminger, and Mike

08:33:48 20    Tomasulo from Winston & Strawn.

08:33:51 21                    Behind them Aaron Hankel from Shook Hardy &

08:33:54 22    Bacon, and Kathleen Barry from Winston & Strawn.

08:33:58 23                    And in the first row, Omer Salik and Julia

08:34:01 24    Kazaks, next to him, from Activision.

08:34:03 25                    THE COURT:  All right.  Well, good morning to

08:34:06 1   you all, too.  All right.

08:34:11 2                So, though I've read portions of the Pretrial

08:34:15 3   Order, including the motions in limine and the body of it,

08:34:19 4   but I guess the first thing to address is damages.

08:34:24 5                What are we going to do about that, Mr. Andre?

08:34:29 6                MR. ANDRE:  Your Honor, we're going to be

08:34:35 7   putting forward a damages case that has three factual bases

08:34:38 8   that the jury can decide a reasonable royalty.

08:34:42 9                First being a cost savings methodology that you

08:34:45 10  have allowed in the case with Dr. Valerdi and others who

08:34:48 11  will be talking about the cost-savings basis.  This is

08:34:52 12  largely based on a few other Federal Circuit cases that have

08:34:57 13  allowed this type of damages model.

08:34:59 14                We also have a revenue-based model based on the

08:35:04 15  proper apportionment of the revenue and the profits of the

08:35:08 16  infringing technology over the relevant time period that the

08:35:12 17  jury can base a reasonable royalty on.

08:35:15 18                And we also have a per-unit royalty possibility

08:35:18 19  that the jury can base a reasonable royalty on as well.

08:35:22 20                THE COURT:  All right.  So for example, the per

08:35:24 21  unit, let's say cost, I don't know, $100 to buy an

08:35:30 22  Activision software package.

08:35:31 23                How do you get to a per-unit royalty?

08:35:35 24                MR. ANDRE:  It's actually a per-user royalty

08:35:38 25  because it's -- when I say per unit, it's per unit per user.

08:35:41  1                THE COURT:  Right.

08:35:43  2                MR. ANDRE:  And there the jury can rely on

08:35:46  3     different ways.  They can look at it from the profits that

08:35:50  4     are involved in those per-user base and then determine what

08:35:54  5     would be a reasonable royalty based on that.  It wouldn't be

08:35:58  6     a running royalty, per se, but it would be a lump sum

08:36:00  7     royalty on the life of the sales of those patents on those

08:36:03  8     products.

08:36:04  9                THE COURT:  And so is Dr. Meyer going to show up

08:36:06 10     and do calculations related to this?

08:36:09 11                MR. ANDRE:  Dr. Meyer will show up.  I think

08:36:11 12     about 75, 80 percent of her report is still in.  The only

08:36:13 13     thing you excluded was the final number based on the Uniloc.

08:36:19 14                THE COURT:  Right.

08:36:20 15                MR. ANDRE:  So she's going to give a lot of

08:36:22 16     numbers.  She has a lot of numbers by calculation.  She does

08:36:25 17     the apportionments.  She does the Georgia-Pacific Factors.

08:36:28 18     She does most of the things you would expect a damage expert

08:36:31 19     to do and give the jury the factual predicate to come up

08:36:34 20     with a reasonable royalty.

08:36:35 21                THE COURT:  Okay.  All right.  I might have

08:36:43 22     something more for you on this topic.  Let me just hear from

08:36:46 23     the defendants on this.

08:36:47 24                Mr. Enzminger.

08:36:56 25                MR. ENZMINGER:  Your Honor, none of those three

08:36:59   1    suggestions is admissible.  There is no Georgia-Pacific

08:37:03   2    analysis that ties to anything other than the rate that was

08:37:08   3    stricken.  Exmark by the Federal Circuit decided earlier

08:37:13   4    this year and is crystal clear on that you cannot do a

08:37:16   5    generic Georgia-Pacific factor that isn't tied to a specific

08:37:20   6    rate that the expert is advancing.  Otherwise, it's

08:37:22   7    untethered to the facts of the case.

08:37:24   8             So the fact that Dr. Meyer did Georgia-Pacific

08:37:29   9    Factors with respect to the now-excluded Uniloc jury verdict

08:37:35  10    rate is not admissible.  The per-user possibility is

08:37:40  11    inadmissible because there is not a single witness who can

08:37:44  12    tie a per-user royalty rate to the number of users.

08:37:51  13             Dr. Meyer did that, but it was excluded.  She

08:37:54  14    has no other opinion on that.

08:37:56  15             THE COURT:  All right.

08:38:00  16             MR. ENZMINGER:  She doesn't have a royalty rate

08:38:02  17    that she can apply nor does any other witness, and that

08:38:06  18    leaves us back with the cost-savings analysis.  There is no

08:38:09  19    cost-savings analysis in this case.

08:38:17  20             Mr. Andre talked about the Federal Circuit has

08:38:19  21    blessed a cost-savings analysis, and I think he's talking

08:38:22  22    about the Prism case which was a case that he argued in the

08:38:26  23    Federal Circuit.  In that case, the damages expert actually

08:38:29  24    said that there was a cost-savings analysis which analyzed a

08:38:35  25    cost savings for the plaintiff as a result of using the

08:38:39 1    infringing technology versus not using the infringing

08:38:44 2    technology.

08:38:45 3         She had to go out, and they would have to design

08:38:47 4    a specific aspect of their network that they didn't have to

08:38:52 5    do because they were using the prepackaged software that was

08:38:58 6    infringing.  But in that case, the damages expert expressly

08:39:03 7    said that the parties to the hypothetical negotiation would

08:39:07 8    have factored that in.

08:39:10 9         In our case, there is no cost-savings analysis.

08:39:13 10   What they're referring to is Dr. Dr. Valerdi's analysis

08:39:17 11   where he says, If I had to re-engineer the entire game

08:39:20 12   without regard to the patented technology at all, there is

08:39:24 13   not one thing in Dr. Dr. Valerdi's report that relates to

08:39:28 14   the patented technology.

08:39:29 15        He assumes every line of code in the product

08:39:33 16   would have to be rewritten.  Every single line, whether it's

08:39:37 17   patented technology or not.  And he says, If you had to

08:39:42 18   re-engineer the end game, it would cost this.  That's not a

08:39:47 19   cost-savings analogy.

08:39:48 20        And their expert doesn't even say it.  What she

08:39:50 21   said was, Dr. Valerdi provides an additional input into my

08:39:55 22   Georgia-Pacific Factor for my Uniloc verdict, and what it

08:39:59 23   means is that there are not non-infringing alternatives and

08:40:04 24   that cost to redesign the entire game would be so

08:40:07 25   prohibited, we have to look at other indicators of value

08:40:11 1    because it would not have been part of a hypothetical

08:40:14 2    negotiation.  We have to look at other indicators of value.

08:40:17 3         So standing alone, that analysis has absolutely

08:40:21 4    nothing to do with the patented technology.  It has nothing

08:40:24 5    to do with per-user support.  It has nothing to do with

08:40:29 6    applying any number to the royalty base.  It's not a

08:40:35 7    cost-savings analysis.

08:40:36 8         There are other problems with it, too.  It's not

08:40:41 9    tied to the hypothetical negotiation date.  Dr. Valerdi does

08:40:46 10   an analysis where he talks about using current labor rates.

08:40:49 11   This hypothetical negotiation would have occurred ten years

08:40:52 12   ago.  It's not apportioned in any way.

08:40:58 13        Dr. -- I'm sorry.

08:40:59 14        THE COURT:  So but things like that, you had the

08:41:03 15   chance to raise them already, right, but --

08:41:06 16        MR. ENZMINGER:  No.

08:41:06 17        THE COURT:  Why not?

08:41:07 18        MR. ENZMINGER:  Because Dr. Valerdi was never

08:41:10 19   offered as an independent damages analysis.  The only

08:41:13 20   mention of Dr. Dr. Valerdi's analysis in Dr. Meyer's report

08:41:17 21   at all was one paragraph where she says, Dr. Valerdi's

08:41:23 22   analysis of designing the entire game would be too

08:41:26 23   expensive; and therefore, I'm not going to consider

08:41:30 24   alternatives, and then she moved on to other factors.

08:41:34 25        It was never presented as a stand-alone damage

08:41:39  1      theory at all.  And so when you recall the damages, the

08:41:47  2      summary judgment in Daubert, we had 50 pages for 16 claims,

08:41:53  3      five products, three companies.

08:41:54  4                  THE COURT:  Why are you telling me?

08:41:57  5                  MR. ENZMINGER:  We had to make some judgments.

08:41:59  6                  THE COURT:  Well, so either you did raise it, or

08:42:01  7      you didn't raise it, but you can't say, We raised it, and we

08:42:04  8      had to make some judgments.

08:42:06  9                  MR. ENZMINGER:  No.  No.  I'm saying it was

08:42:11 10      never mentioned until this morning as a possible stand-alone

08:42:17 11      damages case.  It's not admissible as a stand-alone damages

08:42:21 12      case because it's not tied to patented technology.  It's not

08:42:25 13      apportioned.  No one testified it was a factor in the

08:42:27 14      reasonable royalty in the reasonable royalty calculation.

08:42:31 15                  And there's no way you can take his $7 billion

08:42:36 16      design-around estimate and put a number on that.  It's just

08:42:39 17      prejudicial.  It's just putting a big number out in front of

08:42:43 18      the jury and saying, Somewhere between zero and $7 billion

08:42:48 19      is a number.

08:42:48 20                  But there's not a single other witness, and

08:42:50 21      certainly not Dr. Valerdi, who can tie that number to a

08:42:54 22      reasonable royalty that the jury can conclude.  They have

08:43:07 23      nobody who can quantify any of these royalty bases that

08:43:16 24      Mr. Andre suggests.

08:43:17 25                  THE COURT:  So do you understand the three

08:43:22  1    Mr. Andre suggests?  So I forget what Mr. Andre called them,

08:43:28  2    the three different theories here.

08:43:30  3           Do you understand what he means by each of the

08:43:34  4    theories that he's described briefly this morning?

08:43:36  5           MR. ENZMINGER:  So the cost-savings methodology,

08:43:42  6    I do not know what his methodology is because what has been

08:43:47  7    submitted to us is in no way a cost-savings analysis.  It is

08:43:51  8    not an analysis of what the defendant saved if, by using an

08:43:56  9    alleged infringing broad M-regular broadcast channel.

08:44:05  10          I mean, if you think about these video games and

08:44:07  11   how complex they are, for example, graphics.  Graphics,

08:44:11  12   rendering graphics, and the artwork, and all of that that

08:44:14  13   goes in the games has no possible relationship to an

08:44:18  14   M-regular broadcast channel.  That would obviously not have

08:44:21  15   to be rewritten, yet Dr. Dr. Valerdi's analysis is that the

08:44:25  16   entire game, every line of code would have to be rewritten.

08:44:29  17          His other assumption is that rewriting the code

08:44:31  18   to avoid the patents would use exactly the same number of

08:44:35  19   lines that the current product has.  There's absolutely no

08:44:44  20   cost savings analysis in this case.

08:44:46  21          With respect to the revenue-based model, I have

08:44:49  22   no idea what he's talking about there because while the

08:44:53  23   company, obviously, has revenue, there is no witness who can

08:44:57  24   take that revenue and reduce it to a rate.

08:44:59  25          THE COURT:  Let's see if we can address that a

08:45:01  1    little more.  Mr. Andre, can you just explain a little more

08:45:05  2    what the revenue-based model is?

08:45:07  3              And let me say, I don't expect to resolve this

08:45:10  4    this morning, but what I expect to do is set a schedule for

08:45:17  5    you all to submit stuff.  But part of that, setting the

08:45:21  6    schedule I think requires that the defendants say, they may

08:45:28  7    not agree with your theory, but at least they understand

08:45:30  8    what it is.

08:45:31  9              MR. ANDRE:  Yeah.  I think, Your Honor, we've

08:45:33 10    given them notice of these three theories since day one of

08:45:35 11    the case.

08:45:36 12              THE COURT:  Well, so because I don't know what

08:45:38 13    it is, but you, of course, don't have to give me notice.

08:45:41 14              MR. ANDRE:  Well, Your Honor, as far as the

08:45:43 15    revenue based, what we have is Dr. Meyer.  When they're

08:45:48 16    talking about the revenues of the games, she does an

08:45:50 17    entire --

08:45:51 18              THE COURT:  So let's assume the games, we're

08:45:56 19    talking World of Warcraft and the Red User are a million

08:46:00 20    dollars; right?

08:46:01 21              MR. ANDRE:  Okay.

08:46:01 22              THE COURT:  Right.

08:46:02 23              MR. ANDRE:  Yeah.

08:46:02 24              THE COURT:  When you say revenues, that's what

08:46:04 25    you mean is over a period of time, we sold a billion

08:46:06  1    dollars.  People paid Activision a billion dollars for these

08:46:10  2    games; right?

08:46:11  3                MR. ANDRE:  Right.  So you have a billion

08:46:13  4    dollars for the games.  You have the profits attributed to

08:46:15  5    those games as well as what the profit margins are for that.

08:46:18  6    You also have the apportionment of what is related to the

08:46:22  7    footprint of the invention.

08:46:23  8                So we have apportionment.  We have the revenues.

08:46:25  9    We have the profits, and we have a lot of other -- the cost

08:46:28 10    of maintenance.  We have the issues regarding the cost of

08:46:31 11    development.

08:46:31 12                THE COURT:  So let's assume, because it was

08:46:38 13    obviously stated to this effect, but let's assume the data

08:46:40 14    says profits are 20 percent.  So instead of a billion, you

08:46:44 15    have 200 million.  That's the profits.

08:46:48 16                I can't remember at this point, did somebody

08:46:55 17    apportion what percentage of the games relates to the

08:47:06 18    technology that's the infringing technology and what portion

08:47:11 19    of it is something else?

08:47:12 20                MR. ANDRE:  Yeah.  Dr. Meyer does that as well.

08:47:15 21    And you also required her to do that, and she did it, and

08:47:17 22    that's still in the case.  So she does --

08:47:19 23                THE COURT:  That was part of what I did like

08:47:23 24    early on?

08:47:23 25                MR. ANDRE:  Yeah, way back when.

08:47:25   1          THE COURT:  Okay.

08:47:26   2          MR. ANDRE:  And so it's something that

08:47:28   3   everything is in there except her final number that she

08:47:31   4   gave.  That's what you excluded based on Uniloc.  So we have

08:47:34   5   all the information there for a jury to make the

08:47:38   6   determination what a royalty would be.

08:47:40   7          THE COURT:  Well, so to just put a concrete

08:47:44   8   thing on it, I assume that apportionment ends up with her

08:47:48   9   saying "X" percent of revenue or maybe of the profit is

08:47:57  10   attributable to the invention.  What's "X"?

08:48:03  11          MR. ANDRE:  I think it's 42 percent.  I don't --

08:48:09  12   there's a number that she had.  I can't recall off the top

08:48:11  13   of my head, but she does an apportionment.

08:48:14  14          THE COURT:  All right.  So basically she's going

08:48:16  15   to say a billion dollars of sales, 200 million in profits,

08:48:22  16   42 percent of this is apportioned to the invention.

08:48:29  17          And is she going to say something more after

08:48:31  18   that?

08:48:31  19          MR. ANDRE:  Well, yeah.  She's going to give

08:48:34  20   some more calculations as to how she got to all those

08:48:37  21   numbers.

08:48:37  22          THE COURT:  Yeah.  Yeah.  I mean, assuming we

08:48:41  23   get to all that, then she says 42 percent of this is

08:48:43  24   apportioned to the infringing technology.  Then does she say

08:48:47  25   something else like, I don't know, so with the hypothetical

08:48:51 1    negotiation, they would have split this and take 21 percent

08:48:57 2    times 200 million and that would have been the lump sum?

08:49:00 3              MR. ANDRE:  She doesn't say that because that

08:49:01 4    was not in her report.  I mean, that final number is the

08:49:04 5    only thing that's missing at this point, what that number

08:49:07 6    would be.

08:49:08 7              But as Your Honor's very well aware of, a jury

08:49:11 8    can make that final determination.  You don't have to give a

08:49:14 9    percentage, per se.  It's not a requirement to give a

08:49:16 10   percentage rate.  It's traditional.

08:49:19 11             We try to do it with the Uniloc, and they don't

08:49:21 12   like that number.  So the jury is going to have to make a

08:49:25 13   determination based on all the facts that are in.  And the

08:49:28 14   fact will be substantial as to the numbers, the revenue

08:49:35 15   numbers, like I said, the cost of development.

08:49:37 16             THE COURT:  But, you know, the numbers are

08:49:42 17   obviously made up, but essentially that I have an

08:49:46 18   understanding what you plan to do in relation to this is,

08:49:52 19   Here's a big number.  Here's a progress number.  Here's the

08:49:56 20   percentage contribution of the games.  Jury, do what you

08:50:03 21   think is fair.

08:50:04 22             MR. ANDRE:  Yeah.  So the Georgia-Pacific

08:50:07 23   Factors which she's going to go through, they're not a

08:50:09 24   generic Georgia-Pacific.  Georgia-Pacific Factors are used

08:50:11 25   to determine a reasonable royalty.  It's not a reasonable

08:50:14 1    royalty rate.  It's a reasonable royalty.

08:50:15 2         So she's going to go through each one as factors

08:50:18 3    and say, This is where the parties would be.  This is what

08:50:21 4    would be considered, and this would tend to lead to, you

08:50:24 5    know, how the parties would be negotiating at that time.

08:50:27 6         So she's going to go through and do that.  So

08:50:29 7    she's going to give them information that they can make a

08:50:33 8    reasonable royalty calculation based on the numbers that's

08:50:35 9    provided.  And they'll also be provided through other people

08:50:38 10   as well.

08:50:39 11        So that's the revenue-based model.  It's

08:50:41 12   everything, but you know, a percentage.

08:50:47 13        THE COURT:  Okay.  I understand what you're

08:50:48 14   saying there.

08:50:51 15        And so, Mr. Enzminger, I'm not asking you

08:50:59 16   whether you like it or not, but do you understand what he

08:51:02 17   just said?

08:51:02 18        MR. ENZMINGER:  I understand what he just said,

08:51:03 19   and I understand that it's not admissible.

08:51:05 20        THE COURT:  So let's skip that for right now.

08:51:08 21   The per-unit analysis, do you understand the plaintiff's --

08:51:17 22   the per user, sorry, do you understand their theory there?

08:51:22 23        MR. ENZMINGER:  No.  The only per-user royalty

08:51:24 24   that has ever been disclosed to us was excluded and none of

08:51:30 25   these --

08:51:30 1              THE COURT:  Based on Uniloc?

08:51:32 2              MR. ENZMINGER:  Yes.

08:51:33 3              THE COURT:  All right.  So Mr. Andre, what about

08:51:35 4    the per user?  Can you just explain that a little more?

08:51:37 5              MR. ANDRE:  Yeah.  We did a -- this is how we

08:51:45 6    describe to them a reasonable royalty based on the number of

08:51:49 7    unique users of the accused products, and then we gave lot

08:51:54 8    numbers or Bates numbers in Dr. Meyer's report.  And the

08:51:56 9    idea here is that you would look at the number of unique

08:51:59 10   users that are using this.

08:52:01 11             THE COURT:  Right.  There's a million users out

08:52:02 12   there, whatever.

08:52:04 13             MR. ANDRE:  Right.  They pay subscription

08:52:06 14   services.  They pay -- you know, there's the revenue

08:52:08 15   generated from that, and you can look at it as a per user in

08:52:13 16   the revenues.

08:52:14 17             The numbers all come in.  She does the whole

08:52:16 18   analysis, what the per-user numbers look like and how the --

08:52:19 19             THE COURT:  Well, when you say the "per-user

08:52:21 20   numbers" look like, there's a million users.  I understand

08:52:23 21   that's not a number or whatever it is, it's out there.  What

08:52:28 22   other numbers, categories of numbers are we talking about

08:52:31 23   here?

08:52:31 24             MR. ANDRE:  It's the -- the users are

08:52:38 25   subscription based --

08:52:40  1                    THE COURT:  Okay.

08:52:40  2                    MR. ANDRE:  -- so it's not a one-time purchase.

08:52:43  3                    THE COURT:  Right.  They pay, I don't know, $50

08:52:45  4      a year or something?

08:52:46  5                    MR. ANDRE:  Fifty bucks a year or something like

08:52:48  6      that, so it's a little bit different analysis.  The users

08:52:51  7      are made -- there's just more data points that she uses for

08:52:55  8      the Georgia-Pacific factors.

08:52:56  9                    THE COURT:  So what the users are paying, is

08:52:59 10      that essentially how you get to the revenue number?

08:53:03 11                    MR. ANDRE:  The revenue is a combination of the

08:53:05 12      users and units sold, and so it's the total revenue that's

08:53:11 13      generated.  The users are really -- the way I'm thinking

08:53:16 14      about using it, Your Honor, is that without her being able

08:53:18 15      to tie in to a rate, this will be an additional set of

08:53:23 16      information that she'll put into the Georgia-Pacific Factors

08:53:27 17      in which the jury can determine a reasonable royalty.  We've

08:53:33 18      disclosed this in our interrogatory responses and went over

08:53:34 19      this in great detail.

08:53:36 20                    THE COURT:  But, in other words, she's going to

08:53:39 21      tell the jury there's "X" number of units that are sold.

08:53:46 22      There's "X" number of users, unique users who each pay a

08:53:52 23      royalty.  Not a royalty, but pay a licensing fee, or user

08:53:55 24      fee, or whatever it is that they pay of "X" number of

08:53:58 25      dollars per year.

08:54:01  1          And so is she going to say something more

08:54:10  2  numerical after that?

08:54:11  3          MR. ANDRE:  She's not giving an ultimate number.

08:54:14  4  No.  She's just going to give the raw data of all that

08:54:17  5  information that the jury can base their royalty on.

08:54:20  6          THE COURT:  So Mr. Enzminger, do you understand

08:54:22  7  that?

08:54:22  8          MR. ENZMINGER:  Do I understand how that can be

08:54:26  9  presented to the jury?  No.

08:54:28 10          THE COURT:  No.  It's nice to ask your own

08:54:33 11  question and answer it, but what I have in mind more was:

08:54:36 12  Do you understand what Mr. Andre says he wants to do?

08:54:40 13          MR. ENZMINGER:  I do not understand what

08:54:42 14  Mr. Andre --

08:54:42 15          THE COURT:  Well, what don't you understand?

08:54:44 16          MR. ENZMINGER:  I don't understand how he can

08:54:46 17  determine a per-user number on subscription services when

08:54:54 18  subscription services are not the accused product.

08:54:58 19          THE COURT:  Okay.  But that's not a question of

08:55:01 20  understanding what he just said, or maybe it is.  I don't

08:55:05 21  know.

08:55:05 22          MR. ENZMINGER:  The problem, Your Honor, is what

08:55:07 23  he just said is not tied to this case.

08:55:11 24          THE COURT:  Well, so here's the thing:  So like

08:55:13 25  I said, I can't decide this this morning, but what I can do

08:55:20  1    is have you -- and I tend to think that it makes sense for

08:55:25  2    you to go first, you know, to write something by a date that

08:55:32  3    we'll pick by like, you know, Monday explaining whatever all

08:55:36  4    the problems are with this.  And that would give plaintiff

08:55:42  5    then a chance, if you say, you know, you never disclosed

08:55:47  6    before or whatever, to say, Yes, it is.  Here it is.

08:55:52  7             And you know, and then after they do that by

08:55:56  8    like, say, Wednesday, then on Thursday, you can submit

08:56:01  9    something saying, you know, No.  You know, whatever.  Then

08:56:10 10    we'll figure this out on Friday, and we'll know what we have

08:56:14 11    on Monday.

08:56:16 12             MR. ENZMINGER:  Your Honor, obviously, we will

08:56:20 13    do what the Court concludes we should do, but let me make a

08:56:26 14    couple of observations.

08:56:27 15             THE COURT:  Okay.

08:56:28 16             MR. ENZMINGER:  The theories that Mr. Andre just

08:56:32 17    talked about are expressly excluded by Uniloc versus

08:56:39 18    Microsoft and by Exmark versus Briggs which were cited in

08:56:42 19    our papers.

08:56:43 20             THE COURT:  When you say "cited" in your

08:56:44 21    papers --

08:56:45 22             MR. ENZMINGER:  Sorry.  Cited in the Motion to

08:56:48 23    Exclude that was resolved yesterday.  But you cannot come in

08:56:51 24    to Court and just give the jury a Georgia-Pacific analysis

08:56:55 25    that isn't tethered to a rate that you are advancing.

08:57:00 1          What the Federal Circuit said earlier this year

08:57:03 2   is referring to an expert.  Nowhere in her report, however,

08:57:07 3   did she tie the relevant Georgia-Pacific Factors to the

08:57:09 4   five-percent reasonable royalty or explain how she

08:57:12 5   calculated the rate using expert testimony on damages to the

08:57:15 6   facts of the case.  If the patentee fails to tie the theory

08:57:18 7   of the facts to the case, her testimony must be excluded.

08:57:22 8   You can't do a generic Georgia-Pacific analysis and tell the

08:57:27 9   jury, Just think about it.

08:57:27 10          THE COURT:  Well, so --

08:57:29 11          MR. ENZMINGER:  Can I --

08:57:30 12          THE COURT:  No.  I'm --

08:57:31 13          MR. ENZMINGER:  Can I answer your question?  I'm

08:57:32 14   sorry.  I apologize.  I went off and didn't answer.

08:57:34 15          THE COURT:  No.  No.  No.  I was going to say,

08:57:36 16   so I'm not going to decide the legal issues here this

08:57:40 17   morning, no matter how impassioned your plea is that, you

08:57:44 18   know, they're violating Federal Circuit law.  I read the

08:57:48 19   papers for the Order we did yesterday or the day before,

08:57:53 20   whenever we did that.  Maybe you cited Exmark in there, but

08:58:00 21   I didn't need that to decide what I decided.

08:58:03 22          MR. ENZMINGER:  Right.

08:58:03 23          THE COURT:  So I didn't read that, so it's not

08:58:05 24   in the forefront of my brain.  So go ahead.  You know, it's

08:58:10 25   useful.

08:58:11  1          I'm not saying don't talk.  I'm just saying be

08:58:14  2    mindful of what is in the realm of possibility this morning.

08:58:18  3          MR. ENZMINGER:  Right.  The other aspect with

08:58:20  4    respect to the process of having the defense go first and

08:58:25  5    try to shoot down what we don't know --

08:58:29  6          THE COURT:  Well, and I'm sorry.  That's the

08:58:31  7    reason why I'm trying to get Mr. Andre to put on the record

08:58:33  8    what it is, because here's the thing:  If I say to them, you

08:58:39  9    go first, he's going to write it up.  Maybe he'll write it

08:58:44 10    up a little, you know.  He'll have a little more detail, but

08:58:48 11    you're going to come back and say, you know, You didn't

08:58:52 12    disclose this.  You didn't do this.  You know, we're not

08:58:57 13    going to get to the heart of the issue.

08:59:00 14          It's going to require an extra round of

08:59:03 15    briefing, I think, because you're going to end up with them

08:59:06 16    going last.  And I don't know, I tend to think that it ought

08:59:11 17    to be on you to try to keep it out, not on them, under the

08:59:15 18    circumstances where we are right now, to, you know, tie up

08:59:23 19    all the loose ends that they could tie up to get this in.

08:59:28 20    But go ahead.

08:59:29 21          MR. ENZMINGER:  Well, I don't mind going first

08:59:32 22    and last, but I do mind not knowing what their theory is.

08:59:38 23    We are ten days away from trial.  We still have never gotten

08:59:42 24    their Rule 26 calculation of damages.  We don't know --

08:59:45 25          THE COURT:  Well, it sounds like you're not

08:59:47  1    going to.

08:59:48  2                MR. ENZMINGER:  Yeah.  Well, I don't know how

08:59:49  3    you would do it given these theories, but it is a

08:59:52  4    requirement of the Federal Rules of Civil Procedure.  We

08:59:56  5    moved to compel on our interrogatory.  We won.

08:59:59  6                They objected.  They brought it to this Court.

09:00:02  7    Their objection was overruled.

09:00:03  8                They gave us this interrogatory response which

09:00:06  9    has really no information in it other than, We're going to

09:00:08 10    put in on whatever we can.  They filed expert reports that

09:00:14 11    came up with a completely different theory that was not

09:00:17 12    disclosed in their reports.  We moved to strike that.

09:00:19 13                I mean, it wasn't disclosure in their

09:00:22 14    interrogatories.  We moved to strike that.  The Special

09:00:24 15    Master allowed it because based on Uniloc.  And one of the

09:00:26 16    documents cited in the interrogatory response was a Uniloc

09:00:30 17    license which, by the way, wasn't the basis for the expert

09:00:33 18    report any way.  But, okay, we move on.

