IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ACCELERATION BAY LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 16-453 (RGA) |
| | ) | |
| ACTIVISION BLIZZARD, INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

**DEFENDANT ACTIVISION BLIZZARD, INC.'S RESPONSE TO
ACCELERATION BAY'S DAMAGES PROFFER**

Morris, Nichols, Arsht & Tunnell LLP
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

B. Trent Webb
Aaron E. Hankel
Jordan T. Bergsten
Maxwell C. McGraw
Shook Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO  64108
(816) 474-6550

Tanya Chaney
Shook Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77002
(713) 227-8008

Original Filing Date:  March 15, 2019
Redacted Filing Date: March 28, 2019

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................................................1
II.    STAGE OF THE PROCEEDINGS ..............................................................................1
III.   SUMMARY OF OBJECTIONS TO ACCELERATION'S PROFFER............................2
IV.    STATEMENT OF FACTS ...........................................................................................4
V.     ARGUMENT ...............................................................................................................6
       a.     Legal Standard .................................................................................................6
       b.     None of Mr. Parr's Opinions Try to Apportion Beyond "Networking" and
              "Multiplayer"—Broad Concepts Undisputedly Predating the Inventions..............6
              i.     Mr. Parr Never Tries to Apportion Beyond the Entire Value of the
                    "Multiplayer Mode" or the "Network Functionality" of the
                    Accused Games........................................................................................8
              ii.    It is Undisputed that "Multiplayer" and "Networked" Games
                    Predate the Patents, that These Modes Do Not Always Infringe;
                    and that these Modes Include Valuable Unpatented Aspects ....................9
              iii.   None of Mr. Parr's Opinions Value or Even Identify Any
                    Improvement Over Prior, Non-Infringing Games, Including
                    Activision's Non-Infringing Predecessors to the Accused Games............12
       c.     The Purported Boeing-Panthesis License is Not Comparable, and Has
              Unreliable Terms Because it Was Never Disclosed and Even Now Has
              Not Been Produced in Final Form ....................................................................15
              i.     Mr. Parr Does Not Even Assess the Substantial Technological
                    Differences Between the Purported Boeing-Panthesis License and
                    this Case ................................................................................................16
              ii.    Mr. Parr Ignores Important Economic Differences Destroying
                    Comparability .........................................................................................18
              iii.   Acceleration's Failure to Timely Disclose, or to Ever Produce, the
                    Purported    Boeing-Panthesis   License   Unfairly   Prejudices
                    Activision and Renders it Unreliable........................................................20
       d.     Mr. Parr Now Directly Relies on Dr. Valerdi's "Cost Savings" to Avoid an
              Undisclosed Alternative, With Insufficient Connection to the Facts of the
              Case...............................................................................................................21
              i.     Mr. Parr's Report Uses Dr. Valerdi's Results In His Calculations
                    Even Though They Are Increasingly Unconnected From the Facts
                    of This Case ...........................................................................................22
              ii.    Dr. Valerdi Violates the Requirement of Testability Because He
                    Does Not Identify What Alternative He is Estimating or How .................24
              iii.   Dr. Valerdi Unreliably Estimates the Cost of Developing the
                    Underlying WoW Game, Which Is Already in the Record ......................25
              iv.    Acceleration's Use of Dr. Valerdi's Calculations to Determine Pre-
                    Suit "Cost Savings" Should Be Excluded Because Acceleration
                    Represented that it Would Not Seek Pre-Suit Damages ...........................26

e.    Acceleration Seeks Damages for CoD and Destiny Only for Game Sales, Which Cannot Infringe the Method Claims Asserted Against Those Games ..............................................................................................27

f.    Mr. Parr's Opinions, All of Which are in the ████████████████ ██████ Should Be Excluded Because they Fail to Explain Away Boeing's Attempts to Sell the Asserted Patents for ██████..........................28

VI.    CONCLUSION.............................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bayer HealthCare LLC v. Baxalta Inc.*,
No. 16-1122-RGA, 2019 WL 330149 (D. Del. Jan. 25, 2019)................................................18

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................................................................................7, 22

*Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*,
430 F. Supp. 2d 346 (D. Del. 2006).......................................................................................6

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...........................................................................................6, 7, 24

*Fractus, S.A. v. Samsung*,
No. 6:09-CV-203, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011).......................................7, 8

*Garretson v. Clark*,
111 U.S. 120 (1884)..........................................................................................................7

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
629 F. Supp. 2d 175 (D. Conn. 2009)....................................................................................24

*Intellectual Ventures I LLC v. Xilinx, Inc.*,
No. 10-1065-LPS, 2014 WL 1814384 (D. Del. Apr. 14, 2014) ...................................4, 29, 30

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
No. 3:15-CV-720-JAG, 2018 WL 1460703 (E.D. Va. Mar. 23, 2018) ...................................7

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)................................................................................14, 18, 30

*M2M Solutions LLC v. Enfora, Inc.*,
167 F. Supp. 3d 665 (D. Del. 2016)................................................................................16, 18

*McMenamin v. M & P Trucking Co.*,
No. CIV. A. 93-6888, 1994 WL 724980 (E.D. Pa. Dec. 29, 1994).......................................21

*Moba, B.V. v. Diamond Auto., Inc.*,
325 F.3d 1306 (Fed. Cir. 2003).........................................................................................3, 28

*NetAirus Techs., LLC v. Apple, Inc.*,
No. LACV1003257JAKEX, 2013 WL 11237200 (C.D. Cal. Oct. 23, 2013) ...................7, 11

*Oddi v. Ford Motor Co.*,
   234 F.3d 136 (3d Cir. 2000).............................................................................................3, 22

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013).............................................................................................21

*Ricoh Co., Ltd. v. Quanta Comput. Inc.*,
   550 F.3d 1325 (Fed. Cir. 2008).............................................................................................28

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
   81 F.3d 355 (3d Cir. 1996).............................................................................................26

*Sprint Commc'ns Co. L.P. v. Comcast IP Holdings*,
   LLC, No. 12-1013-RGA, 2015 WL 410342 (D. Del. Jan. 29, 2015) ...............................10, 15

*Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*,
   No. 03-2910, 2006 WL 3227315 (S.D. Tex. Nov. 6, 2006) ....................................................27

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011).............................................................................................15

*Virnetx, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014).............................................................................2, 7, 11, 12

*Whitserve, LLC v. Computer Packages, Inc.*,
   694 F.3d 10 (Fed. Cir. 2012).............................................................................11, 28, 29, 30

*Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010).............................................................................3, 15, 18

**Statutes**

35 U.S.C. § 271(a) .............................................................................................3, 28

35 U.S.C. § 287.............................................................................................27

## I.      INTRODUCTION

In Plaintiff Acceleration Bay's fourth bite at a submissible damages case, Acceleration strays further than ever from important Federal Circuit safeguards, resulting in its largest damages theory yet.  Having exhausted all facts and theories that it disclosed during discovery, Acceleration now introduces entirely new facts and theories to further inflate its damages numbers.

Acceleration now sets forth seven different damages calculations.  Acceleration fails to properly apportion any of these calculations, attributing all purported value of online gameplay in the accused products to the claimed invention.  Further, each damages calculation is based on one of two inadmissible inputs.  Four of the seven damages calculations are predicated on a newly conjured 12% royalty rate that fails multiple Federal Circuit standards on admissibility, again leaving Acceleration with no admissible damages case.  The remaining damages calculations are based on Acceleration now attempting to convert Dr. Valerdi's purported "cost savings" estimates into an independent damages theory, despite Acceleration's previous damages expert disavowing such an approach.

Acceleration has been given plenty of chances to present a submissible damages case, and every time has moved further in the wrong direction.  It would be severely prejudicial to require Activision to continue to litigate this or any other of Acceleration's rogue damages theories.  Activision respectfully requests that the Court exclude all seven of Acceleration's damages calculations and strike Acceleration's damages proffer in its entirety.

