IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ACCELERATION BAY LLC,

    Plaintiff,

v.

ACTIVISION BLIZZARD INC.,

    Defendant.

Civil Action No. 1:16-cv-00453-RGA

**MEMORANDUM OPINION**

Presently before me are Plaintiff's Motion to Exclude Opinions of Catharine M. Lawton (D.I. 647), Defendant's Motion in Response to Acceleration Bay's Damages Proffer (D.I. 650), and Defendant's Motion to Strike Supplemental Expert Damages Report (D.I. 651). I resolve these motions as follows.

**I. BACKGROUND**

Acceleration Bay LLC ("Acceleration") filed suit against Activision Blizzard Inc. ("Activision") on June 17, 2016. (D.I. 1). It alleges that certain versions of Activision's World of Warcraft ("WoW"), Call of Duty ("CoD"), and Destiny video games infringe its patents. (*Id.*). I scheduled this case for a jury trial to start on October 29, 2018. (D.I. 545). That trial did not happen, however, as it was unclear on the eve of trial whether Plaintiff had an admissible damages case. (D.I. 619 (describing the sequence of events that led me to continue the trial)). I postponed the trial indefinitely, pending resolution of the cloud of issues hanging over Plaintiff's case. (D.I. 613).

Following the cancellation of trial, I issued an order allowing Plaintiff a final opportunity to present an admissible damages case. (D.I. 619 at 2). I granted Plaintiff permission to supplement its expert reports and allowed Defendant a chance to respond. (*Id.*). Plaintiff later requested that it be allowed to submit a report from a new damages expert, Mr. Russell Parr, rather than supplementing its earlier expert's report. (D.I. 630). I permitted Plaintiff to submit such a report with the caveat that I may limit the report depending on its contents. (*Id.* at 3 n.1).

In his report, Mr. Parr opines on seven royalties derived using three approaches: cost savings, revenue-based, and user-based. The following chart provides a summary of those opinions:

| No. | Title | Equation | Amount in Millions | Inputs: | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Dr. Valerdi | Boeing/ Panthesis License | Survey |
| 1 | Cost Savings: Licensing History | $ 2.4 Billion x 12% | $288.30 | Y | Y | |
| 2 | Cost Savings: Rate of Return | $2.54 Billion x 12% | $304 | Y | Y[1] | |
| 3 | Cost Savings: Replacement Cost of Capital | $2.4 Billion x 5.9% | $141.70 | Y | | |
| 4 | [Alt.] Cost Savings: Replacement Cost of Capital | $2.4 Billion x 5.9% x 2 | $283.50 | Y | | |

---

[1] Plaintiff disagrees with listing the Boeing/Panthesis License as an input in the Rate of Return analysis. It argues, "[Mr. Parr's] only reference to the Boeing/Panthesis rate was to use the lesser of the two rates to make the analysis even more conservative." (D.I. 665 at 14 n.7). I do not agree with Plaintiff's conclusion. For example, Mr. Parr opines that 30.3% of WoW revenues are associated with the patented invention. (D.I. 642-1, Exh. A at ¶ 196). He then says, "The 30.3% of revenues associated with the patent[ed] invention provides significant support for the Boeing/Panthesis royalty rate of 12%. These calculations yield a total royalty of approximately $304 million ($2,536,822,551 times 12%)." (*Id.*). While it is true that Mr. Parr appears to use the Boeing/Panthesis License as a means of cutting down a potentially higher rate, the result is that Mr. Parr input the rate from the license directly into his Rate of Return analysis.

2

| | | | | | | |
|---|---|---|---|---|---|---|
| 5 | Cost Savings: Maintenance Costs | $132 Million x 2 | $264.80 | Y | | |
| 6 | Revenue-Based | $4.5 Billion x 57% x 12% | $305 | | Y | Y |
| 7 | User-Based | $57 x 12% x 57% x 61 Million | $240 | | Y | Y |

## II. LEGAL STANDARDS

A. Daubert

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert. Secondly, the testimony must be reliable; it must be based on the methods and procedures of science' rather than on 'subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the

3

> jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) of the Federal Rules of Evidence whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (cleaned up).[1]

### B. Motions to Strike

Federal Rule of Civil Procedure 37(c)(1) provides, "If a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." To determine whether a failure to disclose was harmless, courts in the Third Circuit consider the *Pennypack* factors: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the possibility of curing the prejudice; (3) the potential disruption of an orderly and efficient trial; (4) the presence of bad faith or willfulness in failing to disclose the evidence; and (5) the importance of the information withheld. *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)). "[T]he exclusion of critical evidence is an 'extreme' sanction, not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent of the evidence." *Id.* The determination of whether to exclude evidence is within the discretion of the district court. *Id.*

### III. ANALYSIS

Defendant moves to strike Mr. Parr's report or, in the alternative, to exclude large portions of Mr. Parr's report on *Daubert* grounds. I will grant Defendant's motion to strike in

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the 2011 amendments to it were not intended to make any substantive change.

