IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ACCELERATION BAY LLC, | |
| Plaintiff, | |
| v. | C.A. No. 16-453-RGA |
| ACTIVISION BLIZZARD, INC., | |
| Defendant. | |

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE; James R. Hannah (argued), Paul J. Andre, Lisa Kobialka, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Aaron M. Frankel, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY;

 Attorneys for Plaintiff.

Jack B. Blumenfeld, Cameron P. Clark, MORRIS NICHOLS ARSHT & TUNNELL LLP, Wilmington, DE; Aaron E. Hankel (argued), B. Trent Webb, John Garretson, Jordan T. Bergsten, Maxwell C. McGraw, SHOOK HARDY & BACON LLP, Kansas City, MO;

 Attorneys for Defendant.

October 25, 2022

1

*[signature]*
**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Defendant's supplemental motion for summary judgment of non-infringement based on collateral estoppel. (D.I. 730). I have considered the parties' briefing. (D.I. 731, 735, 739). For the reasons set forth below, I will DENY-IN-PART and GRANT-IN-PART Defendant's motion.

## I. BACKGROUND

Plaintiff filed suit against Defendant alleging infringement of U.S. Patent Nos. 6,701,344 ('344 Patent), 6,714,966 ('966 Patent), 6,732,147 ('147 Patent), 6,829,634 ('634 Patent), 6,910,069 ('069 Patent), and 6,920,497 ('497 Patent). (D.I. 1 at ¶10).

In a summary judgment ruling in 2018, I resolved many of the issues in this case. (*See* D.I. 578, 579). For example, I granted Defendant's summary judgment motion as to the invalidity of all asserted claims of the '634 Patent. (D.I. 578 at 3, 9). Only two infringement allegations remain: (1) infringement by the accused Call of Duty ("CoD") and Destiny games of the '147 and '069 Patents, and (2) infringement by the accused World of Warcraft ("WoW") game of the '344 and '966 Patents. (*See* D.I. 731 at 3 n.3).

This case is related to *Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, No. 16-455-RGA ("*Take-Two* Case"), where Plaintiff accused online features of three video games—NBA 2K15 and NBA 2K16 (collectively, "NBA 2K"), and Grand Theft Auto Online ("GTAO")—of infringing the '344, '966, '147, and '069 Patents. *See Take-Two* Case, 2020 WL 1333131, at *1 (D. Del. Mar. 23, 2020) ("*Take-Two* SJ Opinion"), *appeal dismissed sub nom. Acceleration Bay LLC v. 2K Sports, Inc.*, 2020 WL 9459373 (Fed. Cir. Oct. 2, 2020) (dismissing cross-appeal), and *aff'd in part, dismissed in part sub nom. Acceleration Bay LLC v. 2K Sports, Inc.*, 15 F.4th 1069 (Fed. Cir. 2021) ("*Take-Two* Appeal"). In the *Take-Two* Case, the defendants moved for

2

summary judgment of non-infringement, which I granted in a detailed opinion. *See Take-Two* SJ Opinion. Plaintiff appealed. *See Take-Two* Appeal.

On April 21, 2020, I stayed this case pending resolution of Plaintiff's appeal of my summary judgment ruling in the *Take-Two* Case. (*See* D.I. 711). The Court of Appeals for the Federal Circuit issued a decision on that appeal on October 4, 2021. *See Take-Two* Appeal (affirming-in-part and dismissing-in-part as moot). With the *Take-Two* Case's appeal resolved, Defendant now moves for summary judgment of noninfringement, arguing that Plaintiff is collaterally estopped from relitigating infringement issues it lost in the *Take-Two* Case.

In this case, each remaining asserted claim requires a network that is "m-regular." I construed "m-regular" to mean "[a] state that the network is configured to maintain, where each [participant or computer] is connected to exactly m neighbor [participants or computers]." (D.I. 287 at 5). This construction also applied in the *Take-Two* Case, and Defendant did not appeal this construction. *See Take-Two* Appeal.