09:00:35 19                The Uniloc report gets stricken.  They go back

09:00:39 20    to their interrogatory.  There's nothing in there in a

09:00:42 21    damages case.  Everything they say they're going to do got

09:00:45 22    stricken yesterday.

09:00:46 23                And now we're in a position, ten days from

09:00:48 24    trial, where they are tossing out three new theories.  Now,

09:00:53 25    what I understand, we can deal with the cost-savings

09:00:57 1   methodology if what he is saying is that Dr. Valerdi is the

09:01:01 2   cost-savings analysis.  If that's their position, we are

09:01:05 3   ready to respond, and we can.

09:01:07 4            THE COURT:  Is that your position, Mr. Andre?

09:01:10 5            MR. ANDRE:  He is the principal.  He doesn't

09:01:15 6   give the ultimate.  It's Dr. Valerdi in combination with Dr.

09:01:18 7   Meyer and some other testimony we'll be eliciting which

09:01:22 8   we've given them.  We've cited to them over and over again.

09:01:26 9            MR. ENZMINGER:  Can I get him to tell us what it

09:01:27 10  is now because I don't know what testimony he's talking

09:01:31 11  about.  There is no -- no witness has testified about cost

09:01:35 12  savings.  There is one line in Dr. Dr. Valerdi's report that

09:01:39 13  says the word cost savings, and then he goes off and does a

09:01:43 14  different analysis which he and Dr. Meyer both admit is not

09:01:46 15  a cost-savings analysis.

09:01:48 16           So if there is other testimony, we need to hear

09:01:51 17  it.  I need to know.  What I'm trying to understand is their

09:01:57 18  cost-savings analysis.

09:01:58 19           On the revenue-based model and the per unit, the

09:02:01 20  revenue based, I understand what he said.  I do not

09:02:04 21  understand what he said about per-unit damage possibility

09:02:07 22  because he talked about subscription services which is not

09:02:10 23  at all -- which is not even in this case.

09:02:12 24           And I don't understand what he's talking about

09:02:15 25  with apportionment because Dr. Meyer did no apportionment

09:02:19  1   whatsoever for World of Warcraft.  She's assuming

09:02:22  2   100 percent of World of Warcraft is attributable to the

09:02:26  3   patented technology.  No apportionment at all.

09:02:28  4         She did no apportionment for Destiny.  What she

09:02:31  5   says is that the Destiny game that Bungie makes, its

09:02:34  6   apportionment would be the same as Call of Duty which is

09:02:39  7   there's -- you know, again, that's a cross-examination

09:02:42  8   thought, I guess.  But the per-unit possibility, I have no

09:02:46  9   idea what they're talking about because subscription

09:02:49 10   services are not accused products.  And I don't know how you

09:02:54 11   get from that to any particular number any way.

09:03:02 12         THE COURT:  Anything to say about that,

09:03:04 13   Mr. Andre?

09:03:04 14         MR. ANDRE:  Your Honor, we can go back to the

09:03:13 15   he-said-he-said routine over and over again.  I'm looking at

09:03:16 16   interrogatory responses from 2017 in which we disclosed the

09:03:20 17   evidence, and the theories, and expert reports.

09:03:23 18         With respect to cost savings, we have let them

09:03:27 19   know from day one, it's going to be a cost-savings damages

09:03:30 20   model.  We provided them with expert reports that discuss

09:03:33 21   the cost savings.

09:03:34 22         You specifically said that Dr. Dr. Valerdi's

09:03:37 23   cost savings is in.  They moved on Daubert and in limine to

09:03:43 24   exclude it and or -- it was Daubert actually.  You said,

09:03:46 25   It's in.  They can cross-examine.  That sounds like it's

09:03:49   1    good cross-examination.

09:03:50   2              They feel like they can get Dr. Valerdi on his

09:03:55   3    basis.  Let them do so.  I don't think they will, but we'll

09:03:58   4    let them have their shot at him.

09:04:00   5              As far as Mr. Enzminger keeps talking very

09:04:04   6    passionately about the Georgia-Pacific Factors and how it's

09:04:07   7    not tied to a rate.  Well, as we know, Dr. Meyer cannot give

09:04:10   8    a rate at this point because she did not disclose one.  Her

09:04:13   9    Georgia-Pacific analysis is for a reasonable royalty, and

09:04:16  10    her analysis will be tied to the defendant's and the

09:04:19  11    plaintiff's hypothetical negotiation.

09:04:22  12              As far as the apportionment goes, Your Honor

09:04:26  13    told Dr. Meyer that she needed to apportion the World of

09:04:33  14    Warcraft, and she did that in accordance with the way she

09:04:35  15    did the Call of Duty and Destiny games as well.  So there

09:04:40  16    are apportionment on all three games.

09:04:42  17              In fact, I just got passed a note that Exhibit 5

09:04:44  18    to Dr. Meyer's opening expert report is entitled Cost

09:04:51  19    Savings Some Calculations.  So, you know, I don't know.  I

09:04:53  20    mean, I know Mr. Enzminger is very impassioned about this

09:04:56  21    damage issue.  They'd love to get out of the case, but as

09:04:59  22    Your Honor pointed out, by statute, we're entitled to a

09:05:03  23    reasonable royalty.

09:05:05  24              THE COURT:  Right.  I also pointed out with

09:05:08  25    admissible evidence.

09:05:09   1        MR. ANDRE:  Yeah, exactly, admissible evidence.

09:05:11   2   In this case, we provided what that is.  You know,

09:05:13   3   Dr. Valerdi -- Dr. Meyer is going to give all the -- she has

09:05:18   4   charts, and charts, and charts of revenue numbers and all

09:05:21   5   sorts of different calculations.  That's all admissible

09:05:24   6   evidence.  You already ruled that that's in.  So that's all

09:05:27   7   going to be in the case which a jury can determine a

09:05:30   8   reasonable royalty.

09:05:30   9        THE COURT:  I think actually to be more precise

09:05:34  10   isn't what I ruled is it's not excluded under Daubert?

09:05:37  11        MR. ANDRE:  That's correct.  I believe that was

09:05:40  12   based on the Daubert ruling.  That's correct.

09:05:42  13        THE COURT:  Okay.  That's not necessarily the

09:05:46  14   same thing as it's admissible evidence.

09:05:48  15        MR. ANDRE:  Yeah, that's true.  Under Daubert,

09:05:52  16   her methodology is sound and as a gatekeeper, you've

09:05:55  17   exercised that control.  I will acquiesce to that point.

09:06:01  18        But as far as the admissibility of the evidence,

09:06:04  19   they are saying that the revenues -- they're not saying the

09:06:07  20   revenues are not admissible.  They clearly are.  I mean --

09:06:11  21        MR. ENZMINGER:  We are saying that --

09:06:12  22        THE COURT:  Well --

09:06:14  23        MR. ENZMINGER:  -- they have to be tied to

09:06:16  24   something.  Uniloc says you cannot just throw revenues at

09:06:18  25   the jury and let them make a decision.

09:06:21  1                    MR. ANDRE:  But --

09:06:22  2                    THE COURT:  It would be a strange thing if you

09:06:25  3       can't do revenues when you should be apportioning, but you

09:06:36  4       could -- I mean, that is a concern.

09:06:43  5                    MR. ANDRE:  In order to get to the

09:06:45  6       apportionment, I mean, she could do it blind.  She can say,

09:06:48  7       I looked at the total revenues.  I did an apportionment as

09:06:51  8       to what the actual infringing technology is and give that

09:06:54  9       number and not give the total revenue.  But that's -- they

09:06:57 10       can do the math.

09:06:58 11                    THE COURT:  Yeah.  No.  They can do the math.

09:07:01 12       They can do the math.

09:07:03 13                    MR. ANDRE:  And with respect to Dr. Valerdi, he

09:07:09 14       is giving an expert opinion as to what it would cost to

09:07:13 15       build a non-infringing alternative.  What it would cost, and

09:07:16 16       this is how cost savings is done.  If you're not going to

09:07:19 17       use our technology, and you have to build a non-infringing

09:07:23 18       alternative, how much would it cost?

09:07:25 19                    And then you'd factor out various, you know,

09:07:29 20       issues like he does, and you give an approximation.  And

09:07:34 21       this is a standard methodology used by the Department of

09:07:38 22       Defense.  It's used by most of the largest companies in the

09:07:43 23       world.  Like 60 percent of the S&P 500 or whatever it is

09:07:50 24       used this methodology.  So this is how they calculate an

09:07:53 25       estimation of what it would cost to build software, and

09:07:57  1    that's what he's going to testify to.

09:07:58  2              So you've got Dr. Valerdi who's going to get up

09:08:01  3    there and say if you're going to build a non-infringing --

09:08:03  4    and I'll use, you know, consortium-based patents and you

09:08:06  5    have to get up and build a new system, this is how much it's

09:08:09  6    going to cost.

09:08:11  7              Now, you can use that as a basis for how much

09:08:15  8    did -- you know, how much money would they save?  What is a

09:08:19  9    cost savings of not having to do that, take a license?  And

09:08:21 10    there are calculations.  You can do it.

09:08:24 11              And Dr. Valerdi, you know, the $7 billion number

09:08:27 12    is out there, and it's pretty high.  And Your Honor

09:08:30 13    mentioned that in your Order.  And let me be very clear

09:08:37 14    about this and just so we don't, you know, get too cute.  He

09:08:42 15    calculates each game, how much it costs for each game.

09:08:46 16              And if you were to get a finding that you

09:08:51 17    developed, you know, the non-infringing alternative for one

09:08:54 18    game, you wouldn't have to keep repeating it four times.

09:08:57 19    You would get the benefit of redesigning it one time.

09:09:02 20              So I just want to be very clear.  Dr. Valerdi is

09:09:04 21    going to get up there and say these guys -- you know,

09:09:06 22    there's a $7 billion cost savings.  That's not his

09:09:09 23    testimony.

09:09:11 24              When you add up all those numbers, it adds up to

09:09:13 25    the $7 billion number.  But what he'll testify to is if you

09:09:17 1    were to do the games individually, they would cost 2 million

09:09:20 2    to make a non-infringing alternative for this, and 1 million

09:09:25 3    for this, and 2.6, and he kind of goes through his

09:09:27 4    methodology.  So he gives the information in great detail

09:09:32 5    and how that's done.

09:09:34 6              And like I said, they can challenge him on

09:09:36 7    cross-examination.  But a jury will have that, and they can

09:09:38 8    make a determination based on that testimony.

09:09:40 9              So I think what Mr. Enzminger keeps trying to

09:09:46 10   argue, he's trying to renew some Dauberts here and some

09:09:49 11   other issues on the fly without the benefit of briefing.

09:09:53 12   We're happy to have the Court weigh in on where the damages

09:09:57 13   are next week before Friday, but you know, because there's a

09:10:02 14   few things we'd like to raise as well.  So I think that

09:10:05 15   makes sense.

09:10:05 16             THE COURT:  All right.

09:10:06 17             MR. ENZMINGER:  May I address the schedule --

09:10:08 18             THE COURT:  Sure.

09:10:09 19             MR. ENZMINGER:  -- and one other issue?  The

09:10:12 20   proposed testimony from Dr. Valerdi that Mr. Andre just

09:10:16 21   mentioned is not in his report.  All Dr. Valerdi does is

09:10:20 22   take an input for the estimated number of lines of code for

09:10:24 23   redesigning the entire game and puts it into a computer

09:10:28 24   model, and it spits out a result, and he reports that

09:10:31 25   result.

09:10:31 1        He does not tie his analysis in any way to the

09:10:34 2   patented technology.  So he does not say if you had to not

09:10:38 3   use the technology, you would have to write this many lines

09:10:41 4   of code.

09:10:42 5        Dr. Meyer in her deposition said that was not a

09:10:48 6   cost-savings analysis.  She said, as Mr. Valerdi has

09:10:51 7   indicated with his analysis, it would be very expensive to

09:10:54 8   undertake.  There is no basis upon which to do a cost

09:10:57 9   analysis or cost-savings analysis with regards to something

09:11:00 10  that would not be feasible.  Their expert's testimony is

09:11:05 11  it's not a cost-savings analysis.

09:11:08 12       With respect to the schedule, this case has been

09:11:10 13  going on since 2015.  We're ten days away from trial today.

09:11:14 14  We think that having a round of briefing next week that

09:11:18 15  doesn't tell us until the Friday before trial what their

09:11:21 16  damages case is is a little unreasonable for the defendants,

09:11:24 17  given that we haven't been able to get them to comply with

09:11:27 18  discovery obligations for three years.

09:11:29 19       We would like to propose Monday, Tuesday,

09:11:32 20  Wednesday for the briefing schedule.  We would submit

09:11:35 21  something on Monday.  They, obviously, know their damages

09:11:38 22  case, even if they don't want to tell us.  They can do it on

09:11:43 23  Tuesday.  They can do it now, and they'll be ready for it.

09:11:45 24  They know what we're going to say on Monday, and then

09:11:48 25  they'll respond on Wednesday.

09:11:50  1          THE COURT:  I'm sorry.  I lost track of the

09:11:52  2  schedule there because -- what is the schedule you're

09:11:57  3  proposing?

09:11:57  4          MR. ENZMINGER:  What we're proposing is on

09:11:59  5  Monday, we will file with the Court our brief on why the

09:12:05  6  three theories that Mr. Andre identified.

09:12:08  7          THE COURT:  Right.  Right.  I got that.  Monday,

09:12:10  8  you.  Yeah.

09:12:11  9          MR. ENZMINGER:  And then they can respond with

09:12:13 10  specific citations to where they disclosed the theory, the

09:12:16 11  evidence upon which they intend to rely in support of the

09:12:22 12  theory.  And then on Wednesday, we will respond with our

09:12:27 13  reply on whether that is admissible evidence.

09:12:32 14          THE COURT:  All right.  I understand that

09:12:36 15  proposal.  It's not unreasonable.

09:12:39 16          Mr. Andre, can you live with that?

09:12:40 17          MR. ANDRE:  Sure.

09:12:41 18          THE COURT:  Okay.  All right.  So one other

09:12:44 19  thing, so just to be clear here, so you'll file something by

09:12:55 20  six o'clock on Monday.

09:12:56 21          MR. ENZMINGER:  Yes.

09:12:57 22          THE COURT:  You at six o'clock on Tuesday.  And

09:13:00 23  then your reply, six o'clock on Wednesday.

09:13:03 24          MR. ENZMINGER:  Exactly.

09:13:04 25          THE COURT:  Okay.  All right.  That would be

09:13:06  1    good.

09:13:07  2              Okay.  Let's talk about these.

09:13:11  3              Is there anything else you want to talk about?

09:13:14  4    Otherwise, what I propose is we start talking about these

09:13:17  5    motions in limine.

09:13:19  6              MR. ANDRE:  Just one thing, Your Honor.  Based

09:13:20  7    on the Order that came out the day before yesterday, there

09:13:24  8    is a little bit of a dichotomy in the Court's previous

09:13:24  9    Order.

09:13:32 10              As you remember, the defendants moved to exclude

09:13:38 11    revenues based on the Sony game playing based on publisher

09:13:42 12    agreements that they had with Sony, and Sony had taken a

09:13:45 13    licensing patent.

09:13:46 14              THE COURT:  Yeah.  Yeah.  Yeah.

09:13:47 15              MR. ANDRE:  This is a couple years ago.

09:13:48 16              THE COURT:  We were talking about the Order the

09:13:51 17    other day, what we were calling the Microsoft license.

09:13:54 18              MR. ANDRE:  Exactly.  Exactly.

09:13:55 19              THE COURT:  Yes.

09:13:56 20              MR. ANDRE:  So in one sense, the publisher

09:13:59 21    agreement that they have with Sony was used as a weapon to

09:14:03 22    take Sony out of the play.  They had a license -- this

09:14:08 23    publisher agreement with them, and it was relevant for that.

09:14:10 24              And we can raise this in our briefing Tuesday.

09:14:13 25    We'd like to re-raise the fact that the Microsoft publisher

09:14:17   1   agreement, you ruled it was not relevant in this case, and

09:14:20   2   so our position is there's a little bit of dichotomy if it's

09:14:24   3   kind of equal dignity or equal justice here.  You know, if

09:14:28   4   it's good for them if there's a publisher agreement, it's

09:14:29   5   good enough to get half of the damages out on the

09:14:32   6   PlayStation games, the publisher agreement should be

09:14:34   7   relevant to look at it from our point of view as well.

09:14:36   8          So we'd like to put that in our Tuesday

09:14:39   9   briefing.  I don't know if you'd want it in a motion for

09:14:41  10   reconsideration or how you want us to raise it.  We just

09:14:43  11   want to reserve the record, if nothing else.

09:14:46  12          THE COURT:  Well, you reserved the record.  I

09:14:48  13   mean, I excluded it.  It's something you said before.

09:14:58  14          You know, honestly, I don't think, you know,

09:15:08  15   remembering what I did about Sony a couple years ago, that

09:15:13  16   wasn't about damages.  This is about damages.

09:15:16  17          So they are two different things.  And so unless

09:15:21  18   you really want to like write more briefing on the subject,

09:15:25  19   I would just say you made your objection.  But if you really

09:15:33  20   want to write something more, I don't mind you writing more.

09:15:36  21          MR. ANDRE:  If you don't mind, Your Honor, we

09:15:38  22   just want to put something in, just something short.

09:15:41  23          THE COURT:  All right.  You know, when I'm doing

09:15:44  24   well, I do not mind people preserving the record.  So go

09:15:48  25   ahead.

09:15:48  1          MR. ANDRE:  Okay.

09:15:50  2          THE COURT:  All right.  Anything else?

09:15:52  3          MR. ANDRE:  That's all we have.  We'll go to the

09:15:54  4   motions in limine.

09:15:55  5          THE COURT:  Anything else from your side,

09:15:57  6   Mr. Enzminger?

09:15:58  7          MR. ENZMINGER:  No, Your Honor.

09:15:59  8          THE COURT:  No.  Okay.  So the motions in

09:16:01  9   limine.  So I gather that the way this case is now set up is

09:16:11 10   we've got infringement.  We've got willfulness.  We've got

09:16:15 11   damages, and we've got lack of written description.

09:16:26 12          MR. WEBB:  Yes.

09:16:27 13          THE COURT:  That's it?  Maybe the record won't

09:16:30 14   catch the way my voice asked that question.  So do I have

09:16:34 15   the entire scope of what we think trial is about now?

09:16:39 16          MR. ENZMINGER:  Well, we also have, depending on

09:16:42 17   which of the expert theories that they talk about, there is

09:16:47 18   also an ensnarement issue with respect to doctrine of

09:16:51 19   equivalents.

09:16:51 20          THE COURT:  I'm sorry.  A what issue?  Doctrine

09:16:55 21   of Equivalents?

09:16:55 22          MR. ENZMINGER:  Yeah, attempting to read --

09:16:59 23          THE COURT:  Yeah.  Yeah.  So, but you're not

09:17:05 24   going to present the ensnarement to the jury; right?

09:17:09 25          MR. ENZMINGER:  No, Your Honor.

09:17:09 1                    THE COURT:  Okay.  All right.

09:17:12 2            So let's just go through these motions in

09:17:16 3    limine.  It seemed to me like maybe some of them had been

09:17:21 4    mooted or changed by the passage of time.

09:17:26 5            So the first Acceleration Bay one, which is

09:17:29 6    called to preclude undisclosed fact and expert testimony,

09:17:34 7    three people are mentioned.

09:17:36 8            The first one is Pat Griffith.  I take it, to

09:17:40 9    the extent that the motion is to exclude the expert from

09:17:47 10   Mr. Griffith on World of Warcraft and Destiny, that's moot

09:17:53 11   because the expert doesn't rely on Mr. Griffith for that;

09:17:57 12   right?

09:18:01 13           MR. FRANKEL:  Well, Activision has now

09:18:03 14   confirmed, Your Honor, that they will not use Mr. Griffith

09:18:06 15   to provide a non-infringing alternative for those two games,

09:18:09 16   so --

09:18:10 17           THE COURT:  So moot.

09:18:11 18           MR. FRANKEL:  -- moot, yes.

09:18:13 19           THE COURT:  So that leaves Call of Duty.  And so

09:18:16 20   what I gathered from this is Mr. Griffith -- then the

09:18:24 21   plaintiff's primary objection is that Mr. Griffith's

09:18:31 22   disclosure as a witness was that he was knowledgeable about

09:18:33 23   Call of Duty, but didn't say he was knowledgeable about

09:18:36 24   non-infringing alternatives or something like that.

09:18:40 25           MR. FRANKEL:  That's correct, Your Honor.

09:18:42  1    Activision is now saying that Mr. Griffith will testify, and

09:18:47  2    he's a fact witness, not an expert witness, that Call of

09:18:52  3    Duty can be rendered non-infringing in a matter of minutes

09:18:56  4    by minor modifications.

09:18:58  5                Now, first of all, that appears to be expert

09:19:02  6    opinion.

09:19:02  7                THE COURT:  Yeah.  So I don't know whether -- so

09:19:05  8    presumably what he'd really say is, you know, there's a

09:19:10  9    gizmo here, and if I change it to be that, I could do that

09:19:14 10    in five minutes.  Somebody else will have to say that well,

09:19:18 11    it will be non-infringing, right, because he doesn't know

09:19:21 12    what's infringing and what's not infringing.

09:19:23 13                MR. FRANKEL:  Well, that's exactly the problem.

09:19:25 14    And the common theme between these three witnesses is a

09:19:29 15    discovery shell game.  We still don't know to this minute

09:19:32 16    what this supposed modification is that can be accomplished

09:19:37 17    in minutes.

09:19:38 18                During fact discovery, we didn't get any

09:19:41 19    disclosure that Mr. Griffith was going to testify about

09:19:44 20    non-infringing alternatives.  We served an interrogatory

09:19:47 21    where we asked Activision to disclose any non-infringing

09:19:51 22    alternatives that they were going to use, and they never

09:19:53 23    disclosed that Mr. Griffith had some five-minute change.

09:19:58 24                THE COURT:  Okay.  So hold on a minute on that.

09:19:59 25    So what is the response to that?

09:20:06  1            MR. TOMASULO:  Your Honor, first of all, they

09:20:07  2    deposed Mr. Griffith for seven hours.  They never asked him

09:20:09  3    about any of this.  They never --

09:20:10  4            THE COURT:  Well, so but --

09:20:12  5            MR. TOMASULO:  I'm sorry.

09:20:13  6            THE COURT:  -- they're not going to ask them

09:20:15  7    about things that haven't been raised up for issue, unless

09:20:19  8    they're stupid.  You know, so what Mr. Frankel is saying is

09:20:27  9    you hadn't put them on notice when you should have that

09:20:32 10    Mr. Griffith would be relevant to this topic.

09:20:39 11            MR. TOMASULO:  So I would disagree with that.

09:20:40 12    First of all, they took Mr. Griffith's deposition before

09:20:43 13    they served this interrogatory.  The burden on the plaintiff

09:20:45 14    is on the plaintiff, as with all damages issues, to prove

09:20:48 15    the absence of non-infringing alternatives.  That's their

09:20:51 16    burden.

09:20:52 17            We never knew they were saying that there were

09:20:54 18    none until they served this interrogatory.  They never asked

09:20:56 19    to re-depose Mr. Griffith.  We disclosed.

09:20:58 20            THE COURT:  So, wait.  So they served

09:21:00 21    interrogatories.

09:21:01 22            Did you answer and say, Oh, well, Mr. Griffith

09:21:04 23    is in on that point?

09:21:08 24            MR. TOMASULO:  We gave dozens of non-infringing

09:21:11 25    alternatives.

38

09:21:12  1          THE COURT:  Well, I'm only interested in one.

09:21:14  2          MR. TOMASULO:  Yeah.  We said the game could be

09:21:16  3  modified in a matter of minutes.  We said prior versions of

09:21:19  4  the game.  We said many things that could be done.  You have

09:21:21  5  to have this architecture where you have exactly

09:21:24  6  M-connection.  So we disclosed that the game could be --

09:21:26  7          THE COURT:  So --

09:21:27  8          MR. TOMASULO:  I'm sorry.  Go ahead.

09:21:30  9          THE COURT:  So how were they supposed to know

09:21:32 10  that Mr. Griffith is the person who would back up this?  You

09:21:35 11  know, we gave them a slew of non-infringing alternatives at

09:21:39 12  a high level of generality is essentially what you're

09:21:43 13  saying.

09:21:43 14          MR. TOMASULO:  Well, we disclose the game could

09:21:45 15  be modified.  He was disclosed as a witness for all things

09:21:48 16  with respect to the game, and they never asked that it was

09:21:51 17  disclosed in the expert report.  They never asked for his

09:21:54 18  deposition again.

09:21:55 19          I mean, this has all been disclosed.  The idea

09:21:58 20  that there were no non-infringing alternatives or that the

09:22:01 21  game couldn't be easily modified was disclosed.  Well, who

09:22:04 22  would modify the game?  One of the engineers.  I mean, we

09:22:07 23  said the game could be easily modified.  It could return to

09:22:09 24  a prior configuration.

09:22:11 25          THE COURT:  So what is this easy modification?

09:22:13  1          MR. TOMASULO:  Well, so right now, for instance,

09:22:16  2    their claim depends on the patent, for instance.  But they

09:22:19  3    claim that you have this M-regular configuration where you

09:22:25  4    have to relay voice data through the peers.  You could make

09:22:31  5    all the voice data go through the server, for instance.

09:22:34  6          I mean, it's a very narrow patent.  There's many

09:22:37  7    ways to modify it.  They claim that the infringement comes

09:22:40  8    because you relay data from one pier to another which isn't

09:22:45  9    what the patent claims, in any event, but that's one example

09:22:48 10    of an alternative.  It would just run all the voice data

09:22:51 11    through the server or through a single pier.

09:22:56 12          I mean, the information was disclosed to them.

09:22:58 13    They never asked to take -- they laid in wait here.  They

09:23:01 14    didn't say, Wait a minute.  We'd like to depose Griffith

09:23:04 15    again.  They got this report from Lawton last fall.

09:23:09 16          THE COURT:  All right.  So what about that,

09:23:13 17    Mr. Frankel?  You got a report last fall that had this

09:23:16 18    footnote or whatever it was exactly.

09:23:21 19          Is this, the briefing here, the first time this

09:23:24 20    has come up as to, We've been backstabbed?

09:23:28 21          MR. FRANKEL:  Well, Your Honor, I took

09:23:30 22    Ms. Lawton's deposition, and I asked her to explain the

09:23:33 23    supposed non-infringing alternative that could be done in

09:23:37 24    minutes and would involve completely restructuring the

09:23:40 25    architecture of the game, and she said, I have no idea.  You

09:23:43 1    have to ask Mr. Griffith.  I'm not a technical person.  I

09:23:46 2    don't know.

09:23:46 3            THE COURT:  Okay.  So presumably you took her

09:23:48 4    deposition sometime in 2017?

09:23:50 5            MR. FRANKEL:  We took her deposition in 2018.

09:23:53 6            THE COURT:  All right.  When?

09:23:54 7            MR. FRANKEL:  I believe it was in January.

09:23:56 8            THE COURT:  Okay.  So when have you first raised

09:24:03 9    this as an issue?

09:24:05 10           MR. FRANKEL:  We have objected to the use of

09:24:09 11   Mr. Griffith and the other fact witnesses that we'll talk

09:24:12 12   about in early 2018.

09:24:15 13           THE COURT:  Okay.  So when you were doing the

09:24:17 14   prior version of this Pretrial Order?

09:24:19 15           MR. FRANKEL:  That's correct, if not earlier.

09:24:22 16   And just to be clear, the interrogatory response counsel is

09:24:27 17   referring to, it does not list dozens of non-infringing

09:24:31 18   alternatives, and all that it says is it would be possible

09:24:34 19   to modify within minutes.  And there's no disclosure of

09:24:40 20   that.

09:24:41 21           The experts are just saying, Well, there's this

09:24:44 22   fact witness.  I mean, counsel's suggestion seems to be when

09:24:47 23   we got this vague interrogatory, that we did complain about

09:24:50 24   as having no substance, that we should have re-deposed every

09:24:54 25   fact witness in the case just to see if some of them could

09:24:58 1   provide insight into this issue.

09:25:01 2              MR. TOMASULO:  May I respond?

09:25:02 3              MR. FRANKEL:  Their experts have given opinions

09:25:05 4   in their reports about non-infringing alternatives.  We

09:25:09 5   don't agree.