## II.     STAGE OF THE PROCEEDINGS

Acceleration accuses Activision of infringing four patents through three video games: World of Warcraft ("WoW"), Call of Duty ("CoD"), and Destiny.  The Court has continued trial in this case indefinitely pending resolution of this, Activision's challenge to Acceleration's

"proffer of the case it intends to submit to the jury on damages" (D.I. 619 at 2; *see also* D.I. 630). The Court has already excluded two rounds of damages theories offered by Acceleration (D.I. 578 at 27-28, D.I. 600 at 7), and this proffer is Acceleration's "final opportunity to present [the Court] with an admissible damages case" (D.I. 619 at 2).

### III.    SUMMARY OF OBJECTIONS TO ACCELERATION'S PROFFER

1.      Acceleration does not apportion any of its seven proposed royalties beyond the entire value of "multiplayer" and "networked" games in general.  But it is undisputed that the patents-in-suit relate to only specific networking functionality for only certain multiplayer modes in the accused games. And online games have existed since the 1970s and predate the patents, including Activision's own multiplayer games.  Acceleration does the opposite of what is required by the Federal Circuit on apportionment: it does not even identify, let alone value, the functionality that the patents allegedly add to the accused games over the prior, unaccused networked multiplayer games.  Instead, Acceleration seeks to capture the entire value of networked, multiplayer games, including the valuable unpatented features. This failure to apportion requires exclusion. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

2.      The ▮ royalty Acceleration now advances is based solely on a supposed 2002 agreement between Boeing and Panthesis that *to this day* has not been produced in its final executed form, but is unreliably pieced together from old emails, draft agreements, and one inventor's recollection of events from seventeen years ago.  Acceleration seeks to apply this supposed royalty rate to a hypothetical negotiation Acceleration contends occurred a decade later, while ignoring all events relating to the licensing and sale of the patents and Panthesis products during that time.  Worse, Acceleration does not even discuss the technical comparability of that purported agreement, which would have been executed (if at all) before the

patents issued and before the patent applications added the "m-regular" component that Acceleration acknowledges as central to the issued patents.  Acceleration also ignores important economic differences, including that under any such agreement Boeing would only receive ▮ of a one-time, ▮ fee per game title—not ▮ of game revenue, or number of users, or alleged cost savings, as Acceleration now calculates.  This failure to account for technical and economic differences is fatal. *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010).

3.    For its other damages calculations, Acceleration now changes course to rely on Dr. Valerdi's purported "cost savings" estimate, further underscoring the defects in that opinion. Most notably, Dr. Valerdi does not provide a "cost savings" estimate at all.  Rather, Dr. Valerdi inexplicably assumes that every line of code in the accused products would need to be re-written to avoid infringement, even code having nothing to do with the accused functionality.  In doing so, Dr. Valerdi yields a "cost estimate" that is many multiples higher than the cost of actually developing the accused games from scratch as calculated by Acceleration's previous damages expert.  Acceleration now plugs Dr. Valerdi's numbers directly into its damages calculations without any reduction or accounting for the reduced number of patents and narrowed functionality now remaining in the case. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000).

4.    Acceleration also only seeks damages on CoD and Destiny for sales of these video games, but only asserts method claims against those games, and the "sale or manufacture of equipment to perform a claimed method is not direct infringement within the meaning of 35 U.S.C. § 271(a)." *Moba, B.V. v. Diamond Auto., Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003).

5.    Finally, Acceleration ignores that in the years leading up to the 2012 hypothetical negotiation, (1) Panthesis failed to make a single sale of its software, (2) Boeing unsuccessfully failed for years to sell this patent for its "expectation" of ████, and (3) in 2010, Boeing made a (rejected) offer to sell off all of the asserted patents for ████. Acceleration cannot, while ignoring such facts, provide a reliable basis for a jury to consider its seven royalty models ranging from ████ to ████. *See Intellectual Ventures I LLC v. Xilinx, Inc.*, No. 10-1065-LPS, 2014 WL 1814384, at *4 (D. Del. Apr. 14, 2014).

## IV.    STATEMENT OF FACTS

On April 13, 2018, this Court allowed Acceleration to supplement its **first set of damages theories**, presented through Dr. Christine Meyer, Acceleration's damages expert at the time, to analyze a different hypothetical negotiation date between the parties.  (D.I. 521).  The Court noted that "the law is clear" that Dr. Meyer opined on the wrong date, and gave Acceleration a chance to substitute with "a lawful analysis." (*Id.*).

On August 29, 2018, this Court excluded Acceleration's **second set of damages theories** presented through Dr. Meyer, because they all relied on a jury verdict in a case that did not involve any of the same parties or patents in this case. (D.I. 578 at 27-28).

On September 21, 2018, less than six weeks before the then-scheduled trial in this case, Acceleration disclosed for the first time a **third set of damages theories** consisting of "three royalty bases and a royalty rate of 15.5%" from an un-authenticated online advertisement, which it proposed to support through four different avenues of evidence (D.I. 600 at 1-2).  On October 17, 2018, this Court struck all four avenues of evidence, and held that "the 15.5% royalty rate and bases associated with it are effectively precluded as well." (*Id.* p. 7).

At the pre-trial conference on October 19, 2018, less than two weeks before the then-scheduled trial, Acceleration disclosed for the first time a new, **fourth set of damages theories** it

intended to present at trial. (*See* D.I. 619 at 1).  Activision moved to strike, arguing "that Plaintiff did not properly disclose its theories and that the theories failed to meets the standards set by the Federal Circuit." (D.I. 619 at 1-2 (citing D.I. 601, 603).

Because there was not sufficient time before the scheduled trial to resolve on the merits Activision's challenge to this third set of damages theories, this Court continued trial indefinitely to allow Acceleration to make a "proffer of the case it intends to submit to the jury on damages," explaining that "Plaintiff may supplement its expert reports if it wishes to do so." (D.I. 619 at 2).

Acceleration filed its proffer on February 15, 2019 (D.I. 641).  Acceleration claims that the damages report of Mr. Parr, its new expert on damages, "is incorporated into this proffer in its entirety," and, after some preliminary remarks and citations to case law, Acceleration's proffer merely presents "a summary of [Mr. Parr's] reasonable royalty opinions." (D.I. 641 at 3-4).  This summary is followed by a list of "Additional Supporting Opinions and Testimony," without any analysis or explanation of how any of the listed items might be used to support a royalty other than the ones presented by Mr. Parr. (D.I. 641 at 22-27).

Mr. Parr opines on seven royalties, across three "Approaches" ("Cost-Savings," "Revenue-Based," and "User-Based") all between around ███████ to ████████, as summarized in the below table:[1]

---

[1] The ████████ in Royalty No. 2 is not calculated or explained anywhere in Dr. Parr's report or errata, but it appears to use Dr. Valerdi's ████████ calculation as an input.

| No. | Title | Equation | Amount (millions) | Inputs: | | |
|---|---|---|---|---|---|---|
| | | | | Valerdi | Purported License | Survey |
| 1 | Cost Savings: Licensing History | ███████ | ███ | Y | Y | |
| 2 | Cost Savings: Rate of Return | ███████ | ██ | Y | Y | |
| 3 | Cost Savings: Replacement Cost of Capital | ███████ | ███ | Y | | |
| 4 | [Alt.] Cost-Savings: Replacement Cost of Capital | ███████ | ███ | Y | | |
| 5 | Cost Savings: Maintenance Costs | ██████ | | Y | | |
| 6 | Revenue-Based | ████████ | ██ | | Y | Y |
| 7 | User-Based | | | | Y | Y |

Activision timely files this response (D.I. 630 at 2-3), which respectfully asks the Court to exclude all seven opinions and to strike Acceleration's damages proffer.