4

two significant respects: (1) I will strike Mr. Parr's reliance on Dr. Valerdi for "cost savings" opinions and (2) I will strike Mr. Parr's use of certain Activision surveys as the grounds for apportioning the royalty base. I recognize that exclusion of those two aspects of Mr. Parr's report leaves Plaintiff with no intact damages theories. For completeness, however, I address each of Defendant's other *Daubert* arguments and Defendant's motion to strike Mr. Parr's entire report. I also address Plaintiff's motion to exclude certain opinions of Defendant's damages expert.

*A. Defendant's Motion to Exclude Mr. Parr's Opinions*

Defendant moves to exclude Mr. Parr's expert opinion on several grounds, including: (1) reliance on an unreliable cost savings opinion, (2) failure to properly apportion, (3) reliance on a non-comparable license, (4) failure to address negative facts, and (5) failure to apprehend the scope of the alleged method claim infringement. I address each of its arguments in turn.

**1. "Cost Savings" Opinions: Reliance on Dr. Valerdi[2]**

Five of Mr. Parr's reasonable royalty calculations rely on "cost savings" calculations done by Dr. Ricardo Valerdi. (*See* D.I. 444-1, Exh. C-2 (Valerdi expert report)). Dr. Valerdi specifically opines on "the cost of rearchitecting each of the Accused Products in this case in

---

[2] Defendant previously objected to Dr. Valerdi's opinion based on the computer program he used to generate his $7 billion redesign estimate. (D.I. 442 at 48-49). I dismissed Defendant's argument as a "failure of proof argument." (D.I. 578 at 30-31). Plaintiff characterizes that decision as an approval of Dr. Valerdi's opinion. (D.I. 665 at 3). It was not. My decision was a resolution of the specific issues Defendant chose to raise given the status of Plaintiff's damages case at that time. Defendant does not renew its earlier arguments in this briefing. Rather, it "raises new arguments germane to Mr. Parr's extended reliance on Dr. Valerdi's estimates." (D.I. 650 at 23 n.12). Defendant's decision to identify more specific issues with Dr. Valerdi's opinion at this juncture makes sense. Never before has Plaintiff relied on Dr. Valerdi as a source of its damages base. Accordingly, I will address Defendant's new arguments related to Dr. Valerdi's opinion.

5

order to develop a new networking platform for each of the accused games." (*Id.* at 1). Dr. Valerdi's estimated cost of rearchitecting the accused games is $2.4 billion. (*Id.* at 12-13).

In forming his opinion, Dr. Valerdi relied on:

> the opinions of Drs. Medvidovic and Mitzenmacher that the Accused Products are infringing each of the Asserted Claims. [He] further relied on their opinions that there are no viable non-infringing alternatives to the Asserted Claims, but that, if there were such an alternative, it would require rearchitecting the game to develop a new network architecture and associated functionality.

(*Id.* at 3). Dr. Valerdi's bases his estimate of the cost on the number of lines of code in the current games. (*See generally* D.I. 444-1, Exh. C-2). Essentially, he estimates the cost of developing the software "as-is." (D.I. 653-1, Exh. 7 at 100:6-11). His opinion does not, however, estimate the cost of making any particular alternative network.

"Reliance upon estimated cost savings from use of the infringing product is a well settled method of determining a reasonable royalty." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983) (allowing damages theory based on cost difference between use of an infringing snow-making machine versus a prior art machine); *see also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (affirming damages award that was based, in part, on the costs saved by renting an infringing backhaul structure versus building a non-infringing backhaul structure); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240-41 (Fed. Cir. 2011) (affirming jury damages award that was based, in part, on savings from a reduction in injuries caused by a prior art radial arm saw as a result of the patented invention). The Federal Circuit's precedent on cost savings does not, however, support the admissibility of the estimated cost to switch to an undefined alternative that the patentee contends does not exist.