I held oral argument on the pending motion on September 30, 2022. (*See* D.I. 742).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (cleaned up). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences

3

in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

Collateral estoppel, also known as issue preclusion, bars parties from relitigating matters that they previously had a full and fair opportunity to litigate. *See Montana v. United States*, 440 U.S. 147, 153 (1979). This "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* at 153-54.

In a patent case, the law of the regional circuit applies to collateral estoppel generally and Federal Circuit precedent applies where the determination of collateral estoppel involves substantive issues of patent law. *See Ohio Willow Wood Co. v. Alps South, LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). Under Third Circuit law, collateral estoppel applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Burlington N. R. Co. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1231-32 (3d Cir. 1995) (cleaned up). The "essential to the prior judgment" element can be satisfied when the prior judgment was reached through alternative findings. *Jean Alexander Cosms., Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 255 (3d Cir. 2006) ("we will follow the traditional view that independently sufficient alternative findings should be given preclusive effect"). Whether the "basic requirements for issue preclusion are satisfied" is a question of law. *Id.* at 248; *see also Ohio Willow Wood*, 735 F.3d at 1341 (*de novo* review of the application of collateral estoppel).

As is particular to patent law, "an infringement claim in a second suit is the same claim as in an earlier infringement suit if the accused products in the two suits are essentially the same."

*Phil-Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1353 (Fed. Cir. 2017) (cleaned up). "Accused [products] are essentially the same where the differences between them are merely colorable or unrelated to the limitations in the claim of the patent." *Id.* (cleaned up). The accused product in a second suit need not be produced by the same company as that considered in a first suit. *See Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013) (in holding that "collateral estoppel precludes a plaintiff from relitigating identical issues by merely switching adversaries," affirming "that [a second defendant's] accused rimless magnetic clip-on sunglasses are materially indistinguishable from [a first defendant's] rimless magnetic clip-on sunglasses") (cleaned up). The alleged infringer "bears the burden of showing that the accused devices are essentially the same as those in the prior litigation." *ArcelorMittal Atlantique et Lorraine v. AK Steel Corp.*, 908 F.3d 1267, 1274 (Fed. Cir. 2018).

## III. DISCUSSION

### A. Issues Previously Adjudicated in the *Take-Two* Case

The Parties' dispute centers around three noninfringement issues I decided in the *Take-Two* SJ Opinion.

First, for GTAO, I considered the player movement issue. Plaintiff argued that GTAO infringes the m-regular limitation because the players' avatars "share more data when they are near each other" thus causing an m-regular network to "arise naturally as the players are moving throughout the game." *Take-Two* SJ Opinion at *8 (cleaned up). In rejecting this argument, I held, "Under my claim construction, a network is not m-regular if the participants just happen to connect to the same number of other participants occasionally. Rather, the network must be 'configured to maintain' an m-regular state." *Id.* Based on this, I held that "the [GTAO] players' actions determine how connections are formed, and the network is not 'configured to maintain'

5

any particular state." *Id.* I explained that "if a system is designed to achieve a desired result, one would not normally say the result 'just arises naturally.'" *Id.*

Second, for NBA 2K, I considered the all-connected server issue. Plaintiff argued that a server which connects to all the virtual basketball players is not a "participant" in the game and, thus, does not negate m-regularity. *Id.* at *9. I disagreed, finding that, "the server is not playing basketball .... The server is, however, a participant in the network because it transfers data back and forth between other network participants. These patent claims are directed to network management, so what matters is whether the server is a participant in the network, not whether it is making jump shots or grabbing rebounds." *Id.*

Third, I considered Plaintiff's Doctrine of Equivalents ("DOE") argument that the GTAO network performs substantially the same function as an m-regular network by "optimizing the entire network processing of the network by limiting each participant's network connections" so that "data are distributed in a balanced fashion over the network." *Id.* at *8 (cleaned up); *see also id.* at *10 (similar DOE argument for NBA 2K). I rejected this DOE argument because it "effectively reads the m-regular limitation out of the patent" when "[t]here is no mention of participants connecting to the same number of other participants." *Id.* at *9; *see also id.* at *10 (rejecting Plaintiff's DOE argument for NBA 2K for the same reason).