09:25:09 6              Our experts have provided their responses.  If

09:25:12 7   their experts want to give their own opinions about

09:25:15 8   non-infringing alternatives, that's fairly in the case.  But

09:25:19 9   to bring a fact witness in as a quasi who's never been

09:25:24 10  offered as an expert, didn't provide any opinions or

09:25:26 11  reports, we still don't understand.

09:25:28 12             This is the first time I'm hearing about the

09:25:30 13  basis for this non-infringing alternative, and we're a week

09:25:34 14  out from trial.  It's very prejudicial, and it's contrary to

09:25:37 15  the rules of discovery.  We complained about this multiple

09:25:40 16  times.

09:25:41 17             THE COURT:  Well, you say you "complained about

09:25:44 18  this multiple times," that was before January of 2018.

09:25:54 19             MR. FRANKEL:  That's correct.  We complained

09:25:56 20  about the lack of detail in the interrogatory response.

09:26:00 21             THE COURT:  And it got resolved somehow; right?

09:26:06 22             MR. TOMASULO:  May I tell you how it got

09:26:08 23  resolved, Your Honor?

09:26:09 24             THE COURT:  Sure.  Go ahead.

09:26:10 25             MR. TOMASULO:  Well, the Special Master denied

09:26:12  1    their motion to compel because their infringement

09:26:13  2    contentions were so vague.  He thought that our responses

09:26:16  3    were more than sufficient.

09:26:17  4            So they moved to compel on this very issue and

09:26:19  5    lost.  That's how it was resolved.

09:26:21  6            MR. FRANKEL:  That's an inaccurate summary of

09:26:25  7    the history.  Counsel loves to talk about these motions to

09:26:28  8    compel our infringement contentions.  The Special Master has

09:26:33  9    approved our infringement contentions, approved our expert

09:26:36 10    reports.  Denied the motion to strike our expert reports,

09:26:40 11    denied the motion to strike our final infringement

09:26:43 12    contentions.

09:26:44 13            There's been a failure to identify Mr. Griffith

09:26:47 14    as having knowledge of non-infringing alternatives, and he

09:26:50 15    shouldn't be permitted to present them for the first time

09:26:53 16    live during trial.

09:26:54 17            THE COURT:  So I do have a question.

09:26:58 18    Mr. Frankel, don't go away.

09:27:00 19            So one thing Mr. Frankel said earlier was

09:27:02 20    something about expert testimony, that's different.  These

09:27:07 21    technical experts, do any of them say, for lack of a better

09:27:14 22    word, it's easy to engineer around any problems?

09:27:20 23            MR. TOMASULO:  Yes, they do.

09:27:21 24            THE COURT:  So if you don't have Mr. Griffith as

09:27:33 25    support for, I believe, the damages expert, for

09:27:43  1    Ms. Lawton, does that actually make any difference?

09:27:45  2           MR. TOMASULO:  Well, it does, Your Honor,

09:27:47  3    because the question that the plaintiff, I think,

09:27:51  4    incorrectly phrased the standard for non-infringing

09:27:55  5    alternatives, but their belief of the way they've advocated

09:27:58  6    the standard is that what changes could be made to that game

09:28:03  7    to make it non-infringing, not just does there exist some

09:28:06  8    non-infringing alternative somewhere.  And so they've tried

09:28:09  9    to make it a very narrow standard that makes his testimony

09:28:12 10    much more relevant.

09:28:13 11           They're not satisfied to say they've tried to

09:28:16 12    say that the burden is on us, which it isn't.  And that's

09:28:18 13    something else the Special Master ruled on, that the burden

09:28:21 14    is on the plaintiff to establish the lack of non-infringing

09:28:21 15    alternatives.

09:28:25 16           It's a damages issue, but they're trying to make

09:28:27 17    it so that we have to prove that, one, that this game could

09:28:32 18    be modified to become non-infringing.  So our experts can

09:28:36 19    testify about that.

09:28:36 20           But to have the actual person who designed the

09:28:41 21    game, wrote the code, knows the game going backwards and

09:28:45 22    forward to say, we could have done this at that time, and it

09:28:49 23    wouldn't have --

09:28:50 24           THE COURT:  But your expert is going to say

09:28:52 25    essentially the game thing, but just at a higher level of

09:28:56 1    generality.

09:28:56 2              MR. TOMASULO:  They can't say that they have the

09:29:03 3    experience with code at that time.  It's not offering the

09:29:06 4    same kind of testimony.

09:29:09 5              THE COURT:  But --

09:29:11 6              MR. TOMASULO:  They are going to say that

09:29:12 7    there's non-infringing alternatives and that they are valid.

09:29:16 8              THE COURT:  Okay.  All right.  So I know what

09:29:29 9    I'm inclined to do here.

09:29:33 10             Mr. Frankel, is there anything more you want to

09:29:35 11   say?

09:29:35 12             MR. FRANKEL:  I think we've sufficiently covered

09:29:38 13   this issue.

09:29:39 14             THE COURT:  All right.  Mr. Enzminger, anything

09:29:41 15   else you want to say?

09:29:42 16             MR. ENZMINGER:  Mr. Tomasulo.

09:29:44 17             THE COURT:  Yes.  Sorry.  Yeah, Mr. Tomasulo.

09:29:46 18             MR. TOMASULO:  Well, I want to find that

09:29:47 19   citation from the Special Master.

09:29:51 20             THE COURT:  Well, so what I would plan to do is

09:30:01 21   I don't think that I've heard that there is sufficient

09:30:07 22   disclosure about Mr. Griffith that I'm going to let your

09:30:13 23   expert rely on what he said to her.  I don't think it's

09:30:20 24   about Call of Duty.  I don't actually think it's going to

09:30:25 25   make very much difference given what I understand your

09:30:28  1    experts, your technical experts are going to say.  And so

09:30:35  2    that's what I'm inclined to do.

09:30:38  3         But I do want to check some of these documents

09:30:43  4    that I may not have fully checked just yet, and so it's

09:30:46  5    possible that I could -- so I'll put something in writing

09:30:50  6    which may be just an Order, but that's what I'm inclined to

09:30:56  7    do.

09:30:56  8         All right.  Let's go on to Saralyn Smith and the

09:31:04  9    hypothetical negotiation date.

09:31:10  10        So where do we stand on what various people are

09:31:15  11   going to be saying about what the hypothetical negotiation

09:31:18  12   date is?

09:31:20  13        MR. FRANKEL:  Well, as far as World of Warcraft,

09:31:23  14   one of the primary features that we're accusing of

09:31:26  15   infringement is this Cross-realm zone technology that was

09:31:30  16   added in a particular patch to World of Warcraft.  I believe

09:31:35  17   it was in 2013, and we all know which patch it was that

09:31:40  18   added that functionality.

09:31:42  19        Now, what Activision has done is taken

09:31:46  20   Ms. Smith's view that World of War Craft began to infringe

09:31:53  21   in 2004.  Now, Ms. Smith was identified as a marketing and

09:31:59  22   sales witness.  She was not disclosed.

09:32:02  23        THE COURT:  Mr. Frankel, let me just interrupt

09:32:04  24   for a second.  So you say World of Warcraft, the

09:32:07  25   hypothetical negotiation date is sometime in 2013.

09:32:14 1          By the way, when was the first round of suits in

09:32:22 2   this case?  What was the date they were filed?

09:32:24 3          MR. FRANKEL:  March.  March 2015.

09:32:27 4          THE COURT:  Okay.  So in any event, you're going

09:32:35 5   to say for World of Warcraft, it's sometime in 2013.

09:32:40 6          What do you say for Destiny and Call of Duty?

09:32:46 7          MR. FRANKEL:  Just to be clear, Your Honor, I

09:32:47 8   don't have the exact date, but it's based on a particular

09:32:51 9   patch that is known to both parties for Destiny.  The

09:32:54 10  infringement began with the sale of the game.  It's the

09:32:57 11  first version of the game.

09:32:58 12         THE COURT:  Which is when?

09:33:00 13         MR. FRANKEL:  It's 2014.

09:33:04 14         THE COURT:  And for Call of Duty?

09:33:05 15         MR. FRANKEL:  I believe it's the same, late 2014

09:33:10 16  time frame when the accused products went on sale.

09:33:13 17         THE COURT:  Okay.  All right.  And so what do

09:33:20 18  you say it is, Mr. Enzminger?

09:33:22 19         MR. ENZMINGER:  Well, for one thing, the dates

09:33:28 20  Mr. Frankel is positing are actually contrary to what their

09:33:31 21  expert said.  Their expert says --

09:33:33 22         THE COURT:  Well, so before you start telling me

09:33:35 23  what a big, fat liar he is, why don't you just tell me what

09:33:38 24  your view is.

09:33:40 25         MR. ENZMINGER:  Our view is that the accused

09:33:48  1    World of Warcraft product, according to what their damages

09:33:52  2    is, their expert says is November 23, 2014.  I'm sorry,

09:33:59  3    2004.

09:34:00  4                    They also accuse a patch on January 16, 2007.

09:34:07  5    What Mr. Frankel is talking about when he said 2014 is the

09:34:13  6    Warlords of Draenor where he talks about adding

09:34:16  7    functionality.  But they specifically refused to say to the

09:34:23  8    Special Master that that was when infringement began.  They

09:34:26  9    are accusing games preceding that, and it's in their damages

09:34:29 10    model.

09:34:30 11                    So if --

09:34:32 12                    THE COURT:  So --

09:34:33 13                    MR. ENZMINGER:  So if they are committing --

09:34:34 14                    THE COURT:  -- let me interrupt you for a

09:34:36 15    second.

09:34:36 16                    MR. ENZMINGER:  Yeah.

09:34:36 17                    THE COURT:  So for World of Warcraft, you're

09:34:39 18    saying it is when?

09:34:41 19                    MR. ENZMINGER:  November 23rd, 2004.

09:34:47 20                    THE COURT:  Okay.  Thank you.

09:34:48 21                    And for Destiny, when?

09:34:51 22                    MR. ENZMINGER:  I don't have that date.  I think

09:34:58 23    September 2014.

09:34:59 24                    THE COURT:  Okay.  But basically that's what

09:35:02 25    Mr. Frankel said.

09:35:03 1          MR. ENZMINGER:  Yeah.  I don't think we have a

09:35:05 2     disagreement about this.

09:35:05 3          THE COURT:  And that's because that's when it

09:35:07 4     started to be sold.  And Call of Duty?

09:35:10 5          MR. ENZMINGER:  2007.

09:35:16 6          THE COURT:  Okay.  And so Dr. Meyer's analysis,

09:35:44 7     whatever it is, does she say there are three different

09:35:54 8     hypothetical negotiations or one hypothetical negotiation

09:35:56 9     date?

09:35:57 10          MR. FRANKEL:  So Dr. Meyer has no opinion as to

09:36:01 11     when infringement began.  She provided alternative

09:36:05 12     calculations that were based on both parties' proposed

09:36:09 13     hypothetical negotiation dates.  So --

09:36:12 14          THE COURT:  And --

09:36:13 15          MR. ENZMINGER:  -- Dr. Meyer doesn't --

09:36:14 16          THE COURT:  Wait.

09:36:15 17          MR. ENZMINGER:  I'm sorry.

09:36:16 18          THE COURT:  So when you say "both parties," you

09:36:19 19     mean she had one from 2004 and one from 2013?

09:36:26 20          MR. FRANKEL:  So she gave an opinion on

09:36:28 21     March 2nd, 2004, which is the date that Activision is

09:36:31 22     proposing for World of Warcraft.  She gave an opinion in

09:36:35 23     August of 2007, which is the date that they're proposing for

09:36:38 24     Call of Duty.  And she gave an opinion for 2014, which is

09:36:43 25     the date that the parties agree applies at least to Destiny.

09:36:47  1          THE COURT:  But so to the extent that she's

09:36:58  2  talking about a hypothetical negotiation, she's actually

09:37:01  3  talking about three different hypothetical negotiations, one

09:37:04  4  for each product.

09:37:05  5          MR. FRANKEL:  Well, she's providing the

09:37:09  6  hypothetical negotiations given the various potential dates.

09:37:13  7  The date that applies is a question of fact that would

09:37:18  8  depend on when infringement began.

09:37:20  9          THE COURT:  Right.  But I guess maybe a

09:37:23 10  different way of asking this is:  What is the plaintiff's

09:37:26 11  position as to when the hypothetical negotiation occurs?

09:37:29 12  And is your position that it was one hypothetical

09:37:32 13  negotiation or multiple hypothetical negotiations?

09:37:35 14          MR. FRANKEL:  Well, there's multiple, and that's

09:37:41 15  because there would be infringement of three different

09:37:44 16  product lines.

09:37:46 17          THE COURT:  Okay.  All right.  And so your view

09:37:53 18  is one is in 2013, and the other two were in 2014?

09:37:57 19          MR. FRANKEL:  I'm confident about the two in

09:38:02 20  2014.  I don't have the exact date of the patch.

09:38:04 21          THE COURT:  Okay.  I accept that.

09:38:05 22          MR. FRANKEL:  Your Honor, I just want to note

09:38:08 23  that both parties' damages experts agree that the date of

09:38:12 24  the hypothetical negotiation does not impact the damages

09:38:16 25  analysis with the limited exception of calculating for the

09:38:22  1    time value of money.  That depends on how far back you go.

09:38:26  2              But that's the only impact it has.  Both sides

09:38:29  3    have agreed to that point.

09:38:33  4              THE COURT:  And so, is that right?

09:38:42  5              MR. ENZMINGER:  No.

09:38:45  6              MR. FRANKEL:  Your Honor, I took Ms. Lawton's

09:38:47  7    deposition, their damages expert, and she agreed to that.

09:38:50  8    And that's our expert's position as well, but --

09:38:54  9              THE COURT:  Well, and so I understand,

09:39:00 10    Mr. Frankel, what you've just said.

09:39:04 11              Mr. Enzminger.

09:39:05 12              MR. ENZMINGER:  Dr. Meyer, their expert, has no

09:39:08 13    opinion on the hypothetical negotiation date at all.  She

09:39:12 14    refused to give one.

09:39:13 15              What he is referring to is her report.  Her

09:39:18 16    original report assumed the hypothetical negotiation date on

09:39:21 17    the date of filing of the Complaint.

09:39:23 18              THE COURT:  Right.  I remember that.

09:39:24 19              MR. ENZMINGER:  And she was instructed -- you

09:39:26 20    ordered her to supplement.  What her supplement was was I'm

09:39:31 21    not going to express an opinion on the hypothetical

09:39:34 22    negotiation date, but I will recalculate damages based on a

09:39:37 23    present-value analysis from my original hypothetical

09:39:42 24    negotiation date which was the date of filing of the

09:39:42 25    Complaint.

09:39:45  1          And then she says because of the Book of Wisdom,

09:39:48  2    the hypothetical negotiation date doesn't matter; therefore,

09:39:51  3    I express no opinion.  But if Ms. Lawton, the defense

09:39:55  4    expert, is right on her hypothetical negotiation dates, then

09:39:58  5    I can do a present-value analysis of my royalty and apply it

09:40:05  6    to each of those dates.  She has never provided a

09:40:09  7    hypothetical negotiation date, and that was a subject of a

09:40:12  8    motion to exclude, your Order, that she fix that.

09:40:15  9          She didn't.  She just says, I can do a

09:40:18 10    present-value analysis without expressing an opinion on

09:40:20 11    that.  And that's why Mr. Frankel couldn't answer that

09:40:23 12    question, what is his expert going to say on what the

09:40:25 13    hypothetical negotiation date is, because she doesn't have

09:40:27 14    one in any report.

09:40:29 15          THE COURT:  I thought he did answer the

09:40:31 16    question.

09:40:31 17          MR. FRANKEL:  Your Honor, the issue here, and

09:40:34 18    returning to the subject of the motion in limine, is that a

09:40:37 19    damages expert should not be giving a technical opinion on

09:40:41 20    when infringement began.  That's a technical fact question.

09:40:45 21    And Ms. Lawton opines that World of Warcraft began to

09:40:51 22    infringe in 2004.

09:40:52 23          THE COURT:  I mean, presumably that has to be

09:40:56 24    based on some technical opinion.  Yes; right?  She

09:40:59 25    doesn't --

09:41:00  1                    MR. FRANKEL:  So --

09:41:01  2                    THE COURT:  Right?

09:41:05  3                    MR. FRANKEL:  So she confirmed that she did not

09:41:07  4        speak to any of the technical witnesses, fact witnesses, or

09:41:11  5        technical experts in the case.  The technical experts that

09:41:16  6        Activision has advanced have no opinion on when infringement

09:41:20  7        for World of Warcraft began.

09:41:22  8                    They haven't even looked at the 2004 version of

09:41:24  9        it.  The sole basis that Ms. Lawton has for her opinion

09:41:29 10        about the date is her conversation with Saralyn Smith.

09:41:34 11        Saralyn Smith is a marketing executive.

09:41:37 12                    We asked her some questions about the

09:41:38 13        functionality of World of Warcraft, and she said, I don't

09:41:41 14        know.  I don't know the details of it.

09:41:43 15                    She doesn't know the infringement theories in

09:41:45 16        the case.  She doesn't know the Court's claim construction.

09:41:48 17        There's no possible way that Saralyn Smith is competent to

09:41:53 18        give an opinion as to when World of Warcraft began to

09:41:56 19        infringe.

09:41:57 20                    THE COURT:  So this is what I imagine Saralyn

09:42:00 21        Smith could do.  Maybe she didn't do it.  She could say, or

09:42:06 22        probably like a lot of people at Activision could say, and

09:42:09 23        in fact, earlier things you've said confirm this, this is

09:42:13 24        when this patch was introduced.  This is when that patch was

09:42:16 25        introduced.  This is when the game was created.  You know,

09:42:20  1    there's sort of business record kind of things that probably

09:42:23  2    a lot of people at Activision know.

09:42:26  3            In terms of when, if, in fact, you're accusing a

09:42:33  4    particular functionality, it was introduced by a particular

09:42:39  5    patch, you know, maybe, what they're accusing was -- you

09:42:45  6    know, you could be introducing something that's like

09:42:48  7    entirely new.  You could be introducing something that's an

09:42:51  8    upgrade over what came before.

09:42:53  9            You know, if it's entirely new, probably not a

09:42:57 10    whole lot of analysis needed.  If it's an upgrade, you know,

09:43:03 11    whether or not the upgrade introduced a thing, without

09:43:09 12    knowing in particular, I tend to think, yeah, the marketing

09:43:12 13    director probably can't say that.

09:43:14 14            MR. FRANKEL:  I believe the Court has very

09:43:18 15    cogently described the analysis that needs to take place to

09:43:21 16    determine when the infringement began.  And the issue is

09:43:24 17    that neither Ms. Smith nor Ms. Lawton are qualified to

09:43:30 18    determine which features are accused of infringement and

09:43:34 19    when infringement began.

09:43:35 20            The basis of our motion in limine is that

09:43:38 21    Ms. Smith was never identified to us as a witness who could

09:43:42 22    identify when particular features were added to the game.

09:43:46 23    That was a 30(b)(6) topic.

09:43:49 24            A witness was designated on that issue.  We took

09:43:51 25    his deposition.  Ms. Smith was never identified to us as

09:43:56 1    someone who had any information about when features were

09:43:59 2    added.  And when we asked her some questions along those

09:44:01 3    lines, she had no idea.

09:44:03 4              THE COURT:  What is it that you were deposing

09:44:06 5    her about?

09:44:06 6              MR. FRANKEL:  Marketing and sales.

09:44:09 7              THE COURT:  All right.  Mr. Tomasulo.

09:44:15 8              MR. TOMASULO:  First of all, we'd be willing to

09:44:17 9    drop this issue if they're willing to tell the jury that the

09:44:20 10   earlier versions are non-infringing.  I mean, that's the

09:44:22 11   issue.

09:44:23 12             They have never said -- the only person who's

09:44:26 13   ever identified the exact infringing products is their

09:44:29 14   damages expert, and she does that very clearly in her

09:44:32 15   report.  And she said she got a list of what she said is

09:44:35 16   accused of infringing, both Activision release dates of

09:44:39 17   accused products, and then she has another line that says

09:44:41 18   accused infringing platforms.  And she identifies World of

09:44:46 19   Warcraft release November 23rd, 2004.

09:44:51 20             If they're willing to say --

09:44:52 21             THE COURT:  You know, I was looking around based

09:44:54 22   on the citations and motions in limine that -- so hold the

09:44:59 23   thought because I couldn't find what you were just citing.

09:45:07 24   But so, in any event, Mr. Frankel, did you understand what

09:45:13 25   he just said?

09:45:13  1          MR. FRANKEL:  Yeah, Your Honor.  Activision has

09:45:15  2   been trotting out this schedule from Dr. Meyer's report

09:45:19  3   repeatedly.

09:45:20  4          THE COURT:  No.  No.  No.  Before you get to

09:45:21  5   there, I thought what he was saying -- I don't know how much

09:45:34  6   sense it makes, but I'm not in a good position to judge

09:45:37  7   these things.  I thought he was saying we don't need Saralyn

09:45:41  8   Smith if you agree that the earlier version of World of

09:45:44  9   Warcraft was not infringing.

09:45:46 10          MR. FRANKEL:  I cannot speak to if the 2004

09:45:50 11   version of World of Warcraft infringes because I've never

09:45:52 12   seen the source code for it.  That was not part of discovery

09:45:55 13   in the case.  We were --

09:45:57 14          THE COURT:  But I think maybe all he's asking is

09:46:00 15   that you're not in this case going to say it's infringing.

09:46:06 16   Pretty much you just said you can't say it's infringing

09:46:08 17   because you've never seen the source code.

09:46:10 18          MR. FRANKEL:  Well, the damages that we're

09:46:14 19   seeking begin in 2015, and we've talked about functionality

09:46:19 20   that was added in 2013 or 2014 in that time frame.  I can't

09:46:26 21   say, though, that the 2004 version of World of Warcraft

09:46:29 22   doesn't infringe.

09:46:31 23          And the reason that Activision wants to use that

09:46:33 24   fact is to suggest that the earlier version itself was a

09:46:37 25   non-infringing alternative.  But no technical expert in this

09:46:41  1    case is --

09:46:42  2              THE COURT:  So that's the reason why I'm

09:46:45  3    saying -- I guess what I'm wondering is, and maybe I

09:46:51  4    misunderstood what Mr. Tomasulo was suggesting, but it

09:46:55  5    seemed -- well, so Mr. Tomasulo, I'm thinking that I

09:47:07  6    probably actually have no idea what it was you were

09:47:10  7    suggesting, though what I had thought you were suggesting

09:47:12  8    was:  Why don't we agree that 2013 and 2014 are the relevant

09:47:21  9    hypothetical negotiation dates.

09:47:24 10              And they're not going to say -- I guess what it

09:47:33 11    is is really an argument about whether or not the earlier

09:47:38 12    version of World of Warcraft could be used as -- wait.

09:47:42 13    There's no anticipation or obviousness in the case, so --

09:47:46 14              MR. TOMASULO:  May I?

09:47:47 15              THE COURT:  Yeah.  Yeah.  Go ahead.

09:47:48 16              MR. TOMASULO:  Can I just take you through a

09:47:51 17    little bit of the discovery history on this issue?

09:47:53 18              THE COURT:  No.  I don't think that's going to

09:47:55 19    be helpful.

09:47:55 20              MR. TOMASULO:  Okay.  So then I won't.

09:47:57 21              Their position is that there are no

09:48:00 22    non-infringing alternatives, but they won't tell us which is

09:48:03 23    the first game that actually infringes.  So, for instance,

09:48:06 24    we gave them to inspect the source code from every single

09:48:09 25    Call of Duty game, and so they only are accusing these two

09:48:13  1    games.

09:48:13  2              But basically when it came to identifying the

09:48:18  3    hypothetical negotiation date, they said it was the date

09:48:20  4    that the Complaints were filed.  We moved to compel --

09:48:23  5              THE COURT:  Right.  Right.

09:48:24  6              MR. TOMASULO:  -- all that.

09:48:24  7              THE COURT:  We know that's not the right date.

09:48:26  8              MR. TOMASULO:  So what we did when we got

09:48:28  9    Dr. Meyer's report, one of the things -- I'm sorry,

09:48:31 10    Dr. Meyer's report, we looked at it, and Dr. Meyer

09:48:34 11    identifies the release dates of what she calls the

09:48:36 12    infringing products.

09:48:37 13              THE COURT:  Right, but that's not actually an

09:48:41 14    opinion.

09:48:42 15              MR. TOMASULO:  Well --

09:48:42 16              THE COURT:  Certainly not an opinion she's

09:48:45 17    qualified to give.

09:48:46 18              MR. TOMASULO:  I don't disagree with that, but

09:48:47 19    that's what they're accusing.  In other words, where is it

09:48:51 20    in any expert report that says that's the first date of

09:48:54 21    infringement by -- I mean, they have the burden on this

09:48:56 22    issue.  They have to advance a first date of infringement.

09:48:59 23              It's up to them to say what happened, and they

09:49:02 24    haven't done it.  But what Dr. Meyer, who is the damages

09:49:05 25    expert, she does say that the --

09:49:07 1                    THE COURT:  Well, so I think -- and I guess

09:49:13 2      we're really just talking -- well, we're talking about World

09:49:17 3      of Warcraft and Call of Duty.  I believe that I've heard

09:49:24 4      Mr. Frankel say the first infringement of Call of Duty is

09:49:28 5      2014.

09:49:28 6                    And that for the World of Warcraft, it's

09:49:34 7      whenever this patch was which might have been 2013.

09:49:38 8                    MR. TOMASULO:  What they're not willing to say

09:49:40 9      is that the earlier versions are non-infringing.  In other

09:49:43 10     words, they won't say when the first date of infringement

09:49:45 11     is.  That's the issue.

09:49:46 12                   They want to move the date of first infringement

09:49:48 13     because they want to choose their hypothetical negotiation

09:49:51 14     date as opposed to doing an analysis of what actual event is

09:49:56 15     the supposed first date of infringement.  In other words, we

09:49:59 16     were not infringing, then we started infringing.

09:50:02 17                   Well, if that's the date, then the things that

09:50:04 18     we were doing before -- these games have a long history.

09:50:07 19                   THE COURT:  Well, I guess what I'm wondering is:

09:50:09 20     What difference does it make, because you're not throwing

09:50:11 21     out anticipation or obviousness?  So who cares whether you

09:50:15 22     have a product in 2004 that, you know, did the same thing?

09:50:25 23                   MR. TOMASULO:  Well, because their entire

09:50:27 24     damages case is premised on the idea that there's no way to

09:50:30 25     design around these patents.  So the Call of Duty version of

09:50:33 1   2013 is one of the most successful video games of all time.

09:50:36 2              World of Warcraft was one of the most successful

09:50:39 3   video games of all time by 2013.  If someone said that,

09:50:43 4   Well, you can't use this cross-relevant technology --

09:50:46 5              THE COURT:  Well, I don't know.  Your experts

09:50:52 6   have said the current versions don't infringe and presumably

09:51:00 7   that no earlier versions infringe; right?

09:51:03 8              MR. TOMASULO:  The burden is on them to say

09:51:05 9   there are no --

09:51:07 10              THE COURT:  Mr. Tomasulo --

09:51:08 11              MR. TOMASULO:  I'm sorry.

09:51:09 12              THE COURT:  -- you know, this is hard enough if

09:51:11 13   you won't answer my questions.

09:51:12 14              MR. TOMASULO:  I'm sorry, Your Honor.  Our

09:51:15 15   experts will say that all of our versions do not infringe.

09:51:18 16              THE COURT:  Okay.  So presumably, one thing we

09:51:21 17   know is they're not going to put on experts that say, No,

09:51:23 18   the infringement started in 2007.

09:51:29 19              MR. TOMASULO:  They have made a claim that

09:51:32 20   they're going to argue that prior versions are not

09:51:35 21   non-infringing alternatives.  They are --

09:51:37 22              THE COURT:  Well, they can argue that, but they

09:51:39 23   can't argue that they're not non-infringing alternatives

09:51:42 24   because they don't infringe.  I mean, because they do

09:51:45 25   infringe.  Right?

60

09:51:46  1        There are a lot of different things that go into

09:51:48  2   whether something is a non-infringing alternative.  But they

09:51:51  3   can't argue, yeah, the date that infringement began is 2013,

09:51:55  4   and oh, yeah, your earlier product also infringed.

09:52:00  5        MR. TOMASULO:  Well, that would be helpful to

09:52:02  6   know that they can't do that.

09:52:03  7        THE COURT:  Right.

09:52:05  8        MR. FRANKEL:  Well, Activision's experts have

09:52:10  9   not offered any analysis of any earlier versions of the

09:52:13 10   game.

09:52:14 11        THE COURT:  Right.  Regardless of what their

09:52:15 12   experts say, you can't argue, yeah, the first infringement

09:52:19 13   date is 2013.  And, yeah, it was infringing before then.