## V.   ARGUMENT

### a.  Legal Standard

"[T]he Rules of Evidence—especially Rule 702— . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "The party offering the expert testimony bears the burden of proving admissibility." *Id.*. at 592. "The expert must explain how and why he or she has reached the conclusion being proffered and must have as a basis more than a subjective belief or speculation." *Cryovac Inc. v. Pechiney Plastic Packaging, Inc.*, 430 F. Supp. 2d 346, 362 (D. Del. 2006).

### b.  None of Mr. Parr's Opinions Try to Apportion Beyond "Networking" and "Multiplayer"—Broad Concepts Undisputedly Predating the Inventions

Acceleration's proffer falls far short of the requirement to tie its damages to the asserted patents; in fact, any patentee could submit this very same proffer so long as it alleged that its

6

patent was infringed by Activision's "multiplayer" games, or games with a "networking aspect." Because it is undisputed that such games have existed since the 1970s, can be played without infringing, and owe their success to scores of features not patented by Acceleration, this proffer falls far short of what is required to tie damages evidence to the asserted patents.

For over one hundred years, the law has been that a patentee "must" provide evidence apportioning between "the patented feature and unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Apportionment is an "'essential requirement' for reliability under *Daubert*." *Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015); *see also Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[T]he district court should have exercised its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment were allowed to reach the jury.").

Courts thus routinely exclude damages opinions that only apportion down to a broader technology that the patentee admittedly did not invent, or that admittedly can be used in ways that do not infringe. *E.g. Fractus, S.A. v. Samsung*, No. 6:09-CV-203, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011) (excluding expert testimony on surveys because the "surveys attempt to quantify the estimated value of consumer preference for internal antennas in cell phones" where the "Plaintiff concedes that it did not invent, and the patents-in-suit do not cover, all internal cell phone antenna designs").[2] This Court should follow that lead here to exclude all of Mr. Parr's opinions and strike Acceleration's proffer.

---

[2] *See also NetAirus Techs., LLC v. Apple, Inc.*, No. LACV1003257JAKEX, 2013 WL 11237200, at *5 (C.D. Cal. Oct. 23, 2013) (excluding damages opinion where the patentee "did not invent FaceTime or video calling," and the patentee's damages expert "ma[de] no attempt to value the contribution of Claim 7 to FaceTime, a feature that requires a substantial amount of engineering not provided by the '380 Patent"); *Limelight Networks, Inc. v. XO Commc'ns, LLC*, No. 3:15-CV-720-JAG, 2018 WL 1460703, at *3 (E.D. Va. Mar. 23, 2018) (granting motion to

        i.  Mr. Parr Never Tries to Apportion Beyond the Entire Value of the "Multiplayer Mode" or the "Network Functionality" of the Accused Games

Mr. Parr does not even try to apportion any of his calculations beyond the "multiplayer mode" or the "network functionality" of the accused games, even though the inventors only claimed to make a modest improvement to these long-existing aspects of video games.

For two of Mr. Parr's approaches ("Revenue-Based" and "User-Based"), Mr. Parr recognizes the need to apportion beyond the accused games themselves, but to do so relies solely on survey questions asking about "the multiplayer version of the game" generally.  For these two approaches, Mr. Parr admits that he is valuing the entire "highly responsive multiplayer version of the game, which I understand from conversation with Dr. Medvidovic is tied to the patented technology." (Ex. 1, Parr Report, ¶18(b); *see also id.,* ¶¶ 208, 210-211, 226).  To do so, Mr. Parr took the results from a survey as showing that ▮ of gamers picked "Multiplayer" over two other forced choices as the "Main reason…for buying COD Title." (Ex. 1, Parr Report, ¶ 208; Ex. 5, Kostich Depo. Ex. 5, pp. 2, 13).  For his "Revenue-Based" and "User-Based" approaches, Mr. Parr made no attempt to apportion other than to apply that ▮ number to his calculations for every accused game. *See Fractus, S.A. v. Samsung*, No. 6:09-CV-203, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011) (excluding expert testimony on surveys for failure to apportion to the invented technology).

---

strike damages proffer: "Limelight's proffer still fails to explain how the 8% rate and the newly proposed base actually show the incremental value that the '002 Patent adds to Akamai's product offerings… Reducing the royalty base to 45% of Akamai's revenues based on the fact that 45% of network traffic uses the patented feature ignores the fact that the system depends on many other patents."); Ex. 28, *Apple Inc. v. Wi-LAN, Inc.*, 14cv2235, p. 9 (S.D. Cal. Jan. 3, 2019) (excluding damages opinion relying on a "test of voice call quality using VOLTE compared to voice call quality using Skype" where the inventors "did not invent VOLTE").

For the royalties calculated in Mr. Parr's third, "Cost Savings," approach, Mr. Parr does not discuss apportionment at all.  The only number in these calculations that even purports to tie this approach to the asserted patents are Dr. Valerdi's calculations.   In short, Dr. Valerdi's opinion merely plugs a number for the total lines of code for WoW (regardless of whether it relates to the accused functionality) into a model to produce an estimated cost to "re-architect" each line of code.  Dr. Valerdi's report provides no discussion tying his opinions to the patented invention, except to say that "based on my conversation with Dr. Medvidovic, I included as a percentage the estimated amount of code related to the networking functionality that is built into the application." (Ex. 6, Valerdi Report, p. 12).  At his deposition, Dr. Valerdi clarified that he used every line of code produced in this case because "a hundred percent of the code that we talked about was related to network functionality or impacted by network functionality." (Ex. 7, Valerdi Depo. Tr. at 109:3-12).   Other than using Dr. Valerdi's untethered conclusions in his calculations, Mr. Parr made no further adjustments to tie his "Cost Savings" approach to the patented invention.

ii.  It is Undisputed that "Multiplayer" and "Networked" Games Predate the Patents, that These Modes Do Not Always Infringe; and that these Modes Include Valuable Unpatented Aspects

Apportioning down only to the value of "multiplayer modes" or "networking functionality" is not enough for several reasons.  First, it is undisputed that the inventors of the asserted patents did not invent "multiplayer modes" or "networking functionality" for games. For instance, Acceleration's prior damages expert Dr. Meyer acknowledged that "for personal computer, games with multiplayer capabilities were first released over 20 years ago," and cited to a magazine article discussing several games released in the 1970s that were both "multiplayer" and "networked." (Ex. 9, Meyer Opening Report, ¶ 28, citing Ex. 10, "Infographic: A Massive

History of Multiplayer Online Gaming"). At his deposition, Mr. Parr agreed with that statement. (Ex. 3, Parr Depo. Tr. p. 63:25-64:14; *see also* Ex. 1, Parr Report Ex. 2 p. 142).

Likewise, inventor Fred Holt acknowledged at his deposition that online, multiplayer games existed at the time the inventors were developing the patented inventions. (Ex. 11, 05/31/17 Holt Depo. Tr. at 57:09-60:11). These inventors merely sought to reduce the number of "server crash[es]" and the "business cost problem of supporting server farms" that were "happening to people in the gaming industry" before their invention (*Id.*). Thus, this case is like *Sprint Commc'ns Co. L.P. v. Comcast IP Holdings*, LLC, where this Court excluded "apportionment methodology" that "measures the portion of the IMS network that is made up of the entire billing functionality," where the asserted "patent does not purport to cover billing functionality generally" but only "claim[ed] to increase 'flexibility.'" No. 12-1013-RGA, 2015 WL 410342, at *2 (D. Del. Jan. 29, 2015); *see also supra,* n. 2.