Defendant argues that Dr. Valerdi's cost savings opinion is "no more reliable or scientific than an estimate of the cost to drive to Shangri-La, or El Dorado, or any other imaginary place with an unspecified location." (D.I. 679 at 8). As such, Defendant notes, Dr. Valerdi's cost

6

savings conclusions are inherently untestable. (*Id.*). I agree. Dr. Valerdi does not articulate any characteristics of a non-infringing network and, indeed, adopts the position that such a network does not exist. It defies logic, then, that Dr. Valerdi is able to estimate the cost of making such a thing. As a theoretical matter, one could postulate that the cost of making something that does not exist would cost infinitely more, or infinitely less, than the structure that does exist. Dr. Valerdi provides no justification as to why developing an alternative network would, in theory, cost exactly the same amount as developing the existing network. Of course, he cannot justify this conclusion because he has no basis in fact for concluding that an alternative network might exist at all. Indeed, there is no basis in fact to conclude that creation of the infringing network saved Defendant any money over a theoretical alternative.

Dr. Valerdi's opinion is not an acceptable basis for determining an amount of costs saved by using the accused infringing technology. It is entirely speculative, untestable, and divorced from the facts of this case. Thus, I will exclude Dr. Parr's "cost saving" reasonable royalty opinions as they depend entirely on Dr. Valerdi's opinion.

As this was Plaintiff's final opportunity to present a damages case, Plaintiff will not have an opportunity to submit revised expert reports from Mr. Parr or Dr. Valerdi. Accordingly, I do not consider Defendant's blanket objection that Plaintiff did not cite authority supporting the admissibility or sufficiency of certain cost savings opinions. (*See* D.I. 679 at 19).

### 2. Apportionment

Defendant argues that Mr. Parr failed to sufficiently apportion between the patented and unpatented features of the accused products for his revenue-based and user-based reasonable

7

royalties.³ (D.I. 650 at 6-15). In his report, Mr. Parr concludes, based on an Activision survey in which gamers picked the mode they anticipated playing when they bought CoD: Black Ops III, that 57% of CoD revenue is attributable to multiplayer functionality. (D.I. 642-1, Exh. A at ¶ 208). He then reasons, based on the relative importance of multiplayer functionality in the other accused games, that 57% is a reasonable estimate of the proper amount of revenue to apportion to multiplayer functionality in those games. (*Id.* at ¶¶ 209-211).

Mr. Parr's use of Defendant's survey to apportion between the value to consumers of the multiplayer functionality versus unpatented features is insufficient to meet the standard set by the Federal Circuit for proper apportionment. "[T]he governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). "When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features. . . . The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Id.* Thus, a damages expert must tailor his or her proposed royalty by, for example, "careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof." *Id.*

The 2016 CoD survey that Mr. Parr relies on does not account for any factors, other than gameplay mode options, that may contribute to the value of the accused games. Specifically, the

---

³ As I exclude Mr. Parr's cost savings opinions, I do not consider whether those are adequately apportioned.

8

survey questions were, "What gameplay mode(s) were behind your decision to purchase or ask for each game below?" and "What mode was the primary reason why you bought or asked for each game?" (D.I. 653-1, Exh. 5 at 13 (bar graph visualizing consumer responses of either "Single Player/Campaign," "Multiplayer," or "3rd Mode")). Critically, these questions assume that the gameplay mode is the exclusive driver of a consumer's decision to buy the game. They do not capture those gamers who may purchases a game, for example, because of the quality of the graphics, the storyline, ease of use, or based on the brand of the game. The survey certainly does not attempt to discern what portion of a gamer's decision to buy the game is driven by the multiplayer functionality versus all of the other unpatented features.

Mr. Parr admits that there are other, significant, features of the accused products that contribute economic value to the accused games. (*See* D.I. 642-1, Exh. A at ¶ 145 (noting that story, characters, game quality, ease of use, quality of customer service, and compatibility with popular platforms contribute to the value of the accused games)). His methodology accounts for none of those features. Thus, Mr. Parr's proposed damages figure fails to "carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). I will exclude Mr. Parr's reliance on the 57% figure pulled from Activision's 2016 survey as a means of apportioning down to the value of the patented invention.[4] Accordingly, the Revenue-Based and User-Based reasonable royalty theories are excluded for failure to properly apportion.

---

[4] Mr. Parr notes two other surveys in his apportionment analysis. Both surveys suffer from the same deficiency as the 2016 survey—they address only the significance of multiplayer modes as compared to other modes. (*See* D.I. 680-1, Exh. 35 at 14, 42; *see also* D.I. 642-1, Exh. A at ¶ 208 (Parr report summarizing surveys)). Thus, while I do not address them separately, I find both surveys are independently insufficient to properly apportion the damages base.