Defendant explains that these three issues were actually litigated, determined by final and valid judgment, and essential to the prior judgment. (*See* D.I. 731 at 7-8; *see also Burlington*, 63 F.3d at 1231-32). Plaintiff does not contest that these requirements for collateral estoppel are met. (*See generally* D.I. 735). I agree with Defendant, and find that these three issues were actually litigated (*see generally Take-Two* SJ Opinion; *Take-Two* Appeal), were determined by a final and valid judgment (*see generally Take-Two* SJ Opinion; *see also Phil-Insul Corp.*, 854 F.3d at 1357

6

("the noninfringement determinations in [a previous case] are final for collateral estoppel purposes by virtue of [a plaintiff's] failure to appeal them")), and were essential to the prior judgment (*see Take-Two* SJ Opinion at *7-10).

### B. Issues Currently Being Adjudicated

Defendant argues that noninfringement issues being considered in this case are identical to the player movement, all-connected server, and DOE issues that were previously adjudicated in the *Take-Two* Case.

#### 1. Destiny

Defendant argues that Plaintiff's literal infringement theory for Destiny is collaterally estopped based on both the player movement issue and the all-connected server issue. (D.I. 731 at 10-11, 16-17).

For the player movement issue, Defendant argues that Plaintiff's infringement theory relies on the "undisputed" fact that m-regularity is only established "when [players] move their game characters close to each other in the game world." (*Id.* at 10-11 (citing D.I. 443, Ex. A-4 (Mitzenmacher's Reply Report) at ¶¶36, 41, 45-46, 113 ("A player can connect to another Bubble's Activity Host when they run close to the geographic transition area with that Bubble."))). Defendant asserts that this theory is collaterally estopped because, as was considered with the player movement issue for GTAO, "whether the Destiny network ever becomes or stays m-regular ... depends on 'players' actions.'" (*Id.* at 11).

Plaintiff responds that the Destiny network's m-regularity is maintained "regardless of player movements." (D.I. 735 at 8-10, 8). For example, Dr. Mitzenmacher explains that each member of in-game "Fire Teams" are configured in a network in an m-regular state, where, even if a player leaves a Fire Team, "the network is configured to return to the m-regular state by filling

7

the reserve slot with a new participant." (D.I. 454, Ex. 35 (Mitzenmacher Reply Report) at ¶¶41-46, 42; *see also* D.I. 454, Ex. 28 (Mitzenmacher Report) at ¶¶291-296 (explaining that "the [Destiny] software attempts to maintain connectivity among the players once a multiplayer game session has been established" even "when a peer migrates to a different Bubble")).

I find that Defendant has not shown that the player movement issue being considered with Destiny is essentially the same as what I considered with GTAO. Instead, as Mitzenmacher makes clear, there is a genuine issue of fact regarding whether the m-regularity of the Destiny network is dependent on player movement.

For the all-connected server issue, Defendant argues that all participants are connected to a "BAP [(Bungie Access Protocol)] Server," which "makes m-regularity impossible under the Court's rulings." (D.I. 731 at 16-17 (citing D.I. 732, Ex. 4 (Mitzenmacher Dep. Tr.) at 42:19-23 ("Q: And do you understand that each of these fireteam members has a – maintains a connection to the BAP server throughout their participation in the game? A: That sounds correct."); D.I. 732, Ex. 2 (Mitzenmacher Reply Report) at ¶33 ("[T]he specifications of the Asserted Patents ... do not preclude the participants in a broadcast channel from having additional connections to other networks."))).[1]

Plaintiff responds that the "BAP server is only used to facilitate the formation of a ... network," and, "[o]nce the game starts, the BAP Server is no longer involved and, in particular, it is not broadcasting the gameplay messages[.]" (D.I. 735 at 11 (citing D.I. 454, Ex. 28 at ¶¶80, 89, 191 ("Thus, once this information from the BAP server and gatherer is provided to the incoming participant, connections to the broadcast channel and neighbors in the game session will

---

[1] I understand the expert to mean the asserted claims, not the specifications.

be established to form a fully connected state."), ¶¶197, 198 ("The players send a matchmaking request to the matchmaking server through the BAP server over the internet."))).