09:52:23 14        That's part of what you've got to pick.  You've

09:52:25 15   got to pick a date where you say what came before is not

09:52:30 16   infringing, and you know, but at this point, and patch

09:52:37 17   number nine, you know, that's a good -- you know, that's an

09:52:43 18   easy to understand, yeah, this patch has the infringing

09:52:47 19   technology.

09:52:52 20        And presumably then they can say, Well, so we

09:52:56 21   could have just not introduced the patch and still made a

09:53:00 22   zillion dollars selling whatever it was we were selling

09:53:01 23   before the patch; right?

09:53:03 24        MR. ANDRE:  Your Honor, let me see if I can make

09:53:05 25   this a little clearer, and the reason being is because the

09:53:08  1   games change every year.  So, for example, I'll use Call of

09:53:14  2   Duty.  That's a good example.  We're accusing the Black Ops

09:53:16  3   3 and the Advanced Warfare game.

09:53:18  4            THE COURT:  Okay.

09:53:19  5            MR. ANDRE:  So that wasn't around in 2007.

09:53:21  6   Those games were not.  We have to base our infringement case

09:53:25  7   on when we gave notice for damages.  So we gave notice with

09:53:30  8   filing a claim in 2015.

09:53:32  9            So we had to go after products that were being

09:53:35 10   sold in 2015.  We can't go back and get damages from

09:53:38 11   products sold in 2007 because we didn't give notice back

09:53:42 12   then.  And we've already had that discussion.  You and I had

09:53:45 13   the discussion --

09:53:45 14            THE COURT:  Right.

09:53:46 15            MR. ANDRE:  -- and we acquiesced to that.  So --

09:53:48 16            THE COURT:  You volunteered, but that's a

09:53:52 17   different --

09:53:52 18            MR. ANDRE:  I did volunteer that, and that's

09:53:55 19   something -- so from that perspective, that's where there's

09:53:57 20   a little bit of a conflict.  They're saying they want us to

09:54:00 21   take a position as to when the infringement began.

09:54:03 22            So when the infringement began of Black Ops 3

09:54:08 23   and Advanced Warfare was when those products were released.

09:54:10 24   You can't have infringement beginning of those two games

09:54:13 25   before that.

09:54:14  1          Now, the other previous Call of Duty games may

09:54:17  2   or may not have infringed.  They're not accused in this

09:54:19  3   case.  We're not going to say they infringed in this case

09:54:22  4   because we can't.

09:54:22  5          But we're also not going to say they don't

09:54:25  6   infringe.  We don't think the affirmative position is they

09:54:27  7   do not infringe.  We're just saying they're not accused of

09:54:30  8   infringement in this case because they're not versions that

09:54:32  9   are being sold after we gave notice.

09:54:34 10          So that's kind of the conflict, I think, or

09:54:37 11   maybe the disconnect that I'm hearing any way because

09:54:40 12   defendants want us to go back and say 2004 is not

09:54:44 13   infringing.  Well, we don't know if it's infringing or not.

09:54:46 14          But I know one thing, we can't go back and get

09:54:48 15   damages back then because we didn't give notice until 2015.

09:54:53 16   So what discovery we took was what was being sold in 2015

09:54:55 17   on.  That's the discovery they gave us, and that's the

09:54:57 18   discovery we took.

09:54:58 19          In this case, we can affirmatively say those

09:55:01 20   products that were on sale as of March 2015, which are the

09:55:05 21   ones Mr. Frankel is talking about, those versions went on

09:55:10 22   sale the dates Mr. Frankel gave.  So that's what we're

09:55:13 23   talking about here.

09:55:14 24          They want us to take a different position saying

09:55:16 25   that, yeah, before that they didn't infringe.  Well, we

09:55:19  1    didn't get discovery on it.  We're not alleging they

09:55:22  2    infringed, so we're not going to get up there and say that

09:55:25  3    those products infringe or don't infringe.  We're not going

09:55:28  4    to say either way.

09:55:29  5             We're going to take the affirmative position

09:55:32  6    that these newer games since 2015 do infringe, and our

09:55:36  7    experts, two of our experts say there's non-infringing

09:55:38  8    alternatives.  They say based on the functionality in the

09:55:41  9    games they looked at, there is no viable non-infringing

09:55:45  10   alternative to the technology that's in these patents.

09:55:48  11            We're going to take depositions.  They can go in

09:55:51  12   and say, yeah, but hey, we had a game in 2004.  And our

09:55:56  13   experts will say, To the extent your game in 2004 was using

09:56:01  14   this multi-player, you know, networking that's described in

09:56:05  15   the patents, that's not a viable non-infringing alternative.

09:56:10  16   That's all we're going to say.

09:56:11  17            So if they want to go in there and try to say

09:56:13  18   that their 2004 games were non-infringing alternatives, I

09:56:19  19   mean, they're actually saying the 2015 games were

09:56:22  20   non-infringing alternatives.

09:56:22  21            So I don't know what it's going to get them, but

09:56:27  22   they can make that argument.  We don't want to take the

09:56:27  23   position affirmatively, one way or another, because we just

09:56:29  24   don't know.

09:56:29  25            I think that's the best I can try to clarify

09:56:33  1    that.  I hope that does help a little bit.

09:56:36  2              THE COURT:  All right.

09:56:36  3              MR. FRANKEL:  And Your Honor, just Activision

09:56:39  4    has the burden of production to come forward with

09:56:42  5    non-infringing alternatives, and their experts have not

09:56:45  6    looked at the older games that are not at issue in this case

09:56:49  7    and said, They don't infringe for this specific reason.  So

09:56:54  8    that's not an opinion that they should be presenting at

09:56:56  9    trial.

09:56:58  10             THE COURT:  Okay.

09:57:00  11             MR. TOMASULO:  May I just briefly --

09:57:01  12             THE COURT:  Yes.

09:57:02  13             MR. TOMASULO:  -- respond?  So we've been trying

09:57:04  14   to get this information as to what is the date of first

09:57:07  15   infringement, and it is simply incorrect that there's

09:57:12  16   different versions of World of Warcraft that all of a sudden

09:57:15  17   there was one that didn't exist in 2013.  World of Warcraft

09:57:18  18   has been a continuous operation, and as you correctly

09:57:21  19   described it, it's a series of patches or updates.

09:57:23  20             But it's not like there was some event that

09:57:26  21   happened in 2013 that made it substantially different in its

09:57:30  22   functionality.  We identified these early.

09:57:32  23             THE COURT:  But so what I heard a moment ago is,

09:57:38  24   say, Black Ops was not a version that existed before 2013.

09:57:44  25   It was some other version.  I don't know, you know, so that

09:57:51 1    there's some variation in these games.

09:57:54 2              MR. TOMASULO:  So the networking -- so what's

09:57:57 3    been accused in this case, to be clear, in this case was the

09:57:59 4    networking operation of the game.  Okay.

09:58:01 5              The networking operation for Call of Duty is

09:58:04 6    more or less the exact same since 2007.  That's why we said

09:58:08 7    that 2007 was the date that this particular supposedly

09:58:11 8    infringing code was introduced in the game.  So that's why

09:58:16 9    that date was chosen.

09:58:17 10              And so with respect to World of Warcraft, as

09:58:20 11    best we could see --

09:58:21 12              THE COURT:  All right.  So do you agree with

09:58:34 13    Mr. Frankel that you have the burden of production on

09:58:37 14    non-infringing alternatives?

09:58:39 15              MR. TOMASULO:  No.  No.  We've identified them.

09:58:41 16    What we did was we identified them in discovery.  We

09:58:44 17    produced all of the versions of Call of Duty.  So whether we

09:58:48 18    had the burden or not, we produced all of those things.

09:58:50 19              But it's a damages issue.  And like all damages

09:58:53 20    issues, the plaintiff has the burden on it.

09:58:56 21              THE COURT:  Well, sometimes plaintiff has the

09:58:58 22    burden without having the burden of production.

09:59:01 23              MR. TOMASULO:  So we produced all versions of

09:59:03 24    the source code for Call of Duty going back to the very

09:59:06 25    first Call of Duty.

09:59:07 1          THE COURT:  I'm not sure what's meant by the

09:59:10 2   "burden of production."

09:59:11 3          MR. TOMASULO:  What they served as an

09:59:13 4   interrogatory, we responded and identified earlier versions

09:59:15 5   of the game as non-infringing.  They never took any

09:59:18 6   discovery on it.

09:59:18 7          THE COURT:  But, yeah, okay.  Mr. Frankel.

09:59:25 8          MR. FRANKEL:  Well, there's no interrogatory

09:59:27 9   response from Activision that says, This version of Call of

09:59:34 10  Duty does not infringe and is a non-infringing alternative.

09:59:37 11         THE COURT:  Because they said they all don't

09:59:38 12  infringe.

09:59:39 13         MR. FRANKEL:  Correct.  So we got an

09:59:43 14  interrogatory response all the way at the end of discovery

09:59:46 15  after our access to Call of Duty source code was cut off by

09:59:50 16  Activision that just said, Earlier versions of the games

09:59:54 17  could be a non-infringing alternative.  That's it.  No

09:59:57 18  further disclosure.  No explanation of what versions, what

10:00:00 19  features, or what changes.

10:00:02 20         Our experts addressed that as best as they could

10:00:05 21  in their expert reports.  Their technical experts have not

10:00:09 22  provided any analysis of these earlier versions, but we're

10:00:12 23  talking about Call of Duty now.

10:00:13 24         The motion in limine was that Ms. Smith should

10:00:17 25  not give an opinion that the 2004 version of World of

10:00:22 1    Warcraft had the same functionality that is accused of

10:00:25 2    infringement in this case.  She's not a technical expert.

10:00:28 3              THE COURT:  All right.  I got that.  So thank

10:00:30 4    you for bringing us back to the starting point here.

10:00:34 5              Mr. Tomasulo, what do you have to say about

10:00:36 6    that?

10:00:36 7              MR. TOMASULO:  So Ms. Smith isn't going to talk

10:00:39 8    about the technical attributes of that.  They took a dep --

10:00:42 9    I mean, somebody --

10:00:43 10             THE COURT:  Okay.  Well, so this has all been

10:00:47 11   very interesting, but so she's not going to offer an opinion

10:00:50 12   as to whether the functionality that is accused in 2015 is

10:00:56 13   present in 2004.

10:00:59 14             MR. TOMASULO:  No.  She would not do that.

10:01:00 15             May I --

10:01:01 16             THE COURT:  Does that resolve this matter?

10:01:02 17             MR. FRANKEL:  As long as Ms. Lawton is not going

10:01:05 18   to give that opinion.

10:01:06 19             MR. TOMASULO:  Well, that's different.

10:01:07 20             MR. FRANKEL:  Ms. Lawton said her sole basis was

10:01:11 21   a conversation with Ms. Smith.  So --

10:01:14 22             THE COURT:  All right.  Well, so it does make

10:01:16 23   sense that Ms. Smith can't or isn't going to give the

10:01:19 24   opinion that -- Ms. Lawton can't really rely on Ms. Smith

10:01:25 25   for opinions that are outside of Ms. Smith's areas of

10:01:29  1   knowledge.  Right?

10:01:31  2                MR. TOMASULO:  Well, she wouldn't rely on

10:01:32  3   Ms. Smith's opinion.  She would have to rely on some other

10:01:35  4   piece of evidence with regard to -- what Ms. Smith was going

10:01:39  5   to testify was that the game was on sale at that time --

10:01:43  6                THE COURT:  Okay.

10:01:43  7                MR. TOMASULO:  -- and what their expert has

10:01:46  8   testified or what their expert's report says is that is an

10:01:49  9   accused game.  So, I mean, there really wasn't a whole lot

10:01:52 10   of analysis that was required from our standpoint.  They

10:01:56 11   identified the 2004 version.

10:01:57 12                THE COURT:  Well, so to the extent that your

10:02:00 13   expert wants to say World of Warcraft was on sale in 2004,

10:02:04 14   and I know that because Ms. Smith told me, there's no

10:02:09 15   problem there; right?

10:02:09 16                MR. FRANKEL:  Well, if she's noting that as a

10:02:11 17   bit of trivia, there's no problem.

10:02:13 18                THE COURT:  Yeah.  I --

10:02:14 19                MR. FRANKEL:  But that's not the basis for a

10:02:16 20   date that infringement began, or a non-infringing

10:02:18 21   alternative, or anything like that.  I mean --

10:02:21 22                THE COURT:  Mr. Tomasulo, do you disagree with

10:02:24 23   that?

10:02:25 24                MR. TOMASULO:  The whole point of them

10:02:28 25   identifying the date of the hypothetical negotiation during

10:02:32  1    discovery was so that we could try to determine what was

10:02:36  2    happening at that time, what were the non-infringing

10:02:38  3    alternatives available at that time.  They wouldn't do it.

10:02:42  4              We moved to compel and the Special Master

10:02:45  5    specifically said, You're stuck with the date of the filing

10:02:48  6    of these Complaints, and that's it.

10:02:50  7              THE COURT:  Yeah.  Yeah.  Well, obviously, I

10:02:52  8    changed that by saying, No, pick a real date.

10:02:54  9              MR. TOMASULO:  Right.  So we picked their date.

10:02:56 10    They put it in their report.

10:02:57 11              THE COURT:  Or I told them to pick a real date.

10:02:59 12              MR. TOMASULO:  So we did the analysis.  We tried

10:03:02 13    to figure out what was being accused and when those features

10:03:05 14    were introduced.  So they still haven't said what -- I

10:03:09 15    mean --

10:03:09 16              THE COURT:  Okay.  Well, so based on what I'm

10:03:13 17    hearing, Ms. Lawton cannot rely on Saralyn Smith for

10:03:19 18    anything beyond, This is when a particular version of World

10:03:25 19    of Warcraft went on sale because that's definitely within

10:03:29 20    Ms. Smith's reasonable factual knowledge, based on

10:03:33 21    everything I'm hearing.  And if that's a relevant fact,

10:03:38 22    well, then, she can testify about it.

10:03:40 23              But she, obviously, cannot rely on Ms. Smith for

10:03:46 24    a technical opinion; right?

10:03:49 25              MR. TOMASULO:  Correct.

10:03:49  1        THE COURT:  Okay.  So as far as I'm concerned, I

10:03:53  2   think that's resolved.

10:03:55  3        MR. TOMASULO:  That particular issue, I think,

10:03:57  4   is resolved.

10:03:58  5        THE COURT:  Okay.  So the next one is Bill Chin.

10:04:02  6   And as I understand it, Mr. Chin is some kind of

10:04:07  7   technologically-qualified person who did some sort of

10:04:10  8   testing that Dr. Kelly is relying upon.  And so Dr. Kelly

10:04:18  9   says this is the kind of thing people who are in his area of

10:04:21 10   expertise rely upon.

10:04:23 11        Why isn't that the end of this matter?

10:04:24 12        MR. FRANKEL:  Your Honor, the issue is as

10:04:29 13   follows:  Mr. Chin provided a testing expert report that

10:04:34 14   provides technical opinions in this case.  We asked for his

10:04:38 15   deposition, and Activision refused to make him available for

10:04:42 16   deposition.

10:04:43 17        Now, we have a testing expert, also.

10:04:45 18        THE COURT:  Well, so, but, you know, you say

10:04:49 19   they refuse to make it available for a deposition.  Did you

10:04:53 20   bring this up with the Special Master?

10:04:56 21        MR. FRANKEL:  We told Activision that we would

10:04:58 22   seek to preclude Mr. Chin from testifying if he wasn't --

10:05:03 23        THE COURT:  Okay.  Well, so, you know, if you

10:05:08 24   don't bring it up as a discovery issue when you know about

10:05:11 25   it, you can't then ten days before trial say you can't bring

10:05:19  1    it up.  So to the extent the Complaint is that he wouldn't

10:05:24  2    make them available, or they wouldn't make him available for

10:05:28  3    a deposition, I'm going to reject that argument.

10:05:33  4            Do you have another argument?

10:05:35  5            MR. FRANKEL:  Well, the other issue we have is

10:05:37  6    that Dr. Kelly should not be providing the opinions of

10:05:42  7    someone else.  If Mr. Chin gave technical opinions, he

10:05:46  8    should be the one to provide them.

10:05:48  9            THE COURT:  Well, my impression from what the

10:05:50 10    response was is they say, No, Dr. Kelly is going to give his

10:05:53 11    own opinions.  He's essentially relying on this Mr. Chin,

10:05:59 12    the way senior scientists at the lab relies on junior

10:06:04 13    scientists to do various stuff, and when the senior

10:06:08 14    scientist testifies about what his or her opinions are based

10:06:11 15    on everything.

10:06:12 16            Isn't this like that?

10:06:13 17            MR. FRANKEL:  Well, assuming that the Court is

10:06:16 18    inclined to not strike the report in its entirety, the

10:06:21 19    portions of the report that clearly go into opinions, if I

10:06:25 20    could just give you an example.

10:06:26 21            THE COURT:  Yeah.  Sure.

10:06:27 22            MR. FRANKEL:  So, for example, Mr. Chin collects

10:06:31 23    the data, and then in discussing the data says, This would

10:06:34 24    imply that any type of peer-to-peer communication is

10:06:37 25    impossible.  Discussing other tests --

10:06:40 1            THE COURT:  So my impression is that the

10:06:43 2    response was that Dr. Kelly is not going to say, Well, so

10:06:48 3    Mr. Chin thought they meant they would imply to any kind of

10:06:51 4    peer-to-peer communication was impossible.

10:06:53 5            What he's going to say is Dr. Kelly, having

10:06:57 6    reviewed whatever this data is, I say it's impossible;

10:07:01 7    right?  Isn't that what they're going to do?

10:07:04 8            MR. TOMASULO:  Yes, Your Honor.

10:07:05 9            MR. FRANKEL:  So if we take Dr. Kelly's report

10:07:07 10    and then Mr. Chin's, if Dr. Kelly limits his testimony to

10:07:13 11    the opinions that are in his report and does not use the

10:07:16 12    opinions in Mr. Chin's report, and he only talks about the

10:07:19 13    data in Mr. Chin's report, then in view of your other

10:07:23 14    tentative ruling --

10:07:24 15            THE COURT:  Well, the other one was more than

10:07:27 16    tentative.

10:07:27 17            MR. FRANKEL:  In view of your concrete,

10:07:30 18    well-reasoned opinion, he should not be repeating opinions

10:07:35 19    from Mr. Chin's report.  It should be limited to the

10:07:38 20    opinions that are in his report.

10:07:39 21            THE COURT:  Well, I think they agree to that.

10:07:42 22    Right?  I mean, there may be some argument down the road

10:07:45 23    about what's an opinion or what's a fact or something, and

10:07:50 24    certainly I don't have a basis right now to be parsing

10:07:53 25    through statements about this, that, and the other thing,

10:07:56  1    but that's the impression I get is the representation is

10:08:00  2    Dr. Kelly is going to state his own opinions.  And he may

10:08:03  3    rely on some testing that Mr. Chin did as support, but he's

10:08:08  4    not going to be asked questions, and so he'll be instructed

10:08:13  5    not to repeat back Mr. Chin's opinions attributing them to

10:08:17  6    Mr. Chin.

10:08:18  7            Right.

10:08:18  8            MR. TOMASULO:  I don't expect the name of

10:08:23  9    Mr. Chin would come up at all.

10:08:26 10            MR. FRANKEL:  Well, Your Honor, in view of the

10:08:27 11    fact that the DA in the Take-Two trials are down the road

10:08:29 12    and Mr. Chin provided expert reports, expert testing reports

10:08:33 13    in those cases, may we take his deposition at this point?

10:08:37 14            THE COURT:  You may contact the Special Master.

10:08:41 15            MR. FRANKEL:  Thank you, Your Honor.

10:08:42 16            THE COURT:  Okay.  So as far as in relation to

10:08:47 17    Chin, I'm going to deny it.

10:08:50 18            All right.  So we have to pick up the speed

10:08:52 19    here.  Motion in limine number two.  Oh, yeah, my favorite.

10:08:58 20            So here's what I was thinking about that, as I

10:09:03 21    understand this.  This is the way we're going to start.

10:09:09 22            Oh, let me say what I'm going to do because this

10:09:11 23    is mostly favorable to you, I think.  You know, the

10:09:19 24    defendants may refer to the plaintiff as plaintiff, or

10:09:25 25    Acceleration Bay, or AB, if that's something people are

10:09:27 1   called, or the business, or the company, or the corporation,

10:09:31 2   or maybe even the LLC.

10:09:35 3        Without prior permission, defendants cannot call

10:09:38 4   plaintiff anything else.  I don't want to hear -- obviously,

10:09:42 5   you agree no patent troll, but also no non-practicing

10:09:46 6   entity, no patent-assertion entity.  New term I haven't

10:09:51 7   heard before, paper patent, at least not in this context.

10:09:56 8   You know, they're a business.

10:10:01 9        In terms of the role of counsel who are standing

10:10:08 10  over on the plaintiff's side, I don't want to hear anything

10:10:14 11  at the trial, absent my express permission after the door

10:10:22 12  has been opened wide, about the role of the plaintiff's

10:10:27 13  attorneys in the formation of Acceleration Bay, or the

10:10:33 14  acquisition of the asserted patents, or working on

10:10:38 15  litigation from the agreements with Hamilton Capital.

10:10:43 16       I do not actually understand, as I understand

10:11:00 17  the case right now, why the Litigation Funding Agreement

10:11:05 18  with Hamilton Capital is a relevant piece of information.

10:11:12 19  And the only thing in here -- maybe it was somewhere else.

10:11:18 20  Maybe it was in the opposition.  Wait a second.

10:11:27 21       In terms of Dr. Medvidovic, is that how you

10:11:31 22  pronounce his name?

10:11:33 23            MS. KOBIALKA:  Yes.

10:11:34 24            THE COURT:  Dr. Medvidovic, obviously, if you

10:11:39 25  want to cross him about what his fees are, either on a total

10:11:43  1    dollar value, or hourly, or anything else, I assume that he

10:11:48  2    had no contingent interest in the case.  I assume he has

10:11:53  3    no -- because you discovered him, I assume he has no

10:11:58  4    ownership interest in AB or some other related entity, but

10:12:06  5    so you can ask him about what he's getting paid, if it's a

10:12:10  6    relevant fact that he is a go-to expert for the plaintiff's

10:12:15  7    attorneys.  You can certainly ask him about how many times

10:12:17  8    he's been hired by the plaintiff's attorneys.

10:12:20  9          But the fact that he -- if he -- if you have,

10:12:34 10    maybe you do, if you have pre-suit, I don't know, claim

10:12:41 11    charts or something that he gave to Hamilton Capital to help

10:12:45 12    raise money, if they are inconsistent with what he says at

10:12:50 13    trial, and you want to cross-examine him about them, that's

10:12:53 14    fine.

10:12:55 15          I don't really see how it's relevant that -- to

10:13:00 16    the extent he's giving more or less the same opinions, I

10:13:03 17    don't understand why it's relevant that they were used to

10:13:08 18    help raise money for the plaintiff to operate.

10:13:15 19          Does that address pretty much everything in the

10:13:17 20    motion?

10:13:17 21          MR. ANDRE:  It does, Your Honor.  Thank you.

10:13:20 22          THE COURT:  All right.  Are there any questions

10:13:21 23    from you all?

10:13:23 24          MR. WEBB:  I'm a little late to the party.  I'm

10:13:25 25    sorry.  So just we'd like to have clarity as to the

10:13:30 1    parameters within which they can describe their client.

10:13:33 2            THE COURT:  Well, so that's the reason why I

10:13:37 3    think I started off by saying, or I was trying to say that

10:13:43 4    there's a certain amount of -- this is the starting point

10:13:49 5    because I don't know what they're going to say about their

10:13:51 6    client.  And, you know, my opinion, but it's just my

10:14:03 7    opinion, the less they say about their client, the better.

10:14:06 8    Their client is a business, and owns some patents, and hired

10:14:09 9    them a while back or bought them, and you know, he's now

10:14:15 10   asserting them here.

10:14:18 11           If they want to start talking about, you know,

10:14:21 12   they sell a product, which I don't think they do, well, you

10:14:26 13   know, I'm not going to let them say that.  And if you say,

10:14:28 14   Well, we've got to know that they don't sell any product,

10:14:32 15   you know -- if they say -- and just because they've said

10:14:36 16   something in the Complaint doesn't make it an issue at

10:14:40 17   trial.

10:14:43 18           So, you know, my wish, because I'm not in the

10:14:50 19   business of giving advice, my wish is that plaintiff will

10:14:55 20   stay away from much, if any, description at all of itself

10:15:04 21   because I think the closer they push that, the more likely

10:15:09 22   it is that I'm going to say, okay, fairness requires

10:15:14 23   counterweight.  But until I hear what they actually do, I've

10:15:20 24   got really just hypothetical -- I mean, it's just not good

10:15:28 25   for a motion in limine.

10:15:30 1          MR. WEBB:  Understood.

10:15:31 2          THE COURT:  All right.

10:15:31 3          MR. WEBB:  Just so the sequence would be this,

10:15:34 4  they potentially open the door.  We ask to approach.  I

10:15:37 5  describe how they opened, and I get response from Your Honor

10:15:40 6  about how far I can then push the door the rest of the way

10:15:43 7  open?

10:15:44 8          THE COURT:  Yeah.  And you know, recognizing

10:15:47 9  some things are going to be -- you know, most of what I said

10:15:52 10  just a minute ago is going to be off limits, period.  You

10:15:56 11  know, I mean, I don't want to hear anything about the

10:15:57 12  plaintiff's attorneys, no matter what.  I think I don't want

10:16:01 13  to hear anything about Hamilton Funding, no matter what.

10:16:04 14          You know, but to the extent that they portray

10:16:11 15  themselves as a -- which, you know, if they use nebulous

10:16:20 16  buzz words, I don't know what I'm going to do.  But if they

10:16:23 17  actually start saying, We're doing this, we're doing that,

10:16:32 18  you know, I'm probably going to let you cross-examine them

10:16:39 19  directly on what they say.

10:16:40 20          But I'm not, even then, going to take a very

10:16:42 21  wide view as to what they opened the door to because, for a

10:16:50 22  number of reasons, this case should not be about them.  It

10:16:57 23  should be about the patents and whether or not your products

10:17:03 24  infringe them, which doesn't really involve too much about

10:17:05 25  them.  And so that's the best I can do right now.

10:17:11  1        MR. WEBB:  Understood.  We will abide by your

10:17:13  2   instructions.

10:17:13  3        THE COURT:  All right.  Mr. Andre.

10:17:16  4        MR. ANDRE:  Your Honor, I think that's exactly

10:17:17  5   what we're asking for.  I mean, obviously, the fact that

10:17:22  6   Acceleration Bay has these patents is going to be a fact

10:17:25  7   that comes in.  That they are an existing company, that,

10:17:27  8   also, I think, takes care of the defendant's motion in

10:17:29  9   limine number three where we describe the equal dignity in

10:17:35 10   that.  So we will acquiesce that we won't be bringing up the

10:17:37 11   fact that, oh, they are a big, bad company that got mad

10:17:40 12   at --

10:17:40 13        THE COURT:  Yeah.  Yeah.  Well, good judgment

10:17:45 14   call on your part because I was going to grant their motion

10:17:47 15   on that.

10:17:48 16        MR. ANDRE:  Yeah.  I figured, since you granted

10:17:49 17   this one, because what we're looking for is just, as Your

10:17:52 18   Honor said, try the case on:  Look, here's the patents as

10:17:54 19   construed by the Court.  Here are the products.

10:17:56 20        Do they infringe?  If so, how much money?  And

10:17:59 21   that's what we are looking at.

10:18:00 22        They have a 112 argument.

10:18:02 23        THE COURT:  All right.  So unless there's some

10:18:04 24   reason to discuss defendant's motion in limine number three,

10:18:11 25   based on what Mr. Andre just said, I'm going to consider

10:18:14  1   that to be granted.

10:18:17  2        And presumably, if doors start getting opened

10:18:22  3   one way, we'll be looking at doors all over the place.  But

10:18:27  4   it should stick in my head that these two were two different

10:18:32  5   sides of a similar coin.

10:18:35  6        MR. ANDRE:  And that's exactly what we look at,

10:18:37  7   Your Honor.  If they start attacking our character of our

10:18:40  8   company, we can attack the character of their company.  I

10:18:44  9   think that's all we're saying.

10:18:45 10        THE COURT:  Okay.  Thank you.

10:18:46 11        Motion in limine number three, plaintiff wants

10:18:53 12   to keep out the argument that defendant did not infringe

10:18:56 13   because it practices the prior art.  And, of course, usually

10:19:04 14   this often comes up when there's either anticipation or

10:19:11 15   obviousness as a defense, and they're out.