Second, Mr. Parr freely admits that the "multiplayer" and "networked" versions of the accused games can be played without infringing under Acceleration's theories. But he does nothing to estimate the frequency or popularity of the allegedly infringing uses. Specifically, Mr. Parr acknowledges that infringement of the '069 Patent requires "at least four participants," and the remaining patents require "at least five participants." (Ex. 1, Parr Report n. 63). Mr. Parr also acknowledges that, for WoW, Acceleration's infringement theories do not even turn on the number of players, but depend on a "large number of servers" being involved in the broadcast and re-broadcast of a particular message. (Ex. 1, Parr Report ¶ 39).[3] Mr. Parr does

---

[3] Mr. Parr provides no evidence or discussion to show how the fact that WoW "is always a multiplayer game" (Ex. 1, Parr ¶ 211), or any other fact he discusses, has anything to do with how often the WoW servers send messages in a way that allegedly infringes the '344 and '966 patents. And despite acknowledging that certain messages are not broadcasted at all, he does

nothing to estimate the frequency with which the "multiplayer" or "networked" versions of the game involve enough players or servers for infringement to even be possible.  And he does not identify any value from these instances over the other, admittedly non-infringing, instances that he sweeps up in his calculations.  As such, this case is also like *NetAirus Techs., LLC v. Apple, Inc.*, No. LACV1003257JAKEX, 2013 WL 11237200, at *5 (C.D. Cal. Oct. 23, 2013), which excluded damages opinions in part because they "simply assume[d] that claim 7 is always infringed when FaceTime is used," even though there was an additional "limitation of the claim that must be met for infringement to occur."

Third, Mr. Parr specifically acknowledges valuable unpatented aspects of the accused games but does nothing to account for them in his calculations.  Specifically, Mr. Parr explains that Activision "considers the story and the characters to be features that 'increase demand," and states that "some of the 'main competitive factors for World of Warcraft include game quality, compatibility of products with popular platforms, ease of use, and quality of customer service." (Ex. 1, Parr Report ¶ 145) (internal quotes omitted).  Mr. Parr merely claims that he "take[s] this *Georgia-Pacific* factor into account in my analysis," *id.*, but the Federal Circuit has rejected this type of statement that does "not explain how much each factor affected the rate," *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012), and has reversed a jury verdict where, as here, the damages expert's own statement "confirms that [the expert] did not even attempt to subtract any other unpatented elements from the base, which therefore included various features indisputably not claimed by [the patentee]."  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014).

---

nothing to estimate the frequency of messages that are broadcast and re-broadcast as required by the patents.

      iii.   None of Mr. Parr's Opinions Value or Even Identify Any Improvement Over Prior, Non-Infringing Games, Including Activision's Non-Infringing Predecessors to the Accused Games

Even apart from the unpatented features Mr. Parr expressly recognizes as valuable, Acceleration's proffer fails to apportion out or even discuss other valuable features that are readily apparent from that proffer. This further "confirms that [the expert] did not even attempt to subtract any other unpatented elements from the base" *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) (vacating verdict and concluding the damages expert "should have been excluded").

Most notably, Acceleration's proffer does nothing to apportion out the value of the unpatented features that made prior, admittedly non-infringing "multiplayer" and "networked" versions of World of Warcraft and Call of Duty successful. And Acceleration does not deny that these features appear in Destiny, or argue that they would have been unavailable for use in Destiny. At the pre-trial conference in October 2018, Acceleration counsel disclosed for the first time that infringement allegedly began with the "cross-realm zone technology that was added in a particular patch to World of Warcraft. I believe it was in 2013…" ((D.I. 606, at 45:10-18). Mr. Parr's report clarified that "infringement began for the accused games" in September 2012 for World of Warcraft (with the Mists of Pandaria expansion), and in November 2014 for Call of Duty (with the release of Call of Duty: Advanced Warfare). (Ex. 1, Parr Report ¶ 18(a)).[4] Here, Activision timely disclosed as a non-infringing alternative the "Activision games available before the date on which Plaintiff contends infringement began." (Ex. 12, 07-07-2017 Activision Interrogatory Response, p. 10). But neither Mr. Parr's report nor Acceleration's proffer argue

---

[4] See also id. ¶ 48 ("Because Activision's infringement from sales of the accused products began with its sales of World of Warcraft: Mists of Pandaria, the hypothetical negotiation would take place on or around September 2012.").

that the pre-2012 versions of World of Warcraft or the pre-2014 versions of Call of Duty would be (1) infringing; (2) unavailable; (3) unacceptable; or (4) cost Activision any money at all. Yet Mr. Parr's theories are designed to capture *every* feature in those non-infringing, networked, multiplayer games.

Indeed, Mr. Parr recognizes that success of prior, un-accused multiplayer games, but does not discuss any improvement offered by the accused games that could possibly be tied to the patents.  For instance, Mr. Parr admits that "World of Warcraft's first game release in 2004 is ranked by IGN as one of the top 100 games of all time," and that "[a]ll of the video games in the World of Warcraft franchise are entirely multiplayer." (Ex. 1, Parr Report, ¶¶ 132, 39) (internal quotes omitted).  And even though Acceleration counsel has represented that the "cross-realm zone technology" first released in the 2012 Mists of Pandaria expansion is "one of the primary features that we're accusing," neither Mr. Parr's report nor Acceleration's proffer even *mentions* cross-realm zone technology. (D.I. 606, p. 45:10-18).[5]  Likewise, Mr. Parr refers to Call of Duty as a "blockbuster *franchise*[]," but admits that "all of its releases for Xbox 360, Xbox One, or PC since 2007 have multiplayer capabilities." (Ex. 1, Parr Report ¶¶ 21, 138) (emph. added). Mr. Parr does not identify any improvement in the accused 2014 version of Call of Duty over the multiplayer modes of prior, non-infringing versions of Call of Duty between 2007 and 2014.[6] And although Acceleration accuses the first version of Destiny released in 2013, Mr. Parr's

---

[5] Tellingly, when Mr. Parr discusses what the accused Mists of Pandaria "fourth expansion" actually added to that already-successful WoW franchise in 2012, he only discusses undisputedly non-infringing features, explaining that it "builds on the existing world to include new characters, new territory, and new story options." (Ex. 1, Parr Report, ¶¶ 31(a)).

[6] Neither Acceleration nor its experts have ever disputed Ms. Lawton's claim that the 2007 version of CoD was "the first game with peer to peer routing of voice communications," or point to any changes to CoD's voice communications between the 2007 and 2014 versions. (*See* ex. 13, 11-13-2017 Lawton Report ¶ 765).

report does not value, or even identify, any particular feature of Destiny as being an improvement over Activision's prior, non-infringing multiplayer games.   Indeed, Mr. Parr's report appropriately assumes that a non-infringing alternative developed for WoW could be used for Destiny for no extra cost. (Ex. 1, Parr Report, ¶ 57).   But he fails to explain why in creating Destiny, Activision could not have just drawn on some combination of the non-infringing networks of pre-2012 WoW and pre-2014 CoD to avoid infringement for free.

Mr. Parr's failure to consider, let alone address, these admittedly non-infringing alternatives at the hypothetical negotiation is inexcusable.   For nearly a decade, WoW enjoyed great commercial success without the accused "cross realm zone" feature that was added in September 2012.   Such pre-existing alternatives would not only have been considered at the hypothetical negotiation, they would have shaped the discussion.   There is no credible excuse for Mr. Parr's failure to consider these alternatives before opining that Activision would have paid more than a ███████████ dollars so it could add a free feature to an already successful product.   See Lucent Tech., Inc. v. Gateway, Inc., 580 F.3d 1301, 1332-33 (Fed. Cir. 2009) (vacating damages award based on a lump-sum reasonable royalty award of almost $360 million where the infringing feature "a date-picker feature" was only a minor component of Microsoft's established Outlook software product); see also Rembrandt Social Media, LP v. Facebook, Inc., No. 13-158, 2013 WL 6327852, *5-*6 (E.D. Va. 2013) (excluding patentee's damages expert where, as here, the royalty base was ground in revenues associated with unaccused features existed before the addition of the accused feature:   "[Defendant] could have continued to use those four [unaccused] features without infringing.   Thus, the claim that ... the entire revenue stream attributable to [non-accused features] runs contrary to what common sense indicates a reasonable licensor would pay for the patents at issue.").   Mr. Parr's opinions are the result of

unsound science and do not reflect the incremental value of the patented invention, as required. The opinions are thus unhelpful and should be excluded.