9

Plaintiff also cursorily argues, "The 12% rate Mr. Parr selected from the Boeing-Panthesis license . . . is already apportioned to the footprint of the invention in that it too attempts to value the use of the patented technology in video games in the context of preexisting network technology and unpatented features." (D.I. 665 at 7). An earlier license of the patents-in-suit may have "built in apportionment." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015). Thus, Plaintiff's attorneys' apportionment argument is not, on its face, unreasonable. Mr. Parr's opinion does not, however, tie apportionment to the royalty rate of the Boeing/Panthesis License. (*See* D.I. 642-1 at ¶¶ 205-223). He does not even mention the Boeing/Panthesis License in the apportionment section of his expert opinion. (*Id.*). Mr. Parr's apportionment opinion cannot survive on an opinion that he does not express. Thus, as the selection of the 12% royalty rate is not a basis of Mr. Parr's opinion on apportionment, I do not find that Mr. Parr's opinion properly apportions based on the Boeing/Panthesis License alone.

Defendant next argues that Mr. Parr's efforts to apportion revenues are inadequate because he doesn't account for multiplayer functionality that existed in the prior art. (D.I. 650 at 9-11). It appears that Defendant's argument is that Mr. Parr should apportion down to some subset of the infringing network to account for its incremental value. I do not find Defendant's argument persuasive. Plaintiff accuses the network on which Defendant's games operate. The network as a whole is the infringing unit. Without the underlying network, the accused game modes do not operate. There is no expert testimony to support a conclusion that the patented aspect of the network could be plucked from the game without impacting the functionality of the games. Thus, the value attributable to the infringing network is the value properly apportioned to the patented invention.

A final note: Defendant argues throughout this section of its brief that unaccused earlier versions of the accused games are non-infringing alternatives. (*See* D.I. 650 at 12-15; D.I. 679 at 13-15). As I discuss below, there is no evidence or expert opinion in the record to support a conclusion that earlier versions of the game are non-infringing. (*See* D.I. 665 at 10-11). The fact that a party does not accuse an earlier version of a game is not an admission that the earlier version is non-infringing. Thus, I do not find Defendant's arguments on this point persuasive.

### 3. Boeing/Panthesis License

Defendant objects to Mr. Parr's reliance on a July 2002 patent license between Boeing and Panthesis ("Boeing/Panthesis License"). (D.I. 650 at 15- 21). A copy of the final, executed Boeing/Panthesis License has not been produced in this case. (*Id.* at 15; D.I. 665 at 19-20). There is, however, significant record evidence of the license in the form of drafts and fact witnesses. (D.I. 667 at 14; *see also* 642-1, Exh. A at ¶¶ 63-65 (summary of evidence of the license in Mr. Parr's expert report)). The Boeing/Panthesis license, as described by fact witness Fred Holt, licensed the patent applications that resulted in the patents-in-suit and other intellectual property to Panthesis for 5% of Panthesis stock, $5 million paid over time, and 12% of future revenue. (D.I. 642-1, Exh. A at ¶ 65). Mr. Parr's reasonable royalty calculations apply that 12% rate. Defendant argues that I should exclude Mr. Parr's Boeing/Panthesis License-based theories because (1) Mr. Parr fails to address technical comparability, (2) Mr. Parr ignores economic differences, and (3) Defendant is prejudiced by not having a copy of the final agreement. (D.I. 650 at 16).

As the Boeing/Panthesis License licensed the patents-in-suit, it is sufficiently technically comparable. Defendant argues that the License between Boeing and Panthesis came before certain important amendments to the patent applications. (*Id.* at 16-17). It notes specifically that

11

m-regularity was added to the claims after the licensing date. (*Id.*). It does not, however, articulate how any post-license amendments would have impacted the value of the licensed patents. (*Id.*). Moreover, it is undisputed that the specification discusses m-regularity. (D.I. 679 at 4). That is, the applications discuss the exact technology that is at issue in this case. The close tie between the technology discussed in the application and the issued claims renders them technically comparable. It is not a requirement of technical comparability that the technology be identical. Thus, the patents as they exist today are technically comparable to the applications that existed in 2002. I will not exclude Mr. Parr's opinion on this basis.