From my review, it is unclear whether the BAP server is all-connected. For example, Defendant's cited portion of Dr. Mitzenmacher's deposition testimony is inconclusive regarding whether the BAP server maintains a connection to each participant during gameplay. (*See* D.I. 732, Ex. 4 at 42:19-23 ("That sounds correct.")). Rather, the cited evidence suggests that the BAP server is used for matchmaking. (*See, e.g.*, D.I. 443, Ex. A-2 at ¶192 ("To join a game play area with other players, a matchmaking service is used through the BAP Server. ... The players [send] a request to the matchmaking service through the BAP server which facilitates connections to other clients in the instance one may want to join."). In contrast, the NBA 2K servers were used for "gameplay data." *See Take-Two* SJ Opinion at *9 (considering that the NBA 2K servers "are participants in the NBA 2K Mesh Network because they can equally send and receive heartbeat data, lockstep data, gameplay data, and VoIP data to other participants in the network")). Thus, I do not find that the accused products are essentially the same.

For these reasons, Plaintiff is not collaterally estopped from proceeding with the literal infringement theory it articulates above for Destiny.

### 2. Call of Duty

Plaintiff asserts that CoD relies on two networks that are literally infringing: the "connectivity graph network" and the "gameplay logics network." (D.I. 731 at 9-10). During the oral argument, Plaintiff stated that it dropped the "gameplay logics network" infringement theory. Defendant argues that Plaintiff's remaining infringement theory relying on the "connectivity graph network" is collaterally estopped based on both the player movement issue and the all-connected server issue. (*Id.* at 9-10, 15-16).

For the player movement issue, Defendant argues that Plaintiff's infringement theory relies on players configuring their routers so that they cause "NAT configuration issues." (D.I. 731 at 9-10 (citing D.I. 443, Ex. A-1 (Medvidovic Report) at ¶¶161, 188-190)). Defendant explains that, just as players' actions caused m-regularity in GTAO, "the network configuration ... that allegedly might lead to an m-regular configuration [in CoD] is dynamic and determined by player actions [related to how each player] configure[s] the NAT setting on their router." (*Id.* at 10).

Plaintiff responds that the CoD players configure their routers before they enter a game. (*See* D.I. 735 at 12-14). "This is very different from the GTA infringement case, where the players' actions during the course of the game influence the network connections." (*Id.* at 13 (emphasis omitted)).

I find that these infringement issues are not the same. With GTAO, the players' in-game actions could from time-to-time cause the network to become m-regular. *See Take-Two* SJ Opinion at *8 (considering that "the players' actions determine how connections are formed, and the network is not 'configured to maintain' any particular state"). Plaintiff's theory in this case is not based on in-game actions.

For the all-connected server issue, Defendant argues that each CoD player is connected to a host and "at least some of the data being transferred by that host is the same type of data that Plaintiff's expert identifies as being transferred [by the players] in the 'connectivity graph network.'" (D.I. 731 at 15). Defendant points to the "connectivity graph network" being "set up by various messages sent to and from the host," and the host providing "a list of neighbor participants" when a player disconnects. (*Id.* at 15 (citing D.I. 443, Ex. A-1 (Medvidovic Report) at ¶¶291, 449)). Additionally, Defendant notes that "it is undisputed that sometimes when two players are not able to send voice data directly to one another over this network, this voice data

10

itself is instead relayed through the host server that is connected to everyone in the game." (*Id.* at 15-16 (citing D.I. 732, Ex. 1 (Griffith Dep. Transcript) at 252:11-253:9)). Thus, Defendant asserts that there is no material difference between the all-connected server issue for CoD and NBA 2K. (*Id.*)

Plaintiff responds that the "connectivity graph network" does not rely on an all-connected host server "once [it's] operating." (D.I. 735 at 14-15, 14). Further, while the host server may have the "'capability to relay voice [data,]'" this capability only applies "'when [the connectivity graph network] does not achieve a full mesh topology.'" (D.I. 735 at 14 (quoting D.I. 480, Ex. 72 (Macedonia Dep. Transcript) at 32:19-43:4, 43:2-4)).