10:19:17 16        And I gather that as a general principle,

10:19:25 17   defendant doesn't actually object to this, but of course,

10:19:28 18   the devil is in the details.  And the one thing I was

10:19:35 19   actually curious about, though I will hear what you have to

10:19:38 20   say, Mr. Frankel, in a second was the response, the answer

10:19:51 21   from the defendant, Page 2 of the second full paragraph.  It

10:20:00 22   has a sentence that just caught my attention.

10:20:00 23        Activision is certainly entitled when they

10:20:07 24   activated vis-a-vis networks that they don't infringe "that

10:20:11 25   the patents disavowal and criticize such networks, and they

10:20:17 1    are traditional networks, blah, blah, blah.

10:20:19 2            And there was some other place, I think, in one

10:20:26 3    of these other motion in limines that probably had to do

10:20:28 4    with the IPRs where somebody said, If we're going to put in

10:20:33 5    the prosecution history, as the defendants said, put in the

10:20:37 6    prosecution history, that shows disavowal of this or that.

10:20:42 7    That's not something for the jury.  You know, disavowal is

10:20:47 8    something from me.

10:20:48 9            So is it somebody's intent here to put in the

10:20:57 10   prosecution history of these patents?

10:21:01 11           MR. FRANKEL:  Your Honor, we share your concern.

10:21:07 12   The Court has construed the claims.  Defendants have made

10:21:10 13   arguments about how the prosecution history --

10:21:14 14           THE COURT:  So Mr. Frankel, because I've been

10:21:17 15   picking on defense for this --

10:21:19 16           MR. FRANKEL:  Yes.

10:21:19 17           THE COURT:  -- are you planning to introduce the

10:21:21 18   prosecution histories?

10:21:22 19           MR. FRANKEL:  No, Your Honor.

10:21:23 20           THE COURT:  All right.  Thank you.

10:21:24 21           What about you all?

10:21:25 22           MR. ENZMINGER:  We are not planning to introduce

10:21:27 23   the prosecution history with respect to claim construction;

10:21:31 24   however, we do intend to use it if necessary to

10:21:35 25   cross-examine their witnesses who give inconsistent

10:21:39 1    statements with respect to what the scope of the patent

10:21:42 2    claim is.

10:21:43 3            THE COURT:  So I don't think you can do that.  I

10:21:49 4    take it the witnesses -- I mean, if Mr. Medvidovic, you

10:21:57 5    know, submitted something during the pros -- well, of

10:22:00 6    course, he didn't.  This was like -- it was long ago.

10:22:02 7            You know, cross-examining the people on the

10:22:08 8    prosecution history, that defeats the whole purpose of

10:22:15 9    having claims construed and knowing what the scope is

10:22:18 10   because then you're arguing some different thing.  If you

10:22:20 11   want to cross-examine the experts on the claims themselves,

10:22:25 12   well then that's a different thing.  But I don't see how you

10:22:28 13   can be saying, Well, doesn't it say the prosecution history

10:22:31 14   this, or that, or the other thing.

10:22:36 15           MR. ENZMINGER:  So where it comes up, Your

10:22:38 16   Honor, most often here is with respect to distinguishing the

10:22:44 17   patented invention from the prior art.  And they've taken

10:22:49 18   this expansive view that no one could design around these

10:22:52 19   patents.  And in fact, what the evidence is going to show in

10:22:55 20   this case is these patents are a tiny change on what already

10:22:58 21   existed.

10:22:59 22           So, for example, in order to get the patent over

10:23:03 23   a particular M-regular incomplete network that was fully

10:23:08 24   disclosed in the prior art, they had to add some additional

10:23:11 25   limitations which Mr. Andre likes to ignore.  We --

10:23:15  1              THE COURT:  Well, but if he ignores them,

10:23:17  2    they're in the claims.  You can cross-examine him about

10:23:20  3    them --

10:23:20  4              MR. ENZMINGER:  Right.

10:23:20  5              THE COURT:  -- with the claims.

10:23:21  6              MR. ENZMINGER:  But the existence of the prior

10:23:24  7    art and alternative ways of developing of using a broadcast

10:23:32  8    channel, some of which are on the face of the patent

10:23:35  9    disclaimed, but other art, you know, there were well-known

10:23:38 10    ways between --

10:23:39 11              THE COURT:  But aren't your experts going to

10:23:41 12    actually look at the art and say, The art says this; the art

10:23:43 13    says that?  Presumably, their experts are going to say, no,

10:23:46 14    it doesn't.

10:23:48 15              MR. ENZMINGER:  Well, he will look at -- when

10:23:49 16    you say -- he will say to the jury that the inventors of

10:23:53 17    this patent did not invent M-regular broadcast channels.

10:23:57 18              THE COURT:  Okay.  That's right.  You know, on

10:24:01 19    the surface, that seems like a perfectly reasonable thing to

10:24:04 20    say, but that doesn't require the prosecution history.

10:24:08 21              MR. ENZMINGER:  The prosecution history

10:24:10 22    itself -- well, it requires being able to show the prior art

10:24:13 23    and saying, you know, this is what people knew at the time.

10:24:17 24              THE COURT:  Well, right.  And so you have a

10:24:19 25    piece of prior art that says, you know, copyright 2001.  I'm

10:24:25 1    assuming that's before the priority date.

10:24:29 2            You know, it's out there, and it doesn't have

10:24:34 3    any of the risks the prosecution history does of, you know,

10:24:39 4    that the jury won't understand the context of how

10:24:45 5    prosecution history occurs.  It won't have the back and

10:24:49 6    forth.  It won't have the fact that it's 600 pages long or

10:24:53 7    however long it is.

10:24:57 8            You can accomplish, I think, what you want to

10:24:58 9    accomplish without bringing in the prosecution history.

10:25:02 10           MR. ENZMINGER:  I may have misunderstood the

10:25:04 11   question.  Our intention is not to put the prosecution

10:25:07 12   history document in front of the jury.

10:25:09 13           THE COURT:  Okay.

10:25:10 14           MR. ENZMINGER:  Our intention is to be able to

10:25:11 15   rely on examples of how the state of the art at the time of

10:25:16 16   this invention to show that it's a very narrow invention,

10:25:18 17   and we don't need the prosecution history itself to do that.

10:25:21 18           THE COURT:  Okay.  All right.  Well, so that's

10:25:24 19   maybe an issue resolved.

10:25:26 20           So what about this?  Is there something in

10:25:32 21   particular, Mr. Frankel, on the don't let them argue it's

10:25:42 22   practicing the prior art?  Is there something in particular?

10:25:51 23           Because at a general level, both sides can agree

10:25:55 24   that you can't -- it's not a defense that you're practicing

10:26:00 25   the prior art.  But in my experience, you know, the sides

10:26:10 1    will disagree when you get into a more granular level about

10:26:12 2    this and that.

10:26:13 3            Is there something in particular that you think

10:26:15 4    they're going to do that is typically not allowable under

10:26:21 5    this line of Federal Circuit cases?

10:26:23 6            MR. FRANKEL:  Yes, Your Honor.  I'd like to read

10:26:25 7    from their opposition to the motion in limine where

10:26:29 8    Activision makes arguments that clearly run afoul of the --

10:26:34 9            THE COURT:  All right.

10:26:36 10           MR. FRANKEL:  -- practices.  So Activision wants

10:26:40 11   to explain "that the claimed M-regular incomplete network

10:26:42 12   structure is one of many network structures that existed in

10:26:46 13   the prior art and still exists today."

10:26:48 14           THE COURT:  I'm sorry.  Which page are you on?

10:26:50 15           MR. FRANKEL:  The bottom of Page 1.  And then on

10:26:53 16   to Page 2, and again, this is all in the context of

10:26:57 17   infringement, not damages.

10:27:00 18           THE COURT:  So you say it's in the context of

10:27:02 19   infringement.  I mean, part of it.  There are a lot of

10:27:10 20   different issues going on here, but go ahead.

10:27:16 21           MR. FRANKEL:  And, again, plaintiff would like

10:27:18 22   to prevent the jury from learning that the claims simply do

10:27:21 23   not cover traditional client server and full-mesh network

10:27:26 24   topologies which existed in the prior art and which exist

10:27:30 25   today.  So I want to make a distinction between damages

10:27:33 1    issues that counsel just raised, and the issue of

10:27:36 2    infringement, and then the issue of prior art and

10:27:40 3    invalidity.

10:27:40 4              So prior art and invalidity are now out of the

10:27:43 5    case, and the only question is:  Did the accused products

10:27:45 6    actually practice the claims?  So pointing to technologies

10:27:50 7    that existed before the filing of this patent has no

10:27:53 8    relevance on the question of infringement.

10:27:55 9              And it would be very confusing for the jury for

10:28:00 10   Activision's experts to make the arguments that they've said

10:28:04 11   in the opposition that they intend to make.  The damages

10:28:07 12   question is:  Are there non-infringing alternatives?

10:28:10 13             THE COURT:  Well, so just before we go on, you

10:28:15 14   agree that the defendants could ask your experts or your own

10:28:21 15   experts, Do the claims cover traditional client server and

10:28:27 16   full-mesh network topologies, and presumably the answer is

10:28:32 17   going to be no.

10:28:34 18             MR. FRANKEL:  Well, the question should be:  Do

10:28:38 19   they cover client-server topologies.

10:28:42 20             THE COURT:  Well, I mean, obviously, I have no

10:28:44 21   clue what the actual real question is, but in terms of, you

10:28:48 22   know, what the claims cover, what they don't cover, what the

10:28:52 23   invention is, what the invention isn't, I mean, that's

10:28:57 24   something that when the experts are busy trying to read the

10:29:03 25   products onto the claims, there's going to be testimony

10:29:08  1    about that; right?

10:29:09  2                MR. FRANKEL:  Of course, Your Honor.  We've had

10:29:11  3    the benefit of what may be an unprecedented five claim

10:29:15  4    construction hearings.  We have, you know, very well-defined

10:29:20  5    constructions for the terms that are at issue, and that's

10:29:23  6    what the experts should be applying to determine if there is

10:29:27  7    infringement and if there is not infringement.

10:29:29  8                What we're objecting to is the reference to

10:29:34  9    prior art.  There's no need to bring in prior art to try and

10:29:37 10    shape how the jury should understand the scope of the

10:29:40 11    claims.  That's been done by the Court.

10:29:42 12                THE COURT:  Yeah.  Well, so, you know, at a high

10:29:49 13    level, even when the Court had brilliantly construed all

10:29:55 14    these claims, that doesn't mean the jury is going to

10:29:58 15    understand them.  And so I guess I'm having trouble with

10:30:13 16    your argument which seems to be during the portion that

10:30:19 17    relates to infringement, there should be no mention of any

10:30:23 18    prior art.

10:30:25 19                Is that your position?

10:30:27 20                MR. FRANKEL:  It is, but if I could clarify.  I

10:30:30 21    don't think I've quite gotten to the real point which is

10:30:33 22    that there's no need to refer to the fact that these

10:30:37 23    technologies are prior art to argue noninfringement or to

10:30:42 24    argue non-infringing alternatives.

10:30:44 25                If Activision wants to make the argument that

10:30:47 1    they're using a topology that doesn't infringe, they can

10:30:51 2    make that argument.  If they want to make the argument that

10:30:54 3    there's a topology that's available as a non-infringing

10:30:57 4    alternative, they can make that argument.

10:30:59 5            What they don't need to do is bring in the fact

10:31:02 6    that these technologies supposedly predated these patents.

10:31:06 7    That is not relevant to the issue of non-infringing

10:31:09 8    alternatives.

10:31:10 9            They don't have to show that the non-infringing

10:31:12 10   alternative came before the patent.  They only have to show

10:31:15 11   that it's available when infringement began.  And for

10:31:18 12   purposes of noninfringement, it's not relevant if it's an

10:31:22 13   old technology or if it's a new technology.

10:31:24 14           THE COURT:  So but if the experts say, Well,

10:31:26 15   this technology existed as of 2015, here's a patent that

10:31:32 16   says technology, does it really matter whether the patent's

10:31:38 17   dated, or you're saying it doesn't matter whether the patent

10:31:40 18   is dated 2013 or 1998?  So what it seems to be is you don't

10:31:48 19   want them to be arguing there's something wrong with these

10:31:51 20   patents because these things did this beforehand and existed

10:31:56 21   beforehand, and it seems to be maybe the fact that there's

10:31:59 22   no anticipation or obviousness.

10:32:00 23           And you know, I would think even when only half

10:32:06 24   paying attention that I ought to be able to hear when the

10:32:09 25   defense gets up and says, And these are crappy patents

10:32:11 1    anyhow because look at this stuff that existed beforehand.

10:32:16 2    They're not going to do that.

10:32:17 3         MR. FRANKEL:  Well, Your Honor, that's exactly

10:32:18 4    what we're trying to preclude with this motion in limine,

10:32:21 5    the two portions that I read in.

10:32:22 6         THE COURT:  I'm sorry.  Go ahead, Mr. Frankel.

10:32:26 7         MR. FRANKEL:  Thank you.  So the two portions

10:32:27 8    that I read in start with the non-infringing argument, and

10:32:30 9    then gratuitously talk about the fact that the supposedly

10:32:35 10   non-infringing structure existed in the prior art.

10:32:40 11        That's what we're trying to keep out.  That's

10:32:42 12   what will be confusing to the jury.  It's to try and argue

10:32:46 13   noninfringement by referring to this older technology.  They

10:32:50 14   had a chance to try and show that these claims were invalid

10:32:53 15   in view of the prior art, and all these claims have been

10:32:56 16   conformed.  They're not arguing --

10:32:59 17        THE COURT:  Even if they hadn't been, there's no

10:33:00 18   anticipation or obviousness in the case.

10:33:02 19        MR. FRANKEL:  Correct.  So there's no need to

10:33:04 20   refer to the fact that any of these technologies supposedly

10:33:08 21   predate these patents.  That's what we're trying to seek.

10:33:12 22   If they want to point out that there's a non-infringing

10:33:14 23   alternative that happens to have been around since the

10:33:18 24   1500s, that's fine, but they shouldn't be arguing that it

10:33:21 25   predates the patent.

10:33:22  1              There's no need to get into it.  It's not

10:33:24  2    relevant, and it will be confusing and misleading.

10:33:27  3              THE COURT:  Okay.  I understand.

10:33:28  4              So I think, though Mr. Frankel didn't say it

10:33:38  5    exactly like this, he wants to avoid the suggestion that

10:33:50  6    there's some special -- that as it relates to infringement,

10:33:59  7    there's some -- I guess, if I had to put it in a sentence, I

10:34:08  8    would say Mr. Frankel wants to not emphasize the dates of

10:34:12  9    prior art or just art except as is necessary to make

10:34:21 10    whatever arguments you're going to make on non-infringing

10:34:25 11    alternatives, or damages, or maybe even willfulness.

10:34:32 12              Is there a problem here?

10:34:33 13              MR. ENZMINGER:  Well, the primary problem is I

10:34:37 14    don't understand what that means.

10:34:38 15              THE COURT:  Well, yeah.  Okay.  Leaving that

10:34:41 16    aside, is there any other question?

10:34:43 17              MR. ENZMINGER:  Yes.  There is an issue with

10:34:45 18    that because we are not seeking, in the interest of time, to

10:34:55 19    bring in an invalidity case with respect to obviousness or

10:34:59 20    anticipation, okay, but that does not mean that we are

10:35:06 21    willing to concede an argument to the jury that these are

10:35:10 22    the foundational patents for all multi-player gaming.

10:35:14 23    Multi-player gaming existed, and for the reason I -- you

10:35:20 24    look quizzical.

10:35:20 25              THE COURT:  No.  No.  The reason I'm looking

10:35:21  1    quizzical is because I had a pretrial conference in a

10:35:24  2    different case on Monday where we were arguing about

10:35:27  3    foundational, and all of a sudden, because I can only keep

10:35:31  4    so many things in my head at once, I'm thinking, oh, have I

10:35:34  5    got this case confused with that case?  I'm thinking, no,

10:35:37  6    it's just a different argument being made in a different

10:35:37  7    case.

10:35:40  8             So go ahead.

10:35:41  9             MR. ENZMINGER:  So this question is largely

10:35:46 10    answered by a Federal Circuit case that came out after we

10:35:49 11    did this briefing which basically says even, you know, when

10:35:54 12    the defendant is not asserting practicing the prior art --

10:35:57 13             THE COURT:  Is this like Communique?

10:35:58 14             MR. ENZMINGER:  Yes, exactly.

10:35:59 15             THE COURT:  We have the right to tell the jury,

10:36:04 16    as part of our infringement case, the scope of the patent as

10:36:09 17    it existed and the state of the technology.  That's not the

10:36:13 18    same thing as saying it's invalid.

10:36:16 19             But you know, it's an important part of this

10:36:19 20    case that these are tiny narrow changes to what had been

10:36:24 21    existing for decades.  And it's not --

10:36:27 22             THE COURT:  But that's not for infringement.

10:36:29 23    It's for other issues like damages; right?

10:36:31 24             MR. ENZMINGER:  It's for damages, and a great

10:36:33 25    example of this is the argument we had earlier on World of

10:36:36 1    Warcraft and what the date is.

10:36:39 2              THE COURT:  So I think what Mr. Frankel is

10:36:44 3    concerned about is he's not really concerned about how you

10:36:46 4    use this for damages.  He's concerned about how you use this

10:36:56 5    for, I don't know, infringement.

10:36:58 6              So if you're telling me, Well, I'm not using it

10:37:03 7    for infringement, I'm using it for other things, I think

10:37:05 8    we've more or less resolved the problem.

10:37:07 9              MR. ENZMINGER:  I'm using it for non-infringing

10:37:09 10   alternatives.  I'm using it for damages.  I'm not using it

10:37:15 11   to deal with infringement.

10:37:19 12             THE COURT:  Okay.

10:37:21 13             MR. FRANKEL:  Your Honor, just returning to our

10:37:23 14   actual motion in limine, we asked that defendants not refer

10:37:28 15   to the prior art for purposes of arguing noninfringement.

10:37:32 16   And for purposes of non-infringing alternatives, there's no

10:37:35 17   need to get into the timing of when it became available.

10:37:39 18             THE COURT:  Well, okay.  So this is what I'm

10:37:43 19   hearing:  The plaintiff's main concern is that prior art not

10:37:49 20   be brought up to argue noninfringement.  Defendant

10:37:55 21   representing that it will bring up prior art for other

10:37:59 22   issues to which plaintiff does not generally object.  And so

10:38:12 23   I think that resolves this motion.

10:38:13 24             In terms of the plaintiff's secondary emphasis

10:38:17 25   on not highlighting dates of prior art, you know, it

10:38:27 1    sounds -- it's relevant.  You know, well, the jury is going

10:38:32 2    to hear lots of dates about things.  Most of these documents

10:38:35 3    are dated, so the dates are going to come in.

10:38:40 4         And I expect the defendant to use it for the

10:38:43 5    purpose for which they're offering it, but I don't see a

10:38:48 6    need to put a further restriction on that.  So I'm going to

10:38:55 7    say that, at the high level, both sides agree, and at a

10:39:05 8    slightly lower level, both sides agree.

10:39:13 9         But at the third level, which is the use of

10:39:17 10   dates, they don't agree.  And I'm going to say there's no

10:39:21 11   prejudice to plaintiffs, so I'm not going to restrict

10:39:29 12   defendant's use of dates.

10:39:33 13        All right?

10:39:33 14        MR. FRANKEL:  Thank you.

10:39:34 15        THE COURT:  Okay.  Hold on a minute.

10:39:44 16        All right.  So I think part of the first

10:40:00 17   defendant's motion which is broadly captioned, Plaintiff

10:40:06 18   should be precluded from referencing or presenting argument,

10:40:09 19   evidence, or testimony regarding pre-suit knowledge,

10:40:12 20   copying, use, or denervating by Activision or non-parties.

10:40:16 21   Hard to believe you can brief that in three pages.

10:40:19 22        So I thought a large part of this had been

10:40:27 23   rendered moot by the fact that obviousness and anticipation

10:40:31 24   are not in the case.  Am I right?  Yeah.

10:40:38 25        MR. WEBB:  Your Honor, I believe that's correct,

10:40:39  1    but willfulness still is in the case, and that's the part --

10:40:42  2            THE COURT:  Right.  So there's two aspects to

10:40:44  3    willfulness.  So to the extent that Acceleration Bay has

10:40:49  4    evidence that the defendant knew about the patents, that's a

10:40:54  5    necessary prerequisite to their willfulness case; right?

10:40:59  6            So if it's the case, which is what I gathered

10:41:02  7    from this, that somebody who was connected to Activision was

10:41:06  8    trying to license the patents from Mr. Bourassa or from

10:41:11  9    somebody before all this occurred, that seems to be relevant

10:41:17 10    to willfulness; right?

10:41:18 11            MR. WEBB:  Not necessarily, Your Honor.  In

10:41:21 12    response to our interrogatory, they said that their

10:41:24 13    willfulness evidence was post-filing of this Complaint.  And

10:41:27 14    we relied on that, and that's been the case from very early

10:41:30 15    on in this litigation.

10:41:31 16            THE COURT:  When you say "their evidence," I

10:41:33 17    mean, they can only allege willfulness from the date of the

10:41:37 18    Complaint because that's as far back as they go on damages;

10:41:40 19    right?

10:41:40 20            MR. WEBB:  Well, actually that's where they

10:41:43 21    allege our first knowledge of the patents were as well.  The

10:41:45 22    problem is this:  During discovery, during one of the

10:41:49 23    inventor's depositions, he alluded to some vague discussion

10:41:52 24    with some unnamed Activision employees that occurred before

10:41:56 25    the patent issued.  It was not a part of their response to

10:42:00 1    our willfulness interrogatory, but we were concerned that

10:42:03 2    that may surface during trial as some phantom evidence of

10:42:07 3    bad acting before the patent happened without knowing who

10:42:11 4    the person at Activision was, the fact that no technical

10:42:14 5    details were shared at all, and before the patent issued.

10:42:18 6              THE COURT:  All right.

10:42:18 7              MR. WEBB:  So we are concerned that that

10:42:20 8    narrative not come in because it's, number one, not

10:42:22 9    responsive.  It was not raised in response to our

10:42:25 10   willfulness interrogatory, and it is inadmissible.

10:42:27 11             THE COURT:  Okay.  What do you have to say about

10:42:29 12   that, plaintiff?

10:42:30 13             MR. ANDRE:  Your Honor, the inventor, Mr. Virgil

10:42:41 14   Bourassa, started a -- he and the other co-inventor,

10:42:44 15   Dr.  Fred Holt, started a spin-out company from Boeing as

10:42:50 16   part of Boeing's chairman initiative.  And part of that

10:42:53 17   initiative was to license these patents and utilize these

10:42:55 18   patents.

10:42:56 19             He contacted Activision early on -- patents had

10:43:00 20   been filed.  Patents had not issued at that point -- to talk

10:43:03 21   to Activision about licensing this technology.  Whether that

10:43:09 22   rises to the level of willfulness in light of the patents,

10:43:13 23   it's part of the totality of circumstances you look at.

10:43:15 24             What we do have in this case for notice for

10:43:19 25   certain --

10:43:19  1          THE COURT:  Is it the case that Bourassa doesn't

10:43:21  2   know who he talked to, just somebody at Activision?

10:43:24  3          MR. ANDRE:  He called an executive at

10:43:26  4   Activision.  He spoke about the technology in general.

10:43:28  5          THE COURT:  This would be in what time frame?

10:43:30  6          MR. ANDRE:  In the early 2000s.  So they filed

10:43:33  7   the patents in 2000.  They started the spin-out company.

10:43:36  8   They started talking to the VC's who funded the company up

10:43:40  9   to 2002.  Sometime around that time period, 2001, 2002, they

10:43:45 10   contacted Activision.

10:43:47 11          And it is something that goes to kind of what

10:43:53 12   they were talking about earlier, kind of the state of art,

10:43:55 13   what was going on at the time that this was a -- you know, I

10:44:00 14   would love just to be able to try this case, Your Honor,

10:44:03 15   just to take one step back, show the patent claims, and show

10:44:05 16   products, to be done with it.

10:44:06 17          They want to talk about the state of the art.

10:44:08 18   They want to talk about a lot of different things.  So we've

10:44:11 19   not alleged this is part of the willfulness issue, that

10:44:14 20   Mr. Bourassa's contacting them in 2001-2002 was part of the

10:44:18 21   willfulness issue.

10:44:19 22          THE COURT:  So are you telling me right now,

10:44:21 23   because you seem to be, that you want this Bourassa

10:44:25 24   testimony in, but it's not relevant to the willfulness

10:44:30 25   issue?

10:44:31 1          MR. ANDRE:  It's not to willfulness, Your Honor.

10:44:34 2   The willfulness goes to 2015 when we filed the original suit

10:44:38 3   that was dismissed, and we refiled in 2016.  That's when we

10:44:41 4   said they had the notice.  So that's when we believe

10:44:44 5   willfulness, the conduct going forward.

10:44:47 6          THE COURT:  Okay.  And so the relevance of this

10:44:56 7   Bourassa conversation with somebody at Activision in, say,

10:44:59 8   2002 is -- well, first off, is Bourassa going to be here

10:45:02 9   live and in person?

10:45:03 10          MR. ANDRE:  He will be, Your Honor.

10:45:05 11          THE COURT:  So what is it you expect him to say

10:45:06 12   about that?  Did Mr. Webb characterize it in the way you

10:45:11 13   expect it to be?

10:45:12 14          MR. ANDRE:  To a large extent.  I think what

10:45:14 15   Mr. Bourassa is going to talk about is, you know, when he

10:45:18 16   was tasked to do this with Dr. Holt, he expected to take a

10:45:22 17   few weeks to do it.  It took them over three years to do it.

10:45:25 18   This was not a tiny improvement that could be done in five

10:45:28 19   minutes.  This was a significant --

10:45:30 20          THE COURT:  Well, that's a different thing.  I

10:45:32 21   mean, he's going to testify, yeah, it took me a long time to

10:45:35 22   do the invention.  Okay.  Great.

10:45:37 23          MR. ANDRE:  And it took a long time to do the

10:45:41 24   invention.

10:45:41 25          THE COURT:  So the only part that I'm actually

10:45:43  1    curious or is at issue here is he's going to testify about

10:45:46  2    in relation to Activision, he did what?

10:45:49  3                MR. ANDRE:  He approached them because he

10:45:51  4    realized his invention could solve their problems, their

10:45:55  5    problems in this multi-player game.  This was a new paradigm

10:45:58  6    ship.  This was a state-of-the-art discussion.

10:45:59  7                Now, if we can get rid of all of the

10:46:02  8    state-of-the-art discussions, we can get rid of that.

10:46:04  9    That's what you heard Mr. Frankel and him talk about

10:46:06 10    earlier.

10:46:06 11                And I believe that's going to be the next motion

10:46:08 12    regarding the IPR as well.  If we don't have to talk about

10:46:11 13    the state of the art, what was happening, and what was the

10:46:14 14    state of the art at the time, then Mr. Bourassa doesn't need

10:46:16 15    to talk about the state of art back in 2002, why he went to

10:46:20 16    Activision, why he went to Sony, why he went to these other

10:46:22 17    parties to discuss this technology.

10:46:25 18                THE COURT:  Well, but it seems like -- I can't

10:46:40 19    remember the time frame now.  Did he call Sony and then Sony

10:46:47 20    took a license?

10:46:47 21                MR. ANDRE:  Sony -- he began to negotiate with

10:46:51 22    Sony.  The technology in that time period, the company that

10:46:56 23    he and Dr. Holt had founded dissolved in 2005 because of

10:47:00 24    lack of funds.  Sony took a license in 2006.

10:47:04 25                They approached Boeing to get a license, but

10:47:08  1    based on those conversations they had with Mr. Bourassa and

10:47:12  2    Dr. Holt.  So it was during the time period when they were

10:47:17  3    forming this start-up company called Panthesis.

10:47:20  4                 THE COURT:  Yeah.  Yeah, too much detail here.

10:47:21  5                 MR. ANDRE:  So we're not going to put him in

10:47:31  6    for --

10:47:32  7                 THE COURT:  So did he call people besides from

10:47:34  8    Sony and Activision?

10:47:36  9                 MR. ANDRE:  Yeah.  They talked to a few other

10:47:38 10    folks as well.

10:47:39 11                 THE COURT:  All right.  Well, so on the proffer,

10:47:49 12    as I understand it, which is that part of Mr. Bourassa's

10:47:52 13    invention story is that he tried to license this to a

10:47:59 14    handful of companies, including Activision in 2002.  Maybe

10:48:03 15    that it led to Sony taking a license in 2006, it seems to me

10:48:11 16    to be part of the invention story.