As such, Acceleration's proffer is the very antithesis of that required by the Federal Circuit.  Mr. Parr does not value or even mention the functionality that is actually accused.  *See Sprint Commc'ns Co. L.P. v. Comcast IP Holdings*, LLC, No. 12-1013-RGA, 2015 WL 410342, at *2 (D. Del. Jan. 29, 2015) (excluding expert opinion on damages that "does not mention the improvements added to Comcast's IMS network by the '853 patent").  Instead, he values all of the unpatented features—like the strength of Activision's brand and the look and feel of its games—that caused Activision's networked, multiplayer franchises to be successful before Acceleration claims "infringement began" in 2012. (Ex. 1, Parr Report, ¶ 18(a)).  Acceleration's brazen attempts to capture the entire value of "multiplayer" and "networked" games is not at all helpful to the jury, but would only confuse it by fundamentally subverting the question it is supposed to be answering.  Because this failure to apportion infects each of Mr. Parr's opinions, this Court should exclude Mr. Parr's opinions and strike Acceleration's proffer.

### c. The Purported Boeing-Panthesis License is Not Comparable, and Has Unreliable Terms Because it Was Never Disclosed and Even Now Has Not Been Produced in Final Form

Several of Mr. Parr's calculations apply the exact ███ royalty rate from an un-produced, purported patent license between Boeing and Panthesis in July 2002, which he selectively pieces together from testimony and documents that are seventeen years old.  But he falls far short of the controlling requirements to apply that rate here.  "[T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).  This requires "account[ing] for the technological and economic differences between" the prior licenses and the present case. *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)

(internal quotes omitted).  "The testimony of a damages expert in a patent suit who relies on non-comparable licenses in reaching his royalty rate should be excluded." *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675-76 (D. Del. 2016).

This Court should exclude Mr. Parr's calculation based on the purported Boeing-Panthesis license because: (1) Mr. Parr does not address technical comparability even though important technological differences exist; (2) Mr. Parr ignores important economic differences; and (3) Activision is prejudiced by Acceleration's failure to disclose or even produce this purported license, which is unreliably pieced together by unexecuted draft documents and stale recollections.

      i.  Mr. Parr Does Not Even Assess the Substantial Technological Differences Between the Purported Boeing-Panthesis License and this Case

Neither Mr. Parr's report nor Acceleration's proffer ever discusses technical comparability between what was purportedly licensed to Panthesis and what would be licensed to Activision in this case.  This flaw is fatal, including because the asserted patents had not even issued in July 2002, and the applications were substantially amended after that date.  This Court has excluded a damages expert for less, explaining that "loose, vague allegations of technological comparability, without any explanation, are insufficient, and do not even provide a basis to meaningfully assess technological comparability." *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 667-668 (D. Del. 2016).  The Court should do the same here, where Mr. Parr does not even bother to allege technical comparability, let alone explain it.

Most notably, even assuming Boeing and Panthesis executed a license in July 2002, none of the asserted patents had issued at that time.  And Mr. Parr fails to even try to explain away important amendments to the scope of these patent applications after July 2002.  For instance, Mr. Parr's report recognizes m-regularity as being central to the value of the asserted patents,

and describes one of his three methods as calculating the "costs of building a new non-infringing network instead of the m-regular infringing network it currently uses." (Ex. 1, Parr Report, ¶ 18(c)).  But Mr. Parr and Acceleration fail to address that m-regularity was added to the asserted claims in this case *after* July 2002.[7]   Without any explanation of that central technological difference with this case, Mr. Parr's opinions cannot form the reliable basis for a damages verdict.

Mr. Parr also fails to account for any technological differences from the "software that came to Panthesis as a result of the deal" (Ex. 1, Parr Report ¶ 65).  Mr. Parr merely relies on a new conversation with inventor Fred Holt to summarily conclude that this software had "very little value" because it was "in the early stages, would need to be adapted for any particular application," and because "Mr. Bourassa quickly rewrote almost all the code." (*Id.*).  But Mr. Parr provides no discussion of: (1) the technical relationship between this software and the patents-in-suit; (2) whether Boeing valued this software even if Panthesis only ended up using some of it; and (3) the value and importance of the portion of this software that Panthesis admittedly did *not* re-write.

Because Mr. Parr provided no "basis to meaningfully assess technological comparability," his opinions relying on the purported Boeing-Panthesis license should thus be excluded.  *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 667-668 (D. Del. 2016).

---

[7] See Ex. 14, '344 Patent File History, Sept. 10, 2003 Amendment, Amendments to the Claims, at 2, 3 (amending claim 1, from which claim 12 depends, to include "further wherein the network is m-regular . . ."); see also Ex. 15, '966 Patent File History, Sept. 10, 2003 Amendment, Amendments to the Claims, at 4 (amending claim 13 to include "further wherein the network is m-regular . . ."); see also Ex. 16, '147 Patent File History, Dec. 11, 2003 Amendment, at 4 (withdrawing original claims 1-8 and amending original claim 9 to be the new claim 1 to include "said broadcast channel forming an m-regular graph where m is at least 3 . . .").

ii. Mr. Parr Ignores Important Economic Differences Destroying Comparability

Mr. Parr's opinions using the purported Boeing-Panthesis agreement also ignore important economic differences. This includes an unexplained difference in the royalty base that inflates his royalties to thousands of times what Boeing actually expected to receive per licensed video game. Mr. Parr was required to "account for the technological *and* economic differences" between a Boeing-Panthesis license and this case. *Wordtech Sys., Inc. v. Integrated Network Sols., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (emph. added). Failure to account for even one important economic difference can lead to exclusion. For instance, this Court recently excluded a damages opinion for failing to account for the running-royalty format of a license he applied in his own calculations of a lump-sum royalty. *Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-1122-RGA, 2019 WL 330149, at *6 (D. Del. Jan. 25, 2019).[8] Mr. Parr's opinions fail to account for several equally important economic differences, and should be excluded for this independent reason.

First, Mr. Parr fails to address the crucial economic difference in royalty bases. "For similar license agreements to be used as a proxy for derivation of a fair market royalty, the form of the license compensation should be on a like-kind basis." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325-26 (Fed. Cir. 2009). Mr. Parr fails to address that Panthesis was licensed as a middleware company selling middleware (software for use in developing games), rather than a game developer selling games. Panthesis thus only contemplated selling its

_____

[8] Other than his "Revenue Based" Royalty, which Mr. Parr identifies as "lump sum" (Ex. 1, Parr Report ¶ 204), Mr. Parr does not bother to identify whether any of his calculations are a lump sum or running royalty. His opinions should be excluded on this basis alone, especially because he admits that "[n]early all of" Activision's patent licenses in the record "include a lump sum payment," *id.* at 104(d), and because four of his royalties rely on a ███ running royalty from a purported agreement between Boeing and Panthesis.

middleware to video game publishers, and only for a one-time, ███ charge per video game title. (Ex. 29, July 26, 2017 Holt Depo. Tr. at 513:1-514:12).

In other words, any ███ royalty in a Boeing-Panthesis license merely contemplated that Boeing would receive ███ of that one-time ███ sales price per for a single game title like Call of Duty.[9]  Boeing would receive no more or no less, whether that game title sold 1 or 1 billion copies, had 1 or 1 billion users, enjoyed $1 or $1 billion in cost savings, and had a $1 or $1 billion return on investment.[10]  But Mr. Parr inexplicably applies that very ███ rate to Activision's alleged game sales (resulting in a ████ royalty), to Activision's alleged user count (resulting in a ████ royalty), to Activision's alleged cost savings (resulting in a ████ royalty), and to Activision's alleged rate of return (resulting in a ████ royalty).  Mr. Parr's failure to account for this drastic economic difference in the royalty base and in Boeing's expectations is fatal to these opinions.