Defendant further argues that the Boeing/Panthesis License licensed more than the patents-in-suit. (D.I. 650 at 17). Specifically, the deal also included copyrights, trade secrets, and trademarks. (D.I. 679 at 3). Mr. Parr addresses this issue by noting his understanding, based on conversations with Dr. Holt, that the other property was less important to the deal and attributing the 5% Panthesis stock and $5 million payment to the non-patent property. (D.I. 642-1, Exh. A at ¶ 65). Mr. Parr's explanation, considering the close tie between the Boeing/Panthesis License and the patents-in-suit, is sufficient to support a conclusion of technical comparability. The specific details of the Boeing/Panthesis License may be useful for cross-examination but are not a basis for exclusion.

Defendant next argues that the Boeing/Panthesis License is not economically comparable to the hypothetical negotiation. (D.I. 650 at 18-20). Mr. Parr addresses some of the economic differences in his report. (D.I. 642-1, Exh. A at ¶¶ 67-70). Defendant notes additional circumstances it views as inconsistent with the nature of the hypothetical negotiation: the license's date being eight years before the hypothetical negotiation and the nature of Panthesis's business model. (D.I. 650 at 18-20). Although potentially good impeachment, these economic

differences are not significant enough to render Mr. Parr's opinion so unreliable as to be inadmissible.

Finally, for the purpose of Mr. Parr's expert opinion, Plaintiff sufficiently disclosed the Boeing/Panthesis License. The briefing reflects that there was extensive discovery on the facts and circumstances surrounding the Boeing/Panthesis License. (*See* D.I. 650 at 20; D.I. 665 at 19-20 (discussing discovery efforts related to Boeing/Panthesis License)). Defendant identifies no evidence that Mr. Parr now uses that Plaintiff failed to disclose at an earlier date. There is no requirement that Plaintiff disclose a document that it does not have.

Accordingly, I will not exclude Mr. Parr's opinions for relying on the Boeing/Panthesis License.

### 4. Failure of Mr. Parr to Address Negative Facts

Defendant argues that I should exclude Mr. Parr's opinion for failing to account for certain facts, such as Boeing's attempt to sell the asserted patents for $1 million. (D.I. 650 at 28-30). It cites *Intellectual Ventures I LLC v. Xilinx, Inc.*, 2014 WL 1814384 (D. Del. Apr. 14, 2014), as support for the proposition that an expert must account for negative facts. *Xilinx* is, however, distinguishable. In that case, Xilinx had the contractual option, at the time of the hypothetical negotiation, to license the asserted patents from Intellectual Ventures for $ 2 million. *Id.* at *1-2. Judge Stark found that Intellectual Ventures' expert's failure to address this fact rendered the opinion unreliable and irrelevant. *Id.* at 4. Here, there was no relationship, contractual or otherwise, between Boeing and Activision at the relevant date. Thus, although Boeing's efforts to sell the asserted patents for a relatively low sum are good fodder for cross-examination of Mr. Parr's opinions, Mr. Parr's omission of those efforts does not render his opinion wholly unreliable or irrelevant. I will not exclude Mr. Parr's opinion on this basis.

### 5. Method Claim Infringement Issue

Defendant argues that Mr. Parr misunderstood the scope of infringement of the method claims in this case, rendering his opinion on damages for such infringement unreliable. (D.I. 650 at 27-28). It is not clear from the briefing how any potential misunderstanding, or possible misspeaking, impacted Mr. Parr's ultimate conclusion. Thus, I will not exclude Mr. Parr's opinion on this basis.

### B. *Defendant's Motion to Strike Mr. Parr's Report*

Defendant moves to strike Mr. Parr's expert report under Rule 37. (D.I. 651). On November 28, 2018, I granted Plaintiff leave to submit a damages report from a new expert rather than supplement the report already filed by its previous damages expert, Dr. Meyer. (D.I. 630). While allowing Plaintiff to retain a new expert, I reserved the right to "strike or limit it depending on its contents." (*Id.* at 3 n.1).

Defendant's primary argument is that Mr. Parr's report is not a "supplement" to Dr. Meyer's report within the meaning of Federal Rule of Civil Procedure 26(e). (D.I. 652 at 3-9). Rather, two of the damages methodologies, cost savings (excluded under *Daubert*) and revenue-based, are entirely new as compared to Dr. Meyer's report. (*Id.* at 7). This, Defendant argues, significantly prejudices Activision so as to warrant exclusion. (*Id.* at 9-10).