I am not convinced by Defendant's arguments and find that the CoD connectivity graph network is not essentially the same as the network considered for NBA 2K. Even if the host server is connected to all participants when establishing the connectivity graph network, the parties dispute whether the host server is also a participant during gameplay.

For these reasons, Plaintiff is not collaterally estopped from proceeding with its "connectivity graph network" literal infringement theory for CoD.

### 3. WoW

Defendant argues that Plaintiff's literal infringement theory for WoW is collaterally estopped based on both the player movement issue and the all-connected server issue. (D.I. 731 at 11-12, 17-18).

For the player movement issue, Defendant argues that Plaintiff's "cross realm zones" infringement theory relies on a "scenario [that] depends on the transient connections formed when four players assigned to four different realms each move their avatar to a 'cross realm zone' and

11

'chat' with one another." (D.I. 731 at 11-12 (citing D.I. 443, Ex. A-1 (Medvidovic Report) at ¶¶102, 210)).

Plaintiff responds that, fundamentally, "the infringing WoW [cross-realm] network connects Activision's network servers, and not the individual computers of people playing WoW." (D.I. 735 at 15). Plaintiff explains that a "WoW Server-to-Server Network" is used for the cross realm zones, where "[t]he connections in the servers in the WoW Server-to-Server Network are static and persistent, created by Activision in advance, and do not vary based on player movement (or any other player input)." (*Id.* at 15-16, 16 (citing D.I. 455, Ex. 40 (Medvidovic report) at ¶¶207-209)). For example, Dr. Medvidovic explains, "The realm bundles will start with a static configuration with a set amount of connections, forming an m-regular network." (D.I. 455, Ex. 40 at ¶¶207-210, 209).

I agree with Plaintiff. While Defendant supports its argument by citing paragraph 210 of Dr. Medvidovic's report, this paragraph does not indisputably state that the connections of the cross-realm zone are transient or dependent on player movement. (*See* D.I. 443, Ex. A-1 at ¶210 ("Each realm in the cross-realm area will also have its own Chat Server making 4 Chat Servers in the 4 realm bundle. ... When a message needs to [be] distributed to the area, the User Server will send the message to its Chat Server, the Chat Server will send multiple copies of that message to the User Servers in the area. ... This results in the network being m-regular with exactly the same number of connections, 4 connections, in the cross-realm area with a bundle of 4 realms.")).

For the all-connected server issue, Defendant argues that Plaintiff's "cross-realm zone" infringement theory is flawed because it ignores numerous additional "HiMem" servers that are also network participants and "whose connections make m-regularity impossible." (D.I. 731 at 17-18, 17). In a footnote, Plaintiff responds that these additional server connections are irrelevant

12

because "[Defendant] is relying on connections to servers that are not part of the m-regular WoW Server-to-Server Network." (D.I. 735 at 16 n.2).

I am not convinced by Defendant's argument. Considering the cited evidence, it is unclear whether the "HiMem servers" are network participants. Thus, I do not find that this infringement issue is the same as what I considered with NBA 2K, where the evidence supported the all-connected server being a network participant. (*See Take-Two* SJ Opinion at *9).

For these reasons, Plaintiff is not collaterally estopped from proceeding with its literal infringement theory for WoW.

### 4.  Doctrine of Equivalents

Defendant argues that the DOE issues being considered in this case are identical to the DOE issues that were previously adjudicated for GTAO and NBA 2K. Defendant explains, "In *Take-Two* this Court rejected, as a matter of law, Plaintiff's DOE theories because they 'effectively read[] the m-regular limitation out of the patent' and because 'Plaintiff is barred by prosecution history estoppel from now attempting to erase that limitation from the patents.'" (D.I. 731 at 18 (quoting *Take-Two* SJ Opinion at *9)). Defendant asserts that, in this case, "Plaintiff's expert opinions on DOE are nearly identical to the ones this Court found legally barred [in *Take-Two*], such that collateral estoppel applies here as well." (D.I. 731 at 18-19, 18 (citing *id.*, App. 1 (quoting the DOE theories brought forth by Plaintiff's experts for CoD, Destiny, and WoW))).