10:48:15 17                 And on the representation that it's not going to

10:48:19 18    be argued to be part of willfulness, I don't think there's

10:48:25 19    any prejudice to the defendant.  So I'm inclined to allow

10:48:31 20    that.

10:48:32 21                 MR. WEBB:  Your Honor, just to be clear about a

10:48:34 22    few things, this phone call happened in around 2000 or 2001.

10:48:39 23    The patent issued in 2004.  The conversation was between a

10:48:44 24    financial broker, some sort of a business broker, and

10:48:48 25    allegedly Activision.  We don't know who.

10:48:50 1          Mr. Bourassa will testify that he was listening

10:48:54 2   in on the phone call.  He didn't make the phone call

10:48:56 3   himself, and no technical details were discussed whatsoever.

10:49:01 4   It was merely a business kind of concept.

10:49:03 5          THE COURT:  It's the same thing that Mr. Andre

10:49:06 6   just said essentially, which is he was trying to get

10:49:10 7   interest in getting remunerated for the patent.

10:49:13 8          MR. WEBB:  And that may be relevant and fair,

10:49:16 9   Your Honor, but focusing on my client, the context of a

10:49:19 10  patent case like this, it's not a stretch to understand how

10:49:23 11  the jury might think, Well, gosh, Activision must have

10:49:25 12  gotten something from that phone call; and therefore, they

10:49:28 13  used it in their system to infringe these patents.

10:49:31 14         My concern is with a lurking willfulness issue

10:49:36 15  in this case, the jury will connect the dots in a way that

10:49:38 16  would be improper based upon unnecessarily focusing on a

10:49:42 17  conversation with my client.

10:49:43 18         Now, to be sure, they reached out to a whole lot

10:49:46 19  of companies trying to get someone to license or buy this

10:49:49 20  technology.  They had no takers.

10:49:51 21         By focusing on Activision, the only import would

10:49:54 22  be to suggest to the jury that we did something wrong, that

10:49:58 23  we got something from that phone call that we used

10:50:01 24  improperly.  And I think that is --

10:50:02 25         THE COURT:  Well, you're saying the broker did

10:50:04  1    the conversation.  I mean, presumably whoever the broker was

10:50:07  2    is a business person.  And Mr. Bourassa is just listening.

10:50:12  3    Presumably, they had to be sketched out in pretty broad

10:50:15  4    terms; right?

10:50:15  5              MR. WEBB:  Oh, yeah.  He admitted that there

10:50:17  6    were no technical details discussed.

10:50:19  7              THE COURT:  So how could the jury then say,

10:50:21  8    Well, oh, I guess they stole the technical details from the

10:50:23  9    call?

10:50:24 10              MR. WEBB:  Well, the question is not from the

10:50:26 11    jury whether they take it just from that testimony.

10:50:29 12    Depending on how that testimony is used and packaged, I

10:50:32 13    think that there's a risk that they may go there.

10:50:34 14              And so my concern is, in the abstract, that

10:50:37 15    testimony may not be enough for the jury to go to that next

10:50:41 16    step, that following step.  But that testimony being

10:50:44 17    packaged in a way and presented to the jury could have that

10:50:48 18    effect, and that would be very prejudicial to our client,

10:50:51 19    especially when the patents had not even issued at that

10:50:54 20    time.

10:50:54 21              THE COURT:  But I think that's all things that

10:50:58 22    -- I mean, it's not going to be prejudicial because there's

10:51:01 23    not going to be any basis to conclude that he stole

10:51:06 24    something.  It's going to be admitted that the patent at

10:51:09 25    issue here hadn't even appeared yet.

10:51:12  1        And so, you know, there's going to be a

10:51:21  2   conversation that was held.  If you want to bring it out,

10:51:25  3   maybe they'll bring it out, with a number of other

10:51:28  4   companies.  I mean, it seems to me like something that's

10:51:36  5   going to be a blip in the trial, so I'm going to allow them

10:51:40  6   to do that.

10:51:41  7        MR. WEBB:  Thank you, Your Honor.

10:51:42  8        THE COURT:  Okay.  Is there anything else here

10:51:53  9   because there's not going to be any discussion about Sony

10:51:56 10   and Mr. Van Datta surreptitiously copying asserted patents;

10:52:01 11   right?

10:52:01 12        MR. ANDRE:  I don't know where that's coming

10:52:03 13   from.  We're not going to be presenting that evidence to

10:52:05 14   prove willfulness or for anything.

10:52:07 15        THE COURT:  Okay.  So I don't think there's much

10:52:09 16   else there.  So I'm going to, you know, deny it to the

10:52:17 17   extent it seeks to keep out the Bourassa conversation in

10:52:20 18   2001 or so, and that it's not relevant to willfulness.

10:52:27 19        So the last motion in limine is about the IPRs,

10:52:34 20   I guess.  And I don't really understand why, the fact that

10:52:40 21   there's no anticipation and obviousness defenses here, it

10:52:48 22   doesn't mean that this is pretty moot, too, because what

10:52:50 23   possible relevance could the IPRs or PTAB have on anything?

10:52:57 24        I take it you agree.  No, you want to get them

10:53:02 25   in.

| | |
|---|---|
| 10:53:02 1 | Sorry, Mr. Frankel.  I was putting you on the |
| 10:53:06 2 | side rank here. |
| 10:53:07 3 | What's the relevance to this? |
| 10:53:09 4 | MR. FRANKEL:  Well, the relevance has certainly |
| 10:53:11 5 | been reduced, Your Honor. |
| 10:53:13 6 | THE COURT:  And of course, in my history, it |
| 10:53:15 7 | never had enough relevance to come in.  So when you're |
| 10:53:17 8 | reducing it from not being sufficient, it's still |
| 10:53:20 9 | insufficient. |
| 10:53:21 10 | MR. FRANKEL:  If Activision is not going to talk |
| 10:53:23 11 | about the state of the art, then we're not going to |
| 10:53:27 12 | reference the IPRs. |
| 10:53:29 13 | THE COURT:  Okay.  Well, they're, I guess, going |
| 10:53:33 14 | to do a little talking about the state of the art, but |
| 10:53:36 15 | you're not going to be talking about the IPRs because |
| 10:53:39 16 | they're confusing, and they have no relevance, particularly |
| 10:53:43 17 | in a case where there's not even an issue in the case that's |
| 10:53:47 18 | relevant to IPRs, PTAB, anticipation, obviousness.  And I |
| 10:53:57 19 | guess the one -- hold on a minute. |
| 10:54:11 20 | So I take it, because the only issue here is |
| 10:54:16 21 | this lack of written description, there's going to be no -- |
| 10:54:28 22 | I think I'm getting this confused with a case I had on |
| 10:54:31 23 | Monday.  So, in any event, let's move on. |
| 10:54:35 24 | But I'm going to exclude -- yes, Mr. Frankel. |
| 10:54:38 25 | MR. FRANKEL:  If I could just make two brief |

10:54:40 1    points, Your Honor.  The first is that Activision is calling

10:54:43 2    as witnesses two prior art witnesses that we've objected to,

10:54:49 3    Ed Terrano and Kegel.

10:54:52 4              And all that they were disclosed for was prior

10:54:56 5    art.  The prior art that they were disclosed for was

10:54:58 6    overcome in the IPRs.

10:55:00 7              THE COURT:  So Ed Terrano.  And who is the other

10:55:03 8    one?

10:55:04 9              MR. FRANKEL:  Kegel, K-E-G-E-L.

10:55:05 10             THE COURT:  Are you actually calling Kegel and

10:55:09 11   Terrano?

10:55:09 12             MR. ENZMINGER:  We are going to play some

10:55:10 13   testimony from them.

10:55:11 14             THE COURT:  Why?

10:55:12 15             MR. ENZMINGER:  Because with respect to

10:55:20 16   Mr. Terrano, he designed a Microsoft network that they

10:55:23 17   contend is non-infringing.  We thought it wasn't an

10:55:29 18   anticipatory reference.

10:55:31 19             The Patent Office disagreed with that.  That's

10:55:33 20   fine.  But it still is now then a non-infringing

10:55:37 21   alternative.

10:55:41 22             THE COURT:  All right.  So you're going to call

10:55:46 23   this person.  I'm sorry.  Are we talking about Terrano

10:55:50 24   here --

10:55:51 25             MR. ENZMINGER:  Yeah.  We'll be presenting

10:55:52  1    some --

10:55:53  2              THE COURT:  -- or some deposition?

10:55:55  3              MR. ENZMINGER:  Mr. Terrano, unfortunately, has

10:55:57  4    throat cancer, so he will not be able to be here.  But, yes,

10:56:00  5    with respect to the non-infringing design that existed in

10:56:04  6    the late 1990s that he designed and that Activision used.

10:56:08  7              THE COURT:  Okay.  So basically he's going to

10:56:10  8    say something, and then your expert is going to say

10:56:12  9    something to make it relevant?

10:56:15 10              MR. ENZMINGER:  Exactly.

10:56:16 11              THE COURT:  All right.  And how about Kegel?

10:56:18 12              MR. ENZMINGER:  Same.

10:56:19 13              THE COURT:  All right.  What's your response to

10:56:21 14    that?

10:56:21 15              MR. FRANKEL:  The issue we have is that if

10:56:26 16    Mr. Kegel and Mr. Terrano designed the topologies that are

10:56:29 17    non-infringing, the experts should just say these topologies

10:56:32 18    are available as a non-infringing alternative.

10:56:35 19              The fact that these topologies were created in

10:56:38 20    1990 or the late 1990s before or after these patents is not

10:56:42 21    relevant, and it's confusing.  It's getting into the --

10:56:45 22              THE COURT:  No, but I think, you know, it's not

10:56:51 23    as though the jury is going to be looking at this against

10:56:53 24    the background of, Jeez, where are the anticipation and

10:56:55 25    obviousness defenses that we were expecting?  Hmm.

10:56:59  1          You know, they're going to take it for what it's

10:57:03  2   worth which is you all have some patents.  You say they

10:57:09  3   infringe.  They say the patent is not valid for lack of

10:57:13  4   written description, whatever that is, and those are the

10:57:17  5   issues.

10:57:18  6          They're not going to be saying, huh, prior art.

10:57:23  7   Maybe we ought to just like enter an anticipation verdict.

10:57:27  8   Right?

10:57:28  9          MR. FRANKEL:  Okay.  Well, Your Honor, if

10:57:30 10   they're not going to use the testimony of Terrano or Kegel

10:57:33 11   to suggest invalidity, which it sounds like they won't, then

10:57:37 12   we don't need to refer to the IPRs for that issue.

10:57:39 13          The one other point is that if Activision is

10:57:41 14   going to argue that its invalidity defenses are evidence of

10:57:46 15   no willfulness, then we should be entitled to point out --

10:57:50 16          THE COURT:  I don't think they're going to do

10:57:52 17   that.  They lost.  Right?

10:57:55 18          And I see Mr. Enzminger smiling.

10:57:57 19          MR. ENZMINGER:  No.  That's not an argument

10:57:59 20   we're presenting.

10:58:00 21          THE COURT:  I mean, the jury is going to not

10:58:02 22   hear the words obvious or anticipate; right?

10:58:06 23          MR. ENZMINGER:  Right.

10:58:06 24          THE COURT:  Right.  So we're good.

10:58:07 25          MR. FRANKEL:  Well, so just to be clear,

10:58:09 1    Activision will not rely on its invalidity defenses as

10:58:13 2    evidence of no willfulness at any time.

10:58:16 3           THE COURT:  I think what he was saying is it

10:58:18 4    won't rely on any 102 or 103.  I don't know what they might

10:58:23 5    say about some other things, but...

10:58:26 6           MR. FRANKEL:  Fair enough.

10:58:27 7           THE COURT:  Right?

10:58:28 8           MR. ENZMINGER:  Right.

10:58:28 9           THE COURT:  Okay.  All right.

10:58:30 10          So the IPRs and the PTAB proceedings are out.

10:58:34 11   We've already dealt with motion in limine number three.

10:58:37 12          So here's the thing:  I have a guilty plea now.

10:58:40 13   And we've been here for two-and-a-half hours, so it's time

10:58:43 14   to take a break, I guess.

10:58:45 15          Let me just -- because there are some other

10:58:51 16   things to talk about here.  All right.  Can I just see the

10:59:44 17   court reporter over here for a second?

10:59:44 18          (Discussion held off the record:)

11:00:10 19          THE COURT:  All right.  What I think we need to

11:00:12 20   do is recess.  I've got this guilty plea, but I've got

11:00:15 21   another commitment.  I've got a telephone conference.  I've

11:00:19 22   got a Markman.

11:00:21 23          So the Markman is scheduled for three o'clock

11:00:27 24   until 5:00, but I don't actually think that I am going to

11:00:31 25   need all that time.  So why don't you all plan to be back

11:00:34   1    here at 4:00.  And I don't know when we'll finish the

11:00:38   2    Markman, but whenever we finish, we'll then start back on

11:00:43   3    this where basically I've got the body of your Pretrial

11:00:49   4    Order, and I have some other miscellaneous items.

11:00:56   5            All right.  Okay.

11:00:59   6            So we'll be in recess until four o'clock or

11:01:02   7    whenever this Markman is done.

11:01:02   8            THE CLERK:  All rise.

11:01:04   9            (Court was recessed until 4:05 p.m.)

11:01:13  10            THE CLERK:  All rise.

04:06:36  11            THE COURT:  All right.  Please be seated.

04:06:38  12            So this is a continuation of Acceleration Bay.

04:06:42  13    So the disadvantage of having a break is it gives you a

04:06:45  14    chance to reconsider things that have already happened.

04:06:48  15            So one of the things is this briefing schedule

04:06:52  16    we agreed to on the damages things.  We were thinking about

04:07:01  17    it, and we want to just slightly modify it, which is instead

04:07:04  18    of these three briefs being due Monday at 6:00, Tuesday at

04:07:12  19    6:00, Wednesday at 6:00, we need them to be due Monday at

04:07:15  20    noon, Tuesday at noon, Wednesday at noon.

04:07:18  21            Okay?

04:07:19  22            MR. ANDRE:  Okay.

04:07:20  23            THE COURT:  Thank you.  Then the other thing was

04:07:26  24    let's just assume the worst-case scenario for the

04:07:29  25    plaintiffs, what happens if I sort of exclude these various

04:07:38  1    approaches to approving damages?

04:07:43  2            MR. ANDRE:  Your Honor, as I spoke about

04:07:49  3    earlier, you know, there's a statutory requirement to find

04:07:51  4    the reasonable royalty.  We have a fact-based case we'll put

04:07:56  5    in.  We have testimony from their witnesses in depositions.

04:08:00  6    We have facts we can put in through our own witnesses as

04:08:05  7    well.

04:08:06  8            THE COURT:  Well, at this point you sort of say,

04:08:08  9    Here are three theories.  So I'm asking you to assume that,

04:08:11 10    for one reason or another, I say under Federal Circuit law,

04:08:14 11    you can't do that, which is after all what the defendants

04:08:19 12    want me to say; right?

04:08:21 13            MR. ANDRE:  Well, I'm sure they would love for

04:08:23 14    you to say that.  Then we would come in with the fact-based

04:08:25 15    case strictly and put it in the jury's hands.  We're coming

04:08:28 16    in with some damages theories that we identified this

04:08:32 17    morning to Your Honor.

04:08:33 18            THE COURT:  Right.  When you say a fact-based

04:08:35 19    case, you know, I think it's going to be the case that if I

04:08:45 20    agree with the defendant, and I haven't decided that I agree

04:08:49 21    with the defendant, but if I do, you're not going to have

04:08:55 22    any basis to ask for damages.

04:08:59 23            MR. ANDRE:  Your Honor, we can put witnesses on

04:09:02 24    in the case and talk about what the revenues are, what the

04:09:06 25    profits are.

04:09:07  1                    THE COURT:  Yeah, but that's not, you know, part

04:09:10  2       of -- what I think the Federal Circuit has done is they have

04:09:14  3       created, you know, pretty rigorous requirements for

04:09:20  4       requesting reasonable royalty or other damages.  And you

04:09:30  5       know, the case that everyone cites from 25 years ago, yes,

04:09:38  6       you're entitled to a reasonable royalty.

04:09:43  7                    In any event, I take it from what you're telling

04:09:45  8       me that you'll keep coming up with new damages theories if

04:09:54  9       the ones that are already being suggested are for some

04:09:59 10       reason unacceptable.

04:10:01 11                    MR. ANDRE:  Your Honor, that's exactly right.

04:10:03 12       Under Apple v. Motorola, the Federal Circuit said that, you

04:10:07 13       know, you don't have to have experts to prove a damages

04:10:10 14       case.

04:10:11 15                    THE COURT:  Yeah, okay.  So I didn't really want

04:10:13 16       argument.  I just wanted to know what your plan was, and now

04:10:15 17       I understand what your plan is.

04:10:17 18                    Okay.  So let's go on to the body of the -- yes,

04:10:17 19       Mr. Webb.

04:10:23 20                    MR. WEBB:  Your Honor, just real briefly.  We

04:10:25 21       are planning to address that potential outcome in our

04:10:28 22       briefing.  So if that helps Your Honor, you'll note at least

04:10:31 23       our position.

04:10:32 24                    THE COURT:  I appreciate your thinking about it.

04:10:34 25                    MR. WEBB:  Yes.

04:10:35  1          THE COURT:  Okay.  So unless there's something

04:10:36  2   else you want to do, let's go through the Pretrial Order.

04:10:40  3          Is there something else somebody wants to do?

04:10:44  4   No.  Okay.

04:10:45  5          I've basically, as I went through it, marked

04:10:51  6   various things that were in dispute.  I tried to make myself

04:10:55  7   a note here and there.

04:10:56  8          So the first thing -- oh, and then helpful, my

04:11:00  9   copy doesn't have numbered pages.  But on the first page,

04:11:08 10   that's a dispute that's about the damages issue that we're

04:11:11 11   talking about.

04:11:12 12          So I guess that will await further developments;

04:11:16 13   right?

04:11:18 14          MR. ANDRE:  Yes.

04:11:23 15          MS. KOBIALKA:  Yes.

04:11:24 16          THE COURT:  So moving on to the fourth page, I'm

04:11:29 17   just numbering them as I go, there's sniping on this chart

04:11:37 18   about lack of written description.  And I can't figure out

04:11:40 19   whether I'm supposed to ignore that or whether that's

04:11:43 20   something you want me to address.

04:11:45 21          Basically, it says Acceleration Bay requested

04:11:51 22   Activision to disclose its 112 argument it intends to

04:11:54 23   present at trial.  Activision declined to do so.

04:11:57 24          Then Activision says, Written description

04:11:59 25   defense, as explained in the expert report of Dr. Carter,

04:12:02  1    I'm guessing, but that's without having looked at the report

04:12:06  2    of Dr. Carter, and however many pages he wrote about written

04:12:10  3    description, which is not that many because it usually

04:12:13  4    isn't.

04:12:13  5            Is there a dispute here, or has the fact that

04:12:15  6    it's now lack of written description taken care of the

04:12:18  7    dispute?

04:12:19  8            MR. ANDRE:  Your Honor, I think there's a slight

04:12:21  9    dispute in the fact that we don't really have an

04:12:24 10    understanding as to what their defense is on 112.  They have

04:12:29 11    not narrowed it in any way or given us --

04:12:31 12            THE COURT:  So let's start with the expert

04:12:32 13    report of Dr. Carter.  How many pages does he devote to the

04:12:36 14    written description defects of these five patents?

04:12:41 15            MR. ANDRE:  Let's dig that up.  One second.  But

04:12:44 16    one of the issues we're having is -- I'll just give you one

04:12:48 17    example -- Dr. Carter says the certain claim terms are not

04:12:56 18    inscribed in the patent.  It's not actually the claim term,

04:13:00 19    it's not even the Court's claim construction of that term,

04:13:04 20    but in fact, it's Your Honor's discussion of the claim

04:13:07 21    construction that he says that is not disclosed in the

04:13:12 22    patent.  It does that on several instances which, you know,

04:13:16 23    we think is a legal issue.

04:13:17 24            So we'd like to know exactly what was -- he went

04:13:20 25    through almost every single element in the asserted claims

04:13:23  1    and said each element is not disclosed.

04:13:25  2              THE COURT:  So let me just interrupt you for a

04:13:27  3    second.  Are you all actually going to present this lack of

04:13:29  4    written description defense?

04:13:31  5              MR. ENZMINGER:  The only issue with respect to

04:13:34  6    the notion of lack of written description, and that can

04:13:41  7    encompass ANDA changes.

04:13:42  8              THE COURT:  And ANDA changes.  Okay.  I

04:13:45  9    understand that.

04:13:45 10              So what you're saying is that the lack of

04:13:48 11    written description, that the ANDAs can change.

04:13:53 12              That's it.  Does that help?

04:13:55 13              MR. ANDRE:  That helps.  That's all we needed,

04:13:57 14    Your Honor.  Thanks.

04:13:58 15              THE COURT:  Okay.  Thank you.

04:13:59 16              All right.  Continuing on to Page 6 -- oh, yeah.

04:14:11 17    This is not actually one of your problems.

04:14:13 18              So there's a recitation of the various Markman

04:14:18 19    opinions that I've issued.  I assume some percentage of the

04:14:23 20    Markman claims that I rendered or construed are now

04:14:29 21    irrelevant, for one reason or another.  And I'm wondering if

04:14:32 22    you could put my various Markman Orders, limited to the

04:14:37 23    constructions that are actually relevant to something, not

04:14:41 24    including plain meaning, if I ever said that, into one Order

04:14:44 25    that I can then give the jury.  Normally, I look to

04:14:51 1  Mr. Rovner for that.

04:14:53 2              MR. ROVNER:  We'll take care of that, Your

04:14:55 3  Honor.

04:14:55 4              THE COURT:  Thank you.  Okay.

04:14:57 5              So the next thing is on the following page, and

04:14:59 6  then the one-and-a-half pages following that, you know,

04:15:05 7  Activision wants to summarize various things.  The

04:15:09 8  Acceleration Bay says it's a one-sided summary.

04:15:12 9              I mean, the case history is whatever the case

04:15:15 10 history is.  Why don't we just strike this rather than

04:15:19 11 arguing about it?

04:15:24 12             MR. WEBB:  That's fine, Your Honor.

04:15:25 13             THE COURT:  All right.  Consider it stricken.

04:15:28 14             All right.  So on to -- now I've lost track, but

04:15:36 15 there's a page that has near the top Roman Numeral II,

04:15:41 16 Federal Jurisdiction.

04:15:43 17             MR. ENZMINGER:  Your Honor, does your copy have

04:15:46 18 paragraph numbers?

04:15:47 19             THE COURT:  Yes.  Sorry.  Thank you.

04:15:48 20             That's a very good suggestion.  Yeah, okay.

04:15:52 21 Paragraph 20.

04:15:53 22             Thank you, Mr. Enzminger.  That really is a good

04:15:56 23 suggestion.

04:15:57 24             And there's a statement about Acceleration Bay's

04:16:02 25 statement of issues of fact that remain to be litigated

04:16:04  1   attached as Schedule B1, and then there's some footnotes.

04:16:12  2   And I don't know what the point of the footnotes is.

04:16:16  3          Acceleration Bay says Activision did not

04:16:18  4   disclose any opinion of counsel.  I'm assuming there is no

04:16:22  5   opinion of counsel issue here; right?

04:16:26  6          MR. WEBB:  That's correct, Your Honor.

04:16:28  7          THE COURT:  Okay.  And then it says, apparently

04:16:32  8   attributed to Activision, Acceleration Bay did not identify

04:16:35  9   any alleged pre-suit willfulness.  And based on what I heard

04:16:39 10   this morning, I'm gathering that Acceleration Bay's

04:16:44 11   willfulness case starts when suit is filed.  When the first

04:16:52 12   suit is filed or the second suit is filed?

04:16:54 13          MR. ANDRE:  The first, Your Honor.

04:16:55 14          THE COURT:  Okay.

04:16:56 15          MR. WEBB:  And on that topic, in the afternoon I

04:16:59 16   would like to come back to that for just a couple of

04:17:01 17   housekeeping issues on willfulness.

04:17:03 18          THE COURT:  Okay.  All right.  I'm counting on

04:17:05 19   you to remember that when I say, Is there anything more?

04:17:07 20          Okay?

04:17:08 21          MR. WEBB:  Yes, Your Honor.

04:17:09 22          THE COURT:  All right.  Moving along.

04:17:13 23          So Paragraph 30.  Really amazing thing,

04:17:17 24   Mr. Enzminger.  So somewhere down through it, there's

04:17:24 25   requests about witnesses.  And I gathered that maybe this

04:17:29  1    was being written at the same time as descriptions of who

04:17:32  2    was going to be called, et cetera, was going back and forth.

04:17:40  3                 At this point, does plaintiff have a will-call

04:17:47  4    list, that is, the people it actually expects to call live?

04:17:51  5                 MR. ANDRE:  We do, Your Honor, and we've listed

04:17:54  6    each of those individuals that we expect to call live.

04:17:57  7                 THE COURT:  Okay.  When you say "listed,"

04:17:58  8    somewhere in the Pretrial Order?

04:18:00  9                 MR. ANDRE:  Yes.

04:18:00 10                 THE COURT:  So defendants, have you listed the

04:18:04 11    people you actually expect to call live somewhere?

04:18:08 12                 MR. WEBB:  We have listed all the witnesses

04:18:10 13    which we will call, our live witnesses.

04:18:12 14                 THE COURT:  Yeah.  Yeah.  Yeah, that's not the

04:18:13 15    question I asked.

04:18:14 16                 MR. WEBB:  No, we have not listed will call, may

04:18:17 17    call.  The problem is they've listed 12 live witnesses they

04:18:20 18    intend to call, and 20 witnesses by deposition.  And the

04:18:23 19    math of 11 hours of total trial time leads you to believe

04:18:27 20    that they may not get to all 12 and all 20.

04:18:29 21                 THE COURT:  Well, no.  That's 20 -- I'm sorry.

04:18:33 22                 Yes, Mr. Andre.

04:18:34 23                 MR. ANDRE:  I was going to say, based on this

04:18:36 24    morning's hearing, we're going to drop one of our witnesses.

04:18:38 25    We will let them know about it.  We'll have 11 witnesses,

04:18:41  1    but we do expect to call 11 live witnesses.

04:18:44  2              And the deposition witnesses, we're still going

04:18:47  3    through those, and those will be five and seven-minute

04:18:49  4    clips.  And we'll argue about those.  They'll get notice

04:18:53  5    pursuant to the proceedings.  And that's not something they

04:18:54  6    have to prepare cross-examination for.

04:18:57  7              The live witnesses, they gave us 30.  We'd like

04:19:01  8    to get some --

04:19:02  9              THE COURT:  Yeah.  So here's the thing:

04:19:06 10    Mr. Webb, you know, I think it's the case, and a lot of

04:19:12 11    experienced lawyers are on your side of the table, I would

04:19:15 12    think you could list, Here's the ones we expect to call

04:19:19 13    live.

04:19:20 14              MR. WEBB:  Certainly, we can do that, Your

04:19:22 15    Honor.

04:19:22 16              THE COURT:  And I think that is basically what

04:19:24 17    the plaintiff wants; right?

04:19:26 18              MR. ANDRE:  That's correct, Your Honor.

04:19:28 19              THE COURT:  So you've got their 12 now going to

04:19:32 20    be reduced to 11.  Can you tell them by the end of the day

04:19:40 21    Monday?

04:19:41 22              MR. WEBB:  Absolutely, Your Honor.

04:19:43 23              MR. ANDRE:  Yes.

04:19:45 24              MR. WEBB:  We'll get that pared down today or

04:19:48 25    tomorrow?

04:19:48  1                     THE COURT:  Well, they're pared down from 12 to

04:19:50  2      11.

04:19:50  3                     MR. WEBB:  Yes.

04:19:51  4                     THE COURT:  Mr. Andre can whisper that in your

04:19:54  5      ear right now.  Who are you removing?

04:19:57  6                     MR. ANDRE:  John Garland.  He was the

04:20:03  7      consortium-based license person.

04:20:03  8                     THE COURT:  John Garland, he's removed.  So...

04:20:08  9                     MR. WEBB:  Understood.  Thank you.

04:20:09 10                     THE COURT:  Okay.  So I think that takes care of

04:20:16 11      that page.

04:20:17 12                     So the next page, Paragraph 31, there's a

04:20:25 13      disputed issue where Acceleration Bay says it objects to

04:20:28 14      calling live or by deposition, Scott Bennett, Dan Kegel, and

04:20:36 15      Mark Terrano.  I'm starting to recognize these names now.

04:20:39 16                     Activision responded.  And I take it from the

04:20:41 17      response, you're not calling Scott Bennett?

04:20:45 18                     MR. ENZMINGER:  Correct, Your Honor.

04:20:46 19                     THE COURT:  Okay.  So that's resolved.