Second, Mr. Parr does not account for or even mention the ten-year difference between the 2002 purported Boeing-Panthesis license and the 2012 hypothetical negotiation in this case. Tellingly, one reason why Mr. Parr concludes that the 2006 Boeing-Sony license is not comparable is because it was executed "many years prior to the launch of the infringing products." (Ex. 1, Parr Report ¶ 73).  Mr. Parr's failure to acknowledge or account for the fact that the purported Boeing-Panthesis license was even four years *earlier* exposes the unreliability of his entire opinion.  Importantly, by ignoring this time difference, Mr. Parr fails to consider

---

[9] (Ex. 29, July 26, 2017 Holt Depo. Tr. at 513:1-514:12).

[10] This is corroborated by a Panthesis counter-proposal document showing that Panthesis, as the exclusive licensee for the applications to the asserted patents, could buy out all of its royalties for the entire videogame industry at any time after December 2010 for ████, effectively capping Boeing's royalties for the entire industry at a small fraction of any royalty now sought by Acceleration. (Ex. 31, HOLT 002452 at -253; *see also* Ex. 17, HOLT 003797-819, at -810).  Mr. Parr also fatally fails to address this important economic difference.

Boeing's unsuccessful efforts to sell the patents from 2005 to 2010.  Seeing a lack of interest in the market, Boeing's "opening offer" in 2009 for selling the asserted patents was ███████ dollars, and in 2010 Boeing authorized a (rejected) offer to sell the patents for ██████. (Ex. 18, Radovsky Depo. Tr. at 187:10-24; Ex. 19, Radovsky Depo. Ex. 70).

Mr. Parr's failure to account for any of these economic differences means he cannot reliably apply the ████ license from the purported Boeing-Pantheis agreement, and this Court should exclude those opinions.

> iii. Acceleration's Failure to Timely Disclose, or to Ever Produce, the Purported Boeing-Pantheis License Unfairly Prejudices Activision and Renders it Unreliable

As more fully explained in Activision's motion to strike being filed today, Acceleration did not disclose this purported Boeing-Pantheis license as required by a direct court order, has not produced an executed copy of this purported license, and has selectively discovered new facts to support its positions.  One of the many ways this unfairly prejudices Activision is by denying Activision a meaningful opportunity to develop additional technical and economic differences that prevent Acceleration from showing comparability.

The selective incompleteness of this record further undermines the reliability of Mr. Parr's opinions applying a ████ royalty rate.  As just one example, Mr. Parr does not account for, and apparently did not even review, a May 2003 email from Pantheis co-founder Linda Magnotti explaining that Pantheis was only "required to give Boeing ████ at signing" rather than the ██████ he assumes changed hands. (Ex. 20, HOLT 002455-458, at -457).  That same email confirms that in May 2003 Pantheis did not know where the "Boeing license" was "going to land," suggesting that the draft agreement Mr. Parr relies on was never executed, or was immediately rescinded in favor of different terms (*Id.* at -455).

Mr. Parr's opinion on this purported agreement, which is pieced together by emails, draft agreements, and the nineteen-year old recollection of Dr. Holt, and which is contradicted by later documents he does not even discuss, does not meet the threshold requirement of reliability for presentation to a jury. *See McMenamin v. M & P Trucking Co.*, No. CIV. A. 93-6888, 1994 WL 724980, at *1 (E.D. Pa. Dec. 29, 1994) (excluding expert opinion based on "notations in the medical records at issue" which "are not reliable sources" because they "are hearsay statements uttered by declarants almost two years after the incident"); *see Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013) (applying Third Circuit law to reverse failure to exclude damages testimony) ("Thus, while an expert's data need not be admissible, the data cannot be derived from a manifestly unreliable source.").

### d. Mr. Parr Now Directly Relies on Dr. Valerdi's "Cost Savings" to Avoid an Undisclosed Alternative, With Insufficient Connection to the Facts of the Case

Mr. Parr's royalties do an about-face from Dr. Meyer's reports for Acceleration to directly rely on the calculations of Dr. Valerdi, as five of Mr. Parr's calculations now include a ███████ number from the report of Dr. Valerdi.[11]   Mr. Parr claims that this ███████ measures the cost to Activision of re-architecting WoW from its current version into some undisclosed and undefined non-infringing alternative.  (Ex. 1, Parr Report ¶ 149).   What is worse, Dr. Valerdi admits that this number merely estimates "in the case of the Activision report, the cost of developing the software as is." (Ex. 7, Valerdi Dep. Tr. 100:6–11).   But Activision has argued *specific*, real-world non-infringing alternatives that Acceleration and its experts completely ignore. (Ex. 12, 07-07-2017 Activision Interrogatory Response, p. 10).   And the

---

[11] The ███████ in Mr. Parr's "Cost Savings: Maintenance Costs" is Dr. Valerdi's calculation of the yearly cost to maintain the ███████ "rearchitect[ed]" game, which suffers from the same flaws. (Ex. 7, Valerdi Depo. Tr. at 61:15-24).

*actual*, real-world cost of developing WoW is already in the record (Ex. 9, Meyer Report Exhibit 4E).  Mr. Parr's use of these estimates is thus of no help to the jury, is insufficiently tied to the facts of the case, and should be excluded.

Within the Third Circuit, a court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (citations omitted). "A court may conclude that there is simply too great a gap between the data and the opinion proffered." *Id.; see also CSIRO*, 809 F.3d at 1302 (explaining that the data for any methodology must be "sufficiently tied to the facts of the case").  Mr. Parr's calculations relying on Dr. Valerdi's report fall far short of this test.

> i.  Mr. Parr's Report Uses Dr. Valerdi's Results In His Calculations Even Though They Are Increasingly Unconnected From the Facts of This Case

Mr. Parr's report makes much more extensive use of Dr. Valerdi's calculations than did Dr. Meyer's report for Acceleration, even as later developments in the case have shown those calculations to be less and less reliable.  Acceleration served Dr. Valerdi's report on September 23, 2017. (Ex. 6, Valerdi Report).  Other than serving a one-page errata on October 23, 2017, changing the numbers in one of his charts, Dr. Valerdi has not updated his report. (Ex. 21, Valerdi errata).  Dr. Meyer's September 25, 2017 report did not actually mention the dollar amounts calculated by Dr. Valerdi, let alone use them in her equations.  Instead, she merely pointed out that the ▮▮▮▮▮▮ numbers suggested that "an NIA [non-infringing alternative] . .

. would have been unlikely to be economically viable" such that "***it is necessary to rely on other indicators of value***." (Ex. 9, Meyer Report, ¶ 57) (emph. added).[12]

But Mr. Parr chose to go further and directly plug Dr. Valerdi's results into the majority of his calculations.  Thus, Dr. Valerdi's purported "cost savings" estimates have not changed while the case has substantially narrowed.  Since Dr. Valerdi's errata served in October 2017, the number of patent claims asserted against WoW has been cut by more than half, and the number of patents asserted against WoW has dropped by two.[13]  Dr. Meyer previously opined on behalf of Acceleration that "the royalty should be split equally among the individual patents if the jury were to find infringement of only a subset of patents." (Ex. 9, Meyer Report, ¶ 150). Acceleration and its experts have not disavowed this statement.  Nor have they explained how Dr. Valerdi's calculations for the purported cost of designing WoW to avoid infringement can reliably go unchanged here, where the scope of accused infringement has narrowed so drastically.  Rather, this case is like *Apple Inc. v. Motorola, Inc.*, which affirmed exclusion of a damages expert in part because plaintiff "did not adjust its 40%–50% rate when the ′559 patent dropped out of the case on summary judgment, further suggesting that the rate was never tied to the specific patents at issue." 757 F.3d 1286, 1325 (Fed. Cir. 2014), *overruled on other grounds (claim construction) by Williamson v. Citrix Online*, LLC, 792 F.3d 1339 (Fed. Cir. 2015).