Although Plaintiff pushed the bounds of what I reasonably meant to allow it to do in supplementing its damages case, I find that, regardless of anything else, the changes do not prejudice Defendant under *Pennypack*. Defendant's argument under *Pennypack* focuses entirely on the first factor of the analysis. (*Id.* at 9-11). The first *Pennypack* factor accounts for "prejudice or surprise to the party against whom the evidence is offered." 559 F.2d at 904. When a case involves complex litigation between sophisticated parties, courts are more willing, given a strong showing of prejudice, to exclude evidence even absent a showing under each

14

*Pennypack* factor. *Bridgestone Sports Co. v. Acushnet Co.*, 2007 WL 521894, at *4 (D. Del. Feb. 15, 2007).

Defendant has not made a strong showing of prejudice. And, to the extent that Mr. Parr's report prejudiced Defendant at all, the prejudice has been cured by expert depositions and ample time to prepare for trial on the new theories. Defendant's primary complaint is that Mr. Parr relies on new discussions he had with fact witnesses and technical experts, including an interview with Dr. Holt on the terms of the Boeing/Panthesis License. (D.I. 652 at 10-11). It is undisputed, however, that in 2017, Plaintiff produced the documents Mr. Parr relies on in forming his Boeing/Panthesis License-based theories. (D.I. 667 at 10). It is similarly undisputed that Plaintiff produced Dr. Holt as the fact witness with information relevant to the Boeing/Panthesis License. (*Id.* at 14). Moreover, Defendant's damages expert expressly considered the Boeing/Panthesis relationship in her own expert report. (*See, e.g.*, D.I. 486, Ex. C-6 at ¶ 106). Thus, the only piece of evidence that Defendant did not have throughout this case is an executed version of the Boeing/Panthesis License. The mere fact that Plaintiff never produced a final version of the Boeing/Panthesis License, which it does not have, is not sufficient prejudice to support the extreme sanction of excluding Plaintiff's damages expert. Accordingly, I will not strike Mr. Parr's report on the basis that the final Boeing/Panthesis agreement has not been produced.[5]

---

[5] Defendant makes an additional evidentiary argument in its motion to strike. Specifically, it argues that the Federal Rules of Evidence preclude testimony on the Boeing/Panthesis License and Mr. Parr's opinion relying on such testimony. (D.I. 652 at 11-14). The admissibility of the Boeing/Panthesis testimony under the best evidence rule is not truly a question related to the propriety of Mr. Parr's report. Pursuant to Rule 703, Mr. Parr can rely on evidence that is otherwise inadmissible if it is the sort of evidence an expert in his field "would reasonably rely on." And, assuming testimony on the content of the Boeing/Panthesis License is inadmissible as an exception to the best evidence rule, it is nevertheless likely reasonable for Plaintiff's damages expert to rely on such testimony in forming his opinion. The factual underpinnings of the Rule

### C. *Plaintiff's Motion to Exclude Certain Opinions of Catharine Lawton*

Plaintiff raises two objections to Ms. Lawton's supplemental rebuttal damages report: (1) it argues that Ms. Lawton impermissibly opines on non-infringing alternatives, and (2) it argues that Ms. Lawton impermissibly criticizes the merits of Dr. Valerdi's cost savings opinion. (D.I. 648 at 1). As I exclude Mr. Parr's reliance on Dr. Valerdi's opinion, I will address only Plaintiff's first objection.

Ms. Lawton's assumption of non-infringement of earlier versions of the accused products is baseless and must be excluded. Defendant argues that Ms. Lawton does not opine on non-infringing alternatives, but, rather, assumes non-infringement based on Plaintiff's decision not to pursue infringement claims from prior to 2012. (D.I. 663 at 3-4). It is undisputed that none of its technical experts have opined that the earlier games are non-infringing. (D.I. 677 at 3). Thus, the only support for the conclusion that the earlier versions of the games are non-infringing alternative is Ms. Lawton's assumption. A damages' expert's assumption is not sufficient to support a damages opinion based on a particular non-infringing alternative. Accordingly, I will exclude Mr. Lawton's assumption that earlier game versions are non-infringing alternatives and any damages conclusions stemming from that assumption.

### IV. CONCLUSION

For the reasons discussed above, I will exclude Ms. Lawton's opinions assuming certain games are non-infringing alternatives. I will also exclude Mr. Parr's "cost savings" reasonable royalty opinions and his apportionment opinions that are based on Activision's customer surveys.

---

1004(a) exception to the best evidence rule have not, however, been sufficiently briefed. Ordinarily, I would defer resolving such an evidentiary objection to pre-trial motions *in limine*. I do not see any particular reason this issue ought to be resolved now. Thus, I will not resolve Defendant's best evidence rule objection at this time.

16

Entered this 4 day of September 2019.

_____
United States District Judge