Without citing any evidence, Plaintiff disagrees, arguing that "the infringement claims [Plaintiff] is pursuing against Destiny, Call of Duty, and World of Warcraft are based on specific rules that make the network participants have the same number of connections, not load balancing (as the Court found for GTA), and the relevant networks are not based on a central relay server (as the Court found for NBA 2K)." (D.I. 735 at 17).

13

In granting summary judgment in the *Take-Two* SJ Opinion, I explained that Plaintiff's DOE arguments for both GTAO and NBA 2K were flawed because they attempt "to remove inconvenient claim elements, such as the m-regular limitation." (*Take-Two* SJ Opinion at *10). This reasoning was underscored by the fact that "for the '344, '966, and '147 patents ... the patentee added the m-regular limitation during prosecution" to overcome "a specific prior art reference[,]" thus barring Plaintiff "by prosecution history estoppel from now attempting to erase that limitation from the patents." (*Id.* at *9).

I agree with Defendant. The portions of Plaintiff's expert report cited by Defendant show that, in this case, Plaintiff's expert is effectively reading the m-regular limitation out of the asserted claims by arguing that product functions that balance network connections achieve the same result as the m-regular limitation. (*See, e.g.*, D.I. 443, Ex. A-1 (Medvidovic Report) at ¶¶215-218 (for CoD, explaining that the software performs the function of "not overload[ing] a particular software application node on the network" by "limiting the number of neighbor connections for each participant" to achieve the same result as an m-regular network)). Plaintiff relied on the same DOE arguments in *Take-Two*. (*See* D.I. 731, App. 1).

While there are material differences between the accused products in this case and *Take-Two* as they relate to Plaintiff's literal infringement claims, I do not find that there are material differences between these products for purposes of DOE. Specifically, I find that the accused products in this case and *Take-Two* are essentially the same because, in both cases, Plaintiff relies on a product function that balances network connections as satisfying the m-regular limitation under DOE. Any other differences between the products—such as those identified above when considering literal infringement—"are merely colorable or unrelated" to Plaintiff's infringement claims for the m-regular limitation under DOE. *Phil-Insul Corp.*, 854 F.3d at 1353. My belief

that the accused products are essentially the same is buttressed by Plaintiff's inability to point to any evidence supporting meaningful differences in the accused products as they relate to infringement of the m-regular limitation under DOE. (*See* D.I. 735 at 17; *see also Phil-Insul Corp.*, 854 F.3d at 1353; *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1312 (Fed. Cir. 2010) (applying collateral estoppel when the infringement issue in a second case was identical to the issue considered in an earlier case, and product differences "[did] not change the fact that the [allegedly infringing product] does not infringe")). For these reasons, where each of the elements for collateral estoppel is met, I find that Plaintiff is collaterally estopped from advancing its DOE theories in this case.

### 5. Summary Judgment Absent Collateral Estoppel

Defendant also argues, "even if this court finds that collateral estoppel does not prevent Plaintiff from re-litigating some or all of the issues from *Take Two* identified here, [Defendant] still respectfully submits that the Court should grant summary judgment of no infringement [because] Plaintiff's infringement theories in this case are indistinguishable from those rejected by this Court in *Take Two*." (D.I. 731 at 19). Defendant previously moved for summary judgment of non-infringement, however, and I ruled on that motion. (*See* D.I. 578, 579). Thus, Defendant's present request for summary judgment of non-infringement is, in essence, an untimely motion for reconsideration. I deny summary judgment on this alternative basis because Defendant has not met the standard for reconsideration.

## IV.    CONCLUSION

A separate order will be entered.