04:20:49 20                     And Dan Kegel and Mike Terrano, we were talking

04:20:53 21      about them this morning in terms of prior art or art.

04:20:59 22                     MR. WEBB:  Yes, Your Honor.

04:21:02 23                     THE COURT:  So I think what I said this morning

04:21:07 24      resolves that, doesn't it?

04:21:09 25                     MR. FRANKEL:  Your Honor, I believe Activision

04:21:11  1    represented it will not be calling them as live witnesses.

04:21:13  2              THE COURT:  Oh, well then --

04:21:14  3              MR. ENZMINGER:  That's why I rose.  Dan Kegel,

04:21:18  4    we will be calling live.  Mark Terrano cannot be here.

04:21:22  5              THE COURT:  Throat cancer; right?

04:21:23  6              MR. ENZMINGER:  Sorry?

04:21:24  7              THE COURT:  You said throat cancer?

04:21:27  8              MR. ENZMINGER:  Yes.

04:21:27  9              THE COURT:  So Dan Kegel.  And I take it that

04:21:36 10    what I said this morning was they can call him live,

04:21:44 11    right --

04:21:46 12              MR. FRANKEL:  Your Honor --

04:21:47 13              THE COURT:  -- or did I not address it?

04:21:49 14              MR. FRANKEL:  -- I think we talked about Kegel,

04:21:51 15    and I understood it was going to be a couple minutes of

04:21:54 16    deposition testimony.  He is not an expert witness, so

04:21:58 17    there's no need for him to come and testify about what he

04:22:01 18    was doing in 1990.  It's not relevant to --

04:22:05 19              THE COURT:  Well, I mean, there is a limited

04:22:07 20    amount of time, and I'm sure it's not a great imposition on

04:22:14 21    him to come.  And so I'm not going to say they can't call

04:22:24 22    him live just because it seems not very efficient.  You

04:22:29 23    know, they've got a limited amount of time, so that's kind

04:22:32 24    of a thing to put a cap on what they do.

04:22:35 25              MR. ANDRE:  Your Honor, our concern is that they

04:22:38 1    dropped their invalidity defense most likely because of the

04:22:41 2    success in the IPRs, whatever.

04:22:43 3              THE COURT:  Yeah.  It seems like reasonable

04:22:44 4    supposition.

04:22:46 5              MR. ANDRE:  It is.  They wouldn't want that in,

04:22:47 6    but now they're coming in kind of doing an unofficial

04:22:52 7    invalidity case, noninfringement by invalidity and --

04:22:54 8              THE COURT:  We did talk about this --

04:22:56 9              MR. ANDRE:  Yeah, we did.

04:22:57 10             THE COURT:  -- this morning.

04:22:58 11             MR. ANDRE:  And that's what Mr. Kegel is here to

04:23:01 12   talk about, his work before our patents were filed.  We just

04:23:03 13   don't want there to be that issue coming up that they're

04:23:06 14   doing an unofficial noninfringement by invalidity.

04:23:11 15             THE COURT:  Well, they've said they're not going

04:23:14 16   to do that.  You've raised the issue.

04:23:17 17             You know, there are a lot of things that I'm not

04:23:20 18   well placed to make rulings on at trial, but I think that's

04:23:25 19   the kind of thing that I could recognize that if it's going

04:23:28 20   on.  And so I'm going to let them call Mr. Kegel.  And you

04:23:34 21   know, if you want to remind me on the morning of the day

04:23:36 22   he's going to testify that he's a secret agent kind of guy,

04:23:40 23   I'll be extra alert.

04:23:42 24             Okay?

04:23:43 25             MR. ANDRE:  Thank you, Your Honor.  That would

04:23:44  1    be fine.

04:23:44  2                 THE COURT:  All right.  Oh, on the next page,

04:23:53  3    there's a Paragraph 35, Acceleration Bay requests that the

04:23:59  4    sequestration rule be invoked for all applicable fact

04:24:04  5    witnesses.  Yeah, fine.  It's invoked.

04:24:06  6                 Then there's a footnote, Activision contends

04:24:09  7    that at least Pat Griffith and Kurtis McCathern are not

04:24:13  8    applicable witnesses.  I can't remember.  Are they actually

04:24:20  9    people that you expect either one of them to be testifying

04:24:24 10    live?

04:24:25 11                 MR. WEBB:  Yes, Your Honor.  Both are engineers.

04:24:27 12    One is an engineer with Activision.  One is an engineer with

04:24:34 13    Blizzard.

04:24:34 14                 THE COURT:  But why then are they not -- do you

04:24:38 15    have some party representative?

04:24:39 16                 MR. WEBB:  Sorry.  They're our corporate

04:24:41 17    representatives.

04:24:42 18                 THE COURT:  Okay.  Oh, are you saying you are

04:24:46 19    two defendants?

04:24:47 20                 MR. WEBB:  We're technically one company, but

04:24:49 21    there are two operating companies.  Your Honor, just if I

04:24:51 22    may --

04:24:52 23                 THE COURT:  So why doesn't one of them or the

04:24:55 24    other of them --

04:24:57 25                 MR. WEBB:  Kurtis McCathern will be the

04:25:00  1    corporate rep.  We're in agreement that Pat Griffith will be

04:25:02  2    subject to the Rule 615, sequestration.

04:25:06  3                    THE COURT:  Okay.  All right.

04:25:07  4                    MR. ANDRE:  That's fine, Your Honor.

04:25:09  5                    THE COURT:  Okay.  I thought that sounded fine,

04:25:12  6    too.

04:25:14  7                    All right.  A few pages on, Paragraph 53, and so

04:25:24  8    there is a disputed issue.  And in all the many disputed

04:25:29  9    issues here today, this seems like the one that should not

04:25:32 10    be disputed.  But actually none of them should be disputed,

04:25:38 11    but this seems like the one most obviously should not be

04:25:41 12    disputed.

04:25:42 13                    So if you've got computer games, books, and

04:25:45 14    devices you're going to use, I'd like you to show them to

04:25:52 15    Acceleration Bay four days before trial.  Right?  Is there

04:25:56 16    some reason why you wouldn't?

04:25:57 17                    MR. WEBB:  We consider those to be

04:25:59 18    demonstratives just like boards, and slides, and things like

04:26:01 19    that, Your Honor.  We're not sure why we need to have a

04:26:04 20    special rule.

04:26:06 21                    THE COURT:  Well, are you literally going to do

04:26:08 22    nothing other than --

04:26:09 23                    MR. WEBB:  Show the jury.

04:26:10 24                    THE COURT:  -- hold them up at a distance and

04:26:12 25    say, Look, this is a game?

04:26:13  1              MR. WEBB:  Yes.  We're not going to introduce

04:26:15  2      them into evidence.  They're demonstratives just like

04:26:17  3      anything else.

04:26:18  4              THE COURT:  And you say books and devices.  I

04:26:23  5      understand a box that says World of Warcraft, and it has

04:26:26  6      some jagged lightning on it or something is probably not

04:26:30  7      that exciting.

04:26:31  8              What did you have in mind for books and devices?

04:26:34  9              MR. WEBB:  Your Honor, where are you seeing

04:26:36 10      books and devices?

04:26:37 11              THE COURT:  That's Paragraph 53 after the

04:26:39 12      Acceleration Bay, what their definition of demonstrative

04:26:43 13      physical exhibits is.

04:26:44 14              MR. WEBB:  I honestly don't know what they're

04:26:46 15      referring to there, Your Honor.

04:26:47 16              THE COURT:  Okay.  Well, you have a schedule

04:26:59 17      somewhere in here for exchanging demonstrative evidence

04:27:01 18      before you show it to the jury; right?

04:27:03 19              MR. WEBB:  We do, and there's a one-day dispute

04:27:05 20      with respect to that Acceleration Bay believes

04:27:08 21      demonstratives should be disclosed two days before.

04:27:11 22              THE COURT:  Yeah.  Okay.  Well, we'll get to

04:27:13 23      that in a second.  But so we're talking about a handful of

04:27:16 24      computer dates here.

04:27:20 25              I would like you to show them to Acceleration

04:27:27  1    Bay four days before the first day of trial.  All right?

04:27:31  2             MR. WEBB:  Yes, Your Honor.

04:27:32  3             THE COURT:  Okay.  All right.

04:27:39  4             So on the next page, Paragraph 56, I believe

04:27:49  5    that the issue in here, amid the argument is that there's

04:27:56  6    some financial information that Activision has not updated

04:28:05  7    since 2017, and Acceleration Bay would like it updated.

04:28:15  8             Is that the basic scenario?

04:28:18  9             MS. KOBIALKA:  Yeah, that's correct, Your Honor.

04:28:21 10    We got revenue information up to the beginning, I think, of

04:28:24 11    2017.  We moved to compel it.  There was representations

04:28:27 12    made that prior to trial they would update it.

04:28:31 13             THE COURT:  So hold your fire there for a

04:28:33 14    second.  So I understand part of your objection is not

04:28:37 15    relevant to anything, but I guess we're going to be figuring

04:28:40 16    that out in the next few days.  Besides for that, is there

04:28:43 17    some reason why you think that you don't have to do this?

04:28:48 18             MR. ENZMINGER:  That's the reason, because at

04:28:49 19    the time that this was put together, they weren't advancing,

04:28:53 20    in our view, a damages case.

04:28:54 21             THE COURT:  Okay.  So you can update the

04:28:57 22    financial information through to when?

04:29:02 23             MR. SALIK:  Through third quarter of this year,

04:29:10 24    Your Honor.

04:29:12 25             THE COURT:  Okay.  That's generous.  All right.

04:29:14 1           So when can you do that by?

04:29:18 2           MR. SALIK:  We can do it next week.

04:29:20 3           THE COURT:  Next week, yeah.

04:29:24 4           MR. SALIK:  We can do it as soon --

04:29:25 5           THE COURT:  Can we do it on Monday?

04:29:27 6           MR. SALIK:  I believe so, yes.

04:29:28 7           THE COURT:  Okay.  Well, thank you, sir.

04:29:34 8           All right.  So moving on to the next page.  So

04:29:41 9  there's Paragraph 59 what appears to be 90 "prior art

04:29:48 10 references."

04:29:49 11          I assume that, in fact, the great bulk of these

04:29:54 12 are dropping away.

04:29:58 13          MR. ENZMINGER:  We -- yes.  I would say the bulk

04:30:01 14 of these are dropping away.

04:30:02 15          THE COURT:  Have they dropped away yet?

04:30:03 16          MR. ENZMINGER:  They have not, but -- they have

04:30:11 17 not dropped away yet.

04:30:12 18          THE COURT:  Okay.  So are they, in fact -- I

04:30:16 19 mean, it's not 433 and a few in between, but it's like 90

04:30:22 20 exhibits in a row or in this category?

04:30:24 21          MR. ENZMINGER:  Yes.

04:30:24 22          THE COURT:  Okay.  So are any of these, in fact,

04:30:31 23 when we were talking about this morning -- well, do you know

04:30:37 24 now -- I'm not going to make you say it right this moment,

04:30:40 25 but do you know now how much of those are really in just for

04:30:47  1    anticipation and obviousness?

04:30:50  2              MR. ENZMINGER:  I would say the bulk of them.  I

04:30:51  3    would -- if I were to estimate what remains for purposes of

04:30:56  4    the state of the art, it would probably be maybe a dozen.

04:31:00  5              THE COURT:  Okay.  So can we get you to identify

04:31:04  6    those dozen by some reasonably soon time?

04:31:08  7              MR. ENZMINGER:  Would Tuesday be soon enough?

04:31:11  8              THE COURT:  I think so.  Okay.  So reduce that

04:31:14  9    to about a dozen.

04:31:18 10              On the next page -- oh, so Paragraph 65, I

04:31:28 11    didn't quite understand this paragraph which says after

04:31:35 12    trial, the parties will tell me what should be redacted from

04:31:38 13    the public transcript.

04:31:40 14              And but then it says, Except for these

04:31:43 15    redactions, the courtroom shall otherwise remain open during

04:31:46 16    the duration of the trial.  Obviously, the trial is going to

04:31:49 17    be over before the redactions occur.

04:31:52 18              So I'm guessing this is something that

04:31:56 19    Activision is interested in.  I mean, basically the

04:32:00 20    courtroom I'm expecting it to remain open during the trial.

04:32:11 21              MR. WEBB:  Understood, Your Honor.

04:32:12 22              THE COURT:  Okay.  All right.

04:32:14 23              So I think we've now gotten to the other thing

04:32:16 24    that Mr. Webb was mentioning.  Paragraph 66, the exchange of

04:32:24 25    witnesses, exhibits, deposition testimony, demonstratives to

04:32:29 1    use at trial.  And so the plaintiff wants the

04:32:38 2    further-in-advance schedule.  The defendant wants the

04:32:41 3    less-in-advance schedule; right?

04:32:45 4                 MR. WEBB:  That is correct, Your Honor.

04:32:47 5                 THE COURT:  Okay.  So this is a frequent point

04:32:51 6    of dispute.

04:32:53 7                 Mr. Webb, why do you want the less in advance?

04:32:57 8                 MR. WEBB:  It's mainly logistics, Your Honor.

04:32:59 9    Under the three-day advanced disclosure rule, on Sunday

04:33:03 10   night, we would have to give them our notebooks of exhibits

04:33:06 11   and deposition testimony for the witnesses that we're

04:33:10 12   calling on Wednesday.  This is before we've heard anything

04:33:13 13   about their case.

04:33:14 14                I think it's hard for us to predict, you know,

04:33:17 15   given the discussion today.  There's a lack of clarity as to

04:33:21 16   what we will see on the plaintiff's case, and it's hard for

04:33:24 17   us to predict what exhibits, what witnesses, and what order

04:33:28 18   we'll call them before trial even starts.

04:33:31 19                So even two days is probably a challenge.  Three

04:33:35 20   days makes it pretty unworkable.

04:33:36 21                THE COURT:  Okay.  I appreciate what you're

04:33:39 22   saying.

04:33:41 23                What do you have to say about that?

04:33:43 24                MS. KOBIALKA:  By giving the disclosures as

04:33:48 25   early as we are, including the list of witnesses in order,

04:33:52  1    they're going to have plenty of opportunity to understand

04:33:55  2    what's going to be put forward and at issue.  We're

04:33:58  3    identifying the exhibits with each witness, so that will

04:34:01  4    give them a lot of information, as well as the

04:34:04  5    demonstratives that are going to be created with respect to

04:34:06  6    the witnesses which is separate and apart from the other

04:34:09  7    depositions we were talking about for inspection previously.

04:34:13  8            Given how quickly this case is going to go

04:34:15  9    forward, I think the parties need to be able to meet and

04:34:18 10    confer and be able to raise some of these issues before the

04:34:23 11    Court because we don't have a whole lot of time to deal with

04:34:25 12    them.  If changes have to be made, then we want to be able

04:34:28 13    to address them.  And if we do it in the two-day time,

04:34:31 14    you're going to be hearing things the morning of, and it

04:34:34 15    will be rather chaotic.

04:34:35 16            So we were proposing the three days.  I think

04:34:37 17    that makes the most sense.

04:34:39 18            They have our information at least three days in

04:34:41 19    advance.  And so, I mean, I think that makes the most sense

04:34:46 20    given the compressed schedule we have and the number of

04:34:48 21    witnesses we have.

04:34:49 22            THE COURT:  All right.  Thank you.

04:34:55 23            I understand your point of view, I think.

04:34:58 24    Mr. Webb, anything more on this?

04:35:00 25            MR. WEBB:  Just real briefly, Your Honor.  They

128

04:35:02  1   know what they're going to do with their case already.  We

04:35:04  2   won't know what they plan to do in terms of their

04:35:08  3   presentation of evidence and argument until Monday morning,

04:35:11  4   and so we are in a responsive position based upon what we

04:35:15  5   see in this courtroom.  And so three days advance notice for

04:35:20  6   our witness sequencing --

04:35:21  7          THE COURT:  So the way this three days would

04:35:23  8   work is on Friday at 7:30 p.m., they would be presenting to

04:35:32  9   you witnesses, exhibits, deposition testimony,

04:35:37 10   demonstratives that they were going to use on Monday; is

04:35:40 11   that right?

04:35:40 12          MR. WEBB:  Yeah, exhibits and testimony, but not

04:35:46 13   courtroom testimony.  That's the problem.

04:35:47 14          THE COURT:  Right.

04:35:53 15          MR. WEBB:  And we --

04:35:54 16          THE COURT:  But if it's two days, then they're

04:35:57 17   going to be presenting it Saturday at 7:30 p.m., and they're

04:36:09 18   going to present something on Sunday at 7:30 p.m., and then

04:36:14 19   they're going to do trial on Monday.  And maybe the opening

04:36:20 20   statement will be informative, maybe it won't.

04:36:25 21          MR. WEBB:  I think that's really the key, Your

04:36:27 22   Honor.  We would have to put forward our witnesses and our

04:36:30 23   exhibits before trial even starts, and we're the defendant.

04:36:34 24   And we're projecting that we will get the case on Wednesday.

04:36:37 25   Although I'm not for sure, I assume that's the case.

04:36:40 1      And so we will have to predict what they're

04:36:42 2 going to say the first two-and-a-half days of trial as we're

04:36:46 3 putting forward our evidence that we intend to use to

04:36:49 4 respond to things that we have not yet heard.  That's the

04:36:52 5 problem.

04:36:52 6      Two days, again, it's a challenge because we're

04:36:54 7 still trying to predict, but at least it gives us the

04:36:57 8 benefit of Monday before we have to start disclosing our

04:37:02 9 witnesses and documents for Wednesday.  I'm sorry.

04:37:07 10      THE COURT:  Mr. Andre, the 11 live witnesses you

04:37:10 11 have -- sorry, Ms. Kobialka -- how many of them --

04:37:22 12 presumably you're putting in basically your whole case other

04:37:25 13 than your response to lack of written description before

04:37:30 14 they start; right?

04:37:31 15      MR. ANDRE:  That's correct, Your Honor.

04:37:33 16      THE COURT:  And based on the M-regular thing

04:37:37 17 that Mr. Enzminger said a minute ago, I'm not going to hold

04:37:44 18 you to this, but how long do you expect your rebuttal lack

04:37:47 19 of written description case is going to take?

04:37:50 20      MR. ANDRE:  Well, now considerably less.  Before

04:37:53 21 about 15 minutes ago, we were concerned it was going to take

04:37:55 22 an hour or two because they have about 30 of those terms.

04:37:58 23 They're talking about now just the one term.  I imagine it's

04:38:00 24 going to go very quickly.

04:38:03 25      THE COURT:  Okay.

04:38:04  1          MR. ANDRE:  Less than an hour.  It's going to be

04:38:06  2   very, very quick.

04:38:08  3          THE COURT:  All right.

04:38:08  4          MR. ANDRE:  So I think, you know, Your Honor,

04:38:12  5   the disclosure schedule we're talking about here about

04:38:15  6   disclosing most of the deposition designations, every time I

04:38:20  7   try a case, parties squabble about this back and forth, back

04:38:23  8   and forth.

04:38:24  9          THE COURT:  Yeah.

04:38:24 10          MR. ANDRE:  I don't know why, but they do.  They

04:38:26 11   come to the Court.  What we're trying to make sure is we

04:38:29 12   don't come to you at the last minute and say, Help us make

04:38:33 13   this decision, and then we have a trial technician trying to

04:38:37 14   cut deposition designations in a way that's frantic and

04:38:42 15   prone to mistakes.

04:38:43 16          THE COURT:  You know, I appreciate what you're

04:38:46 17   saying there, but you know, my impression is that no matter

04:38:58 18   when the parties exchange things, the problems are only

04:39:04 19   being brought to me the day they're going to be an issue.

04:39:08 20   Right?

04:39:08 21          MR. ANDRE:  Well, the idea with the disclosure,

04:39:12 22   especially with respect to the depo designations here, is

04:39:15 23   that we get those before the day they come out.  We can

04:39:18 24   address those objections the day before we play them

04:39:21 25   essentially.  That's kind of what -- at least my thought, it

131

04:39:26 1    doesn't do us any great advantage having a three-day

04:39:30 2    disclosure because we're revealing our case.  You know, it

04:39:34 3    gives them extra time to start doing cross-examination of

04:39:36 4    our guys, same as us.

04:39:38 5         They know our witnesses.  Now, they just know

04:39:40 6    the order.  Soon, I guess, we'll know their witnesses as

04:39:44 7    well, and we'll start doing our crosses.

04:39:46 8         But it's really, in my mind, more the depo

04:39:50 9    designation and trying to get the deposition clips sorted

04:39:54 10   out before the morning that they're going to be played.

04:40:04 11        MR. WEBB:  Your Honor --

04:40:04 12        THE COURT:  Yes.

04:40:05 13        MR. WEBB:  -- we agree the depo designations can

04:40:08 14   be a problem at the time at trial.  We can probably agree to

04:40:14 15   three days advanced depo designation exchange if we could

04:40:18 16   also agree to bring disputes to Your Honor more than one day

04:40:22 17   or the day of the intended play of the depositions.  It's

04:40:28 18   more the live witnesses piece for us.

04:40:30 19        THE COURT:  All right.  What do you think about

04:40:31 20   that, Mr. Andre?

04:40:32 21        MR. ANDRE:  Your Honor, that's fine.  If we know

04:40:36 22   their will-call list, and we know which witnesses are coming

04:40:38 23   to trial, like they know which witnesses we're bringing, and

04:40:41 24   they can -- you know, we'll give them the order when the

04:40:44 25   time comes, but they know what we're bringing.

04:40:46  1          If we know what they're bringing, we can start

04:40:48  2   preparing our cross-examinations.  That was one of the

04:40:50  3   reasons we wanted some extra time for the live witnesses.

04:40:53  4          THE COURT:  Okay.  So I take it what you're

04:40:55  5   saying is Mr. Webb's proposal is acceptable, that basically

04:41:00  6   the deposition testimony will be exchanged on the schedule

04:41:04  7   that Acceleration Bay wants.  Everything else will be

04:41:09  8   exchanged on the schedule that the defendant wants.

04:41:14  9          And to the extent that there was -- I wasn't

04:41:20 10   sure whether Mr. Webb was talking to you or talking to me

04:41:23 11   about bringing things to me before the morning of trial.

04:41:28 12   But I'm going to assume he was talking to me, and so yeah,

04:41:32 13   I'm okay with that.

04:41:34 14          MR. WEBB:  Thank you, Your Honor.

04:41:35 15          THE COURT:  All right.

04:41:36 16          MR. ANDRE:  And the only thing is as we keep

04:41:38 17   going down that list, if you go to, you know, the next page,

04:41:41 18   B and C, we have the same -- it's not as big a dispute.

04:41:50 19   It's just two days versus one day on the demonstratives.

04:41:53 20   Once again, just trying to get it to the Court before so we

04:41:57 21   can make changes to demonstrative exhibits.

04:41:59 22          THE COURT:  Right.

04:42:00 23          MR. ANDRE:  So I think if we agree that depo

04:42:02 24   designations three days, all other, the witnesses the party

04:42:08 25   intends to call for direct examination, the list of exhibits

04:42:12  1    and the demonstratives, two days, I think we can live with

04:42:15  2    that.

04:42:15  3            MR. WEBB:  The one caveat I would have, Your

04:42:19  4    Honor, is the demonstratives.  Again, we get the case on

04:42:23  5    Wednesday, and we're not for sure who will be on the stand

04:42:26  6    on Tuesday.  If we need to prepare demonstratives in

04:42:30  7    response to what we hear on the stand for use the following

04:42:33  8    day, a two-day buffer, again, is not workable.

04:43:01  9            THE COURT:  Well, so I guess what I think is I

04:43:04 10    don't know what you're expecting to do with these

04:43:06 11    demonstratives.  You know, I don't really want to see

04:43:10 12    demonstratives that outline people's testimony.  So if we're

04:43:14 13    talking about how does M-regular work, or how does networks

04:43:18 14    work, or you know, technological things, I wouldn't think

04:43:22 15    that's as dependent on what a particular person says.

04:43:29 16            I mean, you may prepare a couple that you end up

04:43:31 17    not needing because they don't go there, that sort of thing,

04:43:34 18    but I think if you have their demonstratives of what they're

04:43:39 19    going to be trying to show, it would strike me that gives

04:43:45 20    you a pretty good indication of what you're likely to be

04:43:49 21    wanting to show.  Right.

04:43:51 22            MR. WEBB:  Potentially, Your Honor.  Maybe we

04:43:53 23    could have a provision that if something occurs the day

04:43:57 24    before, we can provide a demonstrative the night before

04:44:01 25    subject to their objections, and we can raise it with Your

04:44:05 1    Honor the following morning.

04:44:06 2          THE COURT:  Well, I mean, I think that's kind

04:44:08 3    of, you know, probably making a big mistake here because I

04:44:12 4    don't want to spend all of my time, our time arguing about

04:44:18 5    whether or not you could have prepared it a day earlier.

04:44:20 6    But I do think that, generally speaking, that yes, if you in

04:44:27 7    good faith, which I attribute to everybody here, you know,

04:44:33 8    say, Oh, so there's something.  We didn't expect that, so

04:44:36 9    here's a demonstrative on that.  You know, if that's the way

04:44:41 10   I see things happen, I would say, Sure.  Fine.

04:44:44 11         MR. WEBB:  Okay.  Thank you, Your Honor.

04:44:46 12         MR. ANDRE:  Yes, Your Honor.  Your Honor, what

04:44:48 13   did you say about -- I missed something you said about

04:44:51 14   deposition testimony being a demonstrative.

04:44:55 15         THE COURT:  There's two different things.

04:44:57 16         MR. ANDRE:  I'm sorry.  I misheard you.  I

04:44:59 17   wasn't sure what you said about the clip of a deposition.

04:45:03 18   Okay.

04:45:03 19         THE COURT:  No.  What I said, and then maybe you

04:45:07 20   misinterpreted, I said demonstratives that are outlines of

04:45:15 21   testimony.

04:45:17 22         MR. ANDRE:  Oh, like you put a picture of the

04:45:19 23   person who testified by depo earlier, you put the question

04:45:22 24   and answer up there?

04:45:23 25         THE COURT:  No, actually that's not what I

04:45:25  1  meant.

04:45:25  2          MR. ANDRE:  Okay.

04:45:26  3          THE COURT:  I just meant something like, you

04:45:28  4  know, like where you put out for the expert basically and

04:45:33  5  then the expert starts reading the power-point.  That's the

04:45:36  6  kind of demonstrative.

04:45:38  7          MR. ANDRE:  Got it.  I understand now.  I

04:45:41  8  misunderstood, Your Honor.

04:45:43  9          Thank you.

04:45:43 10          MR. WEBB:  Your Honor, the next one,

04:45:45 11  subparagraph C, we are okay with the 7:30 --

04:45:48 12          THE COURT:  Okay.

04:45:49 13          MR. WEBB:  -- deadline for meeting.

04:45:52 14          THE COURT:  Okay.  All right, Mr. Webb.

04:45:58 15          So Mr. Rovner, I'm going to be requesting you to

04:46:05 16  submit a revised Pretrial Order.  Do you get what the

04:46:10 17  agreement or what we've just resolved about all this?

04:46:14 18          MR. ROVNER:  Yes.  With Heather's help, I'm sure

04:46:17 19  we'll understand it even more.

04:46:20 20          THE COURT:  Well, I'm sure she will have what we

04:46:23 21  said right, but I'm not sure that the other thing follows.

04:46:25 22          MR. ROVNER:  I just want to point out one thing

04:46:27 23  that when you were alerted to the paragraph numbers in the

04:46:32 24  Pretrial Order, I was going to raise that, but I was afraid

04:46:34 25  that yours didn't have the paragraph numbers.  That's why I

04:46:36  1    didn't suggest it.  So I'm glad you do.

04:46:38  2              THE COURT:  No.  All right.

04:46:40  3              So I think the next thing we're on to is

04:46:44  4    Paragraph 77 which I'm not really entirely sure -- you know,

04:46:52  5    I wrote a question mark next to this one.  I take it that

04:46:59  6    part of this, which is the defendant's proposal, is that if

04:47:05  7    an expert hasn't actually discussed something, at least a

04:47:11  8    little bit in the expert's report, then they don't want to

04:47:21  9    be now the centerpiece of the testimony of the expert.

04:47:26 10              MR. WEBB:  That's close, Your Honor.  Again,

04:47:31 11    with the lack of clarity that we currently have with respect

04:47:34 12    to what we will see from the plaintiffs at trial, we're just

04:47:37 13    concerned that we may get testimony that is not articulated

04:47:40 14    clearly in a report.

04:47:41 15              THE COURT:  Well, yeah.  So I guess what I'm

04:47:44 16    wondering is there's rules that control these things.  You

04:47:48 17    know, why should I be like throwing stuff into a Pretrial

04:47:54 18    Order trying to put a gloss on the rules?