---

[12] This Court previously rejected Activision's argument that Dr. Meyer's use of Dr. Valerdi's estimates should be excluded based on the unreliability of "the computer program that Dr. Valerdi uses." (D.I. 578 at 30-31).  Activision does not renew that argument here, but raises new arguments germane to Mr. Parr's extended reliance on Dr. Valerdi's estimates, especially in view of new facts arising since the original reports of Dr. Meyer and Dr. Valerdi.

[13] Acceleration has withdrawn 3 of the 4 claims it previously asserted against WoW from the '344 patent; 1 of the 2 claims it previously asserted against WoW from the '966 patent; and both of the 2 claims of the '497 patent previously asserted against WoW.  Further, the Court has invalidated both claims of the '634 patent previously asserted against WoW. (D.I. 578 at 9).

Mr. Parr's reliance on Dr. Valerdi is further unreliable because Dr. Valerdi's calculations did not change when Acceleration withdrew its accusations against the original 2004 WoW game.  Acceleration now admits that Activision's "infringement began" with the release of the fourth WoW **expansion** in 2012. (*Compare* Ex. 9, Meyer Report Exhibit 3, *with* Ex. 1, Parr Report ¶18 (a)).  Acceleration and its experts fail to explain how it could possibly still be appropriate to calculate, for the entire WoW game, "the cost of developing the software as is." (Ex. 7, Valerdi Dep. Tr. 100:6–11).  This is especially so because Mr. Parr acknowledges that the underlying, un-accused 2004 WoW game was "entirely multiplayer," and that the accused 2012 Mists of Pandaria expansion merely "builds on the existing world to include new characters, new territory, and new story options." (Ex. 1, Parr Report, ¶¶ 39, 31(a)).  Rather than use some reliable measure of any cost savings of this 2012 WoW expansion over the original 2004 WoW game, Mr. Parr used Dr. Valerdi's calculations that were made before Acceleration even narrowed its infringement claims to 2012.  This, too, merits exclusion.

    ii.  Dr. Valerdi Violates the Requirement of Testability Because He Does Not Identify What Alternative He is Estimating or How

Dr. Valerdi's calculations and methodology are also too vague to be testable, which is fatal to admissibility.  The Supreme Court in *Daubert* explained: "The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593, 113 S. Ct. 2786, 2796–97, 125 L. Ed. 2d 469 (1993) (internal quotes and alterations omitted); *see also Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 188–89 (D. Conn. 2009) ("Furthermore, as the Supreme Court noted in *Daubert*, a 'key question' to be resolved in determining whether expert testimony is sufficiently reliable is whether the expert's methods are testable and falsifiable.").

24

First, Mr. Parr assumes Dr. Valerdi is estimating the cost of a non-infringing alternative, but Acceleration's experts do not describe or identify any such alternative so that Activision could fairly present a competing estimate.   Although it is common to estimate the cost of switching to a *particular* non-infringing alternative proposed in litigation by the defendant, Dr. Valerdi did not try to do that here.  This, even though Activision proposed several non-infringing alternatives, including "Activision games available before the date on which Plaintiff contends infringement began." (Ex. 12, 07-07-2017 Activision Interrogatory Response, p. 10).   In fact, Acceleration's proffer does not discuss Activision's proposed non-infringing alternatives at all. Had Dr. Valerdi sought to estimate the cost of switching to one of Activision's proposed non-infringing alternatives, or to *any* particular alternative, then the cost of such a switch would perhaps be an issue for cross-examination that the jury could decide.  Because Dr. Valerdi chose to value an undisclosed and apparently undefined alternative, his opinions are not testable and Mr. Parr's royalties relying on Dr. Valerdi should be excluded.

Second, Dr. Valerdi claims to rely solely on an undocumented conversation with Dr. Medvidovic for the number of lines of code to plug into his model.   But Acceleration has provided no methodology for selecting this code that could fairly be tested.  Dr. Medidovic does not describe any methodology for selecting lines of code in his report.  And at his deposition he admitted that "[i]n terms of the exact numbers of lines of code, I don't know that that was ever counted up, but, again, lines of code are a flawed metric, anyway." (Ex. 8, 4-17-18 Medvidovic Depo, at 430:13-16).  With such meager description of the methodology for selecting the lines of code for Dr. Valerdi's estimates, this process, too, was not testable (and admittedly "flawed") and should be excluded.

   iii. Dr. Valerdi Unreliably Estimates the Cost of Developing the Underlying WoW Game, Which Is Already in the Record

Dr. Valerdi's opinions are also unhelpful to the jury because they are merely an error-prone estimate of an undisputed real-world number that is already in the record.  Dr. Meyer's opening report for Acceleration calculated that the combined real-world development cost of making the WoW "base game and all of the expansions listed in Exhibit 3" was around ███ ████ (Ex. 9, Meyer Report Exhibit 4E).  Neither Acceleration nor Mr. Parr have called that number into question or pointed to any contrary, real-world evidence.  And Dr. Valerdi admitted at his deposition that he was not given this real-world information when he prepared his report.  (Ex. 7, Valerdi Dep. Tr. pp. 160:12-161:2).  Because this undisputed real-world information is already in the record, it is not helpful to the jury to hear Dr. Valerdi's nearly eight-times inflated ████████ estimate of "the cost of developing the software as is." (Ex. 7, Valerdi Dep. Tr. 100:6–11).  Mr. Parr's opinions relying on Dr. Valerdi should be excluded for this additional reason.

> iv. Acceleration's Use of Dr. Valerdi's Calculations to Determine Pre-Suit "Cost Savings" Should Be Excluded Because Acceleration Represented that it Would Not Seek Pre-Suit Damages

This Court should further exclude Mr. Parr's opinions based on alleged pre-suit "cost savings," which violate Acceleration's explicit representations to this Court.  "Judicial estoppel . . . seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996).  Acceleration's five "cost savings" theories allege what Activision would have paid in 2012 to save costs between 2012 and 2014.[14]  But Acceleration Bay has repeatedly represented that it is "not seeking damages

---

[14] D.I. 630 at 8 (the royalty is a "portion of the cost-savings that Boeing and Activision would have agreed in 2012"); *see also* Ex. 1, Parr Report at ¶¶ 140-156 (calculating costs

before March of 2015." (*E.g.*, Ex. 22, Jan. 17, 2017 Hr'g Tr. at 22:13 to 23:1) ("Your Honor, to be very clear, and I'll make this statement on the record. . . . We're not seeking damages before March of 2015.").

Here, holding Acceleration to its promise not to seek pre-suit damages means excluding its five "cost savings" opinions.  Indeed, this case should be treated the same as *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, No. 03-2910, 2006 WL 3227315, at *1, *3 (S.D. Tex. Nov. 6, 2006), where the plaintiff was barred from obtaining pre-suit damages under 35 U.S.C. § 287 for failure to mark a patented product.  There the jury verdict granted a lump sum "[u]pfront royalty" based on a hypothetical negotiation set just "two months before suit was filed." *Id.*  at *1, *3.  The court granted judgment as a matter of law overturning that verdict, finding that the royalty "accrued" before suit was filed, and was thus an improper award of pre-suit damages. **3-5.  Because Acceleration's "cost savings" opinions seek to obtain a 2012 payment for cost savings that allegedly accrued between 2012 and 2014, this Court should exclude those opinions.