04:47:56 19              MR. WEBB:  That's well understood, Your Honor,

04:47:58 20    but just so long as we have that understanding.  And in the

04:48:01 21    event if we see something that or hear something that is not

04:48:05 22    in the report, we will approach Your Honor and raise our

04:48:08 23    concerns.

04:48:08 24              THE COURT:  Yeah.  And so the first thing is

04:48:10 25    when you actually -- so this is what I prefer is if you're

04:48:18  1    going to be making objections because something is not in a

04:48:22  2    report, you know, make the objection and say, you know,

04:48:31  3    Rule 37, or Rule 26, or I guess Rule 26.  But before you do

04:48:36  4    anything else, show it to the other side or tell the

04:48:42  5    other -- you know, give the other side a chance to show it's

04:48:46  6    here.  I mean, I think it would be better before you start

04:48:52  7    bringing it up with me, too, because some of these things,

04:48:57  8    you make an objection.  It's not in the report.

04:49:01  9            As I understand it, the report is here.  Though

04:49:04 10    they may not be as long as the parties want, it's still very

04:49:08 11    long, and you've got to make the objection with, you know,

04:49:12 12    five seconds of thought.

04:49:15 13            Sometimes, in fact, my -- generally what I have

04:49:18 14    noticed is the party who's asked a question usually has a

04:49:23 15    notation as to where in the report it backs up what they're

04:49:27 16    saying.  So I don't want to spend a lot of time at side-bars

04:49:32 17    when I think a lot of these things could be hopefully

04:49:37 18    resolved just between you.

04:49:39 19            All right?

04:49:39 20            MR. WEBB:  That sounds great, Your Honor.

04:49:41 21            THE COURT:  You all right with that, Mr. Andre?

04:49:43 22            MR. ANDRE:  We are.  Thank you, Your Honor.

04:49:45 23            THE COURT:  Okay.  All right.  And so I think

04:49:51 24    Paragraph 79, the dispute is -- oh, yeah.

04:50:02 25            Okay.  So this did come up.  So I take it that

138

04:50:07  1    Activision sells World of Warcraft, Special Ops, and Destiny

04:50:14  2    or licenses, whatever the phrase is, and Call of Duty.  And

04:50:20  3    there's not going to be any talk that goes beyond

04:50:30  4    Activision's revenues profits, what have you, relating to

04:50:33  5    the actual accused products; right?

04:50:36  6            MR. ANDRE:  That's correct, Your Honor.

04:50:37  7            THE COURT:  Okay.  And the question of even

04:50:42  8    revenues for the accused products, you know, that's

04:50:51  9    generally an area that the Federal Circuit is not too fond

04:51:00 10    of.  But I guess maybe that we'll have a better picture of

04:51:07 11    that when we finish this briefing next week.

04:51:09 12            MR. WEBB:  I believe so, Your Honor.

04:51:11 13            THE COURT:  Okay.  All right.  So the last thing

04:51:23 14    I have -- no, not the last thing.  So Paragraph 80, the

04:51:30 15    question of time to present their respective cases, I guess

04:51:36 16    the first question is there aren't that many claims left on

04:51:46 17    the plaintiff's side, though, that are spread out over five

04:51:51 18    patents.

04:51:53 19            Do you expect to do all five patents?

04:51:56 20            MR. ANDRE:  No, Your Honor.  That's what I was

04:51:59 21    going to step up and address earlier.  We would like to

04:52:02 22    narrow the case and inform the defendants of doing that.

04:52:05 23            I think currently there are 11 claims and five

04:52:08 24    patents in the case.  We will be doing a significant

04:52:13 25    reduction in the number of claims and at least probably

04:52:16 1    taking one patent out of the case.

04:52:18 2              If the defense will stipulate that that's not

04:52:22 3    going to be used as a weapon against us to say that we

04:52:24 4    brought that in bad faith, it is more to streamline the

04:52:27 5    case.  And I think that normally defendants will agree to

04:52:31 6    that, but we haven't discussed it yet.  I was going to bring

04:52:34 7    it up.

04:52:35 8              THE COURT:  Okay.  While I'm generally not

04:52:38 9    always wild about having things brought up that haven't been

04:52:40 10   discussed, I have no problem with that.  Do you know which

04:52:45 11   patent it is you plan to drop?

04:52:47 12             MR. ANDRE:  Not exactly yet, but we've got a

04:52:50 13   pretty good idea.  I mean, I'm getting heat over here for

04:52:53 14   already mentioning Mr. Garland.  We might need him for

04:52:59 15   licensing, but I think I would like to hold off until the

04:53:02 16   weekend so we can digest what happened today.

04:53:05 17             THE COURT:  Okay.

04:53:06 18             MR. ANDRE:  But I'm pretty certain the 11

04:53:08 19   claims, at least five, probably six of the claims out of the

04:53:11 20   case.

04:53:12 21             THE COURT:  Okay.  Well, that sounds like a

04:53:15 22   positive.

04:53:17 23             And so the part -- of course, we don't talk

04:53:23 24   about claims before the jury that have been dropped, but I

04:53:29 25   took it that maybe what you were saying there was you're

04:53:34  1     also noting that if things go badly here, you don't want

04:53:37  2     this to be in any other motions that come up.

04:53:40  3              Is that right?

04:53:41  4              MR. ANDRE:  That's right, Your Honor.  I don't

04:53:43  5     want there to be some type of an exceptional case because we

04:53:47  6     dropped these claims before -- these claims have survived,

04:53:52  7     obviously, a lot of challenges, and we're dropping them for,

04:53:56  8     you know --

04:53:57  9              THE COURT:  So I get your position which,

04:53:59 10     without hearing from the other side, sounds a

04:54:01 11     hundred-percent reasonable.

04:54:03 12              Mr. Webb, any comment?

04:54:04 13              MR. WEBB:  Obviously, we'd like to see what they

04:54:07 14     plan to drop.  There are two patents that are virtually the

04:54:10 15     same.  If they drop one of those, it's not going to really

04:54:13 16     change anything.  I'd also like to know if they plan to

04:54:16 17     continue the process to seek infringement of all three

04:54:19 18     games.  That would make a big difference to us, obviously.

04:54:22 19              But I would have to consult with my team and my

04:54:25 20     client with respect to what our approach would be to that,

04:54:28 21     how that would change our approach for trial.  But we would

04:54:30 22     love to know that as soon as possible.

04:54:32 23              THE COURT:  Okay.  Well, I think it would be in

04:54:35 24     everybody's interest, including the jury's, to streamline

04:54:42 25     the case.  And certainly my general impression is that

04:54:48  1    streamlining at this point says nothing about good faith,

04:54:54  2    bad faith, reasonableness, or much of anything else.

04:55:00  3              MR. WEBB:  I mean, to address that, we agree.

04:55:03  4              THE COURT:  Okay.

04:55:03  5              MR. WEBB:  I think both parties streamlining,

04:55:05  6    trying to make this an easier process for the jury is a good

04:55:08  7    thing.  We'd just like to know as soon as possible.

04:55:11  8              THE COURT:  That's it.  I basically wanted to

04:55:13  9    encourage your client who's sitting here in the audience --

04:55:19 10    well, I want to encourage you all.  Okay.

04:55:22 11              Okay.  So let's just think about one thing which

04:55:31 12    I haven't thought about yet.  So you have this statement

04:55:48 13    that each party shall have 11 hours total.  It's amazing,

04:55:53 14    considering how much stuff you disagree on, that you agree

04:55:56 15    on that.

04:56:00 16              I'm certainly not going to give you less than

04:56:03 17    11 hours.  And if both sides are satisfied with 11 hours,

04:56:14 18    then I don't see any reason to talk about this anymore.

04:56:19 19    We'll do 11 hours.

04:56:22 20              Are both sides satisfied?

04:56:24 21              MR. ANDRE:  Go ahead.

04:56:26 22              MR. WEBB:  Your Honor, I just would point out

04:56:28 23    that that's an ambitious schedule.  If we have Monday to

04:56:32 24    Friday, I think we can do it.  But, again, the more we can

04:56:36 25    streamline, I think the better.  It's going to be pretty

04:56:38  1    tight, but I think we're in agreement that 11 hours is

04:56:40  2    sufficient.

04:56:41  3             MR. ANDRE:  I think the one thing I noticed was

04:56:43  4    missing from the paragraph, it says it doesn't include

04:56:46  5    closing.

04:56:46  6             THE COURT:  It does not include closing.

04:56:48  7             MR. ANDRE:  I am hoping you would also not

04:56:51  8    include opening as well.  Eleven hours of actual evidence.

04:56:54  9             THE COURT:  Well, so those are good things to

04:56:58 10    bring up.  You've done this before.

04:57:01 11             How long would you expect your opening in a case

04:57:04 12    like this to be?

04:57:05 13             MR. ANDRE:  Thirty minutes.

04:57:08 14             THE COURT:  Mr. Webb, how long will you expect

04:57:10 15    your opening to be?

04:57:11 16             MR. WEBB:  Forty-five minutes, Your Honor.

04:57:16 17    There's a lot of waterfront here.

04:57:18 18             THE COURT:  Yeah.  Yeah.  No, I'm not -- no

04:57:22 19    criticism.

04:57:23 20             So under this schedule, were you all thinking

04:57:31 21    that then Friday morning you'd be making closing arguments

04:57:35 22    to the jury?

04:57:36 23             MR. WEBB:  The way I mapped it out, Your Honor,

04:57:38 24    was three hours Monday, five-and-a-half hours Tuesday,

04:57:43 25    Wednesday, Thursday, and then two-and-a-half hours on Friday

04:57:46 1    which takes us to reading instructions and closing Friday

04:57:49 2    afternoon.  Obviously, we can work to do better than that,

04:57:52 3    but that's how I've mapped it out.

04:57:54 4            THE COURT:  Okay.  Mr. Andre, anything on that?

04:57:57 5            MR. ANDRE:  I believe this is a few years old.

04:58:01 6    When we talked about the trial schedule, you had talked

04:58:03 7    about having closing on the Monday after close of evidence,

04:58:06 8    but I don't know if that still holds true or not.  If you

04:58:09 9    want to get done Friday, it's a bit ambitious to have the

04:58:13 10   jury instructions read, and if there's a charge conference,

04:58:16 11   and all that.

04:58:18 12           So I would say I would agree with Mr. Webb that

04:58:22 13   closing either the close of business Friday, the jury goes

04:58:25 14   home with it over the weekend, or do closings first thing

04:58:28 15   Monday morning, and let them have it at that point.

04:58:31 16           MR. WEBB:  For what it's worth, Activision has a

04:58:35 17   strong preference to giving this to the jury on Friday.  I

04:58:38 18   think we can do it.

04:58:39 19           THE COURT:  Some particular reason?

04:58:43 20           MR. WEBB:  Your Honor, just in order to get this

04:58:45 21   case to the jury and not have it linger any longer --

04:58:48 22           THE COURT:  Okay.  Well, here's --

04:59:40 23           MR. WEBB:  Your Honor, I hate to interrupt your

04:59:42 24   train of thought there.  I was reminded that our corporate

04:59:45 25   representative has an annual trade show that's very

04:59:48  1    important to the company, BlizzCon I believe is the name of

04:59:50  2    it, that he has to attend.  He's flying back to the West

04:59:54  3    Coast Friday at nine o'clock at night.

04:59:59  4             THE COURT:  Okay.  Thank you.  Hold on just a

05:00:03  5    minute.

05:00:22  6             So I have an interest in getting this case to

05:00:26  7    the jury on Friday, too because I have another trial

05:00:30  8    scheduled on the Monday, and those people are pressed for

05:00:39  9    time, too.  I would normally, notwithstanding what everyone

05:00:46 10    says of my Scheduling Order or, in fact, what it says in

05:00:49 11    your trial parameters, I actually go usually until 5:00, not

05:00:54 12    4:30, so.  There's a few extra half hours.

05:01:02 13             And so what I'm thinking about is whether -- so

05:01:06 14    what I'd like to do, if you all can live with 11 hours, is

05:01:16 15    to make opening statements outside, the closing arguments

05:01:19 16    outside the 11 hours, and basically try to get through the

05:01:32 17    testimony.

05:01:40 18             Well, we ought to be able to get through --

05:02:00 19    yeah.  I think if we do 11 hours, I give you a reasonable

05:02:06 20    opening length, which would be roughly 30 minutes for the

05:02:15 21    plaintiff and try to ask Mr. Webb to limit himself to

05:02:21 22    40 minutes maybe, you know, I think we can be almost

05:02:26 23    finished on Friday morning or early Friday morning.

05:02:33 24             And I think we would work on the jury

05:02:37 25    instructions maybe, you know, Wednesday after testimony.  So

05:02:46   1    why don't we plan to do it on Friday.  I wouldn't expect the

05:02:54   2    jury to have a verdict on the Friday, but it's one of those

05:03:01   3    fun things having two cases going on at the same time.

05:03:04   4              So I think we can deal with that if the jury is

05:03:06   5    still deliberating on Monday.  So the day will be from 9:30

05:03:13   6    to 5:00, not 4:30.  And the openings will be outside.

05:03:23   7              Okay.  So I think that will work.

05:03:25   8              All right?

05:03:26   9              MR. WEBB:  Thank you, Your Honor.

05:03:27  10              THE COURT:  And then, though, so that

05:03:37  11    Paragraph 82, there's an argument about the presumption of

05:03:43  12    validity.  And so Acceleration Bay says the jury needs to be

05:03:51  13    instructed on why Activision's burden of proof is clear and

05:03:54  14    convincing evidence and to ensure the distinction and the

05:03:59  15    burden of proof on this issue is properly provided to the

05:04:02  16    jury.

05:04:03  17              You know, I don't really buy the second half of

05:04:06  18    that.  You tell them there's two different burden of proofs.

05:04:10  19    One is this, one is that.  One of them is higher than the

05:04:14  20    other.  So I think that gets that point across.

05:04:18  21              And the other thing is I don't really believe

05:04:22  22    that you need to tell the jury as to why a burden of proof

05:04:29  23    is something or other.  You know, I don't tell them, Well,

05:04:35  24    it's the plaintiff's preponderance of the evidence to prove

05:04:37  25    infringement because they're the ones who filed the suit.

05:04:40  1    You just say the burden of proof is this.

05:04:43  2              And so I'm going to do what I have done in the

05:04:49  3    past which is say that you can refer to the burden of proof

05:04:57  4    all you like, but not to the presumption of validity.  Okay.

05:05:04  5              All right.  So that's through that.

05:05:08  6              I know Mr. Webb reserved at least one thing.

05:05:11  7    And actually before that, let me just mention a few other

05:05:14  8    things.

05:05:17  9              So the Monday morning of trial, you need to

05:05:21 10    provide a glossary of terms and names to the court reporter.

05:05:29 11    And when playing depositions, you need to provide the court

05:05:35 12    reporter with the designations highlighted before the

05:05:38 13    playing of the video.  And when you have a exhibit notebook,

05:05:43 14    you basically need to have one for the court reporter, one

05:05:49 15    for my law clerk, and one for me, and to provide them at the

05:05:53 16    same time as you provide them to the witness.

05:05:55 17              All right.  So that's all I've got on my list.

05:06:06 18              But so, Mr. Andre, what else would you like to

05:06:12 19    talk about?

05:06:12 20              MR. ANDRE:  Just briefly, did you want us to

05:06:15 21    prepare jury binders with the copy of the patents and your

05:06:21 22    Claim Construction Order in it?  Is that something you do in

05:06:23 23    trials or not?

05:06:24 24              THE COURT:  I don't make people do that.  If you

05:06:31 25    wanted to -- you know, one of the things that I think Judge

05:06:36  1    Robinson did, which I would be interested in doing if you

05:06:40  2    want to do it, is to give them a notebook that has the

05:06:47  3    patents, that has the Claim Construction Order, and that has

05:06:53  4    a nice picture of your witnesses so that when people are

05:06:59  5    going through and they're listening to them they can -- you

05:07:04  6    know, name of the witness, and the name or the witness

05:07:07  7    picture and the name.  But I don't know, is that something

05:07:12  8    that you've done somewhere else?

05:07:13  9              MR. ANDRE:  In the past, I've done the Facebook

05:07:16 10    pages.  You know, not Facebook, but the pictures of other

05:07:19 11    witnesses.  We've done that sometimes.

05:07:21 12              You know, it has to be agreed amongst the

05:07:24 13    parties.  And I don't want them to take my picture, but

05:07:26 14    pictures of my witnesses or that kind of stuff.

05:07:27 15              But I can talk with counsel.  And if we think we

05:07:31 16    can agree to something to give to the jury, I just want to

05:07:34 17    make sure that's okay.

05:07:35 18              THE COURT:  Yeah.  Yeah.  If you agree to give

05:07:37 19    the jury something, I'm agreeable to whatever it is you want

05:07:39 20    to give them.

05:07:40 21              MR. ANDRE:  Okay.  That's great.  Thank you.

05:07:41 22    There's nothing else for plaintiff.

05:07:43 23              THE COURT:  So one other thing, I didn't see

05:07:45 24    this in here, and I'm ambivalent about it particularly

05:07:48 25    because -- well, do you want to play the FJC patent video?

05:07:56   1          MR. ANDRE:  Yes, Your Honor.

05:07:57   2          MR. WEBB:  Yes, Your Honor.

05:07:58   3          THE COURT:  Okay.  All right.  So the one thing

05:08:00   4    on that is there's a place where Judge Fogel says, I'm a

05:08:06   5    judge and director of the Administrative Office of the

05:08:09   6    Court.  You've got to blip out the part where he says he's a

05:08:11   7    judge because I don't want them thinking he's giving them

05:08:15   8    jury instructions.

05:08:16   9          Okay?

05:08:16  10          MR. ANDRE:  Okay.

05:08:17  11          THE COURT:  All right.  So, Mr. Andre, I've

05:08:19  12    taken care of you.

05:08:20  13          Mr. Webb, I know you had something at least

05:08:22  14    about willfulness.

05:08:23  15          MR. WEBB:  This shouldn't take longer than an

05:08:26  16    hour.  It's a joke.

05:08:27  17          A couple things, Your Honor.  First, with

05:08:30  18    respect to the dropped patents/products, could we learn what

05:08:35  19    that would be by noon Monday?

05:08:37  20          MR. ANDRE:  Sure.

05:08:39  21          MR. WEBB:  Thank you.

05:08:39  22          Also, willful infringement, earlier today

05:08:44  23    counsel confirmed that they're seeking willfulness based

05:08:47  24    upon notice that occurred with the filing of the lawsuit in

05:08:49  25    March of 2015 forward.  And there was a discussion about

05:08:53  1    some Activision call that was not going to be used as

05:08:56  2    relevant to willfulness in any way.

05:08:58  3              THE COURT:  Right.

05:08:59  4              MR. WEBB:  In looking at the interrogatory

05:09:01  5    responses, it seems that post-filing activity coupled with

05:09:06  6    discovery misconduct by counsel for the defendant is the

05:09:09  7    basis for willful infringement.  And we talked earlier

05:09:13  8    about --

05:09:13  9              THE COURT:  Wait a second.  Is discovery

05:09:16 10    misconduct part of this trial?

05:09:18 11              MR. ANDRE:  No, sir.

05:09:19 12              THE COURT:  Okay.

05:09:19 13              MR. WEBB:  That was my question, Your Honor.

05:09:21 14              THE COURT:  Yeah.  I didn't think it was going

05:09:23 15    to be.

05:09:23 16              MR. WEBB:  And then one last thing, Your Honor.

05:09:25 17    This is something we can probably address in the charge

05:09:29 18    conference on Wednesday.

05:09:31 19              The '147 and '069 patents both have been

05:09:35 20    construed expressly or applied by Your Honor as having an

05:09:39 21    M-regular requirement.  I'm not --

05:09:41 22              THE COURT:  Yeah.  Well, there's express

05:09:43 23    constructions and non-express constructions, but I take it

05:09:48 24    you're talking about some implied construction here.

05:09:51 25              MR. WEBB:  No.  It's a part of your Order that

05:09:54 1    did not make it into the construed terms.  And so we'd just

05:09:57 2    alert Your Honor to that, and that's something we will be

05:10:00 3    addressing in the instruction phase.

05:10:02 4         THE COURT:  Okay.  Well, as long as you're not

05:10:05 5    telling me you're going to tell the jury something.  I mean,

05:10:12 6    in other words, what the jury finds out is the claim

05:10:16 7    constructions.  They don't get, and you don't cross-examine

05:10:20 8    the experts over, Judge Andrews said this or that.

05:10:27 9         MR. WEBB:  No.  Of course, Your Honor.  Why

05:10:28 10   don't we do this:  Why don't we give it to opposing counsel

05:10:30 11   and work this out as best we can.  If we can't, we'll bring

05:10:34 12   it to Your Honor's attention.

05:10:35 13        THE COURT:  Okay.  Well, that sounds reasonable.

05:10:38 14   Okay.

05:10:41 15        Oh, yeah.  Yeah.  So, I'm sorry.  Partly, I

05:10:44 16   don't know why, I'm behind on one or two things.  I will at

05:10:49 17   some point next week look through the voir dire and file

05:10:54 18   something as to what I will ask the panel.  I haven't looked

05:11:03 19   at the preliminary jury instructions.

05:11:09 20        Are there many disputes in them?

05:11:11 21        MS. KOBIALKA:  There's not that many.  They're

05:11:13 22   pretty close and pretty standard on both sides.

05:11:15 23        THE COURT:  So the one thing I'm curious about

05:11:18 24   because the only thing that's ever -- because to the extent

05:11:23 25   that there's a dispute and it's a brain teaser, then I

05:11:28  1    usually just skip it figuring we'll figure it out later, if

05:11:31  2    necessary.

05:11:32  3              But the one thing that there's sometimes

05:11:34  4    competing viewpoints on is what I should tell them about

05:11:40  5    this case.  You know, plaintiff will submit, This is

05:11:45  6    about -- you know, four or five sentences that say, you

05:11:50  7    know, this is Acceleration Bay claiming infringement by big,

05:11:55  8    bad Activision.  And Activision's version will say, This is

05:11:59  9    a patent troll, and I'm supposed to meld those two together.

05:12:03 10              Did you agree on a description of what this case

05:12:05 11    is about?

05:12:07 12              MS. KOBIALKA:  To be quite frank, in the

05:12:09 13    preliminary instructions for defendant, they don't even have

05:12:12 14    that.  We had a very vanilla statement of contentions.  We

05:12:17 15    assert infringement.  There's willfulness, damages, and

05:12:19 16    invalidity, and that's it.  So there's not really a lot of

05:12:23 17    discussion on the preliminary --

05:12:24 18              THE COURT:  Well, if it's vanilla, I can work

05:12:27 19    with that.  You're okay with their vanilla description?

05:12:30 20              MR. WEBB:  I don't have it in front of me.  That

05:12:32 21    may be something that we can visit about, and if we have a

05:12:34 22    problem, we will alert, Your Honor.

05:12:36 23              THE COURT:  Well, yeah.  So if you could visit

05:12:38 24    about that and alert me by Tuesday that there's a problem,

05:12:46 25    otherwise I'm going to just go with whatever it is

05:12:49  1   Acceleration Bay submitted.

05:12:51  2             MR. WEBB:  Fair enough, Your Honor.

05:12:53  3             THE COURT:  The final jury instructions, part of

05:12:55  4   my hope, the usual practice is that you all will continue to

05:13:01  5   discuss them.  I think it's possible -- I looked through.  I

05:13:05  6   think there may still be ones that had anticipation and

05:13:09  7   obviousness, and I don't think there's been a lot of work on

05:13:11  8   them probably for months and probably not that much even

05:13:14  9   back then.

05:13:15 10             So I would like, if we're going to have a charge

05:13:20 11   conference, if we're going to plan on that for Wednesday

05:13:22 12   evening, that by some time, which might be Tuesday evening,

05:13:33 13   you submit a revised our best efforts to resolve disputes.

05:13:39 14   And when there's, you know, a dispute over a few words, not

05:13:46 15   to submit me two different instructions, and I have to

05:13:49 16   figure out where the few words are, but to highlight them or

05:13:53 17   do something so that they're right next to each other.

05:13:55 18             And I can't remember whether I looked at the

05:14:01 19   verdict form or not, but I'm assuming that will be, if it's

05:14:07 20   not already, well out of date once we start reducing claims

05:14:11 21   and patents and things.  And I guess maybe whenever the

05:14:20 22   parties have their best effort joint requests for a verdict

05:14:23 23   form, to submit that.  But in any event, no later than the

05:14:27 24   Tuesday when you're doing the jury instructions.

05:14:29 25             Okay?

05:14:30 1          MR. ROVNER:  Do you want those jury instructions

05:14:32 2     on Tuesday night and the verdict form emailed as well so you

05:14:36 3     have it in Word?

05:14:38 4          THE COURT:  Yes.  Yeah.  And I guess the only

05:14:53 5     other thing I would say, as I say this because,

05:14:56 6     unfortunately, I see a lot of disputes here.  You know, if

05:15:01 7     you really need something during the trial, you know, the

05:15:11 8     Delaware counsel knows what my email address is, my judge

05:15:16 9     address, not the general thing.  And if you need to send me

05:15:22 10    something to catch my attention, send it to me.  Okay?

05:15:27 11         All right.  Anything else?

05:15:28 12         MR. ANDRE:  Just one last thing, Your Honor.  I

05:15:31 13    have not had the privilege of trying a case before Your

05:15:34 14    Honor on the voir dire.

05:15:35 15         THE COURT:  It's a rare privilege.

05:15:37 16         MR. ANDRE:  On voir dire, do you do all the voir

05:15:40 17    dire, or do you let the attorneys do it?  How exactly do you

05:15:43 18    want us to proceed on that?

05:15:44 19         THE COURT:  Well, so basically I will have the

05:15:47 20    questions.  I will read the questions to the panel.  We will

05:15:51 21    note who says yes to a question.

05:15:54 22         Then we seat 14 people.  And if the people that

05:16:00 23    we've seated have answered yes, we bring them over to

05:16:03 24    side-bar, and I will start the questioning by asking them

05:16:10 25    about whatever questions they answered yes to.  Most of the

05:16:13  1    time whatever it is they've answered questions about don't

05:16:18  2    require any followup by the lawyers.

05:16:22  3              I don't think it's likely to happen, but if they

05:16:24  4    say, yeah, the witness, Medvidovic, I know that guy, you

05:16:29  5    know, I'm not going to be able to follow up and see if it's

05:16:32  6    the same Medvidovic or some other Medvidovic.  So, you know,

05:16:35  7    that would be -- and if they say, yeah, my uncle had a

05:16:40  8    patent that got stolen from him, you know, I'll let you all

05:16:44  9    address that.

05:16:45 10              But a lot of the people, you know, probably

05:16:53 11    two-thirds of the people come over to side-bar.  I ask them

05:16:56 12    a few questions, the matter is resolved.  You know, they

05:16:59 13    say, I can't be here because I have to take care of a child

05:17:04 14    who's, you know, got no relatives.

05:17:06 15              You know, I may glance at you.  If you nod your

05:17:08 16    head yes, I will say, okay, thanks, no more questions, and

05:17:11 17    we'll get somebody else.

05:17:12 18              MR. ANDRE:  Okay.  That's very helpful.  Thank

05:17:15 19    you, Your Honor.

05:17:15 20              THE COURT:  Okay.  All right.

05:17:17 21              Well, thank you.  It's been a long day.  I

05:17:19 22    appreciate your attention.  See you soon.

05:17:22 23              THE CLERK:  All rise.

05:17:23 24              THE COURT:  And I'm sorry, you know, I don't

05:17:31 25    have a trial scheduled next week.  Unfortunately, most of

05:17:35  1   the work that I have scheduled next week is for like

05:17:38  2   Wednesday through Friday.  But if you need something, I'm

05:17:41  3   around and reach out to me.

05:17:46  4                   All right?

05:17:48  5                   MR. ANDRE:  Thank you, Your Honor.

6                   MR. WEBB:  Thank you, Your Honor.

7                   THE CLERK:  All rise.

8                   (Pretrial hearing was concluded at 5:17 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF DELAWARE)

2    NEW CASTLE COUNTY)

3

4                    CERTIFICATE OF REPORTER

5

6            I, Heather M. Triozzi, Registered Professional
     Reporter, Registered Merit Reporter, and Notary Public, do
     hereby certify that there on October 19, 2018 proceedings
7    were held and taken down by me in Stenotype notes and
     thereafter transcribed by use of computer-aided
8    transcription and computer printer under my direction.

9

10           I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
     interested in the event of this suit.

11

12

13

14                    Heather M. Triozzi, RPR, RMR

15

16

17

18

19

20

21

22

23

24

25