### e. Acceleration Seeks Damages for CoD and Destiny Only for Game Sales, Which Cannot Infringe the Method Claims Asserted Against Those Games

Acceleration now seeks damages for CoD and Destiny only for the sale of game discs (and unique user counts multiplied by average sales price as a proxy for sales), even though it now only accuses those games of infringing method claims that cannot be infringed by such

---

allegedly avoided through Activision's first alleged infringement in 2012); *id.* at ¶¶ 157-196 (calculating the equity value to a hypothetical standalone business enterprise in 2013) ; *id.* at ¶¶ 197-199 (calculating a royalty based on Activision's replacement cost of capital in 2013-2014) ; *id.* at ¶¶ 200-203 (calculating a royalty based on Activision's development and maintenance costs in 2013-2014).

sales.[15]   "The sale or manufacture of equipment to perform a claimed method is not direct infringement within the meaning of 35 U.S.C. § 271(a)."  *Moba, B.V. v. Diamond Auto., Inc.*, 325 F.3d 1306, 1313 (Fed. Cir. 2003); *Ricoh Co., Ltd. v. Quanta Comput. Inc.*, 550 F.3d 1325, 1335 (Fed. Cir. 2008) ("[A] party that sells or offers to sell software containing instructions to perform a patented method does not infringe the patent under § 271(a).").  Each claim asserted against Call of Duty and Destiny is a method claim.  (D.I. 370 at 5, 6).  But Mr. Parr now opines that Activision owes damages based only on Activision's *manufacture and sale* of the accused Call of Duty and Destiny game discs.  (Ex. 1, Parr Report at ¶213, Parr Exhibit 5).  In reaching these opinions, Mr. Parr assumed "all U.S. sales of the infringing products are infringing."  (*Id.* at ¶ 213).  Because Acceleration only seeks damages for CoD and Destiny for activities that cannot infringe under controlling law, the Court should not only exclude Acceleration's proffer on those games.

### f.   Mr. Parr's Opinions, All of Which are in the ██████████ ██████ Should Be Excluded Because they Fail to Explain Away Boeing's Attempts to Sell the Asserted Patents for ██████

Acceleration's proffer seeks to present seven royalty numbers to the jury, all above ████, and one above ██████████  But Mr. Parr reached those numbers without even attempting to explain away Boeing's efforts to sell the asserted patents for ██████ right before the hypothetical negotiation.  As such, these royalties are not reliable enough for presentation to the jury.  The Federal Circuit has explained that a damages expert's testimony cannot support a jury verdict without adequate explanation of the important facts such that "the jurors would have been able to determine whether such an amount is reasonable."  *Whitserve,*

---

[15] As explained in Activision's contemporaneously filed motion for leave to renew summary judgment, this should also lead this Court to grant partial judgment of non-infringement.

*LLC v. Computer Packages, Inc.*, 694 F.3d 10, 33 (Fed. Cir. 2012) (reversing denial of motion to exclude expert damages testimony that was "conclusory, speculative and, frankly, out of line with economic reality").  Accordingly, Judge Stark has excluded the opinion of a damages expert after concluding that the expert's "failure even to account for the reality that at one point [plaintiff] was willing to license all of [defendant's] alleged infringement—and obviate this litigation—for a cap of about $2 million," and "the absence of any reasonable explanation for why this reality is irrelevant, renders his analysis unreliable." *Intellectual Ventures I LLC v. Xilinx, Inc.*, No. 10-1065-LPS, 2014 WL 1814384, at *4 (D. Del. Apr. 14, 2014) (citing *Whitserve*, 694 F.3d 10, 12–13).

Mr. Parr's proffered opinion is no different from the one excluded in *Xilinx*.  Here Mr. Parr provides no discussion at all on the robust evidence showing that Boeing—which the parties agree would be the licensor in the hypothetical negotiation—would have gladly sold the asserted patents to Activision for around ▮▮▮▮▮ at the time of the hypothetical negotiation in 2012. As a first ignored fact, the evidence uniformly shows that Panthesis never made a single sale, so Boeing would not have collected a single dollar under any royalty rate for Panthesis. (Ex. 11, 5/31/17 Holt Depo. Tr. at 230:23-231:2).  As a second ignored fact, Boeing's company witness Natasha Radovsky unequivocally testified that as of May 2009 Boeing had "outlined its financial expectations" as wanting ▮▮▮▮▮ for the ***sale*** of all the asserted patents, among others, and that this "was a going-in price point." (Ex. 18, Radovsky Depo. Tr. at 187:10-24).  As a third ignored fact, in 2010, after five years of failing to sell these patents,[16] Boeing received an offer of ▮▮▮▮▮ for that same group of patents, and unsuccessfully counter-offered to sell them for ▮

---

[16] *See, e.g.,* Ex. 23, 2009 Email from Intellectual Ventures: "While this technology falls within our current interest spectrum, we just couldn't justify anything close to your financial expectations [of ▮▮▮▮▮.")

███ (Ex. 19, Radovsky Depo. Ex. 70; *see also* Ex. 18, Radvosky Depo. Tr. at 114:13-16). And although Boeing was not required to sell to Activision within this range, there is no evidence that Boeing would have been unwilling to do so. On the contrary, this Court has already found that in 2006 Boeing gave up its right to sue Activision on these patents for the existing and future Activision games on the Sony platform that was dominant at the time. (D.I. 237). There is no evidence that Boeing viewed the remaining Xbox and PC platforms any differently.

Thus, similar to *Whitserve* and *Xilinx*, here a jury could not reasonably award any of Mr. Parr's nine-figure royalties because Mr. Parr calculated those royalties without ***any*** explanation of why a ███ or less) sale of the asserted patent would be unavailable to Activision in 2012, or even any mention of that issue. Rather, Mr. Parr's damages opinions, which are all hundreds of times higher than these amounts actually sought by Boeing, should be excluded as "out of line with economic reality." *See Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 33 (Fed. Cir. 2012); *see also id.* at 31 ("As in *Lucen*t, where the award was a multiple of the average license amounts presented, here, there is 'little evidentiary basis under Georgia–Pacific Factor 2 for awarding roughly three to four times the average amount in the lump-sum agreements in evidence.'"). This Court should thus exclude the entirety of Mr. Parr's report and, consequently, Acceleration's proffer.

## VI.    CONCLUSION

For the aforementioned reasons, Activision respectfully requests that the Court exclude all seven of the royalties opined on by Mr. Parr, and strike Acceleration Bay's proffer on damages.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Stephen J. Kraftschik*
Jack B. Blumenfeld (#1014)
Stephen J. Kraftschik (#5623)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
skraftschik@mnat.com

*Attorneys for Defendant*

OF COUNSEL:

B. Trent Webb
Aaron E. Hankel
Jordan T. Bergsten
Maxwell C. McGraw
Shook Hardy & Bacon LLP
2555 Grand Boulevard
Kansas City, MO  64108
(816) 474-6550

Tanya Chaney
Shook Hardy & Bacon LLP
600 Travis Street, Suite 3400
Houston, TX 77002
(713) 227-8008

March 15, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on March 28, 2019, upon the following in the manner indicated:

Philip A. Rovner, Esquire                                   *VIA ELECTRONIC MAIL*
Jonathan A. Choa, Esquire
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Wilmington, DE  19801
*Attorneys for Plaintiff*

Paul J. Andre, Esquire                                      *VIA ELECTRONIC MAIL*
Lisa Kobialka, Esquire
James R. Hannah, Esquire
Hannah Lee, Esquire
Yuridia Caire, Esquire
Greg Proctor, Esquire
Michael H. Lee, Esquire
William Hannah, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
990 Marsh Road
Menlo Park, CA  94025
*Attorneys for Plaintiff*

Aaron M. Frankel, Esquire                                   *VIA ELECTRONIC MAIL*
Marcus A. Colucci, Esquire
Cristina Martinez, Esquire
Shannon H. Hedvat, Esquire
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY  10036
*Attorneys for Plaintiff*

*/s/ Stephen J. Kraftschik*
_____
Stephen J. Kraftschik (#